## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **W. A. SOKOLOWSKI**, Individually and Derivatively on Behalf of **OCWEN FINANCIAL CORP.**, <br><br> Plaintiff, <br><br> v. <br><br> **WILLIAM C. ERBEY, RONALD M. FARIS, RONALD J. KORN, WILLIAM H. LACY, BARRY N. WISH, and ROBERT A. SALCETTI,** <br><br> Defendants, <br><br> - and - <br><br> **OCWEN FINANCIAL CORPORATION**, a Florida Corporation, <br><br> Nominal Defendant. | Civil No. <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br><br> **JURY DEMAND** |

1953185.1

## I.  INTRODUCTION AND FACTUAL BACKGROUND

1.     The allegations in this Complaint are based upon personal knowledge as to the actions of W. A. Sokolowski ("Plaintiff") and his ownership of shares of Ocwen Financial Corporation ("Ocwen" or the "Company"), and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of his counsel, which included, among other things: (a) review and analysis of the Company's Proxy Statements and other public filings with the SEC; (b) review of other publicly available information, including articles in the news media; (c) review of information on the Company's website and press releases; (d) consultation with persons knowledgeable regarding the facts and circumstances alleged herein; (e) review of securities and consumer class action Complaints and related materials in litigations commenced against some or all of the Individual Defendants and/or the Company; and (f) review of information disclosed as a result of various regulatory investigations and proceedings.

2.     This action is commenced by Plaintiff individually on his own behalf and derivatively on behalf of Ocwen as a result of the wrongdoing by the Individual Defendants (defined below). This action seeks damages from such Individual Defendants and injunctive relief.  As required by the Florida Business Corporation Act, § 607.07401, Plaintiff made a demand on the Board of Directors of Ocwen (the "Board") on February 11, 2014 with respect to the matters alleged in this Complaint (the "Demand").  Defendants did not respond to the Demand in the time required by the statute and, subsequently, has continued to ignore Plaintiff's further demands for action related to these matters.

3.     Nominal Defendant Ocwen is the largest non-bank mortgage servicer of subprime loans in the United States (and fourth largest mortgage servicer overall), collecting payments on

nearly $455 billion in loans as of the fourth quarter of 2013.  The Company has two operating segments, Servicing and Lending.  Through its Servicing segment, Ocwen provides residential and commercial mortgage loan servicing, special servicing, and asset management services to owners of mortgage loans and foreclosed real estate in the United States and internationally.  It essentially acts as a third-party collection agency for banks and other entities that own mortgage portfolios, collecting payments from mortgage borrowers and handling other billing services. The Company's Lending segment is involved in originating and purchasing conventional and government insured residential forward and reverse mortgage loans primarily through its correspondent lending arrangements.

4.     As a mortgage servicer, Ocwen is supposed to assist delinquent borrowers in reworking their loan payments if they fall behind in order to avoid foreclosure.  According to Ocwen's website, the Company states that it "cures more loans and keeps more borrowers current than anyone in the industry," allowing it to "achieve[] pre-foreclosure resolution rates of 70% or more."   Ocwen paints itself as "widely recognized in the national media and by consumer advocacy groups as the industry leader in responsible home retention through foreclosure prevention" and claims "exceptional performance" that is the result of its "state-of-the-art proprietary servicing systems."   Ocwen claims it "modifies loans at rates far above industry norms," stating its "re-default rates are among the lowest."

5.     The Company's predecessor, Oxford, was founded in 1983 by Defendant Wish, who was soon joined by Defendant Erbey, and together they founded Ocwen and took the Company public in 1996.  By 1999, Ocwen had largely stopped making loans to people with poor credit and focused instead on servicing these loans, positioning the Company to reap profits

in the aftermath of the 2008 housing collapse from the millions of delinquent and underwater borrowers.

6.    As regulators became critical of the rising number of foreclosures and lenders' treatment of delinquent borrowers following the 2008 financial crisis and housing collapse, in 2009 Ocwen began the first of four separate company spin-offs.  These spin-off companies, which do business with each other and with Ocwen, were purportedly created to provide technology and perform various services for Ocwen, including management of its foreclosed properties, while appearing, on the surface, to be separate and independent entities from Ocwen.

7.    In August, 2009, Ocwen spun off its Real Estate Owned and related business operations to Altisource Portfolio Solutions S.A. ("Altisource"), a publicly traded company that derives its revenues largely from providing mortgage foreclosure services to Ocwen.   In 2010, Ocwen spun off Home Loan Servicing Solutions, Ltd., ("HLSS"), a publicly traded company created to acquire mortgage servicing rights ("MSRs"), rights to fees, and other income from servicing loans from Ocwen, which hires Ocwen to collect its loan payments. In 2013, Ocwen spun off two more publicly traded companies:   Altisource Residential Corporation ("Residential"), which purchases non-performing loans and foreclosed homes, many from Ocwen, to turn into rental homes; and Altisource Asset Management Corporation ("AAMC"), which serves as the asset manager for Residential's portfolio in exchange for a large quarterly incentive fee.

8.    Defendants Erbey and Wish, among other Ocwen executives, continue to hold equity in the four affiliated publicly traded spin-offs:  Altisource, AAMC, Residential and HLSS. Indeed, Erbey is the largest shareholder in each of the four spin-offs and chairs all five of the publicly traded companies.   As a result, Erbey and Wish, among others, have conflicting

obligations to Ocwen and each of the four spin-offs, all of which continue to derive significant revenues and earnings in large part from their ongoing and substantial, but conflicted, business dealings with Ocwen.[1]

9.      Despite the Individual Defendants' statements that the four spin-offs had sound corporate governance with separate boards and management, and that Ocwen maintained a "'strictly arms-length business relationship with ' [the four spin-off] companies," in actuality, because of the overlapping ownership, control and management of Ocwen and the other four entities, Defendants Erbey and Wish, were siphoning off revenues from Ocwen to the four related spin-off companies for services that were illicitly raising costs for the mortgagees whose loans Ocwen was supposedly servicing, thereby exposing Ocwen and its shareholders to billions of dollars in regulatory and civil liability.  Meanwhile, in direct breach of their fiduciary duties and Company policies, Defendants Erbey and Wish benefited personally because they largely owned the four spin-off companies which profited from the improper fees charged to Ocwen.  As Christopher Wyatt, a housing consultant and former Vice President at Goldman Sachs' Litton Loan Servicing LP ("Litton"), would later articulate, Ocwen's attitude was the "[i]f a mortgage goes into foreclosure and you lose those servicing fees, so what, [y]ou can funnel it to one of your other businesses and still make money from it."

10.      In February 2012, 49 states and the District of Columbia entered into a $25 billion settlement with five banks: Ally Bank (formerly GMAC), Bank of America, Citicorp, JP Morgan Chase and Wells Fargo, five of the nation's biggest mortgage lenders over a myriad of improprieties, ranging from the "robo-signing" of foreclosure documents to failing to negotiate in good faith with homeowners over inflated fees and other charges that pushed them into default

---

[1] Defendant Erbey is in the process of resigning as Chairman of the Boards of Directors of these affiliated companies.

(the "National Mortgage Settlement").  The National Mortgage Settlement encouraged lenders to negotiate lower rates with existing borrowers and to lower principal amounts owed in an effort to keep houses out of foreclosure.  Pursuant to new servicing rules under the National Mortgage Settlement designed to slow down foreclosures, the signing banks were prohibited from employing "robo-signing" in foreclosures or paying agents to speed up foreclosures, took on new detailed paperwork obligations, and had to take a number of other steps before foreclosing, including reviewing any loan modification proposals the borrower made and giving borrowers two weeks to accept or reject any offer the bank made.  Separately, banks also faced regulations limiting the amount of capital they could risk on servicing rights, leading them to offload their servicing businesses.

11.     Ocwen was not a party to the National Mortgage Settlement or the capital rules levied on the banks and its principal officers, Defendants Erbey and Wish, saw an opportunity for further profits.  Between late 2012 and early 2014, Ocwen spent more billions to expand its portfolio of MSRs by aggressively acquiring assets from larger banks that were anxious to dump their mortgage servicing units, as questionable foreclosure practices were attracting regulatory scrutiny.

12.     Ocwen purchased SCI Services Inc. from Morgan Stanley for $1.459 billion in October 2011; Litton from Goldman Sachs for $600 million in October 2011; Residential Capital LLC's ("ResCap") $3 billion loan-servicing unit, owned by Ally Financial Inc., in 2012; Homeward Residential Holdings, Inc. ("Homeward" or HRH") for $750 million in October 2012; Genworth Financial Home Equity Access, Inc. ("Genworth") for $22 million in November 2012; the MSRs and servicing advances from OneWest Bank, FSB for $2.53 billion in January 2013; the MSRs of Ally Bank, a wholly-owned subsidiary of Ally Financial Inc., the indirect

parent of ResCap, for $585 million in March 2013; the 51% of Correspondent One, an entity Ocwen formed with Altisource in March, 2011, that it did not already own for $12.6 million in March 2013; the servicing and origination platforms of Liberty Home Equity Solutions, Inc. ("Liberty") for $22 million in April 2013; and increased its ownership of Ocwen Structured Investments, LLC ("OSI") from 26% to 87.35% for $11 million in January 2014.  All told, Ocwen more than doubled its loan servicing business during 2013 alone, and increased its portfolio by 300% over the two-year period, as bigger banks retreated from the almost $10 trillion per year business of collecting mortgage payments.[2]

13.     Ocwen and its operating subsidiaries have profited over the years from buying high-risk mortgages from banks and then extending higher interest rate loans to already indebted and cash-strapped homeowners.  The Company would also sometimes delay entering payments received until the grace periods had expired, charging borrowers late fees to build up large delinquency balances, and then threaten foreclosure if those delinquency balances were not paid. The Company and its subsidiaries had been under heightened scrutiny from regulators for years for these and other allegedly abusive practices, but the large-scale MSR offloading by large banks and other entities resulting from the National Mortgage Settlement further incentivized the Individual Defendants' misconduct by making it exponentially more profitable.

14.     As early as 2011, the New York Department of Financial Services ("NY DFS"), through its Superintendent, Benjamin Lawsky ("Superintendent Lawsky") began investing Ocwen over the above, and other, allegedly abusive practices toward homeowners.  The NY DFS has regulatory authority over Ocwen, which is chartered as a New York state bank.

---

[2] Mortgage servicing rights peaked at $11.19 trillion of loans in 2007, according to *Inside Mortgage Finance*.  The figure stood at $9.9 trillion as of the fourth quarter of 2013.

15.     On December 4, 2012, *The Wall Street Journal* reported that regulatory approval of Ocwen's then-pending acquisitions of mortgage servicer HRH and a majority stake in the mortgage servicing and origination of assets of ResCap from Ally might be delayed because Superintendent Lawsky was seeking the appointment of a monitor to oversee the Company's mortgage servicing operations for two years.

16.     On December 5, 2012, in an effort to quell criticism so it could continue growing its MSR portfolio, Ocwen's loan servicing unit complied with Superintendent Lawsky's request and entered into a consent order with the NY DFS, agreeing to the appointment of a monitor within 20 days "who [would] report directly to the Department and conduct a comprehensive review" of Ocwen's loan servicing operations in New York, representing approximately 40,000 loans (the "Consent Order").   The Consent Order stated that a June 2012 examination of Ocwen had indicated "non-compliance by Ocwen" with a previous regulatory agreement, including the failure to send 90-day notices in "some instances" before commencing foreclosure actions, and commencing foreclosure actions without proper documentation, along with other violations.   The compliance monitor would serve for 24 months to "identify needed corrective measures to address identified weaknesses and deficiencies in Ocwen's servicing practices, make recommendations to the Superintendent, and oversee their implementation as approved by the Superintendent."   In essence, the Consent Order was designed to subject Ocwen to rules and oversight similar to that of the big banks.

17.     The NY DFS's Monitor, Joseph Smith, began his oversight of the Company's operations in 2013.   Complying with the Consent Order was expensive, costing Ocwen many millions of dollars.   Worse, despite the perseverance of the Monitor and his attempted oversight of the Company, under the stewardship of the Individual Defendants, Ocwen not only continued,

8

but intensified its abusive practices, exposing the Company to billions of dollars in regulatory fines, penalties and civil liability. Upon information and belief, such practices continued to the date of this Complaint. Such practices led to a new agreement with the NY DFS on or about December 22, 2014, which provided for, *inter alia*, an additional $150 million fine, $50 million of which is to be applied towards New York housing programs and aid to foreclosed homeowners, the appointment of two additional non-management directors and extremely stringent compliance requirements the cost of which will well exceed the $150 million payment by the Company.   Such settlement also provides for the resignation of Defendant Erbey as Executive Chairman of the Board.

18.     Meanwhile, the Individual Defendants caused Ocwen to continue to report record financial results and forecast strong revenues and earnings, touting its purported ability to run a lean operation and cut costs, partly by outsourcing work to India and using technology to cure defaults and avoid foreclosures. Concurrently, the Individual Defendants concealed from Ocwen shareholders and the investing public that*, inter alia*, the agreed-upon terms and conditions of the Consent Order were being ignored and that the Company was continuing its abuses of those who had mortgaged their homes. By acting in such manner, the Individual Defendants breached their fiduciary duties to stockholders and exposed Ocwen to substantial liability to those who purchased the Company's securities.

19.     While making these and other misleading representations and failures to disclose material facts, the Individual Defendants acquiesced in Ocwen's practice of overcharging and otherwise abusing borrowers while continuing to expand its MSR portfolio.   For example, Ocwen started to require borrowers engaged in litigation to sign non-disparagement clauses as a condition of getting their mortgage modified.   If the homeowners did not accede to the pressure

and contractually bind themselves to not complain about any abusive or substandard services, they risked losing their mortgage modification.  Such clauses prohibited consumers from saying anything negative about the Company in public forums.

20.     Meanwhile, Ocwen was having difficulty integrating the huge MSR portfolios it had acquired between 2011 and early 2014, and lacked the technical and professional staff required to fairly and competently address delinquent borrowers' concerns. As a result, borrowers were being foreclosed upon improperly at alarming rates. None of such material facts were disclosed to Ocwen's shareholders or the investing public.

21.     At all relevant times, as more fully outlined below, Ocwen lacked sufficient controls related to document execution, resulting in robo-signing, unauthorized execution, assignment backdating, improper certification and notarization, chain of title irregularities and other related practices affecting the integrity of documents Ocwen was using during the foreclosure process.

22.     At all relevant times, as outlined below, Ocwen's loss mitigation and loan modification processes were deficient, causing the Company to: (a) fail to effectively communicate  with borrowers; (b) fail to account for documents submitted by borrowers seeking loss mitigation assistance; (c) fail to address loss mitigation applications in a reasonably timely manner; (d) provide false or misleading reasons for denial of loan modifications; (e) fail to honor terms of loan modifications for transferred accounts; and, (f) backdate hundreds of thousands of letters to borrowers, likely causing them significant harm and exposing the Company to civil liability.

23.     At all relevant times, Ocwen lacked sufficient controls related to general borrower account management resulting in misapplication of payments, inaccurate escrow accounting and

statement, unnecessary purchasing by borrowers of force-placed insurance at excessive costs and assessment of unauthorized fees and charges.  Ocwen had inadequate staffing and lacked internal controls related to customer service, as well as deficiencies in control and over-sight of third-party providers, including outside foreclosure counsel.

24.     At all relevant times, Ocwen lacked sufficient management control and supervision necessary to ensure the Company's compliance with applicable laws and regulations.

25.     At all relevant times, due to conflicting financial interests that Defendants Erbey and Wish and others had in relation to their financial interests in Ocwen affiliates HLSS, Altisource, AAMC and Residential, Ocwen took actions adverse to borrowers in order to continue to direct revenues improperly to those affiliated companies, again exposing Ocwen to billions of dollars of potential regulatory and civil liability.  Among other things, Altisource charged excessive and exorbitant fees to Ocwen to enabled defendants to funnel as much as $65 million in questionable fees to Altisource.

26.     At all relevant times, Ocwen, as the Individual Defendants knew or should have known, lacked adequate internal controls to ensure that its reported financial results were determined in accordance with Generally Accepted Accounting Principles ("GAAP"). Moreover, they knew or should have known that the Company's financial statements were not prepared in accordance with GAAP and failed to provide an accurate and fair representation of the Company's financial and operating condition.

## II.      JURISDICTION AND VENUE

27.     This Court has jurisdiction pursuant to (a) 28 U.S.C. §1331 because Counts I and II assert claims for violations of § 14(a) of the Exchange Act and SEC Rule 14a-9; (b) diversity jurisdiction under 28 U.S.C. § 1332(a)(2), as Plaintiff on the one hand and the Defendants on the other are citizens of different states, and the value of the relief requested exceeds $75,000,

exclusive of interest and costs; and (c) the Court's supplemental jurisdiction over the common law claims pursuant to 28 U.S.C. § 1367(a).

28.     This Court has jurisdiction over each Defendant because each either is an individual with sufficient minimum contacts with this District, or is a corporation conducting business and operating in this District.

29.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a)(2) and (3) and § 1401 because some or all of the events, actions, and failures to act giving rise to the claims asserted herein occurred or were initiated in this District.

30.     In addition to Plaintiff's individual claims asserted pursuant to federal law, this action is brought pursuant to Rule 23.1 of the Federal Rules of Civil Procedure.  This action is not brought collusively to confer jurisdiction on this Court that it would not otherwise have.

### III.     NATURE OF ACTION AND SUMMARY OF CLAIMS

31.     This is a shareholder's action brought individually by Plaintiff and derivatively on behalf of Ocwen.  Each member of Ocwen's Board of Directors named as a Defendant herein, particularly Defendant Erbey, faces personal exposure to civil and/or criminal charges as a result of his participation in at least some of the wrongdoing described herein.  No claims are asserted herein against Ocwen, which is a Nominal Defendant.  Each of the Individual Defendants identified below, all of whom were serving on the Company's Board, collectively and individually initiated or actively participated in a course of conduct in breach of their fiduciary duties that was designed to, and did:

      a.     Conceal the fact that the Company was and is improperly misrepresenting and historically had misrepresented Ocwen's internal controls in order to allow a widespread scheme of wrongful behavior in violation of applicable federal and state

consumer financial laws and regulations, and thereafter through the present, cover-up such wrongdoing;

b.      Deceive regulators and the investing public, including shareholders of Ocwen, regarding the Individual Defendants' management of the Company's operations and compliance with the Consent Order, thus subjecting Ocwen to massive regulatory sanctions and claims by defrauded purchasers of its securities;

c.      Cause and/or permit the Company and its affiliates to charge unauthorized fees, give false and misleading information to borrowers whose loans had been transferred from other servicers, improperly deny loan modifications, fail to honor trial loan modifications from prior servicers, robo-sign foreclosure documents, backdate foreclosure letters, improperly require the purchase of force-placed insurance at excessive premiums, generating kickbacks from insurers;

d.      Conceal material facts with respect to its financial statements and purported audits performed by Deloitte & Touche, LLP ("D&T") and continuously recommend to Ocwen shareholders the continued retention of D&T despite the Individual Defendants' knowledge that D&T's audits were not performed in conformity with Generally Accepted Auditing Standards ("GAAS") and that, as D&T knew or should have known, Ocwen's financial statements were materially misleading;

e.      Waste Ocwen's assets by means of, *inter alia*, causing the Company to spend billions of dollars to comply with the requirements of federal and state regulatory agencies arising from the scheme and wrongful conduct alleged herein, including but not limited to the December 2012 Consent Decree with the NY DFS and the December 2013

settlement with the Consumer Financial Protection Bureau ("CFPB") as well as ongoing federal and state investigations, without any benefit flowing to the Company

f.      Cause the issuance and dissemination of Ocwen's 2014 Proxy Statement, which was materially false and misleading as set forth below;

g.      Use Ocwen's corporate assets to further the personal interests of the Company's largest shareholder, Defendant Erbey, as well as the other Director Defendants, including but not limited to defendant Wish;

h.      Disregard and/or intentionally breach the Company's Code of Business Conduct and Ethics, the Code of Ethics for Senior Financial Officers, the Company's corporate governance guidelines, various Board Committee Charters, as identified herein, as well as other written policies governing their conduct;

i.      Enhance the Individual Defendants' positions as directors and/or officers of Ocwen while providing each of them with substantial compensation, power, and prestige;

j.      Wrongfully refuse the written demands made by Mr. Sokolowski; and fail to pursue substantial claims asserted therein against the Individual Defendants and others, notwithstanding the validity and value of such claims;

k.      Cause counsel to be retained to represent the Board to, *de facto*, protect the Individual Defendants from liability in connection with the claims alleged herein and in other litigation notwithstanding the fact that there had been no showing that such retention has been *bona fide* and that the retention was for the purpose of assisting in an independent and disinterested evaluation of the Plaintiff's pre-suit claims and those of other shareholders of the Company; and

14

l.      Violate their duties of disclosure to stockholders by causing Ocwen to issue in violation of §10(b) of the Securities Exchange Act and Rule 10b-5: (i) materially false and misleading press releases and other statements made to the public; (ii) materially false and misleading financial statements; and (iii) materially false and misleading reports filed with the U.S. Securities and Exchange Commission ("SEC").

32.     At material times, while serving as Ocwen's purportedly independent public accounting firm (*i.e.* auditor), D&T failed to provide to the Company the independent auditing services such firm was well-compensated to provide, negligently or otherwise failed to conduct audits of Ocwen's financial statements in accordance with GAAS as D&T was engaged to do, and issued false and misleading "clean" opinion letters as to the Company's year-end financial statements.

33.     As a direct consequence of the Individual Defendants wrongdoing as alleged herein, Ocwen has become the subject of years-long investigations by the NY DFS, the CFBP and the SEC.   In connection with such investigations, upon information and belief, conflicted counsel is simultaneously representing the interests of both Ocwen and those of the Individual Defendants, particularly Defendant Erbey. The Company has expended and will continue to expend significant amounts of resources and many millions of dollars to address these investigations and settlements and those that may still be forthcoming.   The Individual Defendants now admit that any finding of violations of federal and state laws and regulations as described herein could have a material adverse effect on the Company's financial condition.  It is likely that Ocwen will be subjected to massive future fines and penalties beyond the most recent $150 million fine, and be required to make material changes to its business practices and, as

well, will be forced to pay substantial amounts to defend and ultimately resolve the litigation brought against Ocwen by defrauded investors and borrowers.

34.     The Company already has suffered massive economic damages as well as damage to its reputation and credit ratings as a direct result of the wrongdoing alleged herein.  For example, pursuant to a settlement with the CFPB in December, 2013, Ocwen agreed to pay $2.1 billion to settle allegations that it cheated thousands of homeowners.

35.     In addition to the common law claims alleged herein, this action charges the Individual Defendants with directly participating in and/or aiding and abetting violations of §14 (a) of the Securities Exchange Act of 1934 and Rule 14a-9 thereunder.  Plaintiff seeks to recover for Ocwen the damages caused and currently being caused to the Company by the Individual Defendants.

## IV.     PARTIES

36.     Plaintiff W.A. Sokolowski owns and has continuously owned the common stock of Ocwen at all relevant times herein.  Plaintiff is a citizen of New Jersey.

37.     Nominal Defendant Ocwen is a corporation organized under the laws of Florida with its principal executive office located in Atlanta, Georgia.  Ocwen is a publicly traded corporation the stock of which is listed and traded on the New York Stock Exchange. Ocwen is a Nominal Defendant only, and no claims are asserted against it. Notwithstanding the latest settlement with the NY DFS, its role in connection with this litigation has and will likely be controlled by the Company's about-to-be former Executive Chairman, Defendant Erbey and Ocwen's Board, all members of whom are Defendants herein.

38.     Ocwen, through its subsidiaries, is engaged in the servicing and origination of mortgage loans in the United States and internationally.   Ocwen transacts or has transacted

business in this District and throughout the United States.   On December 27, 2012, Ocwen acquired and became the successor in interest to Homeward, a servicer of residential mortgages and a Delaware corporation.  Ocwen is a successor corporation to Homeward and is liable for the illegal practices, including those of Homeward, alleged in this Complaint.   On September 1, 2011, Ocwen acquired and became the successor in interest to Litton, a servicer of residential mortgages and a Delaware limited partnership.  Ocwen is a successor corporation to Litton and is liable for the illegal practices, including those of Litton, alleged in this Complaint.

39.     The Individual Defendants are named defendants solely with respect to the wrongdoing that occurred while they served as officers and/or directors of Ocwen.  Each is believed to be a citizen of a state or possession other than New Jersey.

**Individual Defendants**

40.     Defendant Erbey co-founded Ocwen and is, and was at all relevant times, Ocwen's Executive Chairman.   Previously Erbey served as the Chief Executive Officer ("CEO") of Ocwen from January 1988 to October 2010 and as the President of Ocwen from January 1988 to May 1998. On November 19, 2012, Defendant Erby sold 145,000 shares of Ocwen common stock at inflated prices while in possession of material non-public information for proceeds of approximately $5 million.   In fiscal 2013, Erbey received total compensation of over $2.9 million from Ocwen.  Erbey is a citizen of St. Croix, U.S. Virgin Islands, where he maintains a residence.  He is sued herein in his capacity as both an officer and director of Ocwen.

41.     In addition to Ocwen, Defendant Erbey is Chairman of the Board and the largest shareholder of four other real estate companies engaged in related aspects of residential home foreclosure which were spun-off from and do substantial business with Ocwen.  Specifically, Erbey has served as Chairman of the Board of Directors for Altisource Portfolio Solutions S.A. ("Altisource"), which runs Hubzu.com, a real-estate site that bills itself as "the easy way to buy

and sell homes online" and where a former homeowner's now bank-owned property can join thousands of others for a quick sale.  He is also the founder of Home Loan Servicing Solutions, Ltd., ("HLSS"), which exists only as a holding company that purchases assets from Ocwen and has served as its Chairman since December 2010.  He has also served as Chairman of the Board of Directors of Altisource Asset Management Corporation, which offers reinsurance and title services, since March 2012.  Finally, Altisource Residential Corporation is the business, for example, of "re-purposing" homes as rental properties after acquiring them through a foreclosure auction or directly from the foreclosed home's investors. Pursuant to the latest settlement with the NY DFS, defendant Erbey is to resign as chairman of the boards of directors of these affiliates.  Defendant Ronald M. Faris ("Faris") has served as a Director of Ocwen since May 2003, as the President of Ocwen since March 2001 and as Chief Executive Officer since October, 2010.  In 2013, Faris received total compensation of over $1.6 million from Ocwen. Faris is a citizen of Florida where he maintains a residence. He is sued herein both as an officer and director of Ocwen.

42.     Defendant Ronald J. Korn ("Korn") has served as a Director of Ocwen since May 2003.  Korn is the Chairman of the Audit Committee and a member of the Compensation Committee of the Board.  Korn received total compensation of $125,000 from Ocwen in 2013. He is a citizen of Florida, where he maintains a residence.

43.     Defendant William H. Lacy ("Lacy") has served as a Director of Ocwen since May, 2002.  Lacy is the Chairman of the Compensation Committee and a member of the Nomination/Governance Committee of the Board.  In 2013, Lacy received total compensation of $120,000 from Ocwen.  He is a citizen of Wisconsin, where he maintains a residence.

44.     Defendant Robert A. Salcetti ("Salcetti") has served as a Director of Ocwen since January, 2011.  Salcetti is the Chairman of the Compliance Committee, member of the Audit Committee and Member of the Nomination/Governance Committees of the Board.  In 2013, he received $128,050 in total compensation from Ocwen.  He is a citizen of Texas, where he maintains a residence.

45.     Defendant Barry N. Wish ("Wish") has served as Chairman Emeritus of the Board of Directors of Ocwen since September, 1996.   Wish is Chairman of the Nomination/Governance Committee and member of the Executive and Audit Committees of the Board.  Defendant Wish is a co-founder of Ocwen and has served on its Board since 1988, first as its Chairman from 1988 to September 1996, and then as its Chairman Emeritus from September 1996.  On various dates beginning in November 2012 and ending in November 2013, Wish sold 1.3 million shares of Ocwen stock at inflated prices while in possession of material non-public information for proceeds in excess of $57 million.  He is a citizen of Florida, where he maintains a residence.

46.     The Defendants named in paragraphs 39 to 45 immediately above are referred to collectively herein as "Individual Defendants."   The Individual Defendants are controlling persons of Ocwen within the meaning of §20 of the Exchange Act since they have, in practical terms, the ability to determine the content of documents filed by the Company with the SEC and must approve such documents, including the Company's Proxy Statements prior to filing.

47.     Each Individual Defendant has served on the Board for years, and thereby reaped substantial fees, perquisites and emoluments at Defendant Erbey's pleasure. None of these Directors can be considered independent or disinterested, none is sufficiently removed from the

underlying and continuing wrongdoing described herein (or its subsequent cover-up), and none of them can address the demands made on them independently or with disinterestedness.

48.     Each member of the Ocwen Board knew of the business practices and course of conduct outlined herein and had specific knowledge of the regulatory and governmental investigations into the Company's misconduct.   Nevertheless, in the face of such specific knowledge regarding past an ongoing wrongdoing, the Individual Defendants breached their fiduciary duties by failing to implement or maintain adequate internal controls and systems to prevent the ongoing and systemic violations of federal, state and local consumer protection laws and regulations and abusive loan servicing and foreclosure practices and/or to require the Company's management to do so. Thus, each of them knowingly, recklessly, and/or with gross negligence caused the Company to violate such laws and engage in the alleged wrongdoing in order to generate more Company profits. In the case of the Individual Defendants other than Defendants Erbey and Wish, they participated and/or acquiesced in such conduct to maintain their favor and keep their positions as Directors and all of the substantial personal benefits that inured to them as a result.

49.     The Individual Defendants were well-informed about and/or actively participated in the wrongdoing alleged herein, as well as deception of the investing public and federal and state regulators. They abdicated their respective stewardship responsibilities to the Company by acquiescing and/or participating in the wrongdoing alleged herein and by placing their loyalty to Defendant Erbey above their loyalty to Ocwen.

50.     The members of the Ocwen Board, each of whom was personally appointed or approved by Defendant Erbey, receive hundreds of thousands of dollars each year in fees and

stock awards as well as very liberal "reimbursement of expenses."  In addition, they received stock options potentially worth millions of dollars.

**V.**     **FACTUAL ALLEGATIONS**

**A.     Ocwen's Failure to Meet Its Obligations Under the Agreement on Mortgage Servicing**

51.     On September 1, 2011, in connection with Ocwen's acquisition of Litton and amid concerns regarding Ocwen's rapid growth and capacity to properly handle a significant portfolio of distressed loans, Ocwen and the NY DFS entered into an Agreement on Mortgage Servicing Practices designed to correct robo-signing and other abusive and illegal foreclosure and servicing practices.  Specifically, the Agreement on Mortgage Servicing Practices required Ocwen to: (1) establish and maintain sufficient capacity to properly board and manage it significant portfolio of distressed loans; (2) engage in sound document execution and retention practices to ensure that mortgage files were accurate, complete and reliable; and (3) implement a system of robust internal controls and oversight with respect to mortgage servicing practices performed by its staff and third-party vendors.

52.     On December 15, 2011, the Agreement on Mortgage Servicing Practices was amended to prevent Ocwen from, among other things, charging borrowers penalties, fees, costs and interest as a result of delays in court appearances caused by the closure of the law firm of Steven J. Baum, one of Ocwen's New York foreclosure counsel, following widespread allegations of improper foreclosure practices by the firm. Notwithstanding such illegal conduct and malpractice, Ocwen has not pursued Baum for the recovery of the damages he has caused the Company, thus wasting its assets.

53.     On June 13, 2012, following complaints about Ocwen's servicing practices, the NY DFS conducted an examination of Ocwen to access it compliance with the 2011 Agreement

21

1953185.1

on Mortgage Servicing Practices, which preliminarily identified gaps in the servicing records of certain loans and indicated Ocwen's non-compliance with the Agreement, including in some instances, failing to send out the required 90 day notice before commencing foreclosure proceedings and/or failing to demonstrate that it even had standing to bring the foreclosure actions. The exam also revealed gaps in Ocwen's Servicing Practices, including indications that in some instances it failed to provide the single point of contract for borrowers; pursued foreclosure against borrowers seeking a loan modification, failed to conduct an independent review of denials of loan modification, failed to ensure that borrower and loan information was accurate and current and failed to ensure that prior modifications efforts were not rendered futile upon transfer of a servicing file to or from Ocwen.

54. On December 5, 2012, Superintendent Lawsky announced that the NY DFS was requiring Ocwen to hire a monitor to ensure compliance with its prior Agreement on Mortgage Servicing Practices and reform its practices. According to Superintendent Lawsky, "It is not enough to have banks and mortgage servicers sign an agreement promising to reform their businesses. The best unrealized reforms won't protect homeowners. To protect homeowners facing the risks of losing their homes, we must ensure that the companies are actually living up to their promises." Each of the Individual Defendants knew of the Agreement on Mortgage Servicing Practices and requirements imposed by regulators. Nevertheless, as outlined below and despite the appointment of the Monitor in December 2012, the Company's abusive practices continued unabated, about which conduct each of the Individual Defendants knew or should have known given their prior knowledge of the Company's misconduct and the governmental investigations.

### B.    Complaint By the Consumer Financial Protection Bureau

55.     Almost a full year later, on December 19, 2013, the Consumer Financial Protection Bureau (the "CFPB"), joined by 49 states and the District of Columbia, filed a Complaint in the United States District Court for the District of Columbia, alleging that Ocwen, HRH and Litton had violated, among other laws, the Unfair and Deceptive Acts and Practices laws of the plaintiff states and the Consumer Financial Protection Act of 2010 by deceiving consumers about their loans and engaging in illegal foreclosures.  According to the CPFB Complaint, investigators found evidence that, among other things, Ocwen repeatedly gave borrowers false or misleading information, did not honor trial mortgage modifications begun by pervious servicers, wrongly charged fees, and denied mortgage loan modifications to eligible borrowers.  During a conference call held with reporters that day, CFPB director Richard Cordray ("Cordray") stated that "[t]oo often, trouble began as soon as the loan was transferred to Ocwen," adding that "Ocwen made troubled borrowers even more vulnerable to foreclosure." At all times material, the Individual Defendants knew or should have known of such practices.

56.     Ocwen, the CFPB and the 49 states and the District of Columbia entered into a Consent Judgment, approved by the Board, also filed in the United States District Court for the District of Columbia on December 19, 2013, under which Ocwen agreed to fund a ***$2.1 billion*** mortgage settlement for mortgage servicing abuses (including $2 billion in first-lien principle reduction and $125 million for cash payments to borrowers whose loans had been foreclosed on). According to the CFPB, Ocwen took advantage of borrowers "at every stage of the process." The $ 2.1 billion far exceeded the $1.5 billion in revenues the Company took in during the first nine months of 2013, and dwarfed the $357 million the Company then had on its books.

57.     The wide-reaching abuses alleged in the CFBP Complaint included charging unauthorized fees, failing to promptly credit borrowers' loan payments, forcing them into

23

expensive insurance policies, improperly denying loan modifications, failing to honor loan modifications, giving false and misleading information to borrowers whose loans had been transferred from other servicers and robo-signing foreclosure documents, many, if not most, of the same abusive practices that were the subject of the NY DFS prior Consent Orders and the reason for the appointment of an independent monitor in December, 2012.

58.     Under the December, 2013 Consent Judgment, Ocwen was required to improve its oversight of its attorneys, bolster training for its employees, refrain from making collection calls when a borrower's application for a modification was pending, and increase its staff.  The 2013 Consent Judgment contained "Examination Findings" indicating the deficiencies Ocwen suffered from:

      a.     Lack of controls related to document execution, including evidence of robo-signing, unauthorized execution, assignment backdating, improper certification and notarization, chain of title irregularities, and other related practices affecting the integrity of documents relied upon in the foreclosure process;

      b.     Deficiencies in loss mitigation and loan modification processes, including but not limited to:

          i.     Failure to effectively communicate with borrowers regarding loss mitigation and other foreclosure avoidance alternatives:

          ii.     Failure to account for documents submitted in tandem with application for loss mitigation assistance;

          iii.     Lack of reasonable expedience in approving or denying loss mitigation applications;

24

        iv.     Providing false or misleading reasons for denial of loan modifications; and,

        v.     Failure to honor the terms of loan modifications for transferred accounts and continued efforts to collect payments under the original note terms.

    c.     Lack of controls related to general borrower account management, including but not limited to:

        i.     Misapplication of borrower payments;

        ii.     Inaccurate escrow accounting and statements; and,

        iii.     Assessment of unauthorized fees and charges.

    d.     Inadequate staffing and lack of internal controls related to customer service;

    e.     Deficiencies in control and oversight of third-party providers, including but not limited to, local foreclosure counsel;

    f.     Deficiencies in document maintenance processes, including but not limited to, failure to produce documents requested in tandem with examinations; and,

    g.     Deficiencies in management control and supervision necessary to ensure compliance with applicable laws and regulations.

**C.**    **New York Regulator Halts Ocwen's Wells Fargo Deal and Further Acquisitions of MSRs**

59.    On January 22, 2014, Ocwen announced that it had agreed to purchase Wells Fargo Bank N.A.'s ("Wells Fargo") MSRs and related services relating to a portfolio of 184,000 loans with an unpaid principal balance of $39 billion for $2.7 billion.

25

60.     On February 6, 2014, citing the Company's potential inability to handle any additional loan servicing given prior alleged abuses, the NY DFS placed Ocwen's $39 billion acquisition of Wells Fargo MSRs on indefinite hold.[3]

61.     On February 11, 2014, *The Financial Times* reported that mortgage-backed securities investors such as PIMCO and BlackRock were considering taking legal action against Ocwen for any forced reductions in principal they suffered as a result of Ocwen's misconduct. If these legal actions were successful, they would have recourse against Ocwen for the $2 billion in principal reduction they face under the 2013 Consent Judgment.

62.     On Tuesday, February 18, 2014, when the Company disclosed that it would indefinitely postpone its previously announced purchase of MSRs from Wells Fargo. This hindering of the Company's ability to obtain additional market share reduced the Company's future probability in the view of investors.

63.     The next day, February 19, 2014, the CFPB's deputy director, Steve Antonakes, sharply criticized the entire third-party mortgage servicing industry, stating that firms were still treating consumers poorly, despite years of pressure from government officials to improve their behavior. The CFPB was threatening to crack down on the "shell games" it charged were being played amongst services, "where the first servicer says the transfer ended all of its responsibility to consumer and the second servicer says it got a data dump missing critical documents." Antonakes further stressed that force-placed insurance was to be used as a "last resort, rather than using it was a profit center that feeds off consumers' distress." Noting that "the notion that government intervention has been required to get the mortgage industry to perform basic

---

[3] The transaction was abandoned on or about November 13, 2014 when the parties "mutually decided" that it could not take place in the face of Superintendent Lawsky's disapproval of it.

functions correctly – like customer service and record keeping – is bizarre ... but regrettably necessary" and that "business as usual has ended in mortgage servicing."  The comments were perceived by investors to be directed largely at Ocwen, which CFPB data demonstrated had received more consumer complaints in 2012 and 2013 than any other third-party mortgage servicer.  Ocwen has been severely damaged by these repeated revelations of misconduct with its stock price  falling by more than 50% this year alone.. As of December 22, 2014, Ocwen shares traded at $16.01per share.

### D.     Continuing NY DFS Investigations And Letters

64.     In a February 26, 2014 letter to Ocwen's general counsel, Timothy Hayes, NY DFS Superintendent Lawsky charged Ocwen with misstating Ocwen's "strictly arms-length business relationship" with HLSS and other affiliates, all chaired by Defendant Erbey, and potentially harming borrowers and pushing homeowners "unduly into foreclosure."  Lawsky demanded detailed information about the financial interest of Ocwen's officers, directors and employees in the various affiliated companies, as well as documentation showing the nature and extent of business relationships between Ocwen and those other firms.  The letter stated, in pertinent part, as follows:

> The Department's ongoing review of Ocwen's mortgage servicing practices has uncovered a number of potential conflicts of interest between Ocwen and other public companies with which Ocwen is closely affiliated.  Indeed, the fact our review has uncovered to date cast serious doubts on recent public statement made by the company that Ocwen has a "strictly arms-length business relationship" with those companies.  We are also concerned that this tangled web of conflicts could create incentives that harm borrowers and push homeowners unduly into foreclosure.  As such, we are demanding additional information on the issues as part of our review.
>
> Pursuant to the December 4, 2012 Consent Order between Ocwen and the Department, we have engaged an independent on-site compliance monitor at Ocwen to conduct a comprehensive review

of Ocwen's servicing operations. It is in the course of the monitorship that we uncovered these potential conflicts between and among Ocwen, Altisource Portfolio Solutions, S.A. ("Altisource Portfolio"), Altisource Residential Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions Ltd., (together the "affiliated companies"), all of which are chaired by William C. Erbey, who also the largest shareholder of each and the Executive Chairman of Ocwen.

As you recall, Altisource Portfolio's Chief Risk Officer was removed as a result of the monitor's review. During its review, the Monitor discovered that Ocwen's Chief Risk Officer also served as the Chief Risk Officer of Altisource Portfolio, and reported directly to Mr. Erbey in both capacities. This individual seems not to appreciate the potential conflicts of interest posed by this dual role, which was particularly alarming given his role as Chief Risk Officer. He told the Monitor that Ocwen paid his entire salary, but he did not know and had apparently never asked which company paid his risk management staff. Indeed, it remains unclear whether Altisource Portfolio paid any compensation for the Chief Risk Officer's services. Although he has since been removed as Altisource Portfolio's Chief Risk Officer, his and Ocwen's failure to affirmatively recognize this conflict demonstrates that the relationship between Ocwen and the affiliated companies warrants further examination.

Presently, Ocwen's management owns stock or stock options in the affiliated companies. This raises the possibility that management has the opportunity and incentive to make decisions concerning Ocwen that are intended to benefit the share price of affiliated companies, resulting in harm to borrowers, mortgage investors, or Ocwen shareholders as a result.

The letter further noted that:

The Department's review of Ocwen's mortgage servicing practices has also found that Ocwen relies extensively on affiliated companies for its information management system (from the programming of comment codes to functioning as Ocwen's IT help desk), as well as procurement of third party services. This further demonstrates the interconnected nature of Ocwen's relationship with the affiliated companies.

65.     As reported by *Bloomberg* on February 27, 2014, "[a]s of mid-February,

American homeowners had filed more than 9,000 mortgage-related complaints against Ocwen –

the highest number of any non-bank servicer," citing data from the CFPB.  *Bloomberg* also reported that "[i]n January [2014], the Treasury Department issued a report on the performance of servicers in the government's Home Affordable Modification Program that started in 2009," noting that "Ocwen was responsible for 79,156 loan modifications that later defaulted, the highest of any servicer," and that "Ocwen's 30 percent re-default rate was the third highest."

66.     On February 27, 2014, the Company issued a press release announcing its Q4 and fiscal 2013 financial results.  The Company reported earnings per share substantially lower than expected; *i.e.* $0.75 – a $0.07, on revenues of just $556 million.  Attributing the shortfall to the Company's inability to integrate the large MSR portfolios it had acquired between 2001 and early 2014, the release quoted Defendant Faris as stating in pertinent part that "[c]onsolidation" was needed to "allow [Ocwen] to substantially lower expenses and reduce the operating complexities of running multiple platforms."  At no time did he acknowledge the massive and negative impact on the Company's results caused by the wrongdoing referred to herein or the regulatory consequences thereof.

67.     On March 3, 2014, the Company filed its annual report on Form 10-K with the SEC for fiscal 2013, signed by Defendants Erbey, Faris, Korn, Lacy, Wish, and Salcetti (as well as a former director, Wilbur Ross) and certified by Defendant Faris under the Sarbanes Oxley Act of 2002 as to the veracity of its contents and the Company's effective internal controls.  The Form 10-K stated in pertinent part:

> Our business is currently dependent on many of the services and products provided under these long-term contracts which include renewal provisions.  *We believe the rates charged under these agreements are market rates as they are materially consistent with one or more of the following:  the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers.*

68.     On April 17, 2014, HLSS issued a press release and held a conference call to discuss the forthcoming release of the Company's first quarter 2014 financial results.  During the conference call, Defendant Erbey disclosed that the NY DFS's indefinite hold on Ocwen's acquisition of MSRs was not limited to Wells Fargo.  Rather, the NY DFS had placed on indefinite hold the transfer of all large MSR portfolios.  During the conference call, Defendant Erbey stated that "[u]ntil we resolve – this related to Ocwen – until we resolve New York State we are not acquiring any new [MSR] portfolios at all.  As a matter of fact, the entire market quite frankly is just – nothing is really being put on for bid right now.  So the whole market has basically stopped until that gets resolved."

69.     On April 21, 2014, Ocwen received a letter from Superintendent Lawsky, questioning the independence of Altisource's relationship with Ocwen and its online auction site Hubzu, which is used to auction off properties facing foreclosure.  According to Superintendent Lawsky, Altisource had an eight-year agreement to manage distressed and repossessed homes in Ocwen's $435 billion servicing portfolio.  Superintendent Lawsky also claimed that the agreement required that Ocwen properties be listed and marketed through Hubzu, even if a distressed borrower had already signed a contract for a short sale.  Defendant Erbey owns or controls approximately 27% of Altisource's stock and 13% of Ocwen's.  According to Superintendent Lawsky's April 21, 2014 letter, "Hubzu appear[ed] to be charging auction fees on Ocwen-serviced properties that [were] up to three times the fees charged to non-Ocwen customers," and the higher fees "ultimately [got] passed on to the investors and struggling borrowers who [were] typically trying to mitigate their losses and [were] not involved in the selection of Hubzu as the host site."  Superintendent Lawsky's letter also stated the relationship between Ocwen, Altisource and Hubzu "raise[d] significant concerns regarding self-dealing."

70.     On April 22, 2014, Defendant Erbey was forced to surrender one million of the two million stock options granted to him on August 21, 2012.  The 500,000 performance-based options and 500,000 extraordinary performance-based option, which had an exercise price of $24.38, had been granted to Erbey under the Company's 2007 Equity Incentive Plan.  The shares were surrendered in response to a shareholder's complaint that the award was inconsistent with the terms of the plan.  On May 2, 2014, *The Wall Street Journal* disclosed that the Company had received a letter on April 28, 2014 from the SEC "informing the company that it was under investigation" in connection with the stock grant.

71.     On May 1, 2014, the Company reported first quarter 2014 financial results that fell well short of what the Individual Defendants had led the investment community to expect, citing the mounting costs of addressing the regulatory crackdown.  As reported by *The Wall Street Journal* that day, "[a]mid the scrutiny, Ocwen has ramped up spending on technology and compliance," noting that "Ocwen on Thursday said such costs helped fuel a 44% surge in overall expenses during the quarter from the same quarter a year earlier," and quoting Defendant Faris as explaining during a conference call held with investors that day that "[t]he bar ha[d] been raised substantially because of the additional activities and documentation now required," *The Wall Street Journal* noted that, as a result, the "$551.3 million [in revenues] posted was less than the $569.4 million that analysts surveyed by Thomson Reuters expected," and Ocwen's net income of $75.8 million, or $0.54 per share, was also far less than the "$1 a share" that "[a]nalysts [had] expected" based upon the information Defendants Erbey and Faris had previously communicated to the investing public.  Quoting Defendant Erbey, *The Wall Street Journal* stated that "[g]oing forward,… compliance [would] be among the most important factors determining long-term success in the servicing business."

72.     On May 2, 2014, the Company filed its quarterly financial report on Form 10-Q with the SEC for the first quarter 2014, certified by Defendant Faris under the Sarbanes Oxley Act of 2002 as to the veracity of its contents and the Company's effective internal controls.  In addition to repeating the Company's false and misleading financial results from the May 1, 2014 press release, the Form 10-Q stated that Ocwen "believe[d] the rates charged under [the agreement with related companies such as Altisource were market rates as they [were] materially consistent with one or more of the following:  the fees charged by Altisource to other customers for comparable services and the rates Ocwen [paid] to or observe[d] from other service providers."

73.     On July 31, 2014, Ocwen announced its financial results for the second quarter 2014, the period ended June 30, 2014.  Ocwen reported net income of $67 million, or $0.48 per diluted share, $0.30 lower than the market had been led to expect, blaming the decline on the rising costs of complying with regulations required by the Consent Decree.

74.     On August 4, 2014, the NY DFS issued a third letter to Ocwen stating that it was reviewing what it called a "troubling transaction" with Altisource relating to the provision of force-placed insurance which was "designed to funnel as much as $65 million in fees annually from already-distressed homeowners to Altisource for minimal work."  The letter went on the question the "role that Ocwen's Executive Chairman William C. Erbey played in approving this arrangement," which the letter stated "appear[ed] to be inconsistent with public statements Ocwen ha[d] made, as well as representations in Company SEC filings." The Department's on-going investigation had revealed that mortgage servicers were setting up affiliated insurance agencies to collect commissions on force-placed insurance, and funneling all of their borrowers' force-placed business through their own agencies, in violation of the anti-inducement provisions

of applicable New York insurance law.   The investigation revealed that the servicers' own insurance agencies had an incentive to purchase force-placed insurance with high premiums because the higher the premiums, the higher the commissions kicked back by insurers to the servicers or their affiliates.

75.    On August 12, 2014, before the opening of trading, the Company disclosed that it would be forced to restate its audited fiscal 2013 and unaudited Q1 2014 financial results, citing accounting improprieties and stating that its financial statements for those periods, including statements concerning the effectiveness of its internal controls, should no longer be relied upon. Describing the initial determination of the accounting improprieties, Ocwen stated in pertinent part as follows:

> The changes we are contemplating principally relate to the valuation methodology of our Financing Liability – MSRs Pledged in connection with certain rights to receive servicing fees, excluding ancillary income, with respect to certain mortgage servicing rights ("Rights to MSRs"), a Level 3 asset, sold to a third party, Home Loan Servicing Solutions, Ltd. ("HLSS").  At March 31, 2014, the Financing Liability – MSRs Pledged, the valuation of which is the cause of the restatement, had a reported carrying value of $634.4 million, or approximately 10% of the total liabilities. We have not had any additional sales of Rights to MSRs in 2014.

> \*       \*       \*

> Following the release of our earnings for the Second Quarter of 2014, and in consultation with Deloitte & Touche LLP, we determined to adopt the changes which are driven by a re-examination of an accounting convention first adopted in 2012 with the completion of the first Rights to MSR's sale transaction to HLSS.  The accounting convention applied a narrow (5%) range to valuations obtained from a third-party valuation expert in determining the carrying value of our Financial Liability – Pledged MSRs related to our sales of Rights to MSR's.  Effective as of June 30, 2014, the Company has stopped using a range.

76.     Prior to these revelations, however, Defendants Wish and Erbey sold more than $62 million worth of Ocwen common stock at inflated prices while in possession of material non-public information, thus avoiding substantial losses they would have incurred but for their illegal insider trading.  Further, on January 28, 2014, Ocwen issued a new $2.2 billion 7-year senior secured term loan to refinance its existing $1.3 billion senior secured term loan, and to acquire the Wells Fargo MSRs.  On October 21, 2014, the NY DFS, through Superintendent Lawsky, issued a fourth letter to Ocwen, this time regarding "serious issues with Ocwen's systems and processes, including Ocwen's backdating of potentially hundreds of thousands of letters to homeowners, likely causing them significant harm."  The NY DFS's review of Owen's mortgaging servicing practices revealed that borrowers were receiving letters denying a mortgage loan modification that were dated more than thirty days prior to the date Ocwen actually mailed the letters.  The borrowers were given thirty days from the date of the denial letter to appeal that denial, but those 30 days had already elapsed by the time they received the backdated letter.  In other cases, Ocwen's systems showed that borrowers facing foreclosure received letters with a date by which to cure their default and avoid foreclosure – but the cure date was months prior to receipt of the letter.  The NY DFS believed that "[t]he existence and pervasiveness of these issues raise critical questions about Ocwen's ability to perform its core functions of servicing loans."

77.     The letter accuses Ocwen of doing nothing to investigate or address the backdating issue even when an employee questioned the accuracy of Ocwen's letter dating processes and alerted the Company's Vice President of Compliance.  Despite the fact that the Individual Defendants knew or should have known of such events, Ocwen did nothing and the employee raised the issue again five months later, but Ocwen has to this day failed to address it,

more than a year after the issue was first discovered.  Worse, Ocwen falsely represented to the Monitor that (1) the issue was isolated to letters of a specific type; (2) the problem affected only 6,100 letters; (3) Ocwen discovered the issue in April or May, 2014; and (4) Ocwen implemented changed to its systems in May 2014 that resolved the problem.

78.     After the Monitor began to independently investigate the issue, and under pressure from NY DFS, Ocwen finally admitted in a memorandum dated September 10, 2014, that the backdating problem was not an isolated event and that changes to its systems in May, 2014 did not fully resolve the problem.  However, Ocwen still identified only a fraction of the instances of backdating that had already been uncovered by the Monitor.  Further, the memorandum falsely repeated the assertion that Ocwen initially discovered the backdating issue in April 2014.  However, upon further investigation and persistent questioning by the Monitor, it was discovered that one of Ocwen's employees had identified the problem in November, 2013 and informed senior management, including the Company's Vice President of Compliance.  Notwithstanding being informed of the backdating, there is no indication that the Individual Defendants did anything to investigate or remedy the problem in November, 2013, nor did the Individual Defendants cause the Company to alert regulators, borrowers, shareholders or other interested parties.  Five months had elapsed when the same employee was forced to raise the issue again.

79.     The backdating issue, among others, starkly illustrates the culture of corruption and abject failure by the Ocwen Board and senior management to discharge their fiduciary duties.  Indeed, it is clear that Ocwen's Board and senior management failed to conduct proper due diligence to ensure that the issue was promptly resolved or take any steps whatsoever to

remedy the harm already done to borrowers and others.   Superintendent Lawsky's letter concludes:

> "The stakes for borrowers and investors are enormous.   If the Department concludes that it cannot trust Ocwen's systems and processes, then it cannot trust Ocwen to comply with the law.   If Ocwen cannot demonstrate immediately that it is capable of properly servicing borrowers' needs, the Department intends to take whatever action is necessary to ensure that borrowers are protected."

80.     Ocwen's troubles did not end here.  Most recently, as reported by *The Wall Street Journal* and others on December 16, 2014, the Monitor for the Office of Mortgage Settlement Oversight ("OMSO"), Joseph A. Smith, Jr., had accused the Company of providing unreliable information about its business practices in the first half of 2014.  The Monitor, who was charged with being the overseer for banks' and mortgage servicers' compliance with the $25 billion National Mortgage Settlement[4] stated in his latest report that Ocwen's internal review group ("IRG") process had serious deficiencies, questioning the independence and integrity of IRG's operations.  The probe into the Company's review process started after an Ocwen employee informed the OMSO of the shortcomings in May, 2014.   After interviewing nine Ocwen employees and reviewing thousands of documents earlier this year, Mr. Smith concluded he could not rely on the work of the internal monitoring group at Ocwen.

81.     Each of the Individual Defendants, because of their positions with Ocwen, controlled the contents of the Company's public statements.  Each of the Individual Defendants was provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent

---

[4] Ocwen became part of the National Mortgage Settlement in December 2013, following its acquisition of Residential Capital LLC's servicing business.  Residential Capital was a unit of Ally Financial Inc., which was one of five banks included in the national settlement.

their issuance or cause them to be corrected.  Because of their positions and access to material

non-public information, the Individual Defendants knew or should have known, or recklessly

disregarded that the adverse facts specified herein had not been disclosed and were being

concealed and that the positive representations being made were false and misleading.  As a

result, each of these defendants is responsible for the accuracy of Ocwen's corporate statements,

financial reports, and filings with regulatory agencies and is, therefore, responsible and liable for

the representations contained therein.

### E.    False Certifications

82.    As senior officers of Ocwen, Defendants Erbey and Faris, among others in

management, had extensive duties to ensure the accuracy and completeness of financial

information disseminated to investors.

83.    As noted in American Institute of Certified Public Accountants ("AICPA")

auditing standard, Section 110.03, a public company's management is responsible for preparing

financial statements in accordance with GAAP:

> "The financial statements are management's responsibility.… Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management.  The auditor's knowledge of these matters and internal controls is limited to that acquired through the audit.  Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility."

84.    In Accounting Series Release 173 (July 2, 1975), the SEC reiterated the duty of

management to present a true representation of a company's operations:

"[I]t is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations."

85.     Pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") and SEC rules promulgated thereunder, the chief executive officer and chief financial officer of reporting corporations, such as Ocwen, are required to certify as to the accuracy and completeness of a company's financial statements.

86.     At all relevant times, Ocwen's senior management, including but not limited to Defendants Erbey and Faris and the members of the Board's Audit Committee, repeatedly opined that internal controls over financial reporting were adequate, despite the fact that there was no check on Defendant Erbey's behavior, and despite the tangled web of conflicts between and among Ocwen and related entities identified herein, as well as other serious wrongful and illegal conduct as referred to herein directed by Defendant Erbey, and acquiesced in by each of the other Individual Defendants.  Notwithstanding such wrongdoing, the Individual Defendants unjustifiably executed in 2012, 2013 and 2014 "clean certifications" pursuant to Sections 302 and 906 of SOX.  These certifications falsely and deceptively stated, *inter alia,* that the Company had disclosed all significant deficiencies and material weaknesses in the design for operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information. As such, the Individual Defendants are liable to the Company as a result of their false certifications.

## VI.     BREACHES OF COMPANY POLICIES

### A.     The Individual Defendants' Roles and Responsibilities

87.     As officers and/or directors of the Company, the Individual Defendants owed to the Company and its shareholders fiduciary duties of trust, due care, candor, good faith, and loyalty.  Each of the Individual Defendants knew it was his fiduciary duty and responsibility to

38

use his utmost ability to oversee the management and administration of Ocwen's business and affairs, to ensure the Company complied with all of its legal obligations and operated in a diligent, honest and prudent manner, and to ensure that effective policies, procedures, systems, and internal controls are in place to prevent, detect and promptly terminate any unlawful corporate conduct or unethical business practices such as those described above.

88.     Each Individual Defendant participated or acquiesced in at least some of the wrongful conduct described herein, thereby breaching his fiduciary duty of loyalty and good faith owed to the Company and its shareholders.  Such conduct is not the product of a valid exercise of business judgment, and constitutes a non-exculpable breach of fiduciary duty for which each director faces a substantial threat of personal liability.

89.     Each Individual Defendant breached his respective duty of loyalty and good faith by knowingly permitting management to engage in violations of federal and state consumer protection and other laws, rules and regulations applicable to Ocwen and its subsidiaries, as described herein, and by failing to implement and/or maintain adequate internal controls to check Defendant Erbey's domination over the Company and related entities identified herein and to prevent violations of the federal  securities laws, consumer protection laws and other laws and regulations as described herein.

90.     The Individual Defendants, as a result of their service on the Board and on the committees described fully in Ocwen's 2014 Proxy Statement, their knowledge and expertise as alleged therein, the receipt by the Board and those committees of regular and complete reports, and as reflected in the Company's belated disclosures and ongoing federal and state investigations, were aware of the unlawful and unethical business practices and knowing

misrepresentations alleged herein, yet knowingly and/or recklessly breached their fiduciary obligations as officers and/or directors of Ocwen, by permitting them to be continued.

91.     Ocwen's improper web of interconnected and affiliated business entities and pervasive consumer protection and mortgage servicing rules violations for the personal benefit of Defendants Erbey and Wish and the other Individual Defendants was not the result of a rogue employee or division, but instead, notwithstanding Ocwen's Code of Business Conduct and Code of Ethics for Senior Financial Officers, reflected a Company-wide, "anything goes" business philosophy, directed, encouraged and aggressively pursued by Defendant Erbey. Such philosophy was aimed at increasing Ocwen's revenues and profits through unscrupulous business practices, as well as improper charges, kickbacks and improper business activities of related entities over compliance with laws and regulations designed to protect both borrowers, investors and the Company, without due regard to the long-term consequences of such wrongdoing. Upon information and belief, the widespread abusive practices and illegal activities described herein were well known to senior management and the entire Board, and were knowingly pursued despite their knowledge of its illegality and/or cover-up and the inevitable harm to Ocwen and its shareholders. The Company's management, accompanied by Board knowledge and/or passivity, knowingly made a calculated bet that any legal consequences from the wrongful conduct described herein would not be found out by governmental regulators and enforcement agencies. By knowingly, recklessly or negligently permitting these business practices and strategies to continue, notwithstanding Ocwen's well-publicized codes of behavior and ethics, the Board adopted it as Company policy, and committed a sustained and systematic failure of compliance oversight in breach of each Board member's fiduciary duty of loyalty and good faith.

40

92.     The Company's Board established the codes of conduct and published them extensively, despite knowing that they were not being and would not be followed.   The Company's April 3, 2013 Proxy Statement assured Ocwen's shareholders that:

> "We have adopted a Code of Business Conduct and Ethics that applies to our Directors, officers and employees as required by the New York Stock Exchange rules.  We have also adopted a Code of Ethics for Senior Financial Officers that applies to our Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer.  Any waivers from either the Code of Business Conduct and Ethics or the Code of Ethics for Senior Financial Officers must be approved by our Board of Directors or a Board Committee and must be promptly disclosed to you."

The personal obligations established by Ocwen's codes of conduct were breached by the Individual Defendants, who are accountable to the Company as well as Plaintiff and the other shareholders for the damages caused to Ocwen.  All such conduct has caused, and will continue to cause the Company and its shareholders substantial economic and other damages, including but not limited to the massive and ongoing costs of investigating misconduct, implementing remedial measures and defending existing and future class action and other lawsuits and further damaging the Company's reputation and goodwill, all of which amounts cannot presently be calculated.

93.     Indeed, contrary to the letter and spirit of Defendant Faris' August 2013 introductory letter and the Code of Business Conduct and Ethics, the Board used every means at their disposal (a) to frustrate the investigations of the CFPB, the NY DFS and the SEC and to delay, as long as possible, any reckoning, (b) to delay public disclosure of the wrongful conduct of the Board and senior management as described herein; and (c) to avoid ultimate accountability for such wrongdoing including failing to act on Plaintiff's pre-suit demands as referred to below. From the time of the wrongdoing alleged herein to the present, the Board and senior management of the Company specifically breached their fiduciary obligations to "not just to comply with the

laws and regulations that apply to our business … [but also] to abide by the highest principles of business ethics" as specifically mandated by the Code of Business Conduct and Ethics. In fact, the Board's Compliance Committee, which was charged with "oversight of the Company's compliance with applicable laws, rules and regulations governing its consumer-oriented businesses (including applicable state and Federal consumer financial protection laws and regulations)", abjectly failed and continues to fail in carrying out the responsibilities which it has been assigned. Indeed, there is no evidence that such Committee even functions.

**B.      Breach of Ocwen's Code of Business Conduct and Ethics**

94.      Ocwen's Code of Business Conduct and Ethics ("Code of Conduct") was adopted on November 2, 2002 and last reviewed and approved on August 20, 2013.  The Code of Conduct is published on Ocwen's website and incorporated by reference in its Proxy Statements. The Code of Conduct, applicable to all Ocwen employees and all members of the Company's Board of Directors, describes the purported policies of conduct followed by Ocwen in conducting its business operations.

95.      The Code of Conduct is approved by the Board of Directors and each of them was directly responsible for approving and causing the publication of the misrepresentations set forth therein.  Compliance with the Code of Conduct is purportedly overseen by the Senior-most Executive of Internal Audit and the Company's general counsel.

96.      In a letter prefacing the Code of Conduct, dated as of August, 2013, Defendant Faris, Ocwen's President and Chief Executive Officer, falsely represented that "[o]ur goal is not just to comply with the laws and regulations that apply to our business; we also strive to abide by the highest principles of business ethics."  His misrepresentations continued:  "The purpose of the Code is to reinforce and enhance the Company's commitment to an ethical way of doing

business.  The policies set forth here continue to be a part of Ocwen's long-standing tradition of high ethical standards as set forth in many of the Management Directives including Management Directive No. 1 – Legal and Ethical Conduct."   As set forth herein, contrary to these representations and assurances, the Company was engaged in a massive scheme of consumer financial abuses, unethical ways of doing business and securities fraud.   The Individual Defendants knowingly or recklessly permitted these abuses to occur, or passively acquiesced therein, with full knowledge of the risks to Ocwen inherent in their deliberate strategy.

97.     The Code of Conduct contained numerous representations, which the Individual Defendants knew, or should have known were false, including the following:

- Ocwen Financial Corporation and its subsidiaries ("Ocwen" or the "Company") are committed to the highest standards of business conduct in our relationship with each other and with our customers/clients, suppliers, shareholders and others.  *This requires that we conduct our business in accordance with all applicable laws and regulations and in accordance with the highest standards of business ethics.*  (Code of Conduct, p. 5 of 21) (emphasis added).

- Ocwen employees and members of the Board are expected to dedicate their best efforts to Company business *and to avoid any conflicts with the interests of Ocwen.  (Id.)*

- In order to maintain the highest degree of integrity in the conduct of Ocwen's business and to maintain your independent judgment, you must avoid any activity or personal interest that creates or appears to create a conflict between your interests and the interests of the Company.  *A conflict of interest occurs when your private interests interfere in any way, or even appear to interfere, with the interest of the Company as a whole.*  A conflict situation can arise when you take actions or have interests that make it difficult for you to perform your company work objectively and effectively. You should never act in a manner that could cause you to lose your independence and objectivity or that could adversely affect the confidence of our customer/clients, suppliers, directors or fellow employees in the integrity of Ocwen or its procedures. *(Id.)*(emphasis added).

- *Financial Interests in Other Businesses*:  Ocwen employees, members of the Board, and their immediate families may not have an ownership

interest in any other enterprise if that interest compromises or appears to compromise the employee's loyalty to Ocwen.  (*Id.*, p. 6 of 21).

- **Insider Trading:**  You are prohibited by Company policy and the law from buying or selling securities of the Company at a time when in possession of "material nonpublic information."  (*Id.*, p. 11 of 21).

- **FAIR DEALING:**  Ocwen depends on its reputation for quality, service and integrity.   The way we deal with our customer/clients, competitors and suppliers mold our reputation, builds long-term trust *and ultimately determines our success.*  You should endeavor to deal fairly with the Company's customers/clients, suppliers, competitors, directors and employees.  *We must never take unfair advantage of others through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair dealing practice. Id.,* p. 13 of 21) (emphasis added).

98.     As outlined above, the Individual Defendants violated the Company's Code of Conduct in a systemic and sustained series of illegal and abusive business practices, dual ownership of affiliated entities that created rampant conflicts of interest and lack of objectivity and independence.   In addition, the Individual Defendants have been accused, in separate lawsuits, of securities fraud and Defendants Erbey and Wish have been accused of insider trading violations.  In short, despite the tenets of the Company's Code of Conduct, the Individual Defendants left ethics, integrity and fair dealing by the wayside on their quest for ever higher revenues and thus, higher compensation and ever more lucrative incentives for themselves, in breach of their fiduciary duties.

99.     Further, the Code of Conduct provides that "[i]f you know of or suspect a violation of applicable laws or regulations, the Code, or the Company's related policies, you must immediately report that information to the Conduct and Ethics line …, the Senior-most Executive of Human Resources or a manager in the Human Resources Department, the Senior-most Executive of Internal Audit and/or the General Counsel ….failure to report a suspected

44

violation of the Code is itself a violation of the Code …".   Thus, to the extent any of the Individual Defendants passively acquiesced in or failed to report known or suspected violations of the Code of Conduct by others, that is itself a violation of the Code of Conduct and breach of fiduciary duty.

100.    Each member of Ocwen's Board, among others, was required to and, upon information and belief, did execute the following statement which appears at the end of the Code of Conduct:

### ACKNOWLEDGMENT FORM

I have received and read the Ocwen Code of Business Conduct and Ethics, and I understand its contents.  I agree to comply fully with the standards, policies and procedures contained in the Code and the Company's related policies and procedures.  I understand that I have an obligation to report to the Senior-most Executive of Internal Audit and/or the General Counsel or any of the other resources identified herein this code (sic) of any suspected violations of the Code of which I am aware.  I acknowledge that the Code is a statement of policies for business conduct and does not, in any way, constitute an employment contract or an assurance of continued employment.

101.    Notwithstanding the execution of the foregoing statement, Defendant Erbey, the members of the Audit and Compliance Committees and each of the other Individual Defendants knowingly failed to adhere to "the standards, policies and procedures contained in the Code and the Company's related policies and procedures."   Moreover, each of the Individual Defendants who executed the foregoing statement, despite their personal knowledge of the wrongdoing alleged herein, failed to fulfill his/her "obligation to report to the Senior-most Executive of Internal Audit and/or the General Counsel … any suspected violation of the Code of which I am aware."

### C.    Breach of Ocwen's Code of Ethics for Senior Financial Officers

102.    Ocwen's Code of Ethics for Senior Financial Officers (the "Code of Financial Ethics") was adopted on November 7, 2002 and last reviewed and approved on December 2, 2013.   The Code of Financial Ethics is published on Ocwen's website and incorporated by reference in its Proxy Statements, including Ocwen's April 3, 2013 Proxy Statement.   The Code of Financial Ethics, applicable to the Company's Chief Executive Officer, Chief Financial Officer, and Chief Accounting Officer (collectively the "Senior Financial Officers"), sets forth specific policies to guide the Company's Senior Financial Officers in the performance of their duties.   The Code of Financial Ethics supplements the Code of Conduct and creates additional obligations for the Company's Senior Financial Officers.

103.    The Code of Financial Ethics states the Ocwen "is committed to full and accurate financial disclosure in compliance with applicable laws, rules and regulations and to maintaining its book and records in accordance with applicable accounting policies, laws, rules and regulations."

104.    The Code of Financial Ethics stresses the importance of compliance with applicable rules and regulations, and references the creation of a culture of high ethical standards, the antithesis of what was actually occurring at the Company.   The Code states:

> Ocwen is committed to conducting our business in accordance with all applicable laws, rules and regulations and in accordance with the highest standards of business ethics.   As a Senior Financial Officer, you must comply with applicable laws.   In addition, you also have leadership responsibilities that include creating a culture of high ethical standards and commitment to compliance, maintaining a work environment that encourages employees to raise concerns and promptly addressing employee compliance concerns.

105.    The Code of Financial Ethics, like the Code of Conduct, stresses the importance of independent judgment and the avoidance of actual or perceived conflicts of interest, stating:

1953185.1

In order to maintain the highest degree of integrity in the conduct of Ocwen's business and your independent judgment, you must avoid any activity or personal interest that creates or appears to create a conflict between your interests and the interests of Ocwen. A conflict of interest occurs when you private interests interfere in any way, or even appear to interfere, with the interests of Ocwen as a whole. *You should conduct the Company's business in an honest and ethical manner and never act in a manner that could cause you to lose your independence and objectivity.* Any material transaction or relationship that reasonably could be expected to give rise to a conflict must be reported to the Audit Committee. (emphasis added).

106.    As outlined above, Ocwen's Senior Financial Officers violated the Company's Code of Financial Ethics in a systemic and sustained manner, misrepresented or failed to disclose the true financial and operating condition of the Company, failed to issue financial statements and Company reports in compliance with GAAP, and participated in or acquiesced in violations of federal securities laws, state and federal consumer financial protection laws and regulations and other applicable laws. The Company's Senior Financial Officers, as well as all of the other Individual Defendants, failed entirely to create a culture of high ethical standards and commitment to compliance, subjecting Ocwen and its shareholders to billions of dollars in damages, as well as expensive, time consuming and on-going governmental and regulatory investigations and substantial potential civil liability from both pending and potential future class action and other litigation.

107.    Each the Company's Senior Financial Officers was  required to and, upon information and belief, did execute the following statement which appears at the end of the Code of Financial Ethics:

### ACKNOWLEDGMENT FORM

I have received and read the Code of Ethics for Senior Financial Officers, and I understand its contents.  I agree to comply fully with the standards, policies and procedures contained in the Code of Ethics

and the Company's related policies and procedures.  I understand that I have an obligation to report to the Senior-most Executive of Internal Audit or the Audit Committee of the Board of Directors any suspected violations of the Code of Ethics of which I am aware.  I certify that, except as fully disclosed in accordance with the terms of this Code of Ethics, I had not engaged in any transactions or activities that would constitute an actual or apparent conflict with the interests of the Company.  I further certify that, except as noted below, I am otherwise in full compliance with the Code of Ethics and any related policies and procedures.

108.    Notwithstanding the execution of the foregoing statement, each of Ocwen's Senior Financial Officers knowingly failed to adhere and fully comply with "the standards, policies and procedures contained in the Code of Financial Ethics and the Company's related policies and procedures."  Moreover, each of these Senior Financial Officers who executed the foregoing statement, despite their personal knowledge of the wrongdoing alleged herein, failed to fulfill his/her "obligation to report to the Senior-most Executive of Internal Audit or the Audit Committee of the Board of Directors any suspected violation of the Code of Ethics of which I am aware."  Each of the Company's Senior Financial Officers falsely certified that "I am otherwise in full compliance with the Code of Ethics and any related policies and procedures" as well as that "I had not engaged in any transactions or activities that would constitute and actual or apparent conflict with the interests of the Company."

### D.    Breach of Ocwen's Audit Committee Charter

109.    Defendants Korn, Wish and Salcetti (the "Audit Committee Defendants") owed specific heightened duties as members of the Board's Audit Committee.  Pursuant to the Audit Committee's Charter, in effect for many years and last amended and adopted on February 25, 2014, these Defendants are responsible for being the Board's front line in the oversight of internal controls and legal compliance, accurate financial reporting and accounting and enforcement of Ocwen's Code of Conduct and Code of Financial Ethics.

110.     Ocwen's current and prior Audit Committee Charters state, in substance:

> The purpose of the Audit Committee (the "Committee" of the Board of Directors (the "Board") of Ocwen Financial Corporation (the "Company") is to provide assistance to the Board in fulfilling its legal and fiduciary obligations with respect to matters involving the accounting, auditing, financial reporting, internal control and legal compliance functions of the Company and its subsidiaries. This includes, without limitation, (a) assuming the Board's oversight of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the Company's independent auditors' qualifications and independence and (iv) the performance of the Company's independent auditors and the Company's internal audit function, and (b) preparing the report required to be prepared by the Committee pursuant to the rules of the Securities and Exchange Commission (the "SEC") for inclusion in the Company's annual proxy statement.

111.     Both before and since being charged with responsibility to investigate the claims made in Plaintiff's February Demand Letter and Supplemental Demand Letter to the Board as referred to below, the Audit Committee has abjectly and knowingly, with the advice of conflicted legal counsel, failed to fulfill the foregoing responsibilities.

112.     In particular, during the period of the wrongdoing alleged herein, the members of the Audit Committee failed to fulfill their oversight responsibilities with respect to the accounting and financial reporting processes of the Company, including the integrity of the financial statements and other financial information, which they knew or should have known were not accurate, were not audited by an independent auditor and suffered material control shortcomings.

113.     Moreover, each of the members of the Audit Committee serving at the times of the wrongdoing alleged herein was personally aware or should have been aware that the Company was not in compliance with legal and regulatory requirements including, *inter alia*, federal securities laws, state consumer protection laws and Mortgage Servicing Practices and

49

federal consumer financial protection laws, rules and regulations.   At all relevant times, the members of the Audit Committee had total access to all documents and information bearing upon the Company's operations including the information relevant to the wrongdoing referred to herein.   In addition to each of such members of the Audit Committee being members of the Board, they were charged with specific responsibilities that enhanced their access to such documents and information pursuant to the Audit Committee Charter which required them to, *inter alia*:

### IV.    <u>DUTIES AND RESPONSIBILITIES OF THE COMMITTEE</u>

a.    Obtain and review at least annual the Company's internal audit plan, internal audit budget and risk management report;

b.    Select, in its sole discretion (subject to shareholder ratification) the firm of independent auditors to audit the books and accounts of the Company and its subsidiaries for each fiscal year, instruct the Company's independent auditors that they are ultimately accountable to the Committee and approve the independent auditors' annual engagement letter as well as all audit and … all permitted non-audit engagements and relationships between the Company and such auditors and pre-approve all audit and … permitted non-audit services to be performed by the independent auditors subject to such procedures as may be established by the Committee.

c.    Review the performance of the Company's independent auditors, including the lead partner of the independent auditors, and, in its sole discretion, make decisions regarding the replacement of termination of the independent auditors when circumstances warrant;

d.    Obtain and review at least annually the report of the independent auditors describing:

1953185.1

       i.     the independent auditors' internal quality-control procedures;

       ii.     any material issues raised by the most recent internal quality-control review, by a peer review or by any inquiry or investigation by any governmental or professional authority of the independent auditors, within the preceding five years, respecting one or more independent audits carried out by the independent auditors, and any steps taken to deal with any such issues;

e.     Review the annual audit plan of the Company's independent auditors, including the scope of the audit, and monitor such plan's progress and results during the year;

f.     Review the results of the year-end audit of the Company by the independent auditors, including any significant matters regarding internal controls over financial reporting that have come to their attention during the conduct of the audit;

g.     Meet to review and discuss with management and the independent auditors the Company's annual audited financial statements and "Management's Discussion and Analysis disclosures, and recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K;

h.     Meet and review and discuss with management and the independent auditors, the Company's quarterly financial statements, Management's Discussion and Analysis and the results of independent auditor's review of the quarterly financial statements;

i.      Review with management, the Company's independent auditors' and the Vice President of the Company's internal auditing department, the following:

i.      critical accounting policies and such other accounting policies of the Company as are deemed appropriate for review by the Committee prior to any interim or year-end filings with the SEC or other regulatory body, including any financial reporting issues which could have a material impact on the Company's financial statements;

ii.      any significant changes in the Company's selection or application of accounting principles;

iii.      alternative treatments of financial information that have been discussed by the independent auditors and management, ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the auditors;

iv.      all other material written communications between the independent auditors and management; and

v.      the effect of off-balance sheet structures on the financial statements of the Company;

j.      Review with the chief executive officer and chief financial officer and independent auditors, the following:

i.      all significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize, and report financial data, including any material weaknesses in internal controls identified by the Company's independent auditors;

52

ii.      any fraud, whether or not material, that involved management or other employees who have a significant role in the Company's internal controls; and

iii.      any significant changes in internal controls over financial reporting, including any corrective actions with regard to significant deficiencies and material weaknesses.

k.      Review:

i.      the adequacy and effectiveness of the Company's accounting and internal control policies and procedures on a regular basis, including the responsibilities, budget and staffing of the Company's internal audit function, through inquiry and discussions with the Company's internal auditors and management of the Company; and

ii.      any required report prepared by management, and attested to by the Company's independent auditors, regarding the effectiveness of the Company's internal controls over financial reporting and stating management's responsibility to establish and maintain such internal controls, prior to its inclusion in the Company's annual report;

l.      Review with management the Company's administrative, operational and accounting internal controls, including any special steps adopted in light of the discovery of material control deficiencies, and evaluate whether the Company is operating in accordance with its prescribed policies, procedures and codes of conduct;

m.      Receive periodic reports from management to assess the impact on the Company of significant accounting or financial reporting developments that may have a bearing on the Company;

n.      Establish and maintain free and open means of communication between and among the Board, the Committee, the Company's independent auditors, the Company's internal auditing department and management, including providing such parties with appropriate opportunities to meet separate and privately with the Committee on a periodic basis;

o.      Discuss guidelines and policies governing the process by which senior management of the Company assess and manage the Company's exposure to risk, as well as the Company's major financial risk exposures, including the Company's credit risk, liquidity risk, regulatory risk, operational risk and enterprise risk, and the steps management has taken to monitor and control such exposures;

p.      Meet regularly with the Company's internal auditors and the independent accountants to discuss the scope and plan for the internal audit and include management in its review of accounting and financial controls, assessment of business risks and legal and ethical compliance programs;

q.      Meet at least annually with the general counsel, and outside counsel when appropriate, to review legal and regulatory matters, including any matters that may have a material impact on the financial statements of the Company;

r.      Prepare the report required by the rules of the SEC to be included in the Company's annual proxy statement;

1953185.1

s.      Review the Company's program to monitor compliance with the Company's Code of Conduct, and meet periodically with the Company's Chief Compliance Officer to discuss compliance with the Code of Conduct:

xxvii.      Establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls and auditing matters, and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters:

xxviii.      Review, approval or ratification of transactions with related persons;

xxix.      Report regularly to the Board on its activities, as appropriate.  In connection therewith, the Committee should review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditors or the performance of the internal audit function;

114.    By knowingly and recklessly failing to ensure internal controls were in place, and by allowing Defendant Erbey to exercise unbounded discretion and personal autonomy over the Company's operations, as well as the operations of the affiliated entities identified herein, and allowing Defendants Erbey and Wish and others to maintain conflicting financial interests, all of which resulted, among other things, in certain of the wrongdoing described above, which is

continuing through the present, the Audit Committee Defendants breached their fiduciary duties of loyalty and good faith owed to the Company.

115.     In light of the widespread nature of the wrongdoing referred to herein, the members of the Audit Committee effectively acquiesced therein and were (and are) personally responsible for the cover-up of such wrongdoing. As such, they (as well as other members of the Board) were not and could never be considered independent, disinterested or investigating the wrongdoing claimed by Plaintiff and other Ocwen shareholders in good faith.

116.     Moreover, upon information and belief, despite their knowledge of ongoing investigations of the Company's illegal practices, neither the members of the Audit Committee nor the Board as a whole commenced any serious internal investigation of the wrongdoing as alleged by Plaintiff and other shareholders of the Company. Moreover, consistent therewith, they continued to appoint D&T as Ocwen's auditor rather than a truly independent auditor which would expose such wrongdoing.

**E.      Breach of Ocwen's Compliance Committee Charter**

117.     Defendants Salcetti and Faris (the "Compliance Committee Defendants") owed specific heightened duties as members of the Board's Compliance Committee.  Pursuant to the Compliance Committee Charter, in effect for many years and last amended and adopted on February 25, 2014, these Defendants are responsible for ensuring that the Company functions in compliance with the laws, rules and regulations governing its consumer-oriented business, including applicable state and Federal consumer financial protection and securities laws and regulations.

118.     The Compliance Committee Charter states as follows:

> The purpose of the Compliance Committee (the "Committee") of
> the Board of Directors (the "Board") of Ocwen Financial

Corporation and its subsidiaries (together, the "Company") is to provide assistance to the Board with (i) establishment and oversight of the Company's compliance function, including the Company's compliance management system, and (ii) oversight of the Company's compliance with applicable laws, rules and regulations governing its consumer-oriented businesses (including applicable state and Federal  consumer financial protection laws and regulations).

119.    Each of the members of the Compliance Committee serving at the times of the wrongdoing alleged herein was personally aware or should have been aware that the Company was not in compliance with legal and regulatory requirements including, *inter alia*, applicable state and federal consumer financial protection laws and regulations.   At all relevant times, the members of the Compliance Committee had total access to all documents and information bearing upon the Company's operations including the information relevant to the wrongdoing referred to herein.   In addition to each of such members of the Compliance Committee being members of the Board, they were charged with specific responsibilities that enhanced their access to such documents and information pursuant to the Compliance Committee Charter which required them to, *inter alia*:

### IV.     <u>DUTIES AND RESPONSIBILITIES OF THE COMMITTEE</u>

a.     Review the status of the Company's compliance with Federal consumer financial laws, applicable state laws and internal policies, procedures and controls;

b.     Receive and oversee the assessment of internal and external data and reports relating to the Company's compliance programs;

c.     Oversee the activities of the Company's Compliance Management Committee, including review of internal data and reports prepared by the Compliance Management Committee;

57

d.      Receive periodic reports, no less than quarterly, from the Chief Compliance Officer and the Company's General Counsel regarding (i) pending or threatened government investigations, examinations, inquiries, demands or proceedings and material litigation, in each case which cover or would be expected to cover compliance with consumer financial laws and/or involve allegations of potentially unlawful, unfair or discriminatory acts and practices, (ii) details and factual information regarding any material claim or pattern of claims alleging that the Company is not in compliance with Federal consumer financial laws and/or applicable state laws or may be engaged in a pattern of unfair, deceptive, abusive, discriminatory acts of practices and (iii) regulatory developments relevant to the Company's business;

e.      Review and approve, at least annually, the Company's formal written compliance plan and policy statements and directives related to compliance with applicable Federal consumer financial laws and applicable state laws;

f.      Review new consumer financial products or services or Company strategies, to determine degree of compliance function participation (including consideration of fair lending or antidiscrimination laws);

g.      Oversee the formulation and implementation of the Company's compliance management system, consisting of four interdependent control components, (i) Board and management oversight, (ii) written compliance program, (iii) response to consumer complaints, and (iv) compliance audit function;

h.      Periodically review the Company's consumer complaint intake and resolution function, in light of risk of violation of state laws and Federal consumer financial laws and related risks to consumers;

i.      Request reports from the Chief Compliance Officer, the Company's General Counsel and management regarding the preparation, implementation and updating of the Company's compliance policies, procedures, training and controls;

j.      Ensure that the full Board receives reports and materials as necessary from time to time regarding significant compliance issues.

120.    The Compliance Committee Charter further requires that the Committee evaluate, on an annual basis, its performance under the Charter, including at least the following:   the adequacy, appropriateness and quality of the information and recommendations presented by the Committee to the Board, the manner in which they were discussed or debated, and whether the number and length of meetings of the Committee were adequate for the Committee to complete its work in a thorough and thoughtful manner.   The Compliance Committee is required to deliver to the Board a report setting forth the results of its annual evaluation, including any recommended changes to the Company's or the Board's policies or practices.

121.    The Compliance Committee Defendants, directly and/or through subordinates, blatantly violated the Company's Compliance Policy by, *inter alia*, participating and/or acquiescing in the wrongdoing and/or failing to have in place adequate internal controls and oversight to prevent the widespread wrongdoing and violation of state and federal consumer financial protection and securities laws and regulations and other wrongdoing as outlined herein, which was systemic and ongoing, all of which has caused Ocwen billions of dollars in damages to date and is subjecting it to further damages, fines, penalties and injunctive relief.   That the Compliance Committee Defendants failed to fulfill their responsibilities is evidenced by the most recent settlement with the NY DFS of December 22, 2014 pursuant to which the Company effectively acknowledged their failings.

F.      **Breach of Ocwen's Corporate Governance Guidelines**

122.    Ocwen's Corporate Governance Guidelines were adopted by the Board on November 7, 2002, and last amended and adopted on February 25, 2014.  Purportedly, the Corporate Governance Guidelines "reflect the Board's commitment to monitor the effectiveness of policy and decision making both at the Board and management level, with a view to enhancing long-term stockholder value."  However, contrary to these representations, and as demonstrated above, the Board failed to effectively monitor either policy or decision-making, instead breaching their fiduciary duties by participating in, acquiescing in and/or failing to prevent widespread abusive practices, rampant conflicts of interest and a myriad of other wrongdoing, as alleged herein.  Further, contrary to the Corporate Governance Guidelines that a "director is expected to spend the time and effort necessary to properly discharge such director's responsibilities," the Individual Defendants had neither the time, nor the inclination, to devote to their duties as Directors, thus enabling the wrongdoing to occur and to continue unabated to the present.

123.    Pursuant to the Corporate Governance Guidelines, in order to build long-term value for the Company's stockholders, the Board was duty-bound to monitor the performance of the Company (in relation to its goals, strategy and competitors) and the performance of Ocwen's Executive Chairman, Defendant Erbey, and the Chief Executive Officer, Defendant Faris.  The Corporate Governance Guidelines further state:

> The Board is also responsible for assuring that the Company's management and employees operate in a legal and ethically responsible manner.  When it is appropriate or necessary, it is the Board's responsibility to remove the Chief Executive Officer and to select his or her successor.

124.    Each of the Individual Defendants breached the Company's Corporate Governance Guidelines by, *inter alia*, their participation and acquiescence in the wrongdoing

alleged herein, failing to implement sufficient internal controls to prevent and/or minimize the alleged wrongdoing and failing to adequately investigate the alleged wrongdoing and remove those responsible in the face of numerous and ongoing investigations and lawsuits.

125.    Ocwen's current and previous Board of Directors Corporate Governance Guidelines further state, in pertinent part:

> "Independence of the Board. The Board shall be comprised of a majority of directors who qualify as independent directors ("independent Directors") under the listing standards of the New York Stock Exchange 9the "NYSE") and applicable law.
>
> The Board shall review annual the relationships that each director has with the Company (directly or as a partner, shareholder or officer of an organization that has a relationship with the Company or otherwise).  Following such annual review, only those directors who the Board affirmatively determines have no material relationship with the Company (directly or as a partner, shareholder or officer of any organization that has a relationship with the Company or otherwise) will be considered Independent Directors, subject to additional qualifications prescribed under the listing standards of the NYSE or under applicable law.  The Board may adopt and disclose categorical standards to assist it in determining director independence.

126.    As a result of direct and indirect Ocwen shareholdings, including his direct and indirect holdings in the related entities with whom Ocwen does business, identified above, Defendant Erbey controls every aspect of the Company's business including, *inter alia*, all nominations to the Company's Board of Directors.  Although the Guidelines proclaim that a majority of Board members should be independent, none of the Ocwen directors is, in fact, free of the control of Defendant Erbey. Each of them owes his appointment, power and lucrative compensation package to Defendant Erbey, who has either directly caused each of them to be appointed to the Board or has acquiesced in their appointments as directors. This is true despite his resignation as Executive Chairman by reason of his shared culpability with the other Individual Defendants and his personal stockholdings.     Thus, each of Ocwen's directors

continues to owe fealty to Defendant Erbey and will take no action contrary to his personal interests. Even if the nominally independent Board members satisfy the rather lax and purely technical "standards" for independence set by the Exchange Act and the New York Stock Exchange, the reality is that each director owes personal fealty to Defendant Erbey and, thus, cannot seriously be considered independent notwithstanding such "standards."

127.    Further, despite certain Guidelines regarding self-evaluation purportedly designed to ensure compliance with Company policies and procedures, the Board and the Nomination/Governance Committee failed to meaningful evaluate board members' performance and/or to take action to ensure that the Individual Defendants, particularly Defendant Erbey, were fulfilling their fiduciary obligations to the Company and had no conflicts of interest.

**G.      Breach of the Nomination/Governance Committee Charter**

128.    At all relevant times, the members of Ocwen's Nomination/Governance Committee were the following:  Defendants: Wish, Lacy and Salcetti.

129.    Ocwen's Nomination/Governance Committee Charter, in effect during the period relevant herein and last amended and adopted February 25, 2014, provides as follows:

> The purposes of the Nomination/Governance Committee (the "Committee") of the Board of Directors (the "Board") of Ocwen Financial Corporation (the "Company") shall be to recommend to the Board individuals qualified to serve as directors of the Company and on committees of the Board: to advise the Board with respect to the Board composition, procedures and committees; to develop and recommend to the Board a set of corporate governance principles applicable to the Company; and to oversee the evaluation of the Board and the Company's management.

130.    The Nomination/Governance Committee's duties with respect to Board Candidates and Nominees included, among other things:

a.      To establish procedures for evaluating the suitability of potential director nominees proposed by management or shareholders.

b.      To review the suitability for continued service as a director of each Board member when his or her term expires and when he or she has a significant change in status, including but not limited to an employment change, and to recommend whether or not the director should be renominated.

c.      The Nomination/Governance Committee was also charged with oversight of the Board Committees, including a duty to establish special committees to address ethical, legal or other matters that arise.   The Charter provides, in pertinent part, as follows with respect to the goals and responsibilities of the Committee with respect to the committee structure of the Board:

d.      To make recommendations to the Board regarding the size and composition of each standing committee of the Board of Directors, including identification of individuals qualified to serve as members of a committee.

e.      To monitor the functioning of the committees of the Board and to make recommendations for any changes, including the creation and elimination of committees.

f.      To recommend that the Board establish such special committees as may be desirable or necessary from time to time in order to address ethical, legal or other matters that may arise.   The Committee's power to make such a recommendation under this Charter shall be without prejudice to the right of any other committee of the Board, or any individual director, to make such a recommendation at any time.

131.   With respect to Corporate Governance, the Nomination/Governance Committee had the following specific responsibilities:

1953185.1

a.      To develop and recommend to the Board a set of corporate governance principles for the Company, which shall be consistent with any applicable laws, regulations and listing standards.

b.      To review periodically, and at least annually, the corporate governance principles adopted by the Board to assure that they are appropriate for the Company, and to recommend any desirable changes to the Board.

c.      To consider any other corporate governance issues that arise from time to time, and to develop appropriate recommendations for the Board.

132.    The Committee was further responsible "for overseeing the evaluation of the Board as a whole and the management of the Company, including the Executive Chairman and the Chief Executive Officer.  The Committee will prepare and assist each other committee's self-evaluation to determine whether such committees are functioning effectively.  The Committee shall establish procedures to allow it to exercise these oversight functions."

133.    Notwithstanding its duties under the Nomination/Governance Committee charter, neither the Committee nor the Board itself made any serious evaluation of the director nominees or sitting directors, particularly in terms of their performance, effectiveness and amount of time available to fulfill their stewardship responsibilities.  Thus, each the director defendant members of the Nomination/Governance committee breached their duties under the charter.

**H.      Breach of Compensation Committee Charter**

134.    At all relevant times, the members of Ocwen's Compensation Committee were the following Director Defendants: Lacy and Korn.

135.    Ocwen's Compensation Committee Charter, in effect during the period relevant herein and last amended and adopted February 25, 2014, provides as follows:

64

> The purposes of the Compensation Committee (the "Committee") of the Board of Directors (the "Board") of Ocwen Financial Corporation (the "Company") shall be to oversee the Company's compensation and employee benefit plans and practices, including its executive compensation plans and its incentive compensation and equity-based plans; and to produce an annual report on executive compensation for inclusion in the Company's proxy statement in accordance with all applicable rules and regulations.

136.    Among the specific responsibilities of the Individual Defendants who were members of the Compensation Committee were, *inter alia*, the following:

a.    To review at least annually the goals and objectives of the Company's executive compensation (other than with respect to the Executive Chairman and the Chief Executive Officer) and to make recommendations to the Board with respect to such executive compensation in light of such goals and objectives.

b.    To review and approve annually the corporate goals and objectives applicable to the compensation of the Executive Chairman and the Chief Executive Officer, evaluate annually the performance of the Executive Chairman and the Chief Executive Officer in light of  such goals and objectives, and either as a Committee or together with the other independent directors on the Board (as directed by the Board), determine and approve each of the Executive Chairman's and the Chief Executive Officer's compensation levels based on their respective evaluations.  In determining the long-term incentive component soft each of the Executive Chairman's and the Chief Executive Officer's compensation, the Committee shall consider all relevant factors, including the Company's performance and relative stockholder return …

c.    To evaluate annually the appropriate form and amount of compensation for Board and Committee service by members of the Board.

137.     With respect to Incentive Compensation and Equity-Based Plans, the Compensation Committee was responsible "[t]o review at least annually the goals and objectives of the Company's incentive compensation and equity-based plans and, to the extent such plans are subject to Board approval, make recommendations to the Board with respect to such plans in light of such goals and objectives."

138.     The Compensation Committee was also specifically charged with evaluating the Company's compensation policies in relation to risk management.   The Compensation Committee Charter directs the Committee members:

> "To review and consider the Company's policies and practices of compensating its employees, including non-executive officers, as they relate to risk management practices and risk-taking incentives, and whether risks arising from the Company's compensation policies and practices for its employees are reasonably likely to have a material adverse effect on the Company."

139.     The members of the Compensation Committee failed to align the compensation of senior executive management and the Board with appropriate risk management practices and risk taking incentives, and instead permitted a structure where short term profits and greed were permitted to override sound and ethical business practices and decision-making.  The Board and senior management was handsomely compensated without meaningful evaluation as to such members performance in relation to stockholder value and long-term performance incentives. As such, each member of the Compensation Committee breached his duties pursuant to the committee charter.

## VII.   DERIVATIVE ALLEGATIONS

### A.     General Derivative Allegations

140.     Plaintiff brings this action derivatively in the right and for the benefit of Ocwen to redress the breaches of fiduciary duty, waste of corporate assets, unjust enrichment and other wrongful conduct by the Individual Defendants as alleged herein.

141.     Plaintiff owns and has continuously owned common stock in Ocwen beneficially during the period of the wrongdoing alleged herein.

142.     Plaintiff will adequately and fairly represent the interests of Ocwen and its shareholders in enforcing and prosecuting its rights, and has retained counsel experienced in prosecuting this type of action.

**B.      Plaintiff has Made Pre-Suit Demand Pursuant to Rule 23.1**

143.     Ocwen's Board of Directors at the time Plaintiff commenced this litigation was comprised of the following six individuals: Defendants Erbey, Faris, Korn, Lacy, Wish and Salcetti.  Each such Defendant owes his position as a director, together with the substantial financial and other benefits thereof, to Defendant Erbey.

144.     On February 11, 2014, Plaintiff made a pre-suit demand on the Board as required by Fed. R. Civ. P. 23.1. A copy of the letter from Richard D. Greenfield, Esq., one of Plaintiff's counsel, setting forth such demands (the "February Demand Letter") is attached hereto as Exhibit "A". The February Demand Letter and the allegations therein are incorporated herein by reference.

145.     Ultimately, after more than four months passed with the Board taking no action to even consider the claims set forth in the February Demand Letter, Mr. Greenfield was informed on June 13, 1014 that the Board had retained counsel in connection with the February Demand Letter. After further inquiry, he learned that the Board had retained Sam Salerio, Jr. of the firm Carlton Fields. Mr. Greenfield then inquired of Mr. Salario to assess the *bona fides* of the

Board's belated response (including the appointment of a so-called special litigation committee or SLC) and the retention of counsel. The inquiry was contained in Mr. Greenfield's e-mail to Mr. Salerio dated June 27, 2014 as follows:

> I understand from Jason Moff's e-mail of June 13 that your firm has been retained by Ocwen's Board of Directors "to advise the Board on the formation and membership of a [special litigation] committee, to advise the committee with respect to its investigation, and to advise the committee with respect to its recommendation to the Board about its response to the allegations in [my] February 11, 2014 letter" to Ocwen's Board.
>
> In connection with that retention, I would appreciate it if you would kindly send to me a copy of the Board's resolutions establishing the special litigation committee ("SLC"), identifying its members, setting forth its mandate and providing for your firm's retention. Moreover, given the substantial passage of time since my letter to the Board of February 11, I trust that you will be kind enough to provide me with answers to the following questions as soon as possible:
>
> 1.   Were you or a representative of your firm present at any portion of any meeting of members of Ocwen's Board of Directors where the Demand Letter was discussed?
>
> 2.   What criteria were used by the Board to determine which of its members would be appointed to serve as the members of the so-called SLC?
>
> 3.   Who participated in the determination of such criteria?
>
> 4.   Were there any factors or facts that the Board considered that might serve to disqualify any individual Ocwen Director from serving on the SLC?
>
> 5.   What process did the Board utilize to select those of its members who would be appointed to serve as the members of the SLC?
>
> 6.   Did anyone investigate each of the proposed members of the SLC to determine whether there were any facts or circumstances which would disqualify any of such members from serving? If so, who performed such investigation and when?
>
> 7.   Has your firm, the SLC and/or Ocwen's Board commenced the investigation of the allegations set forth in the Demand Letter?

1953185.1

8.      If so, when did such investigation commence?

9.      Will your firm and/or the members of the SLC attempt to calculate the extent of the economic and non-economic damages alleged in the Demand Letter?

10.     Will your firm or the SLC be taking any action as to any remedial measures which address any of the wrongdoing alleged in the Demand Letter?

11.     Which persons played a role in the selection of you and/or your firm to advise the Board and/or the SLC?

12.     When did you first learn that you and/or your firm were being considered to represent the SLC, the entire Board of Directors or any of the Ocwen Directors in connection with the Demand Letter?  From whom did you learn this fact?

13.     What steps were taken to insure that there were no facts or circumstances that might justify disqualification of you and/or your firm from acting as counsel to the SLC or the Board?  By whom and when?

14.     Assuming your firm performed a conflict check before being considered for the assignment ultimately accepted by you, when was such conflict check performed and by whom?

15.     Have you or any member of the SLC shared any of the facts that you have uncovered and/or your conclusions relating to the Demand Letter, directly or indirectly, with any member of the Ocwen Board?

I look forward to receiving your responses very shortly.

146.    In turn, despite the fact that the questions posed by Mr. Greenfield addressed the

legitimacy of the Board's response, Mr. Salerio wrote back as follows:

Thank you for your email.  As you may be aware, our firm's engagement on this matter is recent.  We are in the beginning stages of our work.  I do not have client authority to respond to the questions you pose below.  In candor, I would have a difficult time recommending a response to these requests at this early stage, because our involvement here is recent and many of your questions at least implicate issues of attorney-client privilege and work product that need to be considered.

69

The issues that Mr. Salario raised in an attempt to avoid responding to all of the questions were addressed by Mr. Greenfield in his response of July 2, 2014:

> Very few of the questions I directed to you implicate issues of privilege or work product, and, even if they do, your responses can easily av[o]id divulging privileged communications and/or work product. They are fact-based questions going to the bona fides of the process used to select the members of the SLC, your firm, *etc*. As such, I cannot imagine that you will be unable to obtain your clients' permission to respond.

Mr. Salario repeated his refusal to provide any information that could establish the *bona fides* of his appointment or the belated investigation his firm was commencing:

> As noted below, we are not prepared to recommend responding to these requests at this early stage or our engagement.  We will be completing some initial work over the next week or so, and will reach out to you thereafter.

Despite his promise to provide the factual background for the appointment by the Board of the SLC and retention of counsel, neither Mr. Salario nor anyone else on behalf of the Board provided **any** of the requested information.  The failure to establish the legitimacy of the Board's purported response to the February Demand Letter is *prima facie* evidence that such response is a sham established solely for the purposes of creating a "whitewash" of the Individual Defendants' wrongdoing and to provide a staging platform for the eventual motions to dismiss that will be filed by defendants in this and any other shareholder derivative suit.  In fact, Ocwen has **never** disclosed in its SEC filings (including its 2014 Proxy Statement) the existence of Plaintiff's shareholder February Demand Letter or the establishment of a special litigation committee.

147.   Subsequent to the February Demand Letter and even during the sham SLC proceeding, the Individual Defendants continued their wrongdoing. As referred to above,  in

70

August, 2014, Superintendent Lawsky expressed concerns about the way Ocwen was said to have routed insurance fees though one of the Erbey-controlled affiliates of Ocwen after having earlier halted the Company's proposal to acquire the right to service approximately $39 billion in mortgages of Wells Fargo & Co.

148.   In the wake of such ongoing conduct in breach of the fiduciary and other duties of the Individual Defendants, on October 31, 2014, Plaintiff supplemented, *nunc pro tunc*, the February Demand Letter.  A copy of the supplemental demand letter from Richard D. Greenfield, Esq. setting forth additional demands (the "Supplemental Demand Letter") is attached hereto as Exhibit "B".  The Supplemental Demand Letter and the allegations contained therein are incorporated herein by reference.

149.   Notwithstanding the longstanding efforts of Superintendent Lawsky and the Monitor, Mr. Smith, to eradicate its nefarious business practices, the Board continued with "business as usual." As recently as December 17, 2014, *The Palm Beach Post* reported that Mr. Smith had, once again, complained that the Company had "produced unreliable information about its business practices."

150.   In making the demands set forth in the February Demand Letter and the Supplemental Demand Letter, Plaintiff was in no way conceding the disinterestedness or independence of any of the Ocwen directors.  Rather, the pre-suit demands were made to give the Board the opportunity to cause the Company to assert the claims directly, in the first instance, that Plaintiff now asserts derivatively.

151.   In his February Demand Letter, Plaintiff stated:

> "Although this letter demands that you cause the Company to sue yourselves, several of your former colleagues on the Board and D&T, my client does not concede your independence for all purposes or going forward (*see Scattered Corp. v. Chicago Stock*

*Exch*, 701 A. 2d 70 (Del. 1997).  Rather, my client is simply giving the Board the initial opportunity to cause Ocwen to commence the demanded litigation itself.

**C.     The Board's Constructive Rejection of Plaintiff's Demands**

152.     Besides the substantial passage of time since Plaintiff's demands were made (as well as the serious wrongdoing brought to Board members' attention), the prevailing circumstances indicate that Plaintiff's demands have been constructively rejected by the Ocwen Board.  Furthermore, pursuant to Chapter 607 of the Florida Business Corporation Act, §607.07401 (2) "A complaint in a proceeding brought in the right of a corporation must be verified and allege with particularity the demand made to obtain action by the board of directors **and that the demand was refused or ignored by the board of directors for a period of at least 90 days from the first demand unless, prior to the expiration of the 90 days**, the person was notified in writing that the corporation rejected the demand, or unless irreparable injury to the corporation would result by waiting for the expiration of the 90-day period." More than 90 days has elapsed since the February Demand Letter was sent to the Board and it has taken no action either to act upon Plaintiff's demands therein nor has it rejected such demands. As such, Plaintiff's demands are deemed rejected as a matter of law.

153.     The Individual Defendants are each personally exposed to potential liability for the wrongdoing alleged herein, as well as in connection with pending securities fraud and other class action lawsuits and ongoing federal and state investigations.

154.     The Individual Defendants have benefited from the wrongdoing alleged herein, and have engaged in conduct to preserve their positions of control and the perquisites derived therefrom and to protect themselves from personal liability for their acts of mismanagement and breaches of fiduciary duties.

155.     To properly prosecute this lawsuit, the Individual Defendants would have to cause Ocwen to sue themselves, which would expose each of them to tens of millions of dollars in civil liability and/or sanctions.

156.     In light of the Individual Defendants' personal culpability and responsibility for the wrongful acts described herein, the Individual Defendants are not disinterested with respect to responding to Plaintiff's February Demand Letter and Supplemental Demand Letter.

## VIII.   OCWEN'S 2014 PROXY STATEMENT

157.     At all relevant times, each of the Individual Defendants, because of their advisory, executive, managerial, and directorial positions, had access to adverse, non-public information about the Company's financial condition and operations, including the wrongdoing alleged herein.

158.     Each of the Individual Defendants, because of their positions of control and authority as officers and directors of Ocwen, directly and/or indirectly, exercised control over the contents of the various public statements issued by the Company, including Ocwen's 2014 Proxy Statement issued and disseminated by them and in their names.

159.     On or about April 22, 2014, the Individual Defendants caused the issuance and dissemination of Ocwen's Notice of Annual Meeting and Proxy Statement ("2014 Proxy Statement") announcing and soliciting shareholder votes in connection with Ocwen's Annual Meeting of Shareholders held on May 14, 2014.

160.     Among the items of business for consideration by Ocwen's shareholders at the Company's 2014 Annual Meeting was (a) the re-election of directors named in the 2014 Proxy Statement, including Defendants Erbey, Faris, Korn, Salcetti and Wish, each of whom was put forward for re-election by the Board, (b) the ratification of the appointment of D&T as Ocwen's auditor and (c) an advisory vote on Ocwen's executive compensation.

161.    At the time of the 2014 Annual Meeting, these directors, each of whom is elected annually and holds office until the earlier of the election and qualification of his successors or his resignation and removal.

162.    Upon information and belief, each of the directors serving as of April 22, 2014, personally approved the substantive content of the 2014 Proxy Statement and/or indirectly controlled its content, all the while omitting material facts bearing upon how the shareholders of the Company would vote upon, *inter alia*, the Board's nominees for directorships and the ratification of D&T as the Company's auditor.

163.    Despite federal disclosure requirements, the 2014 Proxy Statement was deceptive and failed to disclose the facts set forth herein in neutral, non-pejorative terms including the particularized wrongdoing of and neutral facts about all Board members as described herein, including the mismanagement of the Company's operations and covering up the Company's lack of internal controls, failure to exercise appropriate oversight duties, failure to take action to remedy the charging of unauthorized fees, deceiving consumers regarding alternatives to foreclosures of their homes and providing false and otherwise deceptive information about the status of foreclosure proceeding, permitting in-house and outside counsel to stonewall investigators of the CFPB, the conduct of defendant Erbey and others in the Company's senior management, directly and through the Company's Litton Loan Servicing LP subsidiary, the practices which required their mortgage borrowers to purchase force-placed insurance at excessive cost while taking kickbacks from the insurers, the failure of the non-management members of the Board to fulfill their most fundamental fiduciary duties by*, inter alia*, providing superficial and perfunctory services as directors and devoting insufficient time to the Company's business, as well as the extent to which each of the director nominees who had served during

74

2013 had subjected the Company to class action and other litigation as a result of the wrongdoing described herein. Had the facts described herein been disclosed in the 2014 Proxy Statement, Ocwen's shareholders would have been able to make an informed decision about reelecting these directors.

164.     Moreover, the Board never conducted any objective evaluation of the conduct of its members including, in particular, the wrongful conduct of Defendant Erbey, to whom each other director owed his highly lucrative position on the Board.

165.     The 2014 Proxy Statement also omitted non-pejorative material facts about the nominees for re-election to the Board, which the Company's shareholders would have wanted to know in voting upon the election of directors.  Specifically, it failed to disclose the extent to which such members of the Board participated in and/or acquiesced in the Company's violations of, *inter alia*, state and Federal consumer financial protection and securities laws and regulations, the Ocwen's Board of Directors Corporate Governance Guidelines, the Audit Committee Charter, the Code of Business Conduct, the Code of Ethics for Senior Financial Officer, the Nomination/Governance Committee Charter, the Compensation Committee Charter and the Compliance Committee Charter.

166.     In order to induce Ocwen's public shareholders to vote in favor of the election of the Board's nominees and to bolster their apparent legitimacy as directors, the 2014 Proxy Statement set forth various representations that the Board (including each of the nominees) followed the Company policies, including the Code of Business Conduct and Ethics, the Code of Ethics for Senior Financial Officers, the Corporate Governance Guidelines and each of the Committee Charters identified above. Indeed, each of these Company policies and Committee Charters was specifically incorporated by reference in the 2014 Proxy Statement, which directed

shareholders to Ocwen's website to view these Company policies and guidelines in their entirety. Each of the representations, as set forth in these Company policies and identified above, was false and misleading so as to lead Ocwen's shareholders to believe that the nominees for re-election warranted favorable votes when they did not. Ultimately, at Ocwen's 2014 Annual Meeting of Shareholders, as a direct consequence of the Individual Defendants being controlling persons of Ocwen pursuant to §20 of the Exchange Act and their violations of the Exchange Act, a majority of the Company's shareholders were induced to vote in favor of the Board's proposals, including their own recommendations of themselves for re-election.

167.   The nominees for election to directorships of Ocwen, as set forth in the Company's 2014 Proxy Statement, were elected, and such elections were an essential link between the false and misleading 2014 Proxy Statement and the wrongdoing such directors engaged in following Ocwen's 2014 Annual Meeting.   To the extent that their serving as directors damaged and continues to damage the Company, as described herein, such damages would not have taken place but for their election.   These directors receive lucrative compensation packages from Ocwen for sitting on the Board, including fees for committee chairs and "reimbursement of expenses."   Such compensation paid to the directors amounted to damages that would not have been sustained by the Company but for its 2014 Proxy Statement.

168.   The same essential facts which were legally required to be disclosed in the 2014 Proxy Statement with respect to the wrongful conduct of Defendant Erbey and the other members of Ocwen's Board and which facts were omitted would have undoubtedly influenced the vote of the Company's shareholders as to the Board's executive compensation proposal. Such omitted facts were material to such advisory vote.

169.    The 2014 Proxy Statement also sought shareholder ratification of D&T as Ocwen's auditor as recommended by the Board's Audit Committee. In seeking such ratification, the Board omitted from the 2014 Statement material facts regarding the competence of D&T, its failure to perform its audits of Ocwen's financial statements in accordance with GAAS and its generation of, *inter alia*, opinion letters that falsely stated that Ocwen's financial statements were prepared in conformity with GAAP, when they were not. While the shareholder vote sought was for ratification of the appointment of D&T, had Ocwen shareholders been informed of all material facts regarding D&T's audits, they would not have so ratified the Audit Committee's recommendation and the Audit Committee would have been compelled to select a competent replacement.

170.    During the period of the wrongdoing alleged herein, the Audit Committee of the Board appointed D&T as Ocwen's independent registered public accounting firm (i.e. auditor).  As an integral part of its obligations to Ocwen and its shareholders and pursuant to the terms of its annual retention, D&T was obligated to, *inter alia:* carry out its audits in conformity with the standards of the Public Company Accounting Oversight Board (United States) and GAAS.   Those standards require that D&T "plan and perform the audit to obtain reasonable assurance about whether effective internal controls over financial reporting were maintained in all material respects."   *See* D&T's Report of Independent Registered Public Accounting Firm dated February 28, 2014 accompanying Ocwen's 2013 Annual Report.  D&T was required to, and did, render its purported opinions that the Company's financial statements were prepared in conformity with GAAP and were otherwise accurate in all material respects, and that the "audit included obtaining an understanding of internal controls over financial reporting, assessing the risk that a material weakness exits, testing

77

and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we consider necessary in the circumstances." *Id.* D&T represented that its audit provided a reasonable basis for its opinion.

171.   Thus, it was D&T's responsibility to evaluate Ocwen's internal controls, which it repeatedly failed to do over a period of at least five years or, to the extent that it did so, any such evaluation was performed negligently.  Thus, despite knowing otherwise, D&T stated in each of its annual opinion letters, as follows:

> "in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2013, based on criteria established in Internal Control – Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission."

172.   Defendant D&T knew or should have known that the foregoing statement was false. Indeed, given the widespread misconduct in which the Company's management was engaged for many years, which is continuing to the present, and the known pattern of wrongdoing which artificially inflated Ocwen's revenues and earnings, it should have been obvious to D&T and the Board's Audit Committee, which is required to "review the adequacy and effectiveness of Ocwen's internal controls" and even the Company's entire Board, that the Company's internal controls were materially deficient and displayed significant weaknesses.

173.   If D&T had conducted its year-end audits of Ocwen's consolidated and subsidiary financial statements in conformity with GAAS, as it was contractually obligated to do, and as an expert in the auditing of financial services businesses, it either was obvious or should have been obvious to D&T that the Company's internal controls were materially deficient and that Ocwen was engaging in widespread and systemic wrongdoing as alleged herein.

174.    During the fiscal years ended December 31, 2011, 2012 and 2013, and through 2014 to date, both D&T and the Company maintained, either by words or deeds, that there were no disagreements between them as to any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreements if not resolved to the satisfaction of D&T would have caused it to make reference to the subject matter of the disagreements in connection with its reports on the Company's consolidated financial statements for such years.

175.    D&T was motivated to "look the other way" and deliver "clean" opinions as to Ocwen's year-end financial statements when, in fact, D&T knew that such "clean" opinions were wholly unjustified.  In order to retain the continued patronage and substantial fees generated by Ocwen and upon information and belief the other Erbey-controlled entities, D&T repeatedly generated "clean," unqualified opinions that the year-end financial statements of the Company and its subsidiaries were prepared in accordance with GAAP and that such statements were audited by it in conformity with GAAS when D&T knew such representations were false and would deceive the investing public and the SEC.

176.    Thus, despite its knowledge to the contrary, D&T repeatedly opined in its annual opinion letters provided to the Board and to Ocwen's shareholders, that:

> "In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Ocwen Financial Corporation and its subsidiaries at December 31 [of each year] and the results of their operations and their cash flows for each of the three years in the period ended [December 31, 2013] in conformity with accounting principles generally accepted in the United States of America."

177.    The statements made by D&T in its annual opinion letters on Ocwen's year-end financial statements were materially false and misleading because of, *inter alia*, the widespread deficiencies in Ocwen's internal controls which were known or which should have been known

to D&T and each of the members of the Audit Committee that allowed much of the unlawful conduct complained of herein to occur and continue unabated to the present.

178.   Notwithstanding, or perhaps because of D&T's acquiescence, Ocwen's Audit Committee repeatedly selected D&T as the Company's auditor and proposed its choice to Ocwen's shareholders for ratification.

179.   Ocwen was damaged by the continued engagement of D&T during at least the last three years thereof as D&T continued to be in breach of its engagement, for which Ocwen continued to pay it millions of dollars in fees for audits that were not conducted in accordance with GAAS.   All told, Ocwen paid many millions of dollars in fees which, under the circumstances, were unjustly paid and received.

180.   Ultimately, D&T's failure to acknowledge publicly and, in particular, in filings with the SEC, Ocwen's lack of adequate financial and operational controls, harmed the Company to a substantial extent to a degree that cannot presently be determined. Absent the ratification of D&T as Ocwen's auditor pursuant to the 2014 Proxy Statement, such damages would not have occurred or, at least, would have been far lower than they ultimately were.

## IX.   DAMAGES SUFFERED BY OCWEN

181.   The Board and senior management of Ocwen, including Defendant Erbey, in particular, failed to act in accordance with any legitimate exercise of business judgment and consistently with the fiduciary duties owed by them to Ocwen and its shareholders.

182.   Ocwen's directors utterly failed to implement validly functioning reporting and controls to prevent Ocwen's serious and ongoing violations of federal, state and local consumer financial protection laws, rules and regulations and abusive tactics and practices. Notwithstanding the public disclosure of much of the wrongdoing set forth herein, Ocwen's Board has failed to take steps to make fundamental and meaningful changes in the Company's

culture and corporate governance consistent with the fiduciary duties of the members of Ocwen's Board.  As a result, the wrongdoing, and resultant damages are continuing.

183.    As a result of the Individual Defendants' breaches of their fiduciary duties as described herein, Ocwen has already been forced to pay well in excess of $1 billion to settle claims by the CFPB, and has been exposed and continues to be exposed to substantial injury to its reputation and corporate goodwill, as well as to ongoing governmental investigations and enforcement actions, potential criminal and civil liability, including class action lawsuits and potential loss of licenses and approvals necessary to engage in the servicing and lending businesses. [5] Moreover, as a consequence of the December 22, 2014 settlement with the NY DFS, the Company is being required to pay $150 million in penalties and other compensation and will have to absorb substantial additional expenses, probably well-exceeding $150 million, as a result of the compliance-related aspects of such settlement.

184.    As a direct result of the wrongdoing referred to herein and the Individual Defendants' concealment thereof in filings with the SEC and otherwise, investors have been defrauded and the Company has been named as a defendant in class actions commenced by such investors.  Such class actions, covering investors who purchased Ocwen stock during the period May 2, 2013 to October 20, 2014, have now been consolidated into *United Union of Roofers, etc. v. Ocwen Financial Corporation, et al*, 14-CIV-81057 (WPD) pending in this Court.

185.    The Company also has been caused to expend tens of millions of dollars in the defense of pending securities and consumer class action lawsuits and the ongoing and concluded investigations referred to herein. As a direct consequence, Ocwen has incurred and will continue to incur substantial costs of defending against such litigation and investigations and, ultimately,

---

[5] The settlement was stated to be greater than $2 billion.

resolving them with Ocwen's funds, despite the fact that the underlying wrongdoing was and is the responsibility of the Individual Defendants named herein.

186.    Ocwen has suffered and will continue to suffer substantial harm to an extent not yet fully capable of determination.

187.    The wrongdoing of each of the Individual Defendants and D&T, as described herein, was an essential link in the damages caused and being caused to Ocwen and its shareholders as a result thereof.  As a direct and proximate result of such wrongdoing, Ocwen has expended and will continue to expend large sums of money to comply with subpoena requests and to cooperate with the CFPB, NY DFS, and SEC investigations, the ongoing monitoring and to conduct any further investigations and respond to further requests for information that may be necessary.   Additionally, an adverse finding by any of the regulatory agencies investigating Ocwen could result in fines, sanctions and disciplinary actions against the Company.  Moreover, the investigation of at least certain of the underlying claims and the manner of the investigation purportedly being carried out by the members of the Audit Committee, aided and abetted by D&T, has been a waste of the Company's assets since such investigation was not and is not for Ocwen's benefit but solely for the benefit of the Individual Defendants who are the alleged wrongdoers.

188.    For a period of many years, Ocwen's senior management and members of the Board became knowledgeable of, but nevertheless concealed, definitive and material information with respect to the Company's repeated violations of federal and state consumer financial protection laws and regulations, conflicts of interest and other wrongful conduct as described herein.  Even now, the Individual Defendants continue to cause Ocwen to conceal the most material information from its shareholders and the investing public generally. By such

82

concealment, the Individual Defendants have subjected the Company to additional investor litigation and massive consumer and other claims.

189.    The Company has been the subject of far-reaching and serious investigations with respect to the wrongdoing alleged herein, including multi-year investigations by the CFPB, NY DFS and the SEC.

190.    Because the Company's Board suffers massive conflicts of interest due to the personal culpability of Defendant Erbey and other members of the Board, the members of the Board are not capable of advancing solely the Company's interests and not their own.  Based upon the facts and circumstances described herein, it is clear that the members of Ocwen's Board are not dealing with Plaintiff's claims objectively, independently,  and solely in the Company's best interests.

191.    Should the Company's interests continue to be represented as they are at present, Ocwen will be irreparably harmed.

## COUNT I

(For Violations of §14(a) of the Exchange Act)

192.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

193.    This claim is asserted by Plaintiff individually against the Individual Defendants who were members of the Company's Board of Directors and controlling persons of Ocwen pursuant to §20 when the 2014 Proxy Statement was issued and disseminated to Ocwen's shareholders. Such claims arise from their violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 in connection with such Proxy Statement issued for the 2014 Annual Meeting of Shareholders.

194.     Through the 2014 Proxy Statement, the Board solicited the votes of Plaintiff and the other Ocwen shareholders in connection with, *inter alia*, the re-election of Defendant Erbey and all other members of the Company's Board and the retention of D&T as the Company's auditor.

195.     The Board, through the Company's 2014 Proxy Statement, recommended that Ocwen's shareholders vote in favor of each of the Board's proposals; in particular, in favor of the re-election of each of Board members nominated for re-election in 2014; to ratify the appointment by the Audit Committee of the Board of D&T; and to hold an advisory vote to approve executive compensation.

196.     The 2014 Proxy Statement contained untrue statements of material fact and omitted other facts necessary to make the statements made not misleading, and failed to disclose material facts as more fully set forth above.  In particular, the 2014 Proxy Statement failed to disclose material information regarding the nominee directors and the conduct of Ocwen's business by them and their fellow directors, as set forth above.

197.     In addition to the frustration of Plaintiff's personal suffrage rights as an Ocwen shareholder, these deceptions proximately caused the Company direct and indirect economic and other damages following the 2014 Annual Meeting in an amount which cannot presently be determined.

198.     As a result of the use by the Company's Board of Directors of the 2014 Proxy Statement to solicit the votes of Ocwen's shareholders, which Proxy Statement failed to disclose the material facts set forth herein, the Board's director nominees, as well as the other Board proposals, were approved.

199.    By utilizing the 2014 Proxy Statement, the suffrage rights of Plaintiff and each other shareholder of the Company have been violated, which conduct is in violation of Section 14 (a) of the Exchange Act and SEC Rule 14a-9.

## COUNT II

(For Violations of §14(a) of the Exchange Act)

200.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

201.    This claim is asserted by Plaintiff derivatively on behalf of Ocwen against the Individual Defendants who were members of the Company's Board of Directors and controlling persons of Ocwen pursuant to §20 of the Exchange Act when the 2014 Proxy Statement was issued and disseminated to Ocwen's shareholders.

202.    As a result of the use by the Company's Board of Directors of the 2014 Proxy Statement to solicit the votes of Ocwen's shareholders, which Proxy Statement failed to disclose the material facts set forth herein, the Board's director nominees (the entire Board), as well as the other Board proposals, were approved.  Such votes in favor of the Board's proposals, including the re-election of Defendant Erbey, damaged the Company in an amount which cannot presently be determined. Such damages included the fact that, pursuant to his re-election in 2014, Defendant Erbey was able to maintain his control over the Board, as well as his substantial interest in and control over affiliated entities identified herein, to obstruct the Company's ability to resolve, *inter alia*, the NY DFS and CFPB allegations of abusive tactics and self-dealing; to fundamentally alter the Company's wrongful business practices and to stop the waste of millions of dollars of Ocwen's resources on the sham investigation by the Audit Committee.

## COUNT III

(Breach of Fiduciary Duty and Waste of Corporate Assets)

85

203.   Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

204.   The Individual Defendants all owed and/or owe fiduciary duties to the Company and its shareholders to exercise candor, good faith and loyalty.  By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Ocwen the highest obligation of good faith and loyalty in the management and administration of the affairs of the Company, including the oversight of Ocwen's compliance with federal and state consumer financial protection laws and regulations, avoidance of conflicting loyalties and business relationships and compliance with company codes of conduct and tenants of corporate governance.

205.   Each member of the Board had specific fiduciary duties as defined by the Company's key corporate governance documents and principles, and as set forth above, that, had they been discharged in accordance with the Board's obligations, would have either necessarily prevented the misconduct and consequent harm to the Company, or would have uncovered and corrected such misconduct, as alleged herein.

206.   The Individual Defendants consciously violated their corporate responsibilities and intentionally breached their fiduciary duties to protect the rights and interests of Ocwen's and its shareholders.

207.   As a direct and proximate result of the Individual Defendants' conscious failure to perform their fiduciary obligations, they have caused the Company to waste valuable corporate assets and expend its corporate funds unnecessarily.

208.   As a result of the misconduct alleged herein, Ocwen has sustained and will continue to sustain significant damages, not only monetarily, but also to its corporate image, reputation and goodwill.

1953185.1

209.    As a result of the misconduct alleged herein, the Individual Defendants are personally liable to the Company in an amount which cannot presently be determined.

## COUNT IV

### (Unjust Enrichment)

210.    Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

211.    Each of the Individual Defendants was and is being unjustly compensated by Ocwen with compensation packages and otherwise despite the failure of their stewardship of the Company and their personal implication in the wrongdoing set forth herein. In addition, as set forth above, on various dates beginning in November 2012 and ending in November, 2013, defendants Erbey and Wish sold shares of Ocwen stock at fraudulently inflated prices for proceeds in excess of $62 million while in possession of material inside information not disclosed to Ocwen's shareholders or the investing public generally.  As such, defendant Wish was unjustly enriched.

212.    Each of the Individual Defendants who have been unjustly enriched by the wrongdoing set forth in this Complaint should be required to account for and repay the Company therefor together with their earnings thereupon.

## COUNT V

### (Breach of the Duty of Candor)

213.    Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

214.    Each of the sitting Ocwen directors, at the time of the issuance and dissemination of the Company's 2014 Proxy Statement, by reason of the fact that such proxy statements was

and is false and misleading, as described herein, breached his respective duties of candor owed to Ocwen, Plaintiff, and the Company's other shareholders.

215.    For the reasons set forth with respect to Plaintiff's Exchange Act claims, he is entitled to injunctive relief as set forth below and such damages as he may prove at trial.

## COUNT VI

### (Breach of the Duty of Loyalty)

216.    Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

217.    The wrongful conduct of the Individual Defendants breached their respective duties of loyalty to Ocwen and, as such, should be held accountable to Ocwen for the wrongful conduct described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Determining that Ocwen's 2014 Proxy Statement was false and misleading in violation of §14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder and that the Board has breached its duty of candor in connection therewith;

B.    Requiring the Individual Defendants to issue and disseminate Ocwen's 2015 Proxy Statement it full compliance with their duty of candor as well as applicable federal law and regulations with respect thereto;

C.    Declaring that the Individual Defendants have breached their fiduciary duties owed to Ocwen and wasted its assets, as alleged herein, causing substantial damages to Ocwen;

D.      Requiring the Individual Defendants to pay to the Company the amounts by which it has been damaged or will be damaged by reason of the conduct complained of herein;

E.      Requiring the Individual Defendants to account for and repay the Company to the extent they have been unjustly enriched by their wrongful conduct, as described herein, together with their earnings upon such amounts;

F.      Ordering the Individual Defendants to cause the Company to take all necessary actions to reform and improve its corporate governance, compliance and internal control procedures for the purpose not only of preventing a recurrence of the failures detailed above, but to optimize such procedures in light of relevant and current best practices;

G.      Awarding Ocwen restitution from the Individual Defendants;

H.      Determining and awarding to Ocwen exemplary damages in an amount necessary to punish the Individual Defendants;

I.      Awarding Plaintiff and his counsel reasonable attorneys' fees, expert fees and other reasonable costs and expenses; and

J.      Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all claims so triable.


Dated: December 24, 2014                    COHEN MILSTEIN SELLERS & TOLL PLLC

                                            BY: s/Theodore J. Leopold
                                            Theodore J. Leopold
                                            2925 PGA Boulevard, Suite 200

1953185.1

Palm Beach Gardens, FL 33410
561- 515-1400
tleopold@cohenmilstein.com

COHEN MILSTEIN SELLERS & TOLL PLLC
Steven J. Toll
1100 New York Avenue NW, Suite 500
Washington, DC 20008
202-408-4600
stoll@cohenmilstein.com

COHEN MILSTEIN SELLERS & TOLL PLLC
Richard A. Speirs
88 Pine Street-14TH Floor
New York, NY 10005
212-838-7797
rspeirs@cohenmilstein.com

GREENFIELD & GOODMAN, LLC
Richard D. Greenfield
Marguerite R. Goodman
Ann M. Caldwell
Ilene F. Brookler
250 Hudson Street, 8th Floor
New York, NY  10013
Tel: 917-495-4446
whitehatrdg@earthlink.net

**Counsel for Plaintiff**