## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **W. A.  SOKOLOWSKI**, Individually and Derivatively on Behalf of **OCWEN FINANCIAL CORP.**,<br><br>            Plaintiff,<br><br><br>            v.<br><br>**WILLIAM C. ERBEY, RONALD M. FARIS, RONALD J. KORN, WILLIAM H. LACY, BARRY N. WISH, ROBERT A. SALCETTI, WILBUR ROSS, JOHN V. BRITTI, ALTISOURCE PORTFOLIO SOLUTIONS, S.A., ALTISOURCE RESIDENTIAL CORPORATION, ALTISOURCE ASSET MANAGEMENT CORPORATION and HOME LOAN SERVICING SOLUTIONS,**<br><br>            Defendants,<br><br>            - and -<br><br>**OCWEN FINANCIAL CORPORATION**, a Florida Corporation,<br><br>            Nominal Defendant. | **Civil No. 9:14-cv-81601-WPD**<br><br><br>**AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br><br><br>**JURY DEMAND** |

1953185.1

Plaintiff W.A. Sokolowski ("Plaintiff"), brings this shareholder derivative action on behalf of nominal defendant Ocwen Financial Corporation ("Ocwen" or "the Company") against certain of its current and former officers and directors for breaches of fiduciary duty, including the failure to institute and maintain adequate internal controls over Ocwen's reporting systems and compliance with legal and regulatory guidelines, issuing materially misleading statements to the public in annual reports, press releases and other Securities and Exchange Commission ("SEC") filings, and unjust enrichment, during the period between approximately May 2, 2013 through the present (the "Relevant Period").  Plaintiff makes these allegations upon personal knowledge as to his own actions and, as to all other matters, on information and belief based upon the investigation of his undersigned counsel which includes, among other things:  (1) a review and analysis of Ocwen's public filings with the SEC; (2) a review of press releases, new articles, and other public statements and reports issued by or concerning Ocwen or available to the public, the mortgage-loan servicing and related services industries, and the Individual Defendants named herein; and (3) a review of court records and regulatory proceedings, including but not limited to, pleadings and other documents filed in various actions involving Ocwen.  This action seeks damages from such Individual Defendants and Aider and Abettor Defendants and injunctive relief.  As required by the Florida Business Corporation Act, § 607.07401, Plaintiff made a demand on the Board of Directors of Ocwen (the "Board") on February 11, 2014 with respect to the matters alleged in this Complaint (the "Demand") as well as a follow-up demand on October 31, 2014 (the "Second Demand").  Defendants failed to respond to the Demand and the Second Demand in the time required by the statute, which triggers Plaintiff's right to sue derivatively under the statute and, subsequently, the Board has continued to ignore Plaintiff's further demands for action related to these matters.  Moreover, the

1953185.1

Board members, together with their legal counsel, are participating in an effort to "whitewash" the wrongful conduct described herein, as described more fully below.

## I.      NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of nominal defendant Ocwen against certain current and former officers and directors of the Company for breaches of their fiduciary duties, which resulted in, *inter alia,* increased regulatory scrutiny and regulatory sanctions including substantial fines and penalties, exposure to significant potential liabilities from numerous lawsuits, severe damage to Ocwen's business and reputation; and a drastic decline in the Company's stock price.  Plaintiff alleges that the Company's officers and directors also violated their fiduciary duties and exposed Ocwen to substantial harm by concealing from shareholders and the investing public known failures with respect to the Company's compliance with state and federal regulations governing the servicing of mortgage loans, a failure to establish adequate and permitting Ocwen's now former Chief Executive Officer ("CEO"), Defendant Erbey, to engage in a series of related party transactions with companies in which Defendant Erbey and other defendants have significant ownership interests.   Specifically notwithstanding both government regulations and multiple regulatory decrees requiring Ocwen's compliance with servicing guidelines the Board permitted Ocwen's continued violations of state and federal law including:

- Ocwen engaged in practices of overcharging and otherwise abusing borrowers while continuing to expand its MSR portfolio.   For example, Ocwen started to require borrowers engaged in litigation to sign non-disparagement clauses as a condition of getting their mortgages modified. Such clauses prohibited consumers from saying anything negative about the Company in public forums.
- Ocwen concealed its difficulty integrating the huge MSR portfolios it had acquired between 2011 and early 2014, and lacked the technical and professional staff required to fairly and competently address delinquent borrowers' concerns. As a result, borrowers were being foreclosed upon improperly at alarming rates.

- Ocwen lacked sufficient controls related to document execution, resulting in robo-signing, unauthorized execution, assignment backdating, improper certification and notarization, chain of title irregularities and other related practices affecting the integrity of documents Ocwen was using during the foreclosure process.
- Ocwen's loss mitigation and loan modification processes were deficient, causing the Company to: (a) fail to effectively communicate with borrowers; (b) fail to account for documents submitted by borrowers seeking loss mitigation assistance; (c) fail to address loss mitigation applications in a reasonably timely manner; (d) provide false or misleading reasons for denial of loan modifications; (e) fail to honor terms of loan modifications for transferred accounts; and, (f) backdate hundreds of thousands of letters to borrowers, likely causing them significant harm and exposing the Company to civil liability.
- Ocwen's repeated failures to respond to requests of regulators, notably its failure to produce documents requested by the California Department of Business Oversight ("CDBO") in the course of a routine statutory evaluation, ultimately endangering its ability to do business and maintain its business license in one of the Company's largest markets and resulting in substantial fines.
- Ocwen lacked sufficient controls related to general borrower account management resulting in misapplication of payments, inaccurate escrow accounting and statement, unnecessary purchasing by borrowers of force-placed insurance at excessive costs and assessment of unauthorized fees and charges.
- Ocwen had inadequate staffing and lacked internal controls related to customer service, as well as deficiencies in control and over-sight of third-party providers, including outside foreclosure counsel.
- Ocwen lacked sufficient management control and supervision necessary to ensure the Company's compliance with applicable laws and regulations.
- Due to conflicting financial interests that Defendants Erbey and Wish had in relation to their financial interests in Ocwen affiliates, Ocwen took actions adverse to borrowers in order to continue to direct revenues improperly to those affiliated companies, again exposing Ocwen to billions of dollars of potential regulatory and civil liability.
- At all relevant times, Ocwen, as the Individual Defendants knew or should have known, lacked adequate internal controls to ensure that its business practices were in compliance with regulatory requirements and mandates.

Plaintiff further alleges that certain of the Company's officers and directors sold their personal holdings of Ocwen stock on the basis of material, adverse inside information, in violation of state law and in breach of their fiduciary duties to the Company. Plaintiff also alleges that Defendant Erbey serves as Chairman and owns stock in certain entities that participated in improper related party transactions.  Those entities are named herein as

Defendants for their part in aiding and abetting the Individual Defendants' breaches of fiduciary duties and being unjustly enriched in connection therewith.

2.      Beginning in 2010, Ocwen grew rapidly by acquiring mortgage servicing rights ("MSRs") from major bank mortgage servicers.   Through December 31, 2013, Ocwen's mortgage servicing portfolio grew from 351,595 residential loans with $50 billion in unpaid principal balance ("UPB") to 2,861,918 loans with $464.7 billion in UPB.

3.      In 2010 Ocwen, acquired the MSR assets for 38,000 loans ($6.9 billion in UPB from Saxon Mortgage Services, Inc. ("Saxon") (a unit of Morgan Stanley) and the HomEq Servicing platform ("HomEq") for 134,000 loans ($22.4 billion UPB) from Barclays Bank PLC ("Barclays").   Ocwen's sudden increase by nearly 50% in its loan servicing portfolio acquired from regulated banks drew the attention of the New York State Department of Financial Services ("NY DFS").   In connection with Ocwen seeking approval from the NY DFS for its proposed purchase of MSRs for 245,000 loans ($38.6 billion UPB) from Litton Loan Servicing L.P. ("Litton") in 2011, the NY DFS expressed concerns with Ocwen's rapid growth and its capacity to properly service a significant portfolio of distressed loans.   Consequently, on September 1, 2011, the NY DFS required Ocwen to enter into an Agreement on Mortgage Servicing Practices (the "DFS Agreement") and promise to comply with any national mortgage standards applicable under federal regulations.

4.      Only because Ocwen had consented to the DFS Agreement with the NY DFS in September 2011 was the Company able to enter into transactions in 2012 to buy MSRs for 221,000 loans from JP Morgan, Bank of America, and Saxon (aggregate $40.4 billion UPB). In December 2012, the NY DFS found that Ocwen was not satisfactorily complying with the DFS Agreement.   Ocwen was required to enter into a consent decree with the NY DFS

5

(the "DFS Consent Decree"), pursuant to which it agreed to install an independent compliance monitor (the "Monitor") and to adhere to strict protocols to ensure that the homeowners whose mortgages it serviced were treated fairly.

5.      In acquiring the operations of these companies and their servicing platforms, the Individual Defendants told stockholders and the investing public in general that the Company could profit at higher margins by more efficiently servicing these loans while complying with strict servicing standards.   Ocwen also stated that it intended to integrate the servicing platforms of its acquisitions onto a proprietary servicing platform called REALServicing, which could provide high-quality servicing at 70% less than its competitors, while being fully scalable, and thus able to handle the massive influx of loans acquired from Homeward and ResCap.

6.      REALServicing was a platform owned and leased by Ocwen from Defendant Altisource Portfolio Solutions, S.A. ("Altisource"), a sister corporation of Ocwen also chaired by Defendant Erbey, which had been spun off from Ocwen in 2009 as a separate public company. Altisource is only one of a bevy of related public companies (described below), with interchangeable and shared employees, for each of which Defendant Erbey acts as Chairman and in which he owns a significant stake.  As of December 31, 2013, Defendant Erbey owned 13% of Ocwen's shares and 26% of Altisource's outstanding shares.  All these vertically integrated companies controlled and partially owned by Defendant Erbey derive most, if not all, of their revenue from Ocwen's servicing activities and/or foreclosures resulting from delinquent loans.

7.      For example, if Ocwen determines to foreclose on a delinquent loan – a decision made by software provided by Defendant Altisource – Altisource would handle the foreclosure listing through an online realty company called Hubzu, which Erbey owns a stake and also

6

controlled as Chairman until January 2015. Hubzu sold 25,000 homes in foreclosure in 2012. Altisource may convert some foreclosed homes into rental properties to be leased out by Altisource Residential Corporation ("Residential"), a company in which Defendant Erbey owns 5% of the outstanding shares. Altisource Asset Management Corporation ("AAMC"), which Defendants Erbey controlled as Chairman and in which he owns a 27% interest, acts as Residential's asset manager for rented properties under management. Another related company, Home Loan Servicing Solutions ("HLSS"), buys assets from Ocwen and leases them back to Ocwen to reduce the Company's capital carry. Defendant Erbey also owns a 1% stake in HLSS's publicly traded shares, and also served as Chairman of HLSS until January 2015.

8.      As described herein, it was through activities with many of these related companies that Defendants ran afoul of the servicing standards prescribed under the Consent Decree, the NMS, and other regulatory guidelines.

9.      In building Ocwen's servicing business, Defendant Erbey had focused on obtaining cost efficiencies at the expense of service. The vast majority of Ocwen's employees who have day-to-day responsibilities for servicing Ocwen's portfolio of loans work in India and the Philippines. These employees implement a computer-aided dialogue system developed by Ocwen – but owned by Altisource after the spin-off – to coax homeowners to make payments on their delinquent loans, or alternatively, modify the loan terms, and if this is deemed unsuccessful by the software, foreclose. Ocwen called its platform REALServicing, which Ocwen had developed in connection with its prior focus on distressed, subprime mortgages – well before it began its expansion.

10.      At the same time, the Individual Defendants assured stockholders that Ocwen's low-cost servicing model complied with its responsibilities under the DFS Consent Decree and

the NMS, stating, for example, in the Company's 2013 Annual Report that its "[s]calable and [c]ompliant servicing platform . . . enables us to operate in a compliant manner in an increasingly complex and highly regulated environment."   However, Ocwen's inability to comply with applicable servicing regulations would prevent it from acquiring additional MSRs, the pipeline for growth and more revenues and expose the Company to additional regulatory sanctions.

11.     Thus, throughout the Relevant Period, the Individual Defendants unjustifiably assured stockholders that Ocwen had established a robust set of controls to ensure compliance with regulatory guidelines including the demands of the NY DFS.  For instance, in a press release announcing the Company's fourth-quarter and full-year 2013 ("4Q/FY 2013") financial results attached to a Form 8-K that Ocwen filed with the SEC on February 27, 2014 (the "February 27, 2014 Press Release"), the Company represented that "[w]e continue to focus our attention on regulatory compliance and on assisting struggling homeowners. *During 2013 we made significant progress in enhancing our compliance management system.*"  Similarly, in Ocwen's 2013 Form 10-K, signed by each of the Director Defendants, the Company represented that "[w]e continue to work diligently to assess and understand the implications of the regulatory environment in which we operate and the regulatory changes we are facing. *We devote substantial resources to regulatory compliance. . . .*"

12.     Meanwhile, the Individual Defendants knew that Ocwen's inter-relationships with related companies that Erbey controlled, while ostensibly part of Ocwen's strategy to reduce costs and increase efficiencies, actually created a conflict in that adverse decisions by Ocwen against homeowners could be made simply to fuel profits for Erbey's other companies. To allay investor concerns about potential regulatory risk and scrutiny associated with Ocwen's related-party transactions, the Company repeatedly pronounced in its public disclosures that all

business decisions concerning Erbey's related companies were made independently, at arm's length and without Defendant Erbey's involvement whatsoever.

13.     It is now clear that the Individual Defendants' breached their fiduciary duties owed to Ocwen and its shareholders by failing to implement adequate compliance systems to protect the Company from regulatory risks and improper related-party transactions.  Starting with its acquisition of ResCap's servicing platform and portfolio of loans in February 2013, which were already subject to the NMS guidelines, Ocwen's REALServicing platform was internally revealed to be wholly deficient and incapable of managing the servicing compliance mandates imposed by NMS, let alone the standards that Ocwen had signed onto through the DFS Consent Decree.   Prior to the acquisition, ResCap had developed its own proprietary platform called FiServ to address its NMS requirements.  Through the acquisition of the ResCap portfolio, ResCap's entire compliance team had been acquired by Ocwen as well.  However, Ocwen did not adopt ResCap's use of FiServ to monitor and fulfill its NMS requirements, and instead Ocwen required ResCap's loans to be transferred to REALServicing, the Altisource-owned platform.  While Ocwen's senior management internally recognized the superior capabilities of FiServ, Ocwen told the market that the transition to REALServicing would allow Ocwen to service ResCap's loans more cheaply and at greater margins than its competitors did while still maintaining compliance.

14.     Even after its formal adoption of NMS in December 2013, Ocwen informed its shareholders in May 2014 that while industry costs increased for servicing in light of the additional documentation and steps required by NMS, NMS "had raised the bar on quality" which "strengthens Ocwen's competitive advantage." According to Ocwen, other servicers did not have platforms such as Ocwen's which were "capable of automating the new requirements

9

efficiently or effectively."   Thus, Ocwen claimed that its "margins and competitive advantage should improve."

15.    However, as set forth herein, Ocwen's supposedly "robust" compliance protocols were totally lacking or deficient, while its controls purportedly implemented to manage Defendant Erbey's conflicts of interest as against homeowners were non-existent and/or knowingly ignored altogether on a consistent basis.

16.    With Ocwen's attempt to acquire $39 billion worth of MSRs from Wells Fargo in January 2014, the Individual Defendants' continued failures with respect to regulatory compliance and oversight of the Company's operations came under increased scrutiny from regulators, once again.

17.    On February 6, 2014, NY DFS Superintendent Lawsky halted the Wells Fargo loan acquisition pending the Monitor's review of Ocwen's compliance, expressing "concerns about Ocwen's servicing portfolio growth."   Three weeks later, on February 26, 2014, Superintendent Lawsky wrote an open letter (the "February 26, 2014 Letter") disclosing his concerns about his discovery that S.P. Ravi, the Chief Risk Officer at Ocwen, was also the Chief Risk Officer at Altisource – a dual role presenting serious conflict of interest issues, that had not previously been disclosed.  For the NY DFS, this "raised potential conflicts of interest between Ocwen and other public companies with which Ocwen is closely related."

18.    The following day, during the Company's conference call with analysts and investors to discuss its 4Q/FY 2013 financial results (the "February 27, 2014 Conference Call"), Defendant Erbey addressed the February 26, 2014 Letter, asserting that the Company's agreements with related parties were fully disclosed and on an arm's-length basis.  Furthermore, in its 2013 Form 10-K, filed on March 3, 2014, Ocwen repeated that Defendant Erbey recused

10

himself from all negotiations or approvals of related-party transactions and moreover, with respect to mortgage holders, any services that Ocwen's related parties provided to it were charged at "market rates."

19.     Despite the Individual Defendants' assurances that the four spin-offs had sound corporate governance with separate boards and management, and that Ocwen maintained a "'strictly arms-length business relationship with ' [the four spin-off] companies," in actuality, because of the overlapping ownership, control and management of Ocwen and the other four entities, Defendants Erbey and Wish, were siphoning off revenues from Ocwen to the four related spin-off companies for services that were illicitly raising costs for the mortgagees whose loans Ocwen was supposedly servicing, thereby exposing Ocwen and its shareholders to billions of dollars in regulatory and civil liability.  Meanwhile, in direct breach of their fiduciary duties and Company policies, defendants Erbey and Wish benefited personally because they had significant financial interests in the four spin-off companies which profited from the improper fees charged to Ocwen.

20.     On April 21, 2014, Superintendent Lawsky issued yet another letter (the "April 21, 2014 Letter") further exposing Ocwen's lack of controls and oversight over related-party transactions.   As set forth in the April 21, 2014 Letter, the Monitor had uncovered an arrangement that subjected homeowners whose loans were serviced by Ocwen and foreclosed upon by Altisource to realty fees that were three times higher than those charged for other non-Ocwen properties.  Thus, Ocwen's claims that its related parties charged market rates for fees assessed against Ocwen's homeowners through contracts negotiated at arm's-length were clearly false.

21.     On May 1, 2014, Ocwen disclosed for the first time that efforts to comply with regulatory demands had increased its costs substantially for servicing non-conforming loans and these costs were eating into servicing margins.  The Individual Defendants lack of oversight and the absence of adequate regulatory and compliance measures at Ocwen, led to not only increased regulatory scrutiny, but higher expenses as well.  On July 31, 2014, Ocwen revealed that increased compliance costs were having a devastating impact on the Company.  In particular, Ocwen disclosed that regulatory costs had reached $12 million in the second quarter alone for New York State and national monitors and projected an additional $9 million for such costs in the next quarter, which were "a significant element of [Ocwen's] cost base."

22.     On August 4, 2014, the NY DFS, through the work of the Monitor, disclosed in a letter (the "August 4, 2014 Letter") additional improper related-party transactions.  Notably, Ocwen was accused of using a pass-through, unrelated entity called Southwest Business Corporation ("SWBC"), to kick back fees to Altisource for the placement of force-placed insurance on homeowners whose loans Ocwen was servicing.   This transaction had been approved by Defendant Erbey, did not reflect terms negotiated at arm's length and was put into effect after the NY DFS had raised its concerns in the February 26, 2014 Letter about Ocwen's related-party transactions.  Moreover, it violated prohibitions on kickbacks relating to force-placed insurance.

23.     Finally, the Individual Defendants' failure to adequately install compliance protocols necessary to service the Homeward and ResCap loans, as well as others, was revealed on October 21, 2014.  On that date, the NY DFS, through its ongoing investigation of Ocwen's compliance, revealed in another open letter (the "October 21, 2014 Letter") that Ocwen had engaged in a practice of backdating communications to "potentially hundreds of

12

thousands" of borrowers in violation of the Company's legal and regulatory obligations. This was a devastating disclosure as its truth would essentially end Ocwen's ability to grow through the purchase of more loans and permanently stall the Wells Fargo loan purchase. As the NY DFS declared:  "The stakes for borrowers and investors are enormous.  If the Department concludes that it cannot trust Ocwen's systems and processes, then it cannot trust Ocwen is complying with the law."

24.    On October 21, 2014 Ocwen admitted to the backdating problem, while falsely asserting that the actual number of borrowers affected in New York State was limited and the issue had been completely resolved.   However, Ocwen later revealed that the October 21, 2014 Press Release was inaccurate and accordingly retracted it, admitting that, in fact, the Company was unsure how many borrowers were impacted.   Ocwen had known about the backdating problem – caused by its faulty REALServicing platform as early as November 2013 but, in breach of their fiduciary duties, the Individual Defendants had ignored repeated warnings to fix it.   As a result, on November 13, 2014, Ocwen and Wells Fargo mutually agreed to cancel the previously announced deal.

25.    The Company's regulatory problems are continuing and Ocwen has suffered significant economic damage as a direct result of the wrongdoing alleged herein.  For example, pursuant to a settlement with the CFPB in December, 2013, Ocwen agreed to pay $2.1 billion to settle allegations that it cheated thousands of homeowners.  In addition, the Company has been forced to pay $2.5 million to the CDBO for violations, incur the cost of a full compliance review by a third-party auditor in connection with the settlement with the CDBO, the additional compliance costs associated the increased regulatory scrutiny referenced above and detailed

13

herein, the costs of defending against and resolving a variety of investor and government lawsuits premised on Defendants actions during the Relevant Period.

## II.      JURISDICTION AND VENUE

26.      This Court has jurisdiction pursuant to (a) 28 U.S.C. §1331 because Counts I and II assert claims for violations of § 14(a) of the Exchange Act and SEC Rule 14a-9; (b) diversity jurisdiction under 28 U.S.C. § 1332(a)(2) , as Plaintiff on the one hand and the defendants on the other are citizens of different states, and the value of the relief requested exceeds $75,000, exclusive of interest and costs; and (c) the Court's supplemental jurisdiction over the common law claims pursuant to 28 U.S.C. § 1367(a).

27.      This Court has jurisdiction over each Defendant because each either is an individual with sufficient minimum contacts with this District, or is a corporation conducting business and operating in this District.

28.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a)(2) and (3) and § 1401 because some or all of the events, actions, and failures to act giving rise to the claims asserted herein occurred or were initiated in this District.

29.      In addition to Plaintiff's individual claims asserted pursuant to federal law, this action is brought pursuant to Rule 23.1 of the Federal Rules of Civil Procedure.  This action is not brought collusively to confer jurisdiction on this Court that it would not otherwise have.

## III.      PARTIES

### A.      Plaintiff

30.      Plaintiff W.A. Sokolowski has been a continual holder of Ocwen stock and has been an Ocwen shareholder at all relevant times referenced herein.  Plaintiff is a citizen of New Jersey.

### B.      Defendants

14

1953185.1

**1.      Nominal Defendant**

31.      Nominal Defendant Ocwen is a corporation organized under the laws of Florida with its principal executive office located in Atlanta, Georgia.  Ocwen is a publicly traded corporation the stock of which is listed and traded on the New York Stock Exchange. Ocwen is a Nominal Defendant only, and no claims are asserted against it. Notwithstanding its latest settlement with the NY DFS, Ocwen's role in connection with this litigation has and will likely be controlled by the Company's former Executive Chairman, Defendant Erbey and Ocwen's Board, all members of which are Defendants herein.

**2.      Individual Defendants**

**William C. Erbey**

32.      Defendant Erbey co-founded Ocwen and, until January 2015, was at all relevant times, Ocwen's Executive Chairman.   Pursuant to an agreement with the NY DFS, Defendant Erbey was forced to resign from his position at Ocwen, and did so in January 2015.  Previously Erbey served as the Chief Executive Officer ("CEO") of Ocwen from January 1988 to October 2010 and as the President of Ocwen from January 1988 to May 1998.  During the Relevant Period, Defendant Erbey profited both directly and indirectly through sales of Ocwen common stock at inflated prices while in possession of material non-public information..  In fiscal 2013, Erbey received total compensation of over $2.9 million from Ocwen.  Erbey is a citizen of St. Croix, U.S. Virgin Islands, where he maintains a residence.  He is sued herein in his capacity as both an officer and director of Ocwen.

33.      In addition to Ocwen, Defendant Erbey served as Chairman of the Board and the largest shareholder of four other companies engaged in related aspects of residential home foreclosure which were spun-off from and do substantial business with Ocwen.  Specifically,

Erbey serves as Chairman of the Board of Directors for Altisource, which runs Hubzu.com, a real-estate site that bills itself as "the easy way to buy and sell homes online" and where a former homeowner's now bank-owned property can join thousands of others for a quick sale.  He was also the founder of HLSS, which exists only as a holding company that purchases assets from Ocwen and served as its Chairman from December 2010 through January 2015.  He also served as Chairman of the Board of Directors of AAMC, which offers reinsurance and title services, since March 2012.  Finally, he also served as Chairman of Residential, which "re-purposes" homes as rental properties after acquiring them through a foreclosure auction or directly from the foreclosed home's investors. Pursuant to the latest settlement with the NY DFS, Defendant Erbey resigned as chairman of the boards of directors of these affiliates in January 2015.

34.      Defendant Erbey was also a member and Chairman of Ocwen's Executive Committee during the Relevant Period, which allowed him to exercise additional control over the Board and Individual Defendants.

**Ronald M. Faris**

35.      Defendant Ronald M. Faris ("Faris") has served as a Director of Ocwen since May 2003, as the President of Ocwen since March 2001 and as Chief Executive Officer since October, 2010.  In 2013, Faris received total compensation of over $1.6 million from Ocwen.  Faris is a citizen of Florida where he maintains a residence. He is sued herein both as an officer and director of Ocwen.  Defendant Faris served as a member of both the Executive Committee and the Compliance Committee during the Relevant Period.

**Ronald J. Korn**

36.      Defendant Ronald J. Korn ("Korn") has served as a Director of Ocwen since May 2003.   Korn is the Chairman of the Audit Committee and a member of the Compensation

Committee of the Board.  Korn received total compensation of $125,000 from Ocwen in 2013 - $65,000 in cash compensation, and $60,000 in stock awards.  As of April 2014, Defendant Korn's total beneficial ownership in Ocwen was 22,890 shares.  He is a citizen of Florida, where he maintains a residence.

**William H. Lacy**

37.     Defendant William H. Lacy ("Lacy") has served as a Director of Ocwen since May, 2002.  Lacy is the Chairman of the Compensation Committee and a member of the Nomination/Governance Committee of the Board.  In 2013, Lacy received total compensation of $120,000 from Ocwen - $60,000 in cash compensation and $60,000 in stock awards.  As of April 2014, Defendant Lacy's total beneficial ownership in Ocwen was 12,579 shares.  He is a citizen of Wisconsin, where he maintains a residence.

**Robert A. Salcetti**

38.     Defendant Robert A. Salcetti ("Salcetti") has served as a Director of Ocwen since January, 2011.  Salcetti is the Chairman of the Compliance Committee, member of the Audit Committee and Member of the Nomination/Governance Committees of the Board.  In 2013, he received $128,050 in total compensation from Ocwen - $68,250 in cash compensation and 60,000 in stock awards.  As of April 2014, Defendant Salcetti's total beneficial ownership in Ocwen was 8,267 shares.  He is a citizen of Texas, where he maintains a residence.

**Barry N. Wish**

39.     Defendant Barry N. Wish ("Wish") has served as Chairman Emeritus of the Board of Directors of Ocwen since September, 1996.   Wish is Chairman of the Nomination/Governance Committee and member of Ocwen's Executive and Audit Committees of the Board.  Defendant Wish is a co-founder of Ocwen and has served on its Board since 1988,

first as its Chairman from 1988 to September 1996, and then as its Chairman Emeritus from September 1996.  As a co-founder of Ocwen and its predecessor company, Defendants Wish and Erbey have a decades-long personal, financial and business relationship.  Between November 2012 and November 2013, Wish sold 1.3 million shares of Ocwen stock at inflated prices while in possession of material non-public information for proceeds in excess of $57 million.  In 2013, he received $130,000 in total compensation from Ocwen - $70,000 in cash compensation and 60,000 in stock awards.  As of April 2014, Defendant Wish's total beneficial ownership in Ocwen was 4,151,953 shares, or just over 3% of the outstanding shares in Ocwen.  He is a citizen of Florida, where he maintains a residence.

**Wilbur Ross**

40.   Defendant Wilbur Ross ("Ross") was a director of Ocwen from March 2013 until his resignation in November 2014.  During the Relevant Period, Ross had been a member of Ocwen's Compliance Committee and the Compensation Committee.  Ross is a citizen of the State of Florida.  For fiscal year 2013, Defendant Ross received cash compensation in the amount of $40,240 for his role as member of the Ocwen Board of Directors.  Ross was also awarded stock options with a value of $69,534 during that same period – making his total 2013 compensation as a board member to $109,774.  As of April 2014, Defendant Ross' total beneficial ownership in Ocwen was 1,969,323 shares, or just under 2% of the outstanding shares of Ocwen.  He is named as a defendant herein only with respect to the period in which he served as an Ocwen director.

41.   Defendant Ross is also the Chairman and Chief Executive Officer of WL Ross & Co, LLC ("WLRoss"), a private equity firm.  WLRoss played a key role in Ocwen's acquisition of Homeward.  The Homeward acquisition was partially funded by Ocwen's issuance of 162,000

18

preferred shares (valued at $162.0 million) to WLRoss, which paid a dividend of 3.75% per annum on a quarterly basis.  It was not long after the closing of the Homeward acquisition that Defendant Ross became a Director of Ocwen.   On July 14, 2014, Ocwen entered into a repurchase agreement with certain funds managed by WLRoss pursuant to which 62,000 outstanding shares of Ocwen's Series A Perpetual Convertible Preferred Stock was converted to common stock and immediately cancelled.  The aggregate purchase price paid by Ocwen to WLRoss and its funds was $72.3 million.   Nevertheless, Defendant Ross, who was unjustly enriched thereby, is claimed, according to the Company's 2014 Proxy Statement, to be an "independent director." Defendant Ross is believed to be a citizen of Florida.

**John V. Britti**

42.    Defendant John V. Britti served as the Chief Financial Officer ("CFO") of Ocwen from March 2012 until May 2014.  Since June 2014, Defendant Britti has served as the Company's Executive Vice President and Chief Investment Officer.  Britti has been with the Company since 2011.  As of April 2014, Defendant Britti's total beneficial ownership in Ocwen was 60,618 shares.  Defendant Britti is a citizen of the State of Georgia.

43.    Each of the Individual Defendants, all of whom, except Britti, were serving on the Company's Board of Directors during the Relevant Period, collectively and individually initiated or actively participated in a course of conduct in breach of their fiduciary duties that was designed to, and did:

a.    Deceive regulators and the investing public, including shareholders of Ocwen, regarding the Individual Defendants' management of the Company's operations and compliance with the Consent Order, thus subjecting Ocwen to massive regulatory sanctions and claims by defrauded purchasers of its securities;

b.      Cause and/or permit the Company and its affiliates to charge unauthorized fees, give false and misleading information to borrowers whose loans had been transferred from other servicers, improperly deny loan modifications, fail to honor trial loan modifications from prior servicers, robo-sign foreclosure documents, backdate foreclosure letters, improperly require the purchase of force-placed insurance at excessive premiums, generating kickbacks from insurers;

c.      Waste Ocwen's assets by means of, *inter alia*, exposing the Company to potentially billions of dollars in costs to comply with the requirements of federal and state regulatory agencies arising from the scheme and wrongful conduct alleged herein, including but not limited to the December 2012 Consent Decree with the NY DFS and the December 2013 settlement with the Consumer Financial Protection Bureau ("CFPB"), the December 2014 NY DFS settlement, the January settlement with the CDBO as well as ongoing federal and state investigations;

d.      Use Ocwen's corporate assets to further the personal interests of the Company's largest shareholder, Defendant Erbey, as well as the other Director Defendants, including but not limited to Defendants Wish and Ross;

e.      Disregard and/or intentionally breach the Company's Code of Business Conduct and Ethics, its Code of Ethics for Senior Financial Officers, the Company's corporate governance guidelines, various Board Committee Charters, as identified herein, as well as other written policies governing their conduct;

f.      Enhance the Individual Defendants' positions as directors and/or officers of Ocwen while providing each of them with substantial compensation, power, and prestige;

20

g. Wrongfully refuse the written demands made by Mr. Sokolowski; and fail to pursue substantial claims asserted therein against the Individual Defendants and others, notwithstanding the validity and value of such claims;

h. Conceal the fact that the Company was and is improperly misrepresenting and historically had misrepresented Ocwen's internal controls in order to allow a widespread scheme of wrongful behavior in violation of applicable federal and state consumer financial laws and regulations, and thereafter through the present, cover-up such wrongdoing;

i. Cause counsel to be retained to represent the Board to, *de facto*, protect the Individual Defendants from liability in connection with the claims alleged herein and in other litigation notwithstanding the fact that there had been no showing that such retention has been *bona fide* and that the retention was for the purpose of assisting in an independent and disinterested evaluation of the Plaintiff's pre-suit claims and those of other shareholders of the Company; and

j. Violate their duties of disclosure to stockholders by causing Ocwen to issue in violation of §§10(b) and 14 of the Securities Exchange Act and Rules 10b-5 and 14a-9 promulgated thereunder, respectively: (i) materially false and misleading press releases and other statements made to the public; (ii) materially false and misleading financial statements; and (iii) materially false and misleading reports, including proxy statements, filed with the U.S. Securities and Exchange Commission ("SEC"); which has

21

exposed the Company to substantial liability and money damages in class actions alleging violations of the federal securities laws.[1]

44.     With the exception of Defendants Ross and Britti, each Individual Defendant has served on the Ocwen Board for many years, and thereby reaped substantial fees, perquisites and emoluments at Defendant Erbey's pleasure. None of these Directors can be considered independent or disinterested, none is sufficiently removed from the underlying and continuing wrongdoing described herein (or its subsequent cover-up), and none of them can address the demands made on them independently or with disinterestedness.

45.     Each member of the Ocwen Board knew of the business practices and course of conduct outlined herein and had specific knowledge of the mandatory regulatory and legal requirements for servicing mortgage loans and the ongoing governmental investigations into the Company's misconduct.  Nevertheless, in the face of such specific knowledge regarding past and ongoing wrongdoing, the Individual Defendants breached their fiduciary duties by failing to implement or maintain adequate internal controls and systems to prevent the continuing and systematic violations of federal, state and local consumer protection laws and regulations and abusive loan servicing and foreclosure practices and/or to require the Company's management to do so. Thus, each of them knowingly, recklessly, and/or with gross negligence caused the Company to violate such laws and engage in the alleged wrongdoing.  In the case of the Individual Defendants other than Defendants Erbey and Wish, they participated and/or acquiesced in such conduct to maintain their favor and keep their positions as Directors and all of the substantial personal benefits that inured to them as a result.

---

[1] At all times relevant, the Individual Defendants were "controlling persons" of pursuant to §20 of the Securities Exchange Act.

46.     The Individual Defendants were well-informed about and/or actively participated in the wrongdoing alleged herein, as well as deception of the investing public and federal and state regulators. They abdicated their respective stewardship responsibilities to the Company by acquiescing and/or participating in the wrongdoing alleged herein and by placing their loyalty to Defendant Erbey above their loyalty to Ocwen and its shareholders.

47.     The members of the Ocwen Board, each of whom was personally appointed or approved by Defendant Erbey, receive hundreds of thousands of dollars each year in fees and other compensation as well as very liberal "reimbursement of expenses."  In addition, they received stock options potentially worth millions of dollars.

48.     As a direct consequence of the Individual Defendants' wrongdoing as alleged herein, Ocwen has become the subject of in some cases years-long investigations by the NY DFS, the CFPB, the CDBO, the SEC and private litigants, as well as increased government oversight from various monitors.  In connection with such investigations and complaints, upon information and belief, conflicted counsel is simultaneously representing the interests of both Ocwen and those of the Individual Defendants, particularly Defendant Erbey.  The Company has expended and will continue to expend significant amounts of resources and many millions of dollars to address these investigations and settlements and those that may still be forthcoming. The Individual Defendants now admit that any finding of violations of federal and state laws and regulations as described herein could have a material adverse effect on the Company's financial condition.  It is likely that Ocwen will be subjected to massive future fines and penalties beyond the most recent $150 million fine, and be required to make material changes to its business practices and, as well, will be forced to pay substantial amounts to defend and ultimately resolve the litigation brought against Ocwen by defrauded investors and borrowers.

49.     The Company already has suffered massive economic damages as well as damage to its reputation and credit ratings as a direct result of the wrongdoing alleged herein.  For example, pursuant to a settlement with the CFPB in December 2013, Ocwen agreed to pay $2.1 billion to settle allegations that it cheated thousands of homeowners.  In addition, the Company has been forced to pay $2.5 million to the CDBO for violations, incur the cost of a full compliance review by a third-party auditor in connection with the settlement with the CDBO, the additional compliance costs associated the increased regulatory scrutiny referenced above and detailed herein, the costs of defending against a variety of investor and government lawsuits premised on Defendants actions during the Relevant Period.

50.     In addition to the common law claims alleged herein, this action charges the Individual Defendants with directly participating in and/or aiding and abetting violations of §14 (a) of the Securities Exchange Act of 1934 and Rule 14a-9 thereunder.  Plaintiff seeks to recover for Ocwen the damages caused and currently being caused to the Company by the Individual Defendants.

### 3.     Aider and Abettor Defendants

**Altisource Portfolio Solutions, S.A.**

51.     On August 10, 2009, Ocwen spun off its "Ocwen Solutions" line of business into Defendant Altisource, a separate publicly traded company.  Defendant Erbey served as the Chairman of Altisource until January 2015.  As of December 31, 2013, Defendant Erbey owned or controlled 26% of Altisource's common stock and 873,508 options to purchase Altisource common stock.

52.     Following Altisource's separation from Ocwen, these companies remain inextricably linked.  Upon Altisource's separation, Ocwen entered into several long-term

24

agreements with Altisource all of which allow Altisource to profit from Ocwen's determination to foreclose on a mortgage.  For instance, the parties entered into a Services Agreement whereby "Altisource provides various business process outsourcing services, such as valuation services and property preservation and inspection services, among other things."  Similarly, Ocwen and Altisource entered into a "Support Services Agreement," whereby Ocwen and Altisource provide each other services "in such areas as human resources, vendor management, corporate services, accounting, tax matters, risk management, law and consumer psychology."

53.     Most of Altisource's revenues are derived from services it provides to Ocwen. Altisource's principal revenue source is mortgage servicing technologies – in essence mortgage servicing computer applications – that are leased by Ocwen.  According to Altisource, "Ocwen purchases certain mortgage services and technology services from us under the terms of the master services agreements and amendments to the master services agreements," which extend into 2025.

54.     Altisource was also created for tax-saving purposes and is incorporated in Luxembourg.  In its Annual Report filed with the SEC on Form 10-K for fiscal year 2013 (the "Altisource 2013 Form 10-K"), Altisource reported an effective tax of 6.0%, half of Ocwen's 11.9% effective rate.  Likewise, for fiscal year 2012, Altisource's effective tax rate was 7.0%, less than a quarter of the 29.7% effective tax rate paid by Ocwen.  Given Defendant Erbey's larger stake in Altisource than Ocwen, income earned by Altisource is worth significantly more to Defendant Erbey than income earned by Ocwen.

55.     When Ocwen determines, through its use of Altisource's REALServicing platform, to foreclose on a loan, Altisource steps in to provide an array of foreclosure-related services, including asset management, insurance services, residential property valuation, default

management services, and origination management services.   Altisource's asset management operations involve services such as REO asset management, title insurance, property preservation, and operation of the Hubzu consumer real estate portal.

56.   Hubzu is an online auction site for the sale of homes facing foreclosure and investor-owned properties following foreclosure.   A substantial portion of Ocwen's "real estate owned" ("REO") and short-sale properties are marketed on Hubzu, and the vast majority of Hubzu listings are of Ocwen-serviced properties.   Additionally, Ocwen uses a real estate agent employed by Altisource subsidiary REALHome Services and Solutions, Inc. to acts as the seller's agent for many of its listings on Hubzu.

57.   As set forth in the Altisource 2013 Form 10-K and Altisource's quarterly report filed with the SEC on Form 10-Q for the period ended September 30, 2014 ("3Q 2014"), for fiscal year 2013 and the 9 months ended September 30, 2014, Altisource reported that it earned 65% and 60% of its revenue, respectively, from Ocwen.

58.   In the 2014 Proxy Statement, Ocwen states that for the year ended December 31, 2013, the Company generated $22.7 million under the agreements with Altisource.   Ocwen also paid expenses to Altisource in the amount of $55.1 million, and as of December 31, 2013 there was a net amount payable to Altisource of $3.8 million.

**Altisource Residential Corporation**

59.   Defendant Altisource Residential Corporation was incorporated in Maryland and maintains its principal place of business in the U.S. Virgin Islands at 402 Strand Street, Frederikseted Virgin Islands 00840-3531.   Residential was spun off from Altisource on December 21, 2012, and focuses on acquiring and owning single-family rental assets following foreclosure.   According to Altisource, Residential "is focused on acquiring and managing single

26

family rental properties by acquiring portfolios of sub-performing and non-performing residential mortgage loans."  Residential's Annual Report filed with the SEC on Form 10-K for fiscal year 2013 reported that Altisource contributed $100 million of equity to Residential in exchange for shares that were distributed to Altisource shareholders.  In Ocwen's 2013 Form 10-K, the Company reported that as of December 31, 2013, Defendant Erbey owned or controlled 5% of Residential's common stock and held 291,167 options to purchase Residential common stock.

60.     Residential remains inextricably linked with the Ocwen enterprise. It has few if any of its own employees; Residential also entered into a Support Services Agreement, wherein Altisource could provide human resources, vendor management operations, corporate services, risk management services, quality assurance services, treasury, finance accounting, legal, tax and compliance services.  Moreover, it entered into a long-term master service agreements with Ocwen and Altisource on December 21, 2012 in which it provides property management, leasing and construction management services associated with the acquired single-family rental assets following foreclosure.

61.     Additionally, as set forth in the Company's 2013 Form 10-K, Ocwen entered into a 15-year servicing agreement with Residential's operating partnership, Altisource Residential, L.P.  Pursuant to this agreement, Ocwen agreed to "service residential mortgage loans acquired by [Residential] and provide loan modification, assisted deed-in-lieu of foreclosure, assisted deed-for- lease and other loss mitigation programs."

**Altisource Asset Management Corporation**

62.     Defendant Altisource Asset Management Corporation was incorporated in the U.S. Virgin Islands on March 15, 2012 and maintains its principal place of business in the U.S.

Virgin Islands at 402 Strand Street, Frederikseted Virgin Islands 00840-3531.  AAMC is an asset management company providing portfolio management and corporate governance services to Residential.

63.    AAMC serves as Residential's asset manager.   Under its asset management agreement with Residential, AAMC performs Residential's day-to-day operations, defines investment criteria, executes asset acquisitions for Residential, analyzes property sales, oversees Ocwen's servicing of Resiential's loans, oversees Altisource's renovation, leasing and property management of Residential's properties, and performs asset management and corporate governance duties.  As of December 31, 2013, Defendant Erbey owned or controlled 27% of AAMC's common stock and 87,350 options to purchase AAMC common stock.

64.    According to Ocwen's 2013 Form 10-K, on December 31, 2013, the Company entered into a "support services agreement" with AAMC, whereby Ocwen agreed to "provide business development, analytical and consulting and administrative services to AAMC.

**Home Loan Servicing Solutions**

65.    Defendants Home Loan Servicing Solutions was incorporated in the Cayman Islands and maintains its principal place of business at 190 Elgin Avenue, Georgetown, Grand Cayman KY1-9005, Cayman Islands.  According to Altisource, Defendant Home Loan Servicing Solutions' "primary objective is the acquisition of mortgage servicing rights and related servicing advances, loans held for investment and other residential mortgage related assets." HLSS primarily acquires MSRs from Ocwen and then contracts with Ocwen to service the loans.  As of December 31, 2013, Defendant Erbey owned or controlled 1% of HLSS's common stock.

66.     As set forth in the Company's 2013 Form 10-K, between March 5, 2012 and December 31, 2013, Ocwen sold to HLSS the rights to MSRs and related servicing advances for loans with a UPB of $202.3 billion.

67.     In addition, Ocwen and HLSS have agreed to provide each other with professional services, "including valuation analysis of potential MSR acquisitions, treasury management services, . . . legal licensing and regulatory compliance support services, risk management services and other similar services."

68.     For the year ended December 31, 2013, Ocwen generated revenues of $0.6 million under agreements with HLSS.  During that same period, Ocwen paid expenses of $2.0 million, and as of December 31, 2013 the net amount payable to HLSS by Ocwen was $59.5 million.

69.     Each of the Aiding and Abetting Defendants identified in ¶¶51 through 68, all of whom were companies controlled by Defendant Erbey through his stock ownership and positions as Chairman, collectively and individually knew and substantially assisted in the course of conduct resulting in the breaches of the fiduciary duties and other violations complained of herein.

## IV.     FACTUAL BACKGROUND

### A.     Background of Ocwen's Business

70.     Defendant Ocwen is the largest non-bank mortgage servicer of subprime loans in the United States (and fourth largest mortgage servicer overall), collecting payments on nearly $455 billion in loans as of the fourth quarter of 2013.  The Company has two operating segments, Servicing and Lending.  Through its Servicing segment, Ocwen provides residential and commercial mortgage loan servicing, special servicing, and asset management services to

owners of mortgage loans and foreclosed real estate in the United States and internationally.  The Company's Lending segment is involved in originating and purchasing conventional and government insured residential forward and reverse mortgage loans primarily through its correspondent lending arrangements.

71.     The Company's predecessor, Oxford, was founded in 1983 by Defendant Wish, who was soon joined by Defendant Erbey, and together they founded Ocwen and took the Company public in 1996.  By 1999, Ocwen had largely stopped making loans to people with poor credit and focused instead on servicing these loans, positioning the Company to reap profits in the aftermath of the 2008 housing collapse from the millions of delinquent and underwater borrowers.

72.     Ocwen and its operating subsidiaries have profited over the years from buying high-risk mortgages from banks and then extending higher interest rate loans to already indebted and cash-strapped homeowners.  The Company would also sometimes delay entering payments received until the grace periods had expired, charging borrowers late fees to build up large delinquency balances, and then threaten foreclosure if those delinquency balances were not paid. The Company and its subsidiaries had been under heightened scrutiny from regulators for years for these and other allegedly abusive practices, but the large-scale MSR offloading by large banks and other entities resulting from the National Mortgage Settlement further incentivized the Individual Defendants' misconduct by making it exponentially more profitable.  Between late 2012 and early 2014, Ocwen spent billions to expand its portfolio of MSRs by aggressively acquiring assets from larger banks that were anxious to dump their mortgage servicing units, as questionable foreclosure practices were attracting regulatory scrutiny.

| Counterparty | Acquisition Type | Date | Loan Count | MSR UPB (in billions) |
|---|---|---|---|---|
| Saxon | Asset | May 2010 | 38,000 | $ 6.9 |
| HomeEq | Platform | September 2010 | 134,000 | 22.4 |
| Litton | Platform | September 2011 | 245,000 | 38.6 |
| Saxon | Asset | April 2012 | 132,000 | 22.2 |
| JPMorgan | Asset | April 2012 | 41,200 | 8.1 |
| Bank of America | Asset | June 2012 | 51,000 | 10.1 |
| Homeward | Platform | December 2012 | 421,000 | 77.0 |
| ResCap | Platform | February 2013 | 1,740,000 | 183.1 |
| Ally | Asset | April - August 2013 | 466,900 | 87.5 |
| OneWest | Asset | August 2013 - March 2014 | 299,000 | 69.0 |
| Greenpoint | Asset | December 2013 | 31,400 | 6.3 |

73.     Ocwen acquired many of these MSRs from regulated financial services companies, which had traditionally serviced mortgage loans.  These companies shed their servicing responsibilities as they came under increasing regulatory scrutiny because of shoddy and abusive servicing practices.  Regulators began to demand greater capital requirements for banks that serviced mortgages.  Regulators also extracted a $25 billion settlement in February 2012 (the "National Mortgage Settlement" or "NMS") with five of the then-largest bank mortgage servicers (GMAC/ResCap, Bank of America, Citi, JP Morgan and Wells Fargo).  The NMS also required these servicers to implement changes in how they serviced mortgage loans, handled foreclosures and provided information to bankruptcy courts.  Moreover, capital requirements proposed by Basel III, or the Third Basel Accord, a global, voluntary regulatory standard on bank capital adequacy, stress testing, and market liquidity risk, made it difficult and less profitable for banks to retain servicing rights on loans they originated.

74.     As regulators became critical of the rising number of foreclosures and lenders' treatment of delinquent borrowers following the 2008 financial crisis and housing collapse, in 2009 Ocwen began the first of four separate company spin-offs.  These spin-off companies, which do business with each other and with Ocwen, were purportedly created to provide

1953185.1

technology and perform various services for Ocwen, including management of its foreclosed properties, while appearing, on the surface, to be separate and independent entities from Ocwen.

75.     As set forth above, in August 2009, Ocwen spun off its Real Estate Owned and related business operations to Altisource, a publicly traded company that derives its revenues largely from providing mortgage foreclosure services to Ocwen.   In 2010, Ocwen spun off HLSS, a publicly traded company created to acquire MSRs, rights to fees, and other income from servicing loans from Ocwen, which hires Ocwen to collect its loan payments. In 2013, Ocwen spun off two more publicly traded companies:   Residential, which purchases non-performing loans and foreclosed homes, many from Ocwen, to turn into rental homes; and AAMC, which serves as the asset manager for Residential's portfolio in exchange for a large quarterly incentive fee.

76.     Defendants Erbey and Wish continue to hold equity in the four affiliated publicly traded spin-offs:   Altisource, AAMC, Residential and HLSS.   Indeed, Erbey is the largest shareholder in each of the four spin-offs and chaired all five of the publicly traded companies, until his resignation from all five in January 2015 pursuant to a settlement with the NY DFS.   As a result, Defendants Erbey and Wish had conflicting obligations to Ocwen and each of the four spin-offs during the Relevant Period, all of which continue to derive significant revenues and earnings in large part from their ongoing and substantial, but conflicted, business dealings with Ocwen.

### B.     Ocwen's Exponential Growth

77.     On August 24, 2011, Ocwen asked the NY DFS to approve the Litton acquisition. However, in a September 1, 2011 letter to Ocwen, the NY DFS expressed serious concerns about whether "the post-acquisition entity, which would become the twelfth largest mortgage servicer in the United States with a significant portfolio of stressed loans, would be able to effectively

handle the increased servicing volume and comply with HAMP requirements, internal loss mitigation policies and procedures, and laws and regulations governing mortgage loan servicing and foreclosure activities.

78.     As a result, Ocwen and the NY DFS entered into an Agreement on Mortgage Servicing Practices designed to correct robo-signing and other abusive and illegal foreclosure and servicing practices.  Specifically, the Agreement on Mortgage Servicing Practices required Ocwen to: (1) establish and maintain sufficient capacity to properly board and manage it significant portfolio of distressed loans; (2) engage in sound document execution and retention practices to ensure that mortgage files were accurate, complete and reliable; and (3) implement a system of robust internal controls and oversight with respect to mortgage servicing practices performed by its staff and third-party vendors.

79.     As a result, the NY DFS conditioned its issuance of a "No Objection" letter in connection with the Litton acquisition "upon Ocwen's commitment to adhere, and in the case of any portfolio serviced by a different Ocwen subsidiary or affiliate, to cause to adhere to" the DFS Agreement.

80.     On December 15, 2011, the Agreement on Mortgage Servicing Practices was amended ("December 2011 Amendment") to prevent Ocwen from, among other things, charging borrowers penalties, fees, costs and interest as a result of delays in court appearances caused by the closure of the law firm of Steven J. Baum, one of Ocwen's New York foreclosure counsel, following widespread allegations of improper foreclosure practices by the firm. Notwithstanding such illegal conduct and malpractice, Ocwen has not pursued Baum for the recovery of the damages he has caused the Company, thus wasting its assets. Speaking about the December 2011 Amendment to the Agreement, Superintendent Lawsky stated that it "sets a new higher standard

for the residential mortgage servicing industry, whose troubling foreclosure and servicing practices we have been investigating along with other regulators across the country."

81.     On the heels of its announced plans to acquire MSR assets from Saxon, Ocwen disclosed on November 9, 2011 in its quarterly report filed with the SEC on Form 10-Q for the period ended September 30, 2011 that it had entered into an agreement with JPMorgan Chase to purchase MSR for approximately 82,000 non-prime mortgage loans with a UPB of approximately $15 billion, or 14% of the total UPB of Ocwen's servicing portfolio as of September 30, 2011.

82.     This paved the way for Ocwen's continued exponential growth.  Throughout late 2011 and into 2012, Ocwen announced and closed on a series of transactions which dramatically increased the size of its servicing portfolio including a purchase of 82,000 non-prime mortgage loans with a UPB of approximately $15 billion from J.P. Morgan Chase and 53,100 mortgage loans owned by a government-sponsored enterprise ("GSE") with an aggregate UPB of approximately $10.7 billion.

83.     On May 3, 2012, during the Company's conference call with analysts and investors to discuss Ocwen's financial results for the first quarter of 2012, Defendants Faris reiterated with respect to the servicing standards set forth under the National Mortgage Settlement that "these rules and practices present expansion opportunities as financial institutions will look to subservice more business to specialty servicers with scalable capacity and a demonstrated ability to meet compliance requirements. . . .   Ocwen is a pioneer in principal reduction modifications and we have developed substantial process technology and unique product offerings to support principal. . . ."

84.     By the end of the second quarter of 2012, the Company's MSR portfolio had grown by nearly 83%, from approximately $70.8 billion in UPB as of June 30, 2011, to approximately $128 billion in UPB as of June 30, 2012.   However, as described herein, as Ocwen grew exponentially, the Individual Defendants were not implementing a system of robust internal controls and oversight with respect to its mortgage servicing practices.   On December 12, 2011, *The Wall Street Journal* published an article profiling the Company titled "Thinking Deeply On Risky Lending."   Commenting on Ocwen's astronomical growth, the article reported that "[t]he recent deals will make Ocwen the largest subprime servicer, responsible for roughly one in five subprime mortgages" and "the ninth-largest servicer overall, with $150.6 billion in loans[,]" rendering "[t]he company . . . more than tripled in size since the end of 2009, when it serviced $48.8 billion in mortgages and ranked seventh in subprime servicing."

### C.     Ocwen's 2012 Growth Rate Garners Increased Regulator Attention

85.     On June 13, 2012, following complaints about Ocwen's servicing practices, the NY DFS conducted an examination of the Company to assess it compliance with the 2011 Agreement on Mortgage Servicing Practices, which preliminarily identified gaps in the servicing records of certain loans and indicated Ocwen's non-compliance with the Agreement, including in some instances, failing to send out the required 90-day notice before commencing foreclosure proceedings and/or failing to demonstrate that it even had standing to bring the foreclosure actions.   The exam also revealed significant deficiencies in Ocwen's servicing practices, including indications that in some instances it failed to provide the single point of contract for borrowers; pursued foreclosure against borrowers seeking a loan modification, failed to conduct an independent review of denials of loan modification, failed to ensure that borrower and loan

information was accurate and current and failed to ensure that prior modifications efforts were not rendered futile upon transfer of a servicing file to or from Ocwen.

86.    Nevertheless, in October 2012, Ocwen announced two additional transactions which would expand its servicing portfolio considerably – the purchase of Homeward's loan origination and servicing business was announced on October 3, 2012, and Ocwen's submission of a $3 billion winning bid on ResCap's loan servicing platform.  The ResCap deal alone would have accounted for an increase in Ocwen's portfolio of over $370 billion in UPB.

87.    As a result of this significant increase in its servicing platform, on December 5, 2012, Superintendent Lawsky announced that the NY DFS was requiring Ocwen to hire a monitor to ensure compliance with its prior Agreement on Mortgage Servicing Practices and reform its practices.  According to Superintendent Lawsky, "It is not enough to have banks and mortgage servicers sign an agreement promising to reform their businesses. The best unrealized reforms won't protect homeowners.  To protect homeowners facing the risks of losing their homes, we must ensure that the companies are actually living up to their promises."

88.    Due to these alleged potential violations of the DFS Agreement, Ocwen and the NY DFS entered into a further agreement titled "Consent Order Under New York Banking Law §44."  As part of the DFS Consent Order, Ocwen consented to the installation of an "independent on-site monitor" tasked with conducting "a comprehensive review . . . of Ocwen's servicing operations, including its compliance program and operational policies and procedures."  In furtherance of its continued efforts to ensure that Ocwen was sufficiently protecting the rights of homeowners, the NY DFS required Ocwen to install the Monitor "so that [it] can be sure that the reforms are implemented and homeowners have a real chance to avoid foreclosure."

89.     As part of the DFS Consent Order, Ocwen vowed to cooperate fully with the Monitor and agreed that, in the event of Ocwen's breach of the DFS Consent Order, the NY DFS could pursue "all the remedies available under the New York Banking and Financial Services Laws and may use any and all evidence available to the Department for all ensuring hearings, notices, orders, and other remedies that may be available."

90.     By entering into the DFS Consent Order, Ocwen was able to proceed with closing on the Homeward acquisition in December 2012 as planned.  As a result, Ocwen managed to almost double the UPB of its residential servicing portfolio (an increase of 99.3% during fiscal year 2012) from $102.2 billion to $203.7 billion.

91.     Each of the Individual Defendants knew of the Agreement on Mortgage Servicing Practices and requirements imposed by regulators.  Nevertheless, as outlined herein and despite the appointment of the Monitor in December 2012, the Company's abusive practices continued unabated, about which conduct each of the Individual Defendants knew or should have known given their prior intimate knowledge of the Company's misconduct and the governmental investigations.

     **D.     REALServicing and Ocwen's "Competitive Advantage"**

92.     Throughout the Relevant Period, the Individual Defendants, with full knowledge of Ocwen's inability to abide by and comply with the necessary regulatory requirements it time and time again agreed to adhere to, touted its competitive advantage over others in the industry as a result of REALServicing – the mortgage servicing platform leased from Altisource. Defendants Britti and Erbey, throughout 2013, repeatedly spoke of REALServicing's scalability aspects, which allowed Ocwen to service a non-performing loan at a fraction of the cost of its competitors.

93.     For example, during a May 21, 2013 presentation at the Barclay's High Yield and Syndicated Loan Conference, Defendant Britti stated that Ocwen has "the lowest cost platform in the industry," which provided the Company with "a substantial cost advantage."   In particular, Defendant Britti suggested that it cost Ocwen just $250 per year to service a non-performing loan, or 70% less than the more than $800 a year spent by Ocwen's competitors. Defendant Erbey echoed these sentiments during an August 1, 2013 conference call with analysts and investors discussing the Company's financial results for the period ended June 30, 2013, stating that "Ocwen's cost to service non-performing loans is 70% lower than the industry average," and that REALServicing allows Ocwen "to manufacture new capacity more efficiently and effectively than other servicers."

94.     Notably, following the closing of the ResCap acquisition, which included ResCap's proprietary servicing platform, FiServ, Ocwen announced its plans to transition all of ResCap's loans to Altisource's REALServicing platform, which according to the Individual Defendants, "demonstrates the unique scalability of our technology."

95.     Defendant Faris again referenced the cost savings associated with REALServicing during the December 2013 Conference, stating that the Company would realize a significant cost reduction by transitioning the ResCap portfolio from FiServ to REALServicing:  "We're paying more than we need to for technology.  There is certain technologies that hang off of the ResCap platform that we'll be able to shutter once we complete that transition."  Further, in the February 27, 2014 Press Release, Defendant Faris similarly noted that it was "nearing the end of [its] integration of the legacy ResCap loans onto Ocwen's servicing platform," and that this integration "will allow [Ocwen] to substantially lower expenses and reduce the operating complexities of running multiple platforms."

96.     To allay any concerns that the lower costs associated with REALServicing would come at the expense of compliance, the Individual Defendants assured stockholders that the transition from FiServ to REALServicing would result in increased efficiencies and reduced costs while maintaining the Company's ability to comply with all applicable regulations.  For example, during the October 31, 2013 Conference Call, Defendant Faris stated that "[i]ntegration costs have been somewhat higher than expected *as we have been careful to assure excellent customer service and strong compliance throughout the transfer process*."  Defendant Faris also represented during the December 2013 conference that the transition would result in "significant *reductions* in [Ocwen's] compliance burden."

97.     Each of the Individual Defendants knew of the Agreement on Mortgage Servicing Practices, the Consent Order, and the applicable regulatory requirements imposed by regulators. Nevertheless, as outlined herein, the Company's abusive practices continued unabated, about which conduct each of the Individual Defendants knew or should have known given their prior knowledge of the Company's misconduct and the governmental investigations.  As Ocwen grew exponentially, the Individual Defendants were not implementing a system of robust internal controls and oversight with respect to its mortgage servicing practices.

98.     Premised on these assurances, Ocwen continued to grow at a staggering rate throughout 2013.  In addition to the completion of the ResCap acquisition in February 2013, Ally Financial announced in March that it was selling a separate portfolio of MSR to Ocwen with an UPB of $90 billion.  Furthermore, in June 2013, Ocwen entered into an agreement with OneWest Bank, F.S.B. ("OneWest") to purchase additional MSR with an approximate UPB of $78 billion. And in June 2013, Ocwen disclosed an agreement for an additional purchase of $8.3 billion of MSR from Greenpoint Mortgage Funding, Inc. ("Greenpoint").

### E.    Complaint By the CFPB Demonstrates Ocwen's Recidivist Behavior

99.    On December 19, 2013, the CFPB, joined by 49 states and the District of Columbia, filed a Complaint in the United States District Court for the District of Columbia, alleging that Ocwen, HRH and Litton had violated, among other laws, the Unfair and Deceptive Acts and Practices laws of the plaintiff states and the Consumer Financial Protection Act of 2010 by deceiving consumers about their loans and engaging in illegal foreclosures.  According to the CPFB Complaint, investigators found evidence that, among other things, Ocwen repeatedly gave borrowers false or misleading information, did not honor trial mortgage modifications begun by pervious servicers, wrongly charged fees, and denied mortgage loan modifications to eligible borrowers.  During a conference call held with reporters that day, CFPB director Richard Cordray stated that "[t]oo often, trouble began as soon as the loan was transferred to Ocwen," adding that "Ocwen made troubled borrowers even more vulnerable to foreclosure." At all times material, the Individual Defendants knew or should have known of such practices.

100.    That same day, Ocwen, the CFPB and the 49 states and the District of Columbia entered into a simultaneous Consent Judgment, approved by the Board, which was also filed in the United States District Court for the District of Columbia on December 19, 2013, under which Ocwen agreed to fund a ***$2.1 billion*** mortgage settlement for mortgage servicing abuses (including $2.0 billion in first-lien principal reduction and $125 million for cash payments to borrowers whose loans had been foreclosed on).  According to the CFPB, Ocwen took advantage of borrowers "at every stage of the process."  The $2.1 billion far exceeded the $1.5 billion in revenues the Company took in during the first nine months of 2013.

101.    The wide-reaching abuses alleged in the CFPB Complaint included charging unauthorized fees, failing to promptly credit borrowers' loan payments, forcing them into

expensive insurance policies, improperly denying loan modifications, failing to honor loan modifications, giving false and misleading information to borrowers whose loans had been transferred from other servicers and robo-signing foreclosure documents, many, if not most, of the same abusive practices that were the subject of the NY DFS prior Consent Orders and the reason for the appointment of an independent monitor in December 2012.

102.    Under the December 2013 Consent Judgment, Ocwen was required to improve its oversight of its attorneys, bolster training for its employees, refrain from making collection calls when a borrower's application for a modification was pending, and increase its staff.  The 2013 Consent Judgment contained "Examination Findings" which yet again indicated the wide-ranging and profound deficiencies in Ocwen's mortgage servicing practices

a.    Lack of controls related to document execution, including evidence of robo-signing, unauthorized execution, assignment backdating, improper certification and notarization, chain of title irregularities, and other related practices affecting the integrity of documents relied upon in the foreclosure process;

b.    Deficiencies in loss mitigation and loan modification processes, including but not limited to:

i.    Failure to effectively communicate with borrowers regarding loss mitigation and other foreclosure avoidance alternatives:

ii.    Failure to account for documents submitted in tandem with application for loss mitigation assistance;

iii.    Lack of reasonable expedience in approving or denying loss mitigation applications;

41

          iv.     Providing false or misleading reasons for denial of loan modifications; and,

          v.     Failure to honor the terms of loan modifications for transferred accounts and continued efforts to collect payments under the original note terms.

     c.     Lack of controls related to general borrower account management, including but not limited to:

          i.     Misapplication of borrower payments;

          ii.     Inaccurate escrow accounting and statements; and

          iii.     Assessment of unauthorized fees and charges.

     d.     Inadequate staffing and lack of internal controls related to customer service;

     e.     Deficiencies in control and oversight of third-party providers, including but not limited to, local foreclosure counsel;

     f.     Deficiencies in document maintenance processes, including but not limited to, failure to produce documents requested in tandem with examinations; and,

     g.     Deficiencies in management control and supervision necessary to ensure compliance with applicable laws and regulations.

103.    The servicing reforms set forth in the Consent Judgment (and the National Mortgage Settlement) were also incorporated into Ocwen's 2011 Agreement with the NY DFS, pursuant to the Agreement's provision stating that in the event Ocwen "agrees with any other regulator to adopt greater consumer protections or other more rigorous standards than are contained in this Agreement, such other provisions shall be incorporated by reference herein."

    **F.**    **New York Regulator Halts Ocwen's Wells Fargo Deal**

104.    On January 22, 2014, Ocwen announced that it had agreed to purchase Wells Fargo Bank N.A.'s ("Wells Fargo") MSRs related services relating to a portfolio of 184,000 loans with an unpaid principal balance of $39 billion for $2.7 billion.

105.    On February 6, 2014, citing the Company's potential inability to handle any additional loan servicing given prior alleged abuses, the NY DFS placed Ocwen's $39 billion acquisition of Wells Fargo MSRs on indefinite hold.[2]

106.    On February 11, 2014, *The Financial Times* reported that mortgage-backed securities investors such as PIMCO and BlackRock were considering taking legal action against Ocwen for any forced reductions in principal they suffered as a result of Ocwen's misconduct.  If these legal actions were successful, they would have recourse against Ocwen for the $2 billion in principal reduction they face under the 2013 Consent Judgment.

107.    On February 18, 2014, the Company disclosed that it would indefinitely postpone its previously announced purchase of MSRs from Wells Fargo.

108.    The next day, February 19, 2014, the CFPB's deputy director, Steve Antonakes, sharply criticized the entire third-party mortgage servicing industry, stating that firms were still treating consumers poorly, despite years of pressure from government officials to improve their behavior.  The CFPB was threatening to crack down on the "shell games" it charged were being played amongst services, "where the first servicer says the transfer ended all of its responsibility to consumer and the second servicer says it got a data dump missing critical documents."  Antonakes further stressed that force-placed insurance was to be used as a "last resort, rather than using it was a profit center that feeds off consumers' distress."  Noting that "the notion that government intervention has been required to get the mortgage industry to perform basic

---

[2] The transaction was abandoned on or about November 13, 2014 when the parties "mutually decided" that it could not take place in the face of Superintendent Lawsky's disapproval of it.

functions correctly – like customer service and record keeping – is bizarre ... but regrettably necessary" and that "business as usual has ended in mortgage servicing." The comments were perceived by investors to be directed largely at Ocwen, which CFPB data demonstrated had received more consumer complaints in 2012 and 2013 than any other third-party mortgage servicer. Ocwen has been severely damaged by these repeated revelations of misconduct with its stock price falling by more than 73% in 2014 alone, ending the year at only $15 per share. As of February 5, 2015, Ocwen shares traded as low as $7.66 per share.

### E.      Continuing NY DFS Investigations Uncover Additional Abuses by Ocwen

109.    In a February 26, 2014 letter to Ocwen's general counsel, Timothy Hayes, NY DFS Superintendent Lawsky charged Ocwen with misstating Ocwen's "strictly arms-length business relationship" with HLSS and other affiliates, all chaired by Defendant Erbey, and potentially harming borrowers and pushing homeowners "unduly into foreclosure." Lawsky demanded detailed information about the financial interest of Ocwen's officers, directors and employees in the various affiliated companies, as well as documentation showing the nature and extent of business relationships between Ocwen and those other firms. The letter stated, in pertinent part, as follows:

> The Department's ongoing review of Ocwen's mortgage servicing practices has uncovered a number of potential conflicts of interest between Ocwen and other public companies with which Ocwen is closely affiliated. Indeed, the fact our review has uncovered to date cast serious doubts on recent public statement made by the company that Ocwen has a "strictly arms-length business relationship" with those companies. We are also concerned that this tangled web of conflicts could create incentives that harm borrowers and push homeowners unduly into foreclosure. As such, we are demanding additional information on the issues as part of our review.
>
> Pursuant to the December 4, 2012 Consent Order between Ocwen and the Department, we have engaged an independent on-site compliance monitor at Ocwen to conduct a comprehensive review

of Ocwen's servicing operations.  It is in the course of the monitorship that we uncovered these potential conflicts between and among Ocwen, Altisource Portfolio Solutions, S.A. ("Altisource Portfolio"), Altisource Residential Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions Ltd., (together the "affiliated companies"), all of which are chaired by William C. Erbey, who also the largest shareholder of each and the Executive Chairman of Ocwen.

As you recall, Altisource Portfolio's Chief Risk Officer was removed as a result of the monitor's review.  During its review, the Monitor discovered that Ocwen's Chief Risk Officer also served as the Chief Risk Officer of Altisource Portfolio, and reported directly to Mr. Erbey in both capacities.  This individual seems not to appreciate the potential conflicts of interest posed by this dual role, which was particularly alarming given his role as Chief Risk Officer.  He told the Monitor that Ocwen paid his entire salary, but he did not know and had apparently never asked which company paid his risk management staff.  Indeed, it remains unclear whether Altisource Portfolio paid any compensation for the Chief Risk Officer's services.  Although he has since been removed as Altisource Portfolio's Chief Risk Officer, his and Ocwen's failure to affirmatively recognize this conflict demonstrates that the relationship between Ocwen and the affiliated companies warrants further examination.

Presently, Ocwen's management owns stock or stock options in the affiliated companies.  This raises the possibility that management has the opportunity and incentive to make decisions concerning Ocwen that are intended to benefit the share price of affiliated companies, resulting in harm to borrowers, mortgage investors, or Ocwen shareholders as a result.

The letter further noted that:

The Department's review of Ocwen's mortgage servicing practices has also found that Ocwen relies extensively on affiliated companies for its information management system (from the programming of comment codes to functioning as Ocwen's IT help desk), as well as procurement of third party services.  This further demonstrates the interconnected nature of Ocwen's relationship with the affiliated companies.

110.   As reported by *Bloomberg* on February 27, 2014, "[a]s of mid-February,

American homeowners had filed more than 9,000 mortgage-related complaints against Ocwen –

the highest number of any non-bank servicer," citing data from the CFPB. *Bloomberg* also reported that "[i]n January [2014], the Treasury Department issued a report on the performance of servicers in the government's Home Affordable Modification Program that started in 2009," noting that "Ocwen was responsible for 79,156 loan modifications that later defaulted, the highest of any servicer," and that "Ocwen's 30 percent re-default rate was the third highest."

111.    On February 27, 2014, the Company reported earnings per share substantially lower than expected; *i.e.* $0.75 – a $0.07, on revenues of just $556 million.   Attributing the shortfall to the Company's inability to integrate the large MSR portfolios it had acquired between 2001 and early 2014, the release quoted Defendant Faris as stating in pertinent part that "[c]onsolidation" was needed to "allow [Ocwen] to substantially lower expenses and reduce the operating complexities of running multiple platforms."   At no time did he acknowledge the massive and negative impact on the Company caused by the wrongdoing referred to herein or the regulatory consequences thereof.

112.    On March 3, 2014, the Company filed its Annual Report on Form 10-K with the SEC for fiscal 2013, signed by Defendants Erbey, Faris, Korn, Lacy, Wish, and Salcetti (as well as a former director, Defendant Ross) and certified by Defendant Faris under the Sarbanes Oxley Act of 2002 as to the veracity of its contents and the Company's effective internal controls.   The Form 10-K stated in pertinent part:

> Our business is currently dependent on many of the services and products provided under these long-term contracts which include renewal provisions.  *We believe the rates charged under these agreements are market rates as they are materially consistent with one or more of the following:  the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers.*

113.    On April 17, 2014, HLSS issued a press release and held a conference call to discuss the forthcoming release of the Company's first quarter 2014 financial results.   During the

46

conference call, Defendant Erbey disclosed that the NY DFS's indefinite hold on Ocwen's acquisition of MSRs was not limited to Wells Fargo.  Rather, the NY DFS had placed on indefinite hold the transfer of all large MSR portfolios.  During the conference call, Defendant Erbey stated that "[u]ntil we resolve – this related to Ocwen – until we resolve New York State we are not acquiring any new [MSR] portfolios at all.  As a matter of fact, the entire market quite frankly is just – nothing is really being put on for bid right now.  So the whole market has basically stopped until that gets resolved."

114.    On April 21, 2014, Ocwen received a letter from Superintendent Lawsky, questioning the independence of Altisource's relationship with Ocwen and its online auction site Hubzu, which is used to auction off properties facing foreclosure.  According to Superintendent Lawsky, Altisource had an eight-year agreement to manage distressed and repossessed homes in Ocwen's $435 billion servicing portfolio.  Superintendent Lawsky also claimed that the agreement required that Ocwen properties be listed and marketed through Hubzu, even if a distressed borrower had already signed a contract for a short sale.  Defendant Erbey owns or controls approximately 27% of Altisource's stock and 13% of Ocwen's.  According to Superintendent Lawsky's April 21, 2014 letter, "Hubzu appear[ed] to be charging auction fees on Ocwen-serviced properties that [were] up to three times the fees charged to non-Ocwen customers," and the higher fees "ultimately [got] passed on to the investors and struggling borrowers who [were] typically trying to mitigate their losses and [were] not involved in the selection of Hubzu as the host site."  Superintendent Lawsky's letter also stated the relationship between Ocwen, Altisource and Hubzu "raise[d] significant concerns regarding self-dealing."

115.    On April 22, 2014, Defendant Erbey was forced to surrender one million of the two million stock options granted to him on August 21, 2012.  The 500,000 performance-based

options and 500,000 extraordinary performance-based options, which had an exercise price of $24.38, had been granted to Erbey under the Company's 2007 Equity Incentive Plan.  The shares were surrendered in response to a shareholder's complaint that the award was inconsistent with the terms of the plan.  On May 2, 2014, *The Wall Street Journal* disclosed that the Company had received a letter on April 28, 2014 from the SEC "informing the company that it was under investigation" in connection with the stock grant.

116.    The improper issuance of these stock options to Defendant Erbey further reflect self-dealing, conflicts of interests and the Board's and Compensation Committee's breaches of their fiduciary duties to Ocwen and its shareholders.

117.    On May 1, 2014, the Company reported first quarter 2014 financial results that fell well short of what the Individual Defendants had led the investment community to expect, citing the mounting costs of addressing the regulatory crackdown.  As reported by *The Wall Street Journal* that day, "[a]mid the scrutiny, Ocwen has ramped up spending on technology and compliance," noting that "Ocwen on Thursday said such costs helped fuel a 44% surge in overall expenses during the quarter from the same quarter a year earlier," and quoting Defendant Faris as explaining during a conference call held with investors that day that "[t]he bar ha[d] been raised substantially because of the additional activities and documentation now required," *The Wall Street Journal* noted that, as a result, the "$551.3 million [in revenues] posted was less than the $569.4 million that analysts surveyed by Thomson Reuters expected," and Ocwen's net income of $75.8 million, or $0.54 per share, was also far less than the "$1 a share" that "[a]nalysts [had] expected" based upon the information Defendants Erbey and Faris had previously communicated to the investing public.  Quoting Defendant Erbey, *The Wall Street Journal* stated that "[g]oing

forward,… compliance [would] be among the most important factors determining long-term success in the servicing business."

118.   On May 2, 2014, the Company filed its quarterly financial report on Form 10-Q with the SEC for the first quarter 2014, certified by Defendant Faris under the Sarbanes Oxley Act of 2002 as to the veracity of its contents and the Company's effective internal controls.  In addition to repeating the Company's false and misleading financial results from the May 1, 2014 press release, the Form 10-Q stated that Ocwen "believe[d] the rates charged under [the agreement with related companies such as Altisource were market rates as they [were] materially consistent with one or more of the following:  the fees charged by Altisource to other customers for comparable services and the rates Ocwen [paid] to or observe[d] from other service providers."

119.   On July 31, 2014, Ocwen announced its financial results for the second quarter 2014, the period ended June 30, 2014.  Ocwen reported net income of $67 million, or $0.48 per diluted share, $0.30 lower than the market had been led to expect, blaming the decline on the rising costs of complying with regulations required by the Consent Decree.

120.   On August 4, 2014, the NY DFS issued a third letter to Ocwen stating that it was reviewing what it called a "troubling transaction" with Altisource relating to the provision of force-placed insurance which was "designed to funnel as much as $65 million in fees annually from already-distressed homeowners to Altisource for minimal work."  The letter went on the question the "role that Ocwen's Executive Chairman William C. Erbey played in approving this arrangement," which the letter stated "appear[ed] to be inconsistent with public statements Ocwen ha[d] made, as well as representations in Company SEC filings." The Department's on-going investigation had revealed that mortgage servicers were setting up affiliated insurance

agencies to collect commissions on force-placed insurance, and funneling all of their borrowers' force-placed business through their own agencies, in violation of the anti-inducement provisions of applicable New York insurance law.  The investigation revealed that the servicers' own insurance agencies had an incentive to purchase force-placed insurance with high premiums because the higher the premiums, the higher the commissions kicked back by insurers to the servicers or their affiliates.

121.   On August 12, 2014, the Company disclosed that it would be forced to restate its audited fiscal 2013 and unaudited Q1 2014 financial results, citing accounting improprieties and stating that its financial statements for those periods, including statements concerning the effectiveness of its internal controls, should no longer be relied upon.  Describing the initial determination of the accounting improprieties, Ocwen stated in pertinent part as follows:

> The changes we are contemplating principally relate to the valuation methodology of our Financing Liability – MSRs Pledged in connection with certain rights to receive servicing fees, excluding ancillary income, with respect to certain mortgage servicing rights ("Rights to MSRs"), a Level 3 asset, sold to a third party, Home Loan Servicing Solutions, Ltd. ("HLSS").  At March 31, 2014, the Financing Liability – MSRs Pledged, the valuation of which is the cause of the restatement, had a reported carrying value of $634.4 million, or approximately 10% of the total liabilities.  We have not had any additional sales of Rights to MSRs in 2014.

> \*       \*       \*

> Following the release of our earnings for the Second Quarter of 2014, and in consultation with Deloitte & Touche LLP, we determined to adopt the changes which are driven by a re-examination of an accounting convention first adopted in 2012 with the completion of the first Rights to MSR's sale transaction to HLSS.  The accounting convention applied a narrow (5%) range to valuations obtained from a third-party valuation expert in determining the carrying value of our Financial Liability – Pledged MSRs related to our sales of Rights to MSR's.  Effective as of June 30, 2014, the Company has stopped using a range.

122.     Prior to these revelations, however, Defendants Wish, Ross Erbey sold more than $62 million worth of Ocwen common stock at inflated prices while in possession of material non-public information, thus avoiding substantial losses they would have incurred but for their illegal insider trading.

123.     On October 21, 2014, the NY DFS issued a fourth letter to Ocwen, this time regarding "serious issues with Ocwen's systems and processes, including Ocwen's backdating of potentially hundreds of thousands of letters to homeowners, likely causing them significant harm."  The NY DFS's review of Owen's mortgaging servicing practices revealed that borrowers were receiving letters denying a mortgage loan modification that were dated more than thirty days prior to the date Ocwen actually mailed the letters.  The borrowers were given thirty days from the date of the denial letter to appeal that denial, but those 30 days had already elapsed by the time they received the backdated letter.  In other cases, Ocwen's systems showed that borrowers facing foreclosure received letters with a date by which to cure their default and avoid foreclosure – but the cure date was months prior to receipt of the letter.  The NY DFS believed that "[t]he existence and pervasiveness of these issues raise critical questions about Ocwen's ability to perform its core functions of servicing loans."

124.     The letter accuses Ocwen of doing nothing to investigate or address the backdating issue even when an employee questioned the accuracy of Ocwen's letter dating processes and alerted the Company's Vice President of Compliance.  Despite the fact that the Individual Defendants knew or should have known of such events, Ocwen did nothing and the employee raised the issue again five months later, but Ocwen has to this day failed to address it, more than a year after the issue was first discovered.  Worse, Ocwen falsely represented to the Monitor that (1) the issue was isolated to letters of a specific type; (2) the problem affected only

51

6,100 letters; (3) Ocwen discovered the issue in April or May, 2014; and (4) Ocwen implemented changed to its systems in May 2014 that resolved the problem.

125.   After the Monitor began to independently investigate the issue, and under pressure from NY DFS, Ocwen finally admitted in a memorandum dated September 10, 2014, that the backdating problem was not an isolated event and that changes to its systems in May, 2014 did not fully resolve the problem.  However, Ocwen still identified only a fraction of the instances of backdating that had already been uncovered by the Monitor.  Further, the memorandum falsely repeated the assertion that Ocwen initially discovered the backdating issue in April 2014.  However, upon further investigation and persistent questioning by the Monitor, it was discovered that one of Ocwen's employees had identified the problem in November, 2013 and informed senior management, including the Company's Vice President of Compliance.  Notwithstanding being informed of the backdating, there is no indication that the Individual Defendants did anything to investigate or remedy the problem in November, 2013, nor did the Individual Defendants cause the Company to alert regulators, borrowers, shareholders or other interested parties.  Five months had elapsed when the same employee was forced to raise the issue again.

126.   The backdating issue, among others, starkly illustrates the culture of corruption and abject failure by the Ocwen Board and senior management to discharge their fiduciary duties.  Indeed, it is clear that Ocwen's Board and senior management failed to conduct a proper investigation to ensure that the issue was promptly resolved or take any steps whatsoever to remedy the harm already done to borrowers and others.   Superintendent Lawsky's letter concludes:

> "The stakes for borrowers and investors are enormous.  If the
> Department concludes that it cannot trust Ocwen's systems and

processes, then it cannot trust Ocwen to comply with the law.  If Ocwen cannot demonstrate immediately that it is capable of properly servicing borrowers' needs, the Department intends to take whatever action is necessary to ensure that borrowers are protected."

127.    Ocwen's troubles did not end here.  Most recently, as reported by *The Wall Street Journal* and others on December 16, 2014, the Monitor for the Office of Mortgage Settlement Oversight ("OMSO"), Joseph A. Smith, Jr., had accused the Company of providing unreliable information about its business practices in the first half of 2014.  The Monitor, who was charged with being the overseer for banks' and mortgage servicers' compliance with the $25 billion National Mortgage Settlement[3] stated in his latest report that Ocwen's internal review group ("IRG") process had serious deficiencies, questioning the independence and integrity of IRG's operations.  The probe into the Company's review process started after an Ocwen employee informed the OMSO of the shortcomings in May, 2014.   After interviewing nine Ocwen employees and reviewing thousands of documents earlier this year, Mr. Smith concluded he could not rely on the work of the internal monitoring group at Ocwen.

**F.    California Department of Business Oversight and Investor Complaints**

128.    On January 8, 2013, the CDBO commenced a routine investigation into the servicing practices of Ocwen pursuant to Financial Code section 50302, which requires the commissioner to examine the records, documents and affairs of each licensee under the California Residential Mortgage Lending Act ("CRMLA") to ensure compliance with its provisions.

---

[3] Ocwen became part of the National Mortgage Settlement in December 2013, following its acquisition of Residential Capital LLC's servicing business.  Residential Capital was a unit of Ally Financial Inc., which was one of five banks included in the national settlement.

129.    Based on its review, the Commissioner made several reasonable requests for documents and files to Ocwen, including through a lawfully issued administrative subpoena. Repeatedly, Ocwen refused to produce the requested documents which incurred the maximum penalty under the statute of $1,000.00 in each instance and risked suspension of its license to conduct business in California.

130.    On October 3, 2014, Ocwen was served with the Accusation by the Commissioner charging the Company with numerous violations under California law and seeking a suspension of its mortgage servicing license in California. *See Commissioner of Business Oversight v. Ocwen Loan Servicing, LLC,* OAH No. 2014100930.  Thereafter, on or about January 23, 2015, Ocwen and the CDBO entered into a Consent Order ("CDBO Consent Order"), which, among other terms, prohibited Ocwen from acquiring any additional MSRs secured by properties in California until the CDBO is satisfied that Ocwen can satisfactorily respond to the requests made in the course of a regulatory exam and requires Ocwen to undergo a full compliance review by an independent third-party, which Ocwen is required to pay for, who will conduct a comprehensive review on how Ocwen's practices comply with state law and regulations, including the CRMLA and the California Homeowner Bill of Rights.  In addition, the auditor will also oversee implementation of corrective measures to address deficiencies and weaknesses identified in the course of the review.  Furthermore, Ocwen will be required to pay a penalty of $2.5 million within 10 days of entering the Consent Order.

131.    The Individual Defendants, with full knowledge of the laws and regulations concerning mortgage loan servicing, caused the Company to incur massive expense in connection with the CDBO investigation and settlement, resulting in harm to the Company and its shareholders.

132.    In addition to the CDBO investigation and settlement, as well as the costs associated with the compliance review by the independent third party auditor, Ocwen is also the subject of securities fraud litigation brought by private litigants captioned *In re Ocwen Financial Corporation Securities Litig*ation, 14-Civ-81057-WPD (S.D. Fla).   The Ocwen securities fraud litigation, defended by the same counsel as have represent Ocwen and the Individual Defendants named herein, is premised on the allegations of the Individual Defendants' false statements to investors and the public in the name of the Company regarding its compliance with the strict regulations governing mortgage loan servicing, the NMS Settlement terms, the consent orders and judgments entered into by Ocwen, applicable state and federal statutes and the related party transactions and businesses discussed herein.

133.    In recent weeks, the Company has also received requests from large investors for Ocwen to remove itself as servicer of billions of dollars of mortgages backing mortgage-backed securities the investors own.   As set forth in an article in *The Wall Street Journal* on January 27, 2015, the investor group, which constitutes 25% of the holders of the purportedly $82 billion of securities at issue, the letter from investors alleges generally that Ocwen's string or regulatory problems and bad servicing practices was in direct conflict with the interests of investors and borrowers.

**E.    False Certifications**

134.    As senior officers of Ocwen, Defendants Erbey, Faris and Britti, among others in management, had extensive duties to ensure the accuracy and completeness of financial information disseminated to investors.

135.    As noted in American Institute of Certified Public Accountants ("AICPA") auditing standard, Section 110.03, a public company's management is responsible for preparing financial statements in accordance with GAAP:

> "The financial statements are management's responsibility.… Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management.  The auditor's knowledge of these matters and internal controls is limited to that acquired through the audit. Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility."

136.    In Accounting Series Release 173 (July 2, 1975), the SEC reiterated the duty of management to present a true representation of a company's operations:

> "[I]t is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations."

137.    Pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") and SEC rules promulgated thereunder, the chief executive officer and chief financial officer of reporting corporations, such as Ocwen, are required to certify as to the accuracy and completeness of a company's financial statements.

138.    At all relevant times, Ocwen's senior management, including but not limited to Defendants Erbey and Faris and the members of the Board's Audit Committee, repeatedly opined that internal controls over financial reporting were adequate, despite the fact that there was no check on Defendant Erbey's behavior, and despite the tangled web of conflicts between and among Ocwen and related entities identified herein, as well as other serious wrongful and illegal conduct as referred to herein directed by Defendant Erbey, and acquiesced in by each of

the other Individual Defendants.  Notwithstanding such wrongdoing, the Individual Defendants unjustifiably executed in 2012, 2013 and 2014 "clean certifications" pursuant to Sections 302 and 906 of SOX.  These certifications falsely and deceptively stated, *inter alia,* that the Company had disclosed all significant deficiencies and material weaknesses in the design for operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information. As such, the Individual Defendants are liable to the Company as a result of their false certifications.

## V.  DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.  *Fiduciary Duties*

139.  The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  By reasons of their positions as officers and/or directors and fiduciaries and because of their ability to control the business and corporate affairs of Ocwen, the Individual Defendants owe the Company and its stockholders the fiduciary obligations of trust, loyalty, good faith, candor and due care, and were required to do their utmost to control and manage the affairs of Ocwen in a fair, just, honest and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of Ocwen and its stockholders so as to benefit all stockholders equally, and not in furtherance of their own personal interests or benefit.

140.  Each officer and director of Ocwen owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the

Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, performance, management, projections, and forecasts so that the market price of Ocwen's stock would be based on truthful and accurate information.

141.    In failing to fulfill these duties, the Individual Defendants repeatedly and continuously, throughout the Relevant Period, made material misstatements of fact regarding the Company's compliance with regulatory obligations, its competitive advantages in complying with these obligations at a significant discount over competitors and commitments that it did not place the self-dealing transactions between Ocwen and its network of related companies above the interests of homeowners whose mortgages Ocwen serviced.  Specifically, in the Company's filings with the SEC, press releases, investor presentations and other public documents, Defendants misrepresented and omitted material information in breach of their fiduciary duty of disclosure regarding:

- The reduced costs to Ocwen associated with integrating newly acquired MSR's into the REALServicing platform and that the platform provided Ocwen with a competitive advantage over other servicers;
- The effectiveness of the REALServicing platform in maintaining regulatory compliance in the Company's servicing functions;
- That Ocwen adopted policies and procedures to ensure that potential conflicts of interest are avoided when it came to the related companies, including Altisource and HLSS.
- The purported "market rates" being charged by the related companies comparable to other market participants.
- Ocwen's general ability to adhere to applicable state, federal and local regulations pertaining to the servicing of mortgages.
- Development and enhancement of a compliance management system at Ocwen.
- The true relationship and business dealings between Ocwen and the related companies, and Defendants' characterizations that the Company had been "very complete and open" and provided "full disclosure" of those dealings.

142.    The truth has now been revealed regarding Ocwen's materially misleading statements during the Relevant Period, including that:

1953185.1

- Altisource's REALServicing platform was inferior to platforms such as FiServ because it prevented Ocwen from testing for all of the NMS compliance protocols and also resulted in the letter-backdating issue described herein.
- According to the December 22, 2014 Consent Order, Defendant Faris admitted that Ocwen's use of the REALServicing platform resulted in regularly giving borrowers incorrect and outdated information, sending borrowers backdated letters, unreliably tracking loans for investors and generally failed to maintain accurate records.
- As observed by the NY DFS in its 2014 communications, Ocwen did not have the appropriate or sufficient controls in place to prevent the Company's related-company transactions from causing harm to homeowners.
- In April 2014, the NY DFS found that Altisource's subsidiary, Hubzu, was charging Ocwen inflated rates that were up to three times larger than they were charging non-Ocwen related customers.  This was admitted to by Defendant Faris in the December 2014 Consent Order.
- The NY DFS found, in the April and August 2014 Letters to Ocwen, that the Company lacked sufficient controls to prevent the related-party transactions from causing harm to homeowners.  Furthermore, Defendant Faris admitted in the December 2014 Consent Order that no such written policy existed that required potentially conflicted employees, officers, or directors to recuse themselves from involvements in transactions with the related companies.

**B.**     ***Control, Access and Authority***

143.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Ocwen were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various misleading public statements disseminated by the Company.

144.    Because of their advisory, executive, managerial and directorial positions, each of the Individual Defendants had access to adverse, non-public information about Ocwen's lack of compliance with regulatory guidelines, financial condition, operations and misleading representations and had a duty to refrain from selling Ocwen stock while in possession of such undisclosed material adverse information.

145.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Ocwen, and was at all times acting within the course and scope of such agency.

### C.     *Reasonable and Prudent Supervision*

146.     To discharge their duties, the officers and directors of Ocwen were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the business and financial affairs of the Company.   By virtue of such duties, the Individual Defendants were required to, among other things:

> (i) ensure that the Company complied with applicable legal obligations, requirements and regulations, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

> (ii) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

> (iii) remain informed as to how Ocwen conducted its operations and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws;

> (iv) ensure that Ocwen was operated in a diligent, honest and prudent manner in compliance with applicable laws, rules and regulations;

> (v) properly and accurately guide investors and analysts as to the true financial condition of the Company, including making accurate statements about the Company's operations and financial results;

> (vi) implement adequate internal controls to ensure that the Company complied with all regulatory and legal requirements and to ensure that the Company remedied or reported any defects with

1953185.1

its products to the proper regulatory bodies as well as to the Company's shareholders; and

(vii) establish and implement appropriate risk assessment and risk management procedures.

147.     Ocwen's improper web of interconnected and affiliated business entities, pervasive consumer protection violations, failures to adhere to servicing regulations and the various consent orders, judgments and settlements described herein, and personal benefit of the Individual Defendants was not the result of a rogue employee or division, but instead, notwithstanding Ocwen's Code of Business Conduct and Code of Ethics for Senior Financial Officers, reflected a Company-wide, "anything goes" business philosophy, directed, encouraged and aggressively pursued by Defendant Erbey. Such philosophy was aimed at increasing Ocwen's revenues and profits through unscrupulous business practices, as well as improper charges, kickbacks  and improper business activities of related entities over compliance with laws and regulations designed to protect both borrowers, investors and the Company, without due regard to the long-term consequences of such wrongdoing.  Upon information and belief, the widespread abusive practices and illegal activities described herein were well known to senior management and the entire Board, and were knowingly pursued despite their knowledge of its illegality and/or cover-up and the inevitable harm to Ocwen and its shareholders.  By knowingly, recklessly or negligently permitting these business practices and strategies to continue, notwithstanding Ocwen's well-publicized codes of behavior and ethics, the Board adopted it as Company policy, and committed a sustained and systematic failure of compliance oversight in breach of each Board member's fiduciary duty of loyalty and good faith.

> **D.**     ***Code of Business Conduct and Ethics Allegations***
>
> 1.      <u>Ocwen's Code of Conduct</u>

1953185.1

148.    The Company's Board established the codes of conduct and published them extensively, despite knowing that they were not being and would not be followed.   The Company's April 3, 2013 Proxy Statement assured Ocwen's shareholders that:

> "We have adopted a Code of Business Conduct and Ethics that applies to our Directors, officers and employees as required by the New York Stock Exchange rules.  We have also adopted a Code of Ethics for Senior Financial Officers that applies to our Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer.  Any waivers from either the Code of Business Conduct and Ethics or the Code of Ethics for Senior Financial Officers must be approved by our Board of Directors or a Board Committee and must be promptly disclosed to you."

149.    The obligations established by Ocwen's codes of conduct were breached by the Individual Defendants, who are accountable to the Company as well as Plaintiff and the other shareholders for the damages caused to Ocwen.  All such conduct has caused, and will continue to cause the Company and its shareholders substantial economic and other damages, including but not limited to the massive and ongoing costs of investigating misconduct, implementing remedial measures and defending existing and future class action and other lawsuits and further damaging the Company's reputation and goodwill, all of which amounts cannot presently be calculated.

150.    Indeed, contrary to the letter and spirit of Defendant Faris' August 2013 introductory letter and the Code of Business Conduct and Ethics, the Board members used every means at their disposal (a) to frustrate the investigations of the CFPB, the NY DFS, the CDBO and other regulatory entities and to delay, as long as possible, any reckoning, (b) to delay public disclosure of the wrongful conduct of the Board and senior management as described herein; and (c) to avoid ultimate accountability for such wrongdoing including failing to act on Plaintiff's pre-suit demands as referred to below.  From the time of the wrongdoing alleged herein to the present, the Board and senior management of the Company specifically breached their fiduciary

obligations to "not just to comply with the laws and regulations that apply to our business … [but also] to abide by the highest principles of business ethics" as specifically mandated by the Code of Business Conduct and Ethics. In fact, the Board's Compliance Committee, which was charged with "oversight of the Company's compliance with applicable laws, rules and regulations governing its consumer-oriented businesses (including applicable state and Federal consumer financial protection laws and regulations)", abjectly failed and continues to fail in carrying out the responsibilities which it has been assigned. Indeed, there is no evidence that such Committee even functions with any effectiveness or real oversight or could be considered to be independent since Faris is one of only two members and he exhibits significant conflicts of interest as a member of management.

2. <u>Ocwen's Code of Business Conduct and Ethics</u>

151. Furthermore, Ocwen's Code of Business Conduct and Ethics ("Code of Conduct") was adopted on November 2, 2002 and last reviewed and approved on August 20, 2013.  The Code of Conduct is published on Ocwen's website and incorporated by reference in its Proxy Statements.  The Code of Conduct, applicable to all Ocwen employees and all members of the Company's Board of Directors, describes the purported policies of conduct followed by Ocwen in conducting its business operations.

152. The Code of Conduct is approved by the Board of Directors and each of them was directly responsible for approving and causing the publication of the misrepresentations set forth therein.  Compliance with the Code of Conduct is purportedly overseen by the senior-most executive of internal audit and the Company's general counsel.

153. In a letter prefacing the Code of Conduct, dated as of August, 2013, Defendant Faris, Ocwen's President and Chief Executive Officer, falsely represented that "[o]ur goal is not

63

just to comply with the laws and regulations that apply to our business; we also strive to abide by the highest principles of business ethics."   His misrepresentations continued:  "The purpose of the Code is to reinforce and enhance the Company's commitment to an ethical way of doing business.  The policies set forth here continue to be a part of Ocwen's long-standing tradition of high ethical standards as set forth in many of the Management Directives including Management Directive No. 1 – Legal and Ethical Conduct."   As set forth herein, contrary to these representations and assurances, the Company was engaged in a massive scheme of consumer financial abuses, unethical ways of doing business and securities fraud.   The Individual Defendants knowingly or recklessly permitted these abuses to occur, or passively acquiesced therein, with full knowledge of the risks to Ocwen inherent in their deliberate strategy.

154.   The Code of Conduct, as set for the in the 2014 Proxy Statement, contained numerous representations, which the Individual Defendants knew, or should have known were false, including the following:

- Ocwen Financial Corporation and its subsidiaries ("Ocwen" or the "Company") are committed to the highest standards of business conduct in our relationship with each other and with our customers/clients, suppliers, shareholders and others.  *This requires that we conduct our business in accordance with all applicable laws and regulations and in accordance with the highest standards of business ethics.*  (Code of Conduct, p. 5 of 21) (emphasis added).
- Ocwen employees and members of the Board are expected to dedicate their best efforts to Company business *and to avoid any conflicts with the interests of Ocwen.  (Id.)*
- In order to maintain the highest degree of integrity in the conduct of Ocwen's business and to maintain your independent judgment, you must avoid any activity or personal interest that creates or appears to create a conflict between your interests and the interests of the Company.  *A conflict of interest occurs when your private interests interfere in any way, or even appear to interfere, with the interest of the Company as a whole.*  A conflict situation can arise when you take actions or have interests that make it difficult for you to perform your company work objectively and effectively. You should never act in a manner that could cause you to lose your independence and objectivity or that could adversely affect the

confidence of our customer/clients, suppliers, directors or fellow employees in the integrity of Ocwen or its procedures. *(Id.)*(emphasis added).

- *Financial Interests in Other Businesses*:  Ocwen employees, members of the Board, and their immediate families may not have an ownership interest in any other enterprise if that interest compromises or appears to compromise the employee's loyalty to Ocwen.  (*Id.*, p. 6 of 21).

- **Insider Trading:**  You are prohibited by Company policy and the law from buying or selling securities of the Company at a time when in possession of "material nonpublic information." (*Id.*, p. 11 of 21).

- **Fair Dealing:**  Ocwen depends on its reputation for quality, service and integrity.  The way we deal with our customer/clients, competitors and suppliers mold our reputation, builds long-term trust *and ultimately determines our success.*  You should endeavor to deal fairly with the Company's customers/clients, suppliers, competitors, directors and employees.  *We must never take unfair advantage of others through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair dealing practice. Id.,* p. 13 of 21) (emphasis added).

155.   As outlined above, the Individual Defendants violated the Company's Code of Conduct in a systematic and sustained series of illegal and abusive business practices, dual ownership of affiliated entities that created rampant conflicts of interest and lack of objectivity and independence.  In addition, certain of the Individual Defendants have been accused, in separate lawsuits, of securities fraud and Defendants Erbey and Wish have been accused of insider trading violations.  In short, despite the tenets of the Company's Code of Conduct, the Individual Defendants left ethics, integrity and fair dealing by the wayside on their quest for ever higher revenues and thus, higher compensation and ever more lucrative incentives for themselves, in breach of their fiduciary duties.

156.   Further, the Code of Conduct provides that "[i]f you know of or suspect a violation of applicable laws or regulations, the Code, or the Company's related policies, you must immediately report that information to the Conduct and Ethics line …, the Senior-most Executive of Human Resources or a manager in the Human Resources Department, the Senior-

65

most Executive of Internal Audit and/or the General Counsel ….failure to report a suspected violation of the Code is itself a violation of the Code …".  Thus, to the extent any of the Individual Defendants passively acquiesced in or failed to report known or suspected violations of the Code of Conduct by others, that is itself a violation of the Code of Conduct and breach of fiduciary duty.

157.   Each member of  Ocwen's Board, among others, was  required to and, upon information and belief, did execute the following statement which appears at the end of the Code of Conduct:

### ACKNOWLEDGMENT FORM

I have received and read the Ocwen Code of Business Conduct and Ethics, and I understand its contents.  I agree to comply fully with the standards, policies and procedures contained in the Code and the Company's related policies and procedures.  I understand that I have an obligation to report to the Senior-most Executive of Internal Audit and/or the General Counsel or any of the other resources identified herein this code (sic) of any suspected violations of the Code of which I am aware.  I acknowledge that the Code is a statement of policies for business conduct and does not, in any way, constitute an employment contract or an assurance of continued employment.

158.   Notwithstanding the execution of the foregoing statement, Defendant Erbey, the members of the Audit and Compliance Committees and each of the other Individual Defendants knowingly failed to adhere to "the standards, policies and procedures contained in the Code and the Company's related policies and procedures."  Moreover, each of the Individual Defendants who executed the foregoing statement, despite their personal knowledge of the wrongdoing alleged herein, failed to fulfill his/her "obligation to report to the Senior-most Executive of Internal Audit and/or the General Counsel … any suspected violation of the Code of which I am aware."

3.      Ocwen's Code of Ethics for Senior Financial Officers

159.     Ocwen's Code of Ethics for Senior Financial Officers (the "Code of Financial Ethics") was adopted on November 7, 2002 and last reviewed and approved on December 2, 2013.   The Code of Financial Ethics is published on Ocwen's website and incorporated by reference in its Proxy Statements, including Ocwen's April 3, 2013 Proxy Statement.   The Code of Financial Ethics, applicable to the Company's Chief Executive Officer, Chief Financial Officer, and Chief Accounting Officer (collectively the "Senior Financial Officers"), sets forth specific policies to guide the Company's Senior Financial Officers in the performance of their duties.   The Code of Financial Ethics supplements the Code of Conduct and creates additional obligations for the Company's Senior Financial Officers.

160.     The Code of Financial Ethics states the Ocwen "is committed to full and accurate financial disclosure in compliance with applicable laws, rules and regulations and to maintaining its book and records in accordance with applicable accounting policies, laws, rules and regulations."

161.     The Code of Financial Ethics stresses the importance of compliance with applicable rules and regulations, and references the creation of a culture of high ethical standards, the antithesis of what was actually occurring at the Company.   The Code states:

> Ocwen is committed to conducting our business in accordance with all applicable laws, rules and regulations and in accordance with the highest standards of business ethics.   As a Senior Financial Officer, you must comply with applicable laws.   In addition, you also have leadership responsibilities that include creating a culture of high ethical standards and commitment to compliance, maintaining a work environment that encourages employees to raise concerns and promptly addressing employee compliance concerns.

162.     The Code of Financial Ethics, like the Code of Conduct, stresses the importance of independent judgment and the avoidance of actual or perceived conflicts of interest, stating:

> In order to maintain the highest degree of integrity in the conduct of Ocwen's business and your independent judgment, you must avoid any activity or personal

67

interest that creates or appears to create a conflict between your interests and the interests of Ocwen.  A conflict of interest occurs when you private interests interfere in any way, or even appear to interfere, with the interests of Ocwen as a whole.  *You should conduct the Company's business in an honest and ethical manner and never act in a manner that could cause you to lose your independence and objectivity.*  Any material transaction or relationship that reasonably could be expected to give rise to a conflict must be reported to the Audit Committee.  (emphasis added).

163.    As outlined above, Ocwen's Senior Financial Officers, namely Defendants Faris and Britti, violated the Company's Code of Financial Ethics in a systematic and in a sustained manner, misrepresented or failed to disclose the true financial and operating condition of the Company, failed to issue financial statements and Company reports in compliance with GAAP, and participated in or acquiesced in violations of federal securities laws, state and federal consumer financial protection laws and regulations and other applicable laws. The Company's Senior Financial Officers, as well as all of the other Individual Defendants, failed entirely to create a culture of high ethical standards and commitment to compliance, subjecting Ocwen and its shareholders to billions of dollars in damages, lost market value of their stock holdings, as well as expensive, time consuming and on-going governmental and regulatory investigations and substantial potential civil liability from both pending and potential future class action and other litigation.

164.    Each the Company's Senior Financial Officers was required to and, upon information and belief, did execute the following statement which appears at the end of the Code of Financial Ethics:

## ACKNOWLEDGMENT FORM

I have received and read the Code of Ethics for Senior Financial Officers, and I understand its contents.  I agree to comply fully with the standards, policies and procedures contained in the Code of Ethics and the Company's related policies and procedures.  I understand that I have an obligation to report to the Senior-most Executive of Internal Audit or the Audit Committee of the Board of

Directors any suspected violations of the Code of Ethics of which I am aware.  I certify that, except as fully disclosed in accordance with the terms of this Code of Ethics, I had not engaged in any transactions or activities that would constitute an actual or apparent conflict with the interests of the Company.  I further certify that, except as noted below, I am otherwise in full compliance with the Code of Ethics and any related policies and procedures.

165.   Notwithstanding the execution of the foregoing statement, each of Ocwen's Senior Financial Officers knowingly failed to adhere and fully comply with "the standards, policies and procedures contained in the Code of Financial Ethics and the Company's related policies and procedures."  Moreover, each of these Senior Financial Officers who executed the foregoing statement, despite his/her personal knowledge of the wrongdoing alleged herein, failed to fulfill his/her "obligation to report to the Senior-most Executive of Internal Audit or the Audit Committee of the Board of Directors any suspected violation of the Code of Ethics of which I am aware."  Each of the Company's Senior Financial Officers falsely certified that "I am otherwise in full compliance with the Code of Ethics and any related policies and procedures" as well as that "I had not engaged in any transactions or activities that would constitute and actual or apparent conflict with the interests of the Company."

E.     *Audit Committee Allegations*

166.   Defendants Korn, Wish and Salcetti (the "Audit Committee Defendants") owed specific heightened duties as members of the Board's Audit Committee.  Pursuant to the Audit Committee's Charter, in effect for many years and last amended and adopted on February 25, 2014, these Defendants are responsible for being the Board's front line in the oversight of internal controls and legal compliance, accurate financial reporting and accounting and enforcement of Ocwen's Code of Conduct and Code of Financial Ethics.

167.   Ocwen's current and prior Audit Committee Charters state, in substance:

The purpose of the Audit Committee (the "Committee" of the Board of Directors (the "Board") of Ocwen Financial Corporation (the "Company") is to provide assistance to the Board in fulfilling its legal and fiduciary obligations with respect to matters involving the accounting, auditing, financial reporting, internal control and legal compliance functions of the Company and its subsidiaries.  This includes, without limitation, (a) assuming the Board's oversight of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the Company's independent auditors' qualifications and independence and (iv) the performance of the Company's independent auditors and the Company's internal audit function, and (b) preparing the report required to be prepared by the Committee pursuant to the rules of the Securities and Exchange Commission (the "SEC") for inclusion in the Company's annual proxy statement.

168.    Both before and since being charged with responsibility to investigate the claims made in Plaintiff's February Demand Letter and Second Demand Letter to the Board as referred to below, the Audit Committee has abjectly and knowingly, with the advice of conflicted legal counsel, failed to fulfill the foregoing responsibilities.

169.    In particular, during the period of the wrongdoing alleged herein, the members of the Audit Committee failed to fulfill their oversight responsibilities with respect to the accounting and financial reporting processes of the Company, including the integrity of the financial statements and other financial information, which they knew or should have known were not accurate, were not properly audited by an independent auditor and suffered material control shortcomings.

170.    Moreover, each of the members of the Audit Committee serving at the times of the wrongdoing alleged herein was personally aware or should have been aware that the Company was not in compliance with legal and regulatory requirements including, *inter alia*, federal securities laws, state consumer protection laws and mortgage servicing practices and federal consumer financial protection laws, rules and regulations.  At all relevant times, the members of the Audit Committee had total access to all documents and information bearing upon

70

the Company's operations including the information relevant to the wrongdoing referred to herein.   In addition to each of such members of the Audit Committee being members of the Board, they were charged with specific responsibilities that enhanced their access to such documents and information pursuant to the Audit Committee Charter which required them to, *inter alia*:

IV.    DUTIES AND RESPONSIBILITIES OF THE COMMITTEE

a.    Obtain and review at least annually the Company's internal audit plan, internal audit budget and risk management report;

b.    . . .

c.    . . .

d.    Obtain and review at least annually the report of the independent auditors describing:

   i.    the independent auditors' internal quality-control procedures;

   ii.    any material issues raised by the most recent internal quality-control review, by a peer review or by any inquiry or investigation by any governmental or professional authority of the independent auditors, within the preceding five years, respecting one or more independent audits carried out by the independent auditors, and any steps taken to deal with any such issues;

e.    Review the annual audit plan of the Company's independent auditors, including the scope of the audit, and monitor such plan's progress and results during the year;

f.    Review the results of the year-end audit of the Company by the independent auditors, including any significant matters regarding internal controls over financial reporting that have come to their attention during the conduct of the audit;

g.    Meet to review and discuss with management and the independent auditors the Company's annual audited financial statements and "Management's Discussion and Analysis disclosures, and recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K;

h.    Meet and review and discuss with management and the independent auditors, the Company's quarterly financial statements, Management's Discussion and Analysis and the results of independent auditor's review of the quarterly financial statements;

i.    Review with management, the Company's independent auditors' and the Vice President of the Company's internal auditing department, the following:

        i.     critical accounting policies and such other accounting policies of the Company as are deemed appropriate for review by the Committee prior to any interim or year-end filings with the SEC or other regulatory body, including any financial reporting issues which could have a material impact on the Company's financial statements;

        ii.    any significant changes in the Company's selection or application of accounting principles;

        iii.   alternative treatments of financial information that have been discussed by the independent auditors and management, ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the auditors;

        iv.   all other material written communications between the independent auditors and management; and

        v.    the effect of off-balance sheet structures on the financial statements of the Company;

    j.    Review with the chief executive officer and chief financial officer and independent auditors, the following:

        i.     all significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize, and report financial data, including any material weaknesses in internal controls identified by the Company's independent auditors;

        ii.    any fraud, whether or not material, that involved management or other employees who have a significant role in the Company's internal controls; and

        iii.   any significant changes in internal controls over financial reporting, including any corrective actions with regard to significant deficiencies and material weaknesses.

    k.    Review:

        i.     the adequacy and effectiveness of the Company's accounting and internal control policies and procedures on a regular basis, including the responsibilities, budget and staffing of the Company's internal audit function, through inquiry and discussions with the Company's internal auditors and management of the Company; and

        ii.    any required report prepared by management, and attested to by the Company's independent auditors, regarding the effectiveness of the Company's internal controls over financial reporting and stating management's responsibility to establish and maintain such internal controls, prior to its inclusion in the Company's annual report;

    l.    Review with management the Company's administrative, operational and accounting internal controls, including any special steps adopted in light of the discovery of material control deficiencies, and evaluate whether the Company is operating in accordance with its prescribed policies, procedures and codes of conduct;

m.      Receive periodic reports from management to assess the impact on the Company of significant accounting or financial reporting developments that may have a bearing on the Company;

n.      Establish and maintain free and open means of communication between and among the Board, the Committee, the Company's independent auditors, the Company's internal auditing department and management, including providing such parties with appropriate opportunities to meet separate and privately with the Committee on a periodic basis;

o.      Discuss guidelines and policies governing the process by which senior management of the Company assess and manage the Company's exposure to risk, as well as the Company's major financial risk exposures, including the Company's credit risk, liquidity risk, regulatory risk, operational risk and enterprise risk, and the steps management has taken to monitor and control such exposures;

p.      Meet regularly with the Company's internal auditors and the independent accountants to discuss the scope and plan for the internal audit and include management in its review of accounting and financial controls, assessment of business risks and legal and ethical compliance programs;

q.      Meet at least annually with the general counsel, and outside counsel when appropriate, to review legal and regulatory matters, including any matters that may have a material impact on the financial statements of the Company;

r.      Prepare the report required by the rules of the SEC to be included in the Company's annual proxy statement;

s.      Review the Company's program to monitor compliance with the Company's Code of Conduct, and meet periodically with the Company's Chief Compliance Officer to discuss compliance with the Code of Conduct:

xxvii.      Establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls and auditing matters, and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters:

xxviii.      Review, approval or ratification of transactions with related persons;

xxix.      Report regularly to the Board on its activities, as appropriate.  In connection therewith, the Committee should review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditors or the performance of the internal audit function;

171.    By knowingly and recklessly failing to ensure internal controls were in place and regulatory guidelines adhered to, and by allowing Defendant Erbey to exercise unbounded

discretion and personal autonomy over the Company's operations, as well as the operations of the affiliated entities identified herein, and allowing Defendants Erbey and Wish to maintain conflicting financial interests, all of which resulted, among other things, in certain of the wrongdoing described above, which is continuing through the present, the Audit Committee Defendants breached their fiduciary duties of loyalty and good faith owed to the Company.

172.    In light of the widespread nature of the wrongdoing referred to herein, the members of the Audit Committee effectively acquiesced therein and were (and are) personally responsible for the cover-up of such wrongdoing. As such, they (as well as other members of the Board) were not and could never be considered independent, disinterested or investigating the wrongdoing claimed by Plaintiff and other Ocwen shareholders in good faith.

173.    Moreover, upon information and belief, despite their knowledge of ongoing investigations of the Company's illegal practices, neither the members of the Audit Committee nor the Board as a whole commenced any serious internal investigation of the wrongdoing as alleged by Plaintiff and other shareholders of the Company. Moreover, consistent therewith, they continued to appoint D&T as Ocwen's auditor rather than a truly independent auditor which would expose such wrongdoing.

### F.    *Compliance Committee Allegations*

174.    Defendants Salcetti and Faris (the "Compliance Committee Defendants") owed specific heightened duties as members of the Board's Compliance Committee.  Pursuant to the Compliance Committee Charter, in effect for many years and last amended and adopted on February 25, 2014, these Defendants are responsible for ensuring that the Company functions in compliance with the laws, rules and regulations governing its consumer-oriented business,

including applicable state and Federal consumer financial protection and securities laws and regulations.

175.    The Compliance Committee Charter states as follows:

The purpose of the Compliance Committee (the "Committee") of the Board of Directors (the "Board") of Ocwen Financial Corporation and its subsidiaries (together, the "Company") is to provide assistance to the Board with (i) establishment and oversight of the Company's compliance function, including the Company's compliance management system, and (ii) oversight of the Company's compliance with applicable laws, rules and regulations governing its consumer-oriented businesses (including applicable state and Federal  consumer financial protection laws and regulations).

176.    Each of the members of the Compliance Committee serving at the times of the wrongdoing alleged herein was personally aware or should have been aware that the Company was not in compliance with legal and regulatory requirements including, *inter alia*, applicable state and federal consumer financial protection laws and regulations.   At all relevant times, the members of the Compliance Committee had total access to all documents and information bearing upon the Company's operations including the information relevant to the wrongdoing referred to herein.   In addition to each of such members of the Compliance Committee being members of the Board, they were charged with specific responsibilities that enhanced their access to such documents and information pursuant to the Compliance Committee Charter which required them to, *inter alia*:

**<u>DUTIES AND RESPONSIBILITIES OF THE COMMITTEE</u>**

a.      Review the status of the Company's compliance with Federal consumer financial laws, applicable state laws and internal policies, procedures and controls;

b.      Receive and oversee the assessment of internal and external data and reports relating to the Company's compliance programs;

c.      Oversee the activities of the Company's Compliance Management Committee, including review of internal data and reports prepared by the Compliance Management Committee;

d.      Receive periodic reports, no less than quarterly, from the Chief Compliance Officer and the Company's General Counsel regarding (i) pending or

threatened government investigations, examinations, inquiries, demands or proceedings and material litigation, in each case which cover or would be expected to cover compliance with consumer financial laws and/or involve allegations of potentially unlawful, unfair or discriminatory acts and practices, (ii) details and factual information regarding any material claim or pattern of claims alleging that the Company is not in compliance with Federal consumer financial laws and/or applicable state laws or may be engaged in a pattern of unfair, deceptive, abusive, discriminatory acts of practices and (iii)regulatory developments relevant to the Company's business;

      e.     Review and approve, at least annually, the Company's formal written compliance plan and policy statements and directives related to compliance with applicable Federal consumer financial laws and applicable state laws;

      f.     Review new consumer financial products or services or Company strategies, to determine degree of compliance function participation (including consideration of fair lending or antidiscrimination laws);

      g.     Oversee the formulation and implementation of the Company's compliance management system, consisting of four interdependent control components, (i) Board and management oversight, (ii) written compliance program, (iii) response to consumer complaints, and (iv) compliance audit function;

      h.     Periodically review the Company's consumer complaint intake and resolution function, in light of risk of violation of state laws and Federal consumer financial laws and related risks to consumers;

      i.     Request reports from the Chief Compliance Officer, the Company's General Counsel and management regarding the preparation, implementation and updating of the Company's compliance policies, procedures, training and controls;

      j.     Ensure that the full Board receives reports and materials as necessary from time to time regarding significant compliance issues.

177.    The Compliance Committee Charter further requires that the Committee evaluate, on an annual basis, its performance under the Charter, including at least the following: the adequacy, appropriateness and quality of the information and recommendations presented by the Committee to the Board, the manner in which they were discussed or debated, and whether the number and length of meetings of the Committee were adequate for the Committee to complete its work in a thorough and thoughtful manner. The Compliance Committee is required to deliver to the Board a report setting forth the results of its annual evaluation, including any recommended changes to the Company's or the Board's policies or practices.

178.    The Compliance Committee Defendants, directly and/or through subordinates, blatantly violated the Company's Compliance Policy by, *inter alia*, participating and/or acquiescing in the ongoing wrongdoing and/or failing to have in place adequate internal controls and oversight to prevent the widespread wrongdoing and violation of state and federal consumer financial protection, mortgage servicing and securities laws and regulations and other wrongdoing as outlined herein, which was systemic and ongoing, all of which has caused Ocwen billions of dollars in damages to date and is subjecting it to further damages, fines, penalties and injunctive relief.    That the Compliance Committee Defendants failed to fulfill their responsibilities is evidenced by the most recent settlement with the NY DFS of December 22, 2014 pursuant to which the Company effectively acknowledged their failings.

179.    Furthermore, Defendant Faris' involvement and participation on the Compliance Committee presents a clear conflict of interest and makes clear that the Compliance Committee was nothing more than another arm of Management under the influence and control of management, as opposed to an independent entity.

**G.    Corporate Governance Guidelines**

180.    Ocwen's Corporate Governance Guidelines were adopted by the Board on November 7, 2002, and last amended and adopted on February 25, 2014.  Purportedly, the Corporate Governance Guidelines "reflect the Board's commitment to monitor the effectiveness of policy and decision making both at the Board and management level, with a view to enhancing long-term stockholder value."  However, contrary to these representations, and as demonstrated above, the Board failed to effectively monitor either policy or decision-making, instead breaching their fiduciary duties by participating in, acquiescing in and/or failing to prevent widespread abusive practices, rampant conflicts of interest and a myriad of other

wrongdoing, as alleged herein.  Further, contrary to the Corporate Governance Guidelines that a "director is expected to spend the time and effort necessary to properly discharge such director's responsibilities," the Individual Defendants had neither the time, nor the inclination, to devote to their duties as Directors, thus enabling the wrongdoing to occur and to continue unabated to the present.

181.   Pursuant to the Corporate Governance Guidelines, in order to build long-term value for the Company's stockholders, the Board was duty-bound to monitor the performance of the Company (in relation to its goals, strategy and competitors) and the performance of Ocwen's Executive Chairman, Defendant Erbey, and the Chief Executive Officer, Defendant Faris.  The Corporate Governance Guidelines further state:

> The Board is also responsible for assuring that the Company's management and employees operate in a legal and ethically responsible manner.  When it is appropriate or necessary, it is the Board's responsibility to remove the Chief Executive Officer and to select his or her successor.

182.   Each of the Individual Defendants breached the Company's Corporate Governance Guidelines by, *inter alia*, their participation and acquiescence in the wrongdoing alleged herein, failing to implement sufficient internal controls to prevent and/or minimize the alleged wrongdoing and failing to adequately investigate the alleged wrongdoing and remove those responsible in the face of numerous and ongoing investigations and lawsuits.

183.   Ocwen's current and previous Board of Directors Corporate Governance Guidelines further state, in pertinent part:

> "Independence of the Board. The Board shall be comprised of a majority of directors who qualify as independent directors ("independent Directors") under the listing standards of the New York Stock Exchange (the "NYSE") and applicable law.
>
> The Board shall review annual the relationships that each director has with the Company (directly or as a partner, shareholder or officer of an organization that

has a relationship with the Company or otherwise). Following such annual review, only those directors who the Board affirmatively determines have no material relationship with the Company (directly or as a partner, shareholder or officer of any organization that has a relationship with the Company or otherwise) will be considered Independent Directors, subject to additional qualifications prescribed under the listing standards of the NYSE or under applicable law. The Board may adopt and disclose categorical standards to assist it in determining director independence.

184.    As a result of direct and indirect Ocwen shareholdings, including his direct and indirect holdings in the related entities with which Ocwen does business, identified above, Defendant Erbey controls every aspect of the Company's business including, *inter alia*, all nominations to the Company's Board of Directors. Although the Guidelines proclaim that a majority of Board members should be independent, none of the Ocwen directors is, in fact, free of the control of Defendant Erbey. Each of them owes his appointment, power and lucrative compensation package to Defendant Erbey, who has either directly caused each of them to be appointed to the Board or has acquiesced in their appointments as directors. This is true despite his resignation as Executive Chairman by reason of his shared culpability with the other Individual Defendants and his personal stockholdings. Thus, each of Ocwen's directors continues to owe fealty to Defendant Erbey and will take no action contrary to his personal interests. Even if the nominally independent Board members satisfy the rather lax and purely technical "standards" for independence set by the Exchange Act and the New York Stock Exchange, the reality is that each director owes personal fealty to Defendant Erbey and, thus, cannot seriously be considered independent notwithstanding such "standards."

185.    Further, despite certain Guidelines regarding self-evaluation purportedly designed to ensure compliance with Company policies and procedures, the Board and the Nomination/Governance Committee failed to meaningful evaluate board members' performance

and/or to take action to ensure that the Individual Defendants, particularly Defendant Erbey, were fulfilling their fiduciary obligations to the Company and had no conflicts of interest.

### H.   Nomination/Governance Committee Allegations

186.   At all relevant times, the members of Ocwen's Nomination/Governance Committee were the following:  Defendants: Wish, Lacy and Salcetti.

187.   Ocwen's Nomination/Governance Committee Charter, in effect during the period relevant herein and last amended and adopted February 25, 2014, provides as follows:

> The purposes of the Nomination/Governance Committee (the "Committee") of the Board of Directors (the "Board") of Ocwen Financial Corporation (the "Company") shall be to recommend to the Board individuals qualified to serve as directors of the Company and on committees of the Board: to advise the Board with respect to the Board composition, procedures and committees; to develop and recommend to the Board a set of corporate governance principles applicable to the Company; and to oversee the evaluation of the Board and the Company's management.

188.   The Nomination/Governance Committee's duties with respect to Board Candidates and Nominees included, among other things:

> a.   To establish procedures for evaluating the suitability of potential director nominees proposed by management or shareholders.
> b.   To review the suitability for continued service as a director of each Board member when his or her term expires and when he or she has a significant change in status, including but not limited to an employment change, and to recommend whether or not the director should be renominated.
> c.   The Nomination/Governance Committee was also charged with oversight of the Board Committees, including a duty to establish special committees to address ethical, legal or other matters that arise.  The Charter provides, in pertinent part, as follows with respect to the goals and responsibilities of the Committee with respect to the committee structure of the Board:
> d.   To make recommendations to the Board regarding the size and composition of each standing committee of the Board of Directors, including identification of individuals qualified to serve as members of a committee.
> e.   To monitor the functioning of the committees of the Board and to make recommendations for any changes, including the creation and elimination of committees.
> f.   To recommend that the Board establish such special committees as may be desirable or necessary from time to time in order to address ethical, legal

or other matters that may arise.  The Committee's power to make such a recommendation under this Charter shall be without prejudice to the right of any other committee of the Board, or any individual director, to make such a recommendation at any time.

189.    With respect to Corporate Governance, the Nomination/Governance Committee had the following specific responsibilities:

> g.    To develop and recommend to the Board a set of corporate governance principles for the Company, which shall be consistent with any applicable laws, regulations and listing standards.
> h.    To review periodically, and at least annually, the corporate governance principles adopted by the Board to assure that they are appropriate for the Company, and to recommend any desirable changes to the Board.
> i.    To consider any other corporate governance issues that arise from time to time, and to develop appropriate recommendations for the Board.

190.    The Committee was further responsible "for overseeing the evaluation of the Board as a whole and the management of the Company, including the Executive Chairman and the Chief Executive Officer.  The Committee will prepare and assist each other committee's self-evaluation to determine whether such committees are functioning effectively.  The Committee shall establish procedures to allow it to exercise these oversight functions."

191.    Notwithstanding its duties under the Nomination/Governance Committee charter, neither the Committee nor the Board itself made any serious evaluation of the director nominees or sitting directors, particularly in terms of their performance, effectiveness and amount of time available to fulfill their stewardship responsibilities.  Thus, each the director defendant members of the Nomination/Governance committee breached their duties under the charter.

I.    *Compensation Committee Allegations*

192.    At all relevant times, the members of Ocwen's Compensation Committee Defendants Lacy and Korn.

193.     Ocwen's Compensation Committee Charter, in effect during the period relevant

herein and last amended and adopted February 25, 2014, provides as follows:

> The purposes of the Compensation Committee (the "Committee") of the Board of Directors (the "Board") of Ocwen Financial Corporation (the "Company") shall be to oversee the Company's compensation and employee benefit plans and practices, including its executive compensation plans and its incentive compensation and equity-based plans; and to produce an annual report on executive compensation for inclusion in the Company's proxy statement in accordance with all applicable rules and regulations.

194.     Among the specific responsibilities of the Individual Defendants who were

members of the Compensation Committee were, *inter alia*, the following:

> a.     To review at least annually the goals and objectives of the Company's executive compensation (other than with respect to the Executive Chairman and the Chief Executive Officer) and to make recommendations to the Board with respect to such executive compensation in light of such goals and objectives.

> b.     To review and approve annually the corporate goals and objectives applicable to the compensation of the Executive Chairman and the Chief Executive Officer, evaluate annually the performance of the Executive Chairman and the Chief Executive Officer in light of  such goals and objectives, and either as a Committee or together with the other independent directors on the Board (as directed by the Board), determine and approve each of the Executive Chairman's and the Chief Executive Officer's compensation levels based on their respective evaluations.  In determining the long-term incentive component soft each of the Executive Chairman's and the Chief Executive Officer's compensation, the Committee shall consider all relevant factors, including the Company's performance and relative stockholder return …

> c.     To evaluate annually the appropriate form and amount of compensation for Board and Committee service by members of the Board.

195.     With respect to Incentive Compensation and Equity-Based Plans, the

Compensation Committee was responsible "[t]o review at least annually the goals and objectives

of the Company's incentive compensation and equity-based plans and, to the extent such plans

are subject to Board approval, make recommendations to the Board with respect to such plans in

light of such goals and objectives."

196.    The Compensation Committee was also specifically charged with evaluating the Company's compensation policies in relation to risk management.   The Compensation Committee Charter directs the Committee members:

> "To review and consider the Company's policies and practices of compensating its employees, including non-executive officers, as they relate to risk management practices and risk-taking incentives, and whether risks arising from the Company's compensation policies and practices for its employees are reasonably likely to have a material adverse effect on the Company."

197.    The members of the Compensation Committee failed to align the compensation of senior executive management and the Board with appropriate risk management practices and risk taking incentives, and instead permitted a structure where short term profits and greed were permitted to override sound and ethical business practices and decision-making.  The Board and senior management was handsomely compensated without meaningful evaluation as to such members performance in relation to stockholder value and long-term performance incentives. As such, each member of the Compensation Committee breached his duties pursuant to the committee charter.

198.    Furthermore, as set forth above, the Compensation Committee breached their fiduciary duties by awarding Defendant Erbey one million stock options under the 2007 Compensation Plan that he was forced to return due to a violation of the Company's stock option plan.  A violation that was brought to the Committee's attention by an Ocwen shareholder and which the SEC commenced an investigation into.  This was a gross failure of the role and duties of the Compensation Committee and further reflects their being controlled by Defendant Erbey.

83

## VII.   DERIVATIVE ALLEGATIONS

### A.   General Derivative Allegations

199.   Plaintiff brings this action derivatively in the right and for the benefit of Ocwen to redress the breaches of fiduciary duty, waste of corporate assets, unjust enrichment and other wrongful conduct by the Individual Defendants as alleged herein.

200.   Plaintiff owns and has continuously owned common stock in Ocwen beneficially during the period of the wrongdoing alleged herein.

201.   Plaintiff will adequately and fairly represent the interests of Ocwen and its shareholders in enforcing and prosecuting its rights, and has retained counsel experienced in prosecuting this type of action.

### B.   Plaintiff has Made Pre-Suit Demands Pursuant to Rule 23.1

202.   Ocwen's Board of Directors at the time Plaintiff commenced this litigation was comprised of the following seven individuals: Defendants Erbey, Faris, Korn, Lacy, Wish, Ross and Salcetti.  Each such Defendant owes his position as a director, together with the substantial financial and other benefits thereof, to Defendant Erbey.

203.   On February 11, 2014, Plaintiff made a pre-suit demand on the Board as required by Fed. R. Civ. P. 23.1. A copy of the letter from Richard D. Greenfield, Esq., one of Plaintiff's counsel, setting forth such demands (the "February Demand Letter") is attached hereto as Exhibit "A".  The February Demand Letter and the allegations therein are incorporated herein by reference.

204.   Ultimately, after more than four months passed, and with the Board taking no action within 90 days (as required by Chapter 607 of the Florida Business Corporation Act, §607.07401) to even consider the claims set forth in the February Demand Letter, Mr. Greenfield was informed on June 13, 1014 that the Board had retained counsel, Carlton Fields Jorden &

Burt ("Carlton Fields"), to represent its members (each of the Individual Defendants) in connection with the February Demand Letter.

205.     After further inquiry, Mr. Greenfield learned that the Board had retained Sam Salerio, Jr. and the firm Carlton Fields to represent it in connection with Plaintiff's February Demand Letter.   Mr. Greenfield then inquired of Mr. Salerio to assess the *bona fides* of the Board's belated response (including the appointment of a so-called special litigation committee or "SLC") and the retention of counsel. The inquiry was contained in Mr. Greenfield's e-mail to Mr. Salerio dated June 27, 2014 as follows:

> I understand from Jason Moff's e-mail of June 13 that your firm has been retained by Ocwen's Board of Directors "to advise the Board on the formation and membership of a [special litigation] committee, to advise the committee with respect to its investigation, and to advise the committee with respect to its recommendation to the Board about its response to the allegations in [my] February 11, 2014 letter" to Ocwen's Board.
>
> In connection with that retention, I would appreciate it if you would kindly send to me a copy of the Board's resolutions establishing the special litigation committee ("SLC"), identifying its members, setting forth its mandate and providing for your firm's retention. Moreover, given the substantial passage of time since my letter to the Board of February 11, I trust that you will be kind enough to provide me with answers to the following questions as soon as possible:
>
> 1.     Were you or a representative of your firm present at any portion of any meeting of members of Ocwen's Board of Directors where the Demand Letter was discussed?
>
> 2.     What criteria were used by the Board to determine which of its members would be appointed to serve as the members of the so-called SLC?
>
> 3.     Who participated in the determination of such criteria?
>
> 4.     Were there any factors or facts that the Board considered that might serve to disqualify any individual Ocwen Director from serving on the SLC?
>
> 5.     What process did the Board utilize to select those of its members who would be appointed to serve as the members of the SLC?

1953185.1

6.      Did anyone investigate each of the proposed members of the SLC to determine whether there were any facts or circumstances which would disqualify any of such members from serving? If so, who performed such investigation and when?

7.      Has your firm, the SLC and/or Ocwen's Board commenced the investigation of the allegations set forth in the Demand Letter?

8.      If so, when did such investigation commence?

9.      Will your firm and/or the members of the SLC attempt to calculate the extent of the economic and non-economic damages alleged in the Demand Letter?

10.     Will your firm or the SLC be taking any action as to any remedial measures which address any of the wrongdoing alleged in the Demand Letter?

11.     Which persons played a role in the selection of you and/or your firm to advise the Board and/or the SLC?

12.     When did you first learn that you and/or your firm were being considered to represent the SLC, the entire Board of Directors or any of the Ocwen Directors in connection with the Demand Letter?  From whom did you learn this fact?

13.     What steps were taken to insure that there were no facts or circumstances that might justify disqualification of you and/or your firm from acting as counsel to the SLC or the Board?  By whom and when?

14.     Assuming your firm performed a conflict check before being considered for the assignment ultimately accepted by you, when was such conflict check performed and by whom?

15.     Have you or any member of the SLC shared any of the facts that you have uncovered and/or your conclusions relating to the Demand Letter, directly or indirectly, with any member of the Ocwen Board?

I look forward to receiving your responses very shortly.

206.    In turn, despite the fact that the questions posed by Mr. Greenfield addressed the legitimacy of the Board's response, Mr. Salerio wrote back as follows:

Thank you for your email.  As you may be aware, our firm's engagement on this matter is recent.  We are in the beginning stages of our work.  I do not have client authority to respond to the questions you pose below.  In candor, I would have a difficult time

86

> recommending a response to these requests at this early stage, because our involvement here is recent and many of your questions at least implicate issues of attorney-client privilege and work product that need to be considered.

207.    The issues that Mr. Salerio raised in an attempt to avoid responding to all of the questions were addressed by Mr. Greenfield in his response of July 2, 2014:

> Very few of the questions I directed to you implicate issues of privilege or work product, and, even if they do, your responses can easily av[o]id divulging privileged communications and/or work product. They are fact-based questions going to the bona fides of the process used to select the members of the SLC, your firm, *etc*. As such, I cannot imagine that you will be unable to obtain your clients' permission to respond.

208.    Mr. Salerio repeated his refusal to provide any information that could establish the *bona fides* of his appointment or the belated investigation his firm was commencing:

> As noted below, we are not prepared to recommend responding to these requests at this early stage or our engagement.  We will be completing some initial work over the next week or so, and will reach out to you thereafter.

209.    Despite his promise to provide the factual background for the appointment by the Board of the SLC and retention of counsel, neither Mr. Salerio nor anyone else on behalf of the Board provided **any** of the requested information.  The failure to establish the legitimacy of the Board's purported response to the February Demand Letter is *prima facie* evidence that such response is a sham established solely for the purposes of creating a "whitewash" of the Individual Defendants' wrongdoing and to provide a staging platform for the eventual motions to stay and/or dismiss that will be filed by defendants in this and any other shareholder derivative suit.  In fact, Ocwen has ***never*** disclosed in its SEC filings (including its 2014 Proxy Statement) the existence of Plaintiff's Demand Letter, his Second Demand Letter, the demand letters sent to the Board by other Ocwen shareholders or the establishment of an SLC.

210.    The sham nature of the SLC and the process undertaken by Carlton Fields in furtherance of a "whitewash" of the wrongful conduct of the Defendants named herein is explained by, *inter alia*, the fact that Carlton Fields, purportedly "independent counsel," was receiving its direction from the Company's conflicted attorneys who were also simultaneously counsel for certain Individual Defendants (including Defendant Erbey) in this litigation, the securities fraud and other litigation.  Indeed, such direction was for the purpose of, as indicated above, establishing a pretext for seeking a stay of any shareholder litigation (such as this one) and for an ultimate motion to dismiss based upon the SLC's "whitewash."  In addition, Carlton Fields was apparently not independent, as it was selected by the Board, rather than the SLC.

211.    Subsequent to the Demand Letter and even during the sham (and wholly concealed) SLC process, the Individual Defendants continued their wrongdoing. As referred to above, in August, 2014, Superintendent Lawsky expressed concerns about the way Ocwen was said to have routed insurance fees though one of the Erbey-controlled affiliates of Ocwen after having earlier halted the Company's proposal to acquire the right to service approximately $39 billion in mortgages of Wells Fargo & Co.  On October 31, 2014, after flagrantly deceiving Ocwen's Monitor, Joseph Smith, and consistently violating federal, New York and other states' laws. See letter from Mr. Lawsky to Timothy Hayes, Ocwen's General Counsel, attached hereto as Exhibit "B", the contents of which are incorporated herein by reference.

212.    In the wake of such ongoing conduct in breach of the fiduciary and other duties of the Individual Defendants, on October 31, 2014, Plaintiff supplemented, *nunc pro tunc*, the Demand Letter.  A copy of the Second Demand Letter from Richard D. Greenfield, Esq. setting forth additional demands is attached hereto as Exhibit "B".  The Second Demand Letter and the allegations contained therein are incorporated herein by reference.

213.    Notwithstanding the longstanding efforts of Superintendent Lawsky and the Monitor, Mr. Smith, to eradicate its nefarious business practices, the Board continued with "business as usual." As recently as December 17, 2014, *The Palm Beach Post* reported that Mr. Smith had, once again, complained that the Company had "produced unreliable information about its business practices."

214.    In making the demands set forth in the Demand Letter and the Second Demand Letter, Plaintiff was in no way conceding the disinterestedness or independence of any of the Ocwen directors.  Rather, the pre-suit demands were made to give the Board the opportunity to cause the Company to assert the claims directly, in the first instance, that Plaintiff now asserts derivatively.

215.    In his initial Demand Letter, Plaintiff stated:

> "Although this letter demands that you cause the Company to sue yourselves, several of your former colleagues on the Board and D&T, my client does not concede your independence for all purposes or going forward (*see Scattered Corp. v. Chicago Stock Exch*, 701 A. 2d 70 (Del. 1997).  Rather, my client is simply giving the Board the initial opportunity to cause Ocwen to commence the demanded litigation itself.

## C.    The Board's Constructive Rejection of Plaintiff's Demands

216.    Besides the substantial passage of time since Plaintiff's demands were made (as well as the serious wrongdoing brought to Board members' attention), the prevailing circumstances indicate that Plaintiff's demands have been constructively rejected by the Ocwen Board. Furthermore, pursuant to Chapter 607 of the Florida Business Corporation Act, §607.07401 (2) "A complaint in a proceeding brought in the right of a corporation must be verified and allege with particularity the demand made to obtain action by the board of directors **and that the demand was refused or ignored by the board of directors for a period of at least 90 days from the first demand unless, prior to the expiration of the 90 days**, the person

was notified in writing that the corporation rejected the demand, or unless irreparable injury to the corporation would result by waiting for the expiration of the 90-day period." More than 90 days has elapsed since each of the Plaintiff's demand letters were sent to the Board and it has taken no action either to act upon Plaintiff's demands therein nor has it rejected such demands. As such, Plaintiff's demands are deemed rejected as a matter of law.

217. The Individual Defendants are each personally exposed to potential liability for the wrongdoing alleged herein, as well as in connection with pending securities fraud and other class action lawsuits and ongoing federal and state investigations.

218. The Individual Defendants have benefited from the wrongdoing alleged herein, and have engaged in conduct to preserve their positions of control and the perquisites derived therefrom and to protect themselves from personal liability for their acts of mismanagement and breaches of fiduciary duties.

219. To properly prosecute this lawsuit, the Individual Defendants would have to cause Ocwen to sue themselves, which would expose each of them to tens of millions of dollars in civil liability and/or sanctions.

220. In light of the Individual Defendants' personal culpability and responsibility for the wrongful acts described herein, the Individual Defendants are not disinterested with respect to responding to Plaintiff's Demand Letter and Second Demand Letter.

## VIII.   OCWEN'S 2014 PROXY STATEMENT

221. At all relevant times, each of the Individual Defendants, because of their advisory, executive, managerial, and directorial positions, had access to adverse, non-public information about the Company's financial condition and operations, including the wrongdoing alleged herein.

222.    Each of the Individual Defendants, because of their positions of control and authority as officers and directors of Ocwen, directly and/or indirectly, exercised control over the contents of the various public statements issued by the Company, including Ocwen's 2014 Proxy Statement issued and disseminated by them and in their names.

223.    On or about April 22, 2014, the Individual Defendants caused the issuance and dissemination of Ocwen's Notice of Annual Meeting and Proxy Statement ("2014 Proxy Statement") announcing and soliciting shareholder votes in connection with Ocwen's Annual Meeting of Shareholders held on May 14, 2014.

224.    Among the items of business for consideration by Ocwen's shareholders at the Company's 2014 Annual Meeting was (a) the re-election of directors named in the 2014 Proxy Statement, including Defendants Erbey, Faris, Korn, Salcetti and Wish, each of whom was put forward for re-election by the Board, (b) the ratification of the appointment of Deloitte & Touche LLP ("D&T")[4] as Ocwen's auditor and (c) an advisory vote on Ocwen's executive compensation.

225.    At the time of the 2014 Annual Meeting, these directors, each of whom is elected annually and holds office until the earlier of the election and qualification of his successors or his resignation and removal.

226.    Upon information and belief, each of the directors serving as of April 22, 2014, personally approved the substantive content of the 2014 Proxy Statement and/or indirectly controlled its content, all the while omitting material facts bearing upon how the shareholders of the Company would vote upon, *inter alia*, the Board's nominees for directorships and the ratification of D&T as the Company's auditor.

---

[4] Now known simply as Deloitte, LLP.

227.     Despite federal disclosure requirements, the 2014 Proxy Statement was deceptive and failed to disclose the facts set forth herein in neutral, non-pejorative terms including the particularized wrongdoing of and neutral facts about all Board members and related-company relationships as described herein, including the mismanagement of the Company's operations and covering up the Company's lack of internal controls, failure to exercise appropriate oversight duties, failure to take action to remedy the charging of unauthorized fees, deceiving consumers regarding alternatives to foreclosures of their homes and providing false and otherwise deceptive information about the status of foreclosure proceeding, permitting in-house and outside counsel to stonewall investigators of the CFPB, the conduct of defendant Erbey and others in the Company's senior management, directly and through the Company's Litton Loan Servicing LP subsidiary, the practices which required their mortgage borrowers to purchase force-placed insurance at excessive cost while taking kickbacks from the insurers, the failure of the non-management members of the Board to fulfill their most fundamental fiduciary duties by, *inter alia*, providing superficial and perfunctory services as directors and devoting insufficient time to the Company's business, as well as the extent to which each of the director nominees who had served during 2013 had subjected the Company to class action and other litigation as a result of the wrongdoing described herein.

228.     Furthermore, the Proxy Statement failed to disclose key facts including that Ocwen had opted to pursue business relationships with the related companies despite known facts regarding conflicts of interests and regulatory shortcomings that would result from those dealings.  Specifically, the Defendants failed to disclose, Altisource's REALServicing platform was inferior to other servicing platforms that were not owned by the related companies because it prevented Ocwen from testing for all of the NMS compliance protocols and also resulted in the

92

letter-backdating issues; the related company business dealings resulted in regularly giving borrowers incorrect and outdated information, sending borrowers backdated letters, unrealiably tracking loans for investors and generally failed to maintain accurate records; because of comingling of employees and resources between Ocwen and the Erbey controlled related companies, Ocwen did not have the appropriate or sufficient controls in place to prevent the Company's related-company transactions from causing harm to homeowners; the related companies were charging Ocwen inflated rates that were up to three times larger than they were charging non-Ocwen related customers; and that Ocwen had no written policy that required potentially conflicted employees, officers, or directors to recuse themselves from involvements in transactions with the related companies.  Had the facts described herein been disclosed in the 2014 Proxy Statement, Ocwen's shareholders would have been able to make an informed decision about reelecting these directors.

229.    Moreover, the Board never conducted any objective evaluation of the conduct of its members including, in particular, the wrongful conduct of Defendant Erbey, to whom each other director owed his highly lucrative position on the Board.

230.    The 2014 Proxy Statement also omitted non-pejorative material facts about the nominees for re-election to the Board, which the Company's shareholders would have wanted to know in voting upon the election of directors.  Specifically, it failed to disclose the extent to which such members of the Board participated in and/or acquiesced in the Company's violations of, *inter alia*, state and Federal consumer financial protection and securities laws and regulations, the Ocwen's Board of Directors Corporate Governance Guidelines, the Audit Committee Charter, the Code of Business Conduct, the Code of Ethics for Senior Financial Officer, the

Nomination/Governance Committee Charter, the Compensation Committee Charter and the Compliance Committee Charter.

231.    In order to induce Ocwen's public shareholders to vote in favor of the election of the Board's nominees and to bolster their apparent legitimacy as directors, the 2014 Proxy Statement set forth various representations that the Board (including each of the nominees) followed the Company policies, including the Code of Business Conduct and Ethics, the Code of Ethics for Senior Financial Officers, the Corporate Governance Guidelines and each of the Committee Charters identified above. Indeed, each of these Company policies and Committee Charters was specifically incorporated by reference in the 2014 Proxy Statement, which directed shareholders to Ocwen's website to view these Company policies and guidelines in their entirety. Each of the representations, as set forth in these Company policies and identified above, was false and misleading so as to lead Ocwen's shareholders to believe that the nominees for re-election warranted favorable votes when they did not. Ultimately, at Ocwen's 2014 Annual Meeting of Shareholders, as a direct consequence of the Individual Defendants being controlling persons of Ocwen pursuant to §20 of the Exchange Act and their violations of it, a majority of the Company's shareholders were induced to vote in favor of the Board's proposals, including their own recommendations of themselves for re-election.

232.    The nominees for election to directorships of Ocwen, as set forth in the Company's 2014 Proxy Statement, were elected, and such elections were an essential link between the false and misleading 2014 Proxy Statement and the wrongdoing such directors engaged in following Ocwen's 2014 Annual Meeting.  To the extent that their serving as directors damaged and continues to damage the Company, as described herein, such damages would not have taken place but for their election.  These directors receive lucrative compensation

packages from Ocwen for sitting on the Board, including fees for committee chairs and "reimbursement of expenses."  Such compensation paid to the directors amounted to damages that would not have been sustained by the Company but for its 2014 Proxy Statement.

233.    The same essential facts which were legally required to be disclosed in the 2014 Proxy Statement with respect to the wrongful conduct of Defendant Erbey and the other members of Ocwen's Board and which facts were omitted would have undoubtedly influenced the vote of the Company's shareholders as to the Board's executive compensation proposal. Such omitted facts were material to such advisory vote.

## IX.    DAMAGES SUFFERED BY OCWEN

234.    The Board and senior management of Ocwen, including Defendant Erbey, in particular, failed to act in accordance with any legitimate exercise of business judgment and consistently with the fiduciary duties owed by them to Ocwen and its shareholders.

235.    Ocwen's directors utterly failed to implement validly functioning reporting and controls to prevent Ocwen's serious and ongoing violations of federal, state and local consumer financial protection laws, rules and regulations and abusive tactics and practices. Notwithstanding the public disclosure of much of the wrongdoing set forth herein, Ocwen's Board has failed to take steps to make fundamental and meaningful changes in the Company's culture and corporate governance consistent with the fiduciary duties of the members of Ocwen's Board.  As a result, the wrongdoing, and resultant damages are continuing.

236.    As a result of the Individual Defendants' breaches of their fiduciary duties as described herein, Ocwen has already settled claims with regulatory agencies throughout the Country in an amount exceeding of $2 billion to date, and has been exposed and continues to be exposed to substantial injury to its reputation and corporate goodwill, as well as to ongoing governmental investigations and enforcement actions, potential criminal and civil liability,

including class action lawsuits and potential loss of licenses and approvals necessary to engage in the servicing and lending businesses.  Moreover, as a consequence of the December 22, 2014 settlement with the NY DFS, the Company is being required to pay $150 million in penalties and other compensation and will have to absorb substantial additional expenses, probably well-exceeding $150 million, as a result of the compliance-related aspects of such settlement.

237.    As a direct result of the wrongdoing referred to herein and the Individual Defendants' concealment thereof in filings with the SEC and otherwise, investors have been defrauded and the Company has been named as a defendant in class actions commenced by such investors.  Such class actions, covering investors who purchased Ocwen stock during the period May 2, 2013 to October 20, 2014, have now been consolidated into *United Union of Roofers, etc. v. Ocwen Financial Corporation, et al*, 14-CIV-81057 (WPD) pending in this Court.

238.    The Company also has been caused to expend tens of millions of dollars in the defense of pending securities and consumer class action lawsuits and the ongoing and concluded investigations referred to herein. As a direct consequence, Ocwen has incurred and will continue to incur substantial costs of defending against such litigation and investigations and, ultimately, resolving them with Ocwen's funds, despite the fact that the underlying wrongdoing was and is the responsibility of the Individual Defendants named herein.

239.    Ocwen has suffered and will continue to suffer substantial harm to an extent not yet fully capable of determination, including the significant deterioration in the market value of the Company.

240.    The wrongdoing of each of the Individual Defendants and Aider and Abettor Defendants, as described herein, was an essential link in the damages caused and being caused to Ocwen and its shareholders as a result thereof.   As a direct and proximate result of such

wrongdoing, Ocwen has expended and will continue to expend large sums of money to comply with subpoena requests and to cooperate with the CFPB, NY DFS, CDBO and other regulatory investigations, the ongoing monitoring and to conduct any further investigations and respond to further requests for information that may be necessary.   Additionally, an adverse finding by any of the regulatory agencies investigating Ocwen could result in additional fines, sanctions and disciplinary actions against the Company.   Moreover, the investigation of at least certain of the underlying claims and the manner of the investigation purportedly being carried out by the members of the Audit Committee, aided and abetted by the related companies, has been a waste of the Company's assets since such investigation was not and is not for Ocwen's benefit but solely for the benefit of the Individual Defendants who are the alleged wrongdoers.

241.    For a period of many years, Ocwen's senior management and members of the Board became knowledgeable of, but nevertheless concealed, definitive and material information with respect to the Company's repeated violations of federal and state consumer financial protection laws and regulations, conflicts of interest and other wrongful conduct as described herein.   Even now, the Individual Defendants continue to cause Ocwen to conceal the most material information from its shareholders and the investing public generally. By such concealment, the Individual Defendants have subjected the Company to additional investor litigation and massive consumer and other claims.

242.    The Company has been the subject of far-reaching and serious investigations with respect to the wrongdoing alleged herein, including multi-year investigations by the CFPB, NY DFS, CDBO and the SEC.

243.    Because the Company's Board suffers massive conflicts of interest due to the personal culpability of Defendant Erbey and other members of the Board, the members of the

Board are not capable of advancing solely the Company's interests and not their own.  Based upon the facts and circumstances described herein, it is clear that the members of Ocwen's Board are not dealing with Plaintiff's claims objectively, independently, and solely in the Company's best interests.  Indeed, they, through their already-conflicted counsel, have caused the formation of the SLC (from among the Director Defendants), purportedly to carry out unbiased and independent investigations of the wrongdoing alleged in Plaintiff's pre-suit Demand Letters and those of other Ocwen shareholders.

244.   Should the Company's interests continue to be represented as they are at present, Ocwen will be irreparably harmed.

## COUNT I

### (For Violations of §14(a) of the Exchange Act)

245.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

246.   This claim is asserted by Plaintiff individually against the Individual Defendants who were members of the Company's Board of Directors and controlling persons of Ocwen pursuant to §20 when the 2014 Proxy Statement was issued and disseminated to Ocwen's shareholders. Such claims arise from their violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 in connection with such Proxy Statement issued for the 2014 Annual Meeting of Shareholders.

247.   Through the 2014 Proxy Statement, the Board solicited the votes of Plaintiff and the other Ocwen shareholders in connection with, *inter alia*, the re-election of Defendant Erbey and all other members of the Company's Board.

248.   The Board, through the Company's 2014 Proxy Statement, recommended that Ocwen's shareholders vote in favor of each of the Board's proposals; in particular, in favor of

the re-election of each of Board members nominated for re-election in 2014 and to hold an advisory vote to approve executive compensation.

249.    The 2014 Proxy Statement contained untrue statements of material fact and omitted other facts necessary to make the statements made not misleading, and failed to disclose material facts as more fully set forth above.  In particular, the 2014 Proxy Statement failed to disclose material information regarding the nominee directors and the conduct of Ocwen's business by them and their fellow directors, as set forth above.

250.    In addition to the frustration of Plaintiff's personal suffrage rights as an Ocwen shareholder, these deceptions proximately caused the Company direct and indirect economic and other damages following the 2014 Annual Meeting in an amount which cannot presently be determined.

251.    As a result of the use by the Company's Board of Directors of the 2014 Proxy Statement to solicit the votes of Ocwen's shareholders, which Proxy Statement failed to disclose the material facts set forth herein, the Board's director nominees, as well as the other Board proposals, were approved.

252.    Despite federal disclosure requirements, the 2014 Proxy Statement failed to disclose all facts about the related-company relationships and business dealings as described herein, including the mismanagement of the Company's operations and covering up the Company's lack of internal controls, failure to exercise appropriate oversight duties, failure to take action to remedy the charging of unauthorized fees, deceiving consumers regarding alternatives to foreclosures of their homes and providing false and otherwise deceptive information about the status of foreclosure proceeding, permitting in-house and outside counsel to stonewall investigators of the CFPB and CDBO, the conduct of defendant Erbey and others in

the Company's senior management, the practices which required their mortgage borrowers to purchase force-placed insurance at excessive cost while taking kickbacks from the insurers, the failure of the non-management members of the Board to fulfill their most fundamental fiduciary duties by, *inter alia*, providing superficial and perfunctory services as directors and devoting insufficient time to the Company's business, as well as the extent to which each of the director nominees who had served during 2013 had subjected the Company to class action and other litigation as a result of the wrongdoing described herein.

253.    Furthermore, the Proxy Statement failed to disclose key facts including that Ocwen had opted to pursue business relationships with the related companies despite known facts regarding conflicts of interests and regulatory shortcomings that would result from those dealings.  Specifically, the Defendants failed to disclose, Altisource's REALServicing platform was inferior to other servicing platforms that were not owned by the related companies because it prevented Ocwen from testing for all of the NMS compliance protocols and also resulted in the letter-backdating issues; the related company business dealings resulted in regularly giving borrowers incorrect and outdated information, sending borrowers backdated letters, unrealiably tracking loans for investors and generally failed to maintain accurate records; because of comingling of employees and resources between Ocwen and the Erbey-controlled related companies, Ocwen did not have the appropriate or sufficient controls in place to prevent the Company's related-company transactions from causing harm to homeowners; the related companies were charging Ocwen inflated rates that were up to three times larger than they were charging non-Ocwen related customers; and that Ocwen had no written policy that required potentially conflicted employees, officers, or directors to recuse themselves from involvements in transactions with the related companies.  Defendants violated their duties by failing to disclose

the facts regarding the inherent conflicts associated with Ocwen's business dealings with HLSS, Altisource, AAMC and Residential.

254.    By utilizing the 2014 Proxy Statement, the suffrage rights of Plaintiff and each other shareholder of the Company have been violated, which conduct is in violation of Section 14 (a) of the Exchange Act and SEC Rule 14a-9.

## COUNT II

(For Violations of §20 of the Exchange Act)

255.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

256.    This claim is asserted by Plaintiff derivatively on behalf of Ocwen against the Individual Defendants who were members of the Company's Board of Directors and controlling persons of Ocwen pursuant to §20 of the Exchange Act when the 2014 Proxy Statement was issued and disseminated to Ocwen's shareholders.

257.    As a result of the use by the Company's Board of Directors of the 2014 Proxy Statement to solicit the votes of Ocwen's shareholders, which Proxy Statement failed to disclose the material facts set forth herein, the Board's director nominees (the entire Board), as well as the other Board proposals, were approved.  Such votes in favor of the Board's proposals, including the re-election of Defendant Erbey, damaged the Company in an amount which cannot presently be determined. Such damages included the fact that, pursuant to his re-election in 2014, Defendant Erbey was able to maintain his control over the Board, as well as his substantial interest in and control over affiliated entities identified herein, to obstruct the Company's ability to resolve, *inter alia*, the NY DFS and CFPB allegations of abusive tactics and self-dealing; to fundamentally alter the Company's wrongful business practices and to stop the waste of millions of dollars of Ocwen's resources on the sham investigation by the Audit Committee.

## COUNT III

(Breach of Fiduciary Duty, Waste of Corporate Assets and Breach of Duty of Loyalty)

258.     Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

259.     The Individual Defendants all owed and/or owe fiduciary duties to the Company and its shareholders to exercise candor, good faith and loyalty.  By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Ocwen the highest obligation of good faith and loyalty in the management and administration of the affairs of the Company, including the oversight of Ocwen's compliance with federal and state consumer financial protection laws and regulations, avoidance of conflicting loyalties and business relationships and compliance with company codes of conduct and tenants of corporate governance.

260.     Each member of the Board had specific fiduciary duties as defined by the Company's key corporate governance documents and principles, and as set forth above, that, had they been discharged in accordance with the Board's obligations, would have either necessarily prevented the misconduct and consequent harm to the Company, or would have uncovered and corrected such misconduct, as alleged herein.

261.     The Individual Defendants consciously violated their corporate responsibilities and intentionally breached their fiduciary duties to protect the rights and interests of Ocwen's and its shareholders.

262.     As a direct and proximate result of the Individual Defendants' conscious failure to perform their fiduciary obligations, they have caused the Company to waste valuable corporate assets and expend its corporate funds unnecessarily.

263.    As a result of the misconduct alleged herein, Ocwen has sustained and will continue to sustain significant damages, not only monetarily, but also to its corporate image, reputation and goodwill.

264.    As a result of the misconduct alleged herein, the Individual Defendants are personally liable to the Company in an amount which cannot presently be determined.

## COUNT IV

(Unjust Enrichment)

265.    Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

266.    Each of the Individual Defendants was and is being unjustly compensated by Ocwen with compensation packages and otherwise despite the failure of their stewardship of the Company and their personal implication in the wrongdoing set forth herein.

267.    In addition, as set forth above, on various dates beginning in November 2012 and ending in November, 2013, Defendants Erbey, Wish, Ross sold shares of Ocwen stock at fraudulently inflated prices for proceeds in excess of $62 million while in possession of material inside information not disclosed to Ocwen's shareholders or the investing public generally.  As such, Defendants Erbey, Wish and Ross were unjustly enriched.

268.    Moreover, Defendant Erbey was unjustly enriched through the compensation he received as Chairman of the four related-companies which Ocwen conducted business with, despite Mr. Erbey's conflicts of interests – namely, Residential, Altisource, AAMC and HLSS.

269.    Each of the Aider and Abettor Defendants as well as Defendants Erbey and Wish profited unjustly from business directed to the foregoing entities as described above.

1953185.1

270.     Each of the Individual Defendants and Aider and Abettor Defendants who have been unjustly enriched by the wrongdoing set forth in this Complaint should be required to account for and repay the Company therefor together with their earnings thereupon.

## COUNT V

### (Breach of the Duty of Candor)

271.     Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

272.     Each of the sitting Ocwen directors, at the time of the issuance and dissemination of the Company's Proxy Statements, the Company's year-end and quarterly SEC filings on Forms 10-K and 10-Q, respectively, and the Company's Form 8-K reports, filed during the Relevant Period, by reason of the fact that such filings were and are materially false and misleading, as described herein, breached his respective duties of disclosure and candor owed to Ocwen, Plaintiff, and the Company's other shareholders.

273.     For the reasons set forth with respect to Plaintiff's claims, he is entitled to injunctive relief and such damages as he may prove at trial.

## COUNT VI

### (Aider and Abettor Liability)

274.     Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

275.     The Aider and Abettor Defendants knew and substantially assisted in the wrongful conduct which resulted in the breaches of the Individual Defendants' respective duties of loyalty to Ocwen and, as such, should be held accountable for the wrongful conduct at issue.

276.     As set forth herein, the Individual Defendants owed several duties, including the duties of disclosure, candor, loyalty, among others, to Ocwen.   The Individual Defendants

104

breached those duties, and with knowledge of those breaches – as a result of the control of all of those entities by Defendant Erbey, the ownership of the stock in the Aider and Abettor Defendant companies by Individual Defendants and the Individual Defendants' role as directors and officers of Ocwen – the Aider and Abettor Defendants provided substantial assistance and encouragement of those breaches, and as such, should be liable under Florida law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Determining that Ocwen's 2014 Proxy Statement was false and misleading in violation of §14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder and that the Board has breached its duty of candor in connection therewith;

B.      Requiring the Individual Defendants to issue and disseminate Ocwen's 2015 Proxy Statement it full compliance with their duty of candor as well as applicable federal law and regulations with respect thereto;

C.      Declaring that the Individual Defendants have breached their fiduciary duties owed to Ocwen and wasted its assets, as alleged herein, causing substantial damages to Ocwen;

D.      Requiring the Individual Defendants and the Aider and Abettor Defendants to pay to the Company the amounts by which it has been damaged or will be damaged by reason of the conduct complained of herein;

E.      Requiring the Individual Defendants and the Aider and Abettor Defendants to account for and repay the Company to the extent they have been unjustly enriched by their wrongful conduct, as described herein, together with their earnings upon such amounts;

F.      Ordering the Individual Defendants to cause the Company to take all necessary actions to reform and improve its corporate governance, compliance and internal control

procedures for the purpose not only of preventing a recurrence of the failures detailed above, but to optimize such procedures in light of relevant and current best practices;

G.      Ordering the Individual Defendants to cause the Company to develop appropriate procedures for Ocwen's dealings with its affiliated companies identified herein and/or developing appropriate procedures and controls to protect the Company and shareholders from unfair and harmful related-company transactions;

H.      Awarding Ocwen restitution from the Individual Defendants;

I.      Determining and awarding to Ocwen exemplary damages in an amount necessary to punish the Individual Defendants;

J.      Awarding Plaintiff and his counsel reasonable attorneys' fees, expert fees and other reasonable costs and expenses; and

K.      Granting such other and further relief as this Court may deem just and proper.

106

**JURY DEMAND**

      Plaintiff demands a trial by jury on all claims so triable.


Dated: February 11, 2015           **COHEN MILSTEIN SELLERS & TOLL PLLC**

                              BY: s/Theodore J. Leopold
                              Theodore J. Leopold
                              2925 PGA Boulevard Suite 200
                              Palm Beach Gardens, FL 33410
                              561- 515-1400
                              tleopold@cohenmilstein.com

                              COHEN MILSTEIN SELLERS & TOLL PLLC
                              Steven J. Toll
                              1100 New York Avenue NW, Suite 500
                              Washington, DC 20008
                              202-408-4600
                              stoll@cohenmilstein.com

                              COHEN MILSTEIN SELLERS & TOLL PLLC
                              Richard A. Speirs
                              (admitted *pro hac vice*)
                              Daniel B. Rehns
                              (*pro hac vice* pending)
                              88 Pine Street-14TH Floor
                              New York, NY 10005
                              212-838-7797
                              rspeirs@cohenmilstein.com
                              drehns@cohenmilstein.com

                              GREENFIELD & GOODMAN, LLC
                              Richard D. Greenfield
                              (admitted *pro hac vice*)
                              Marguerite R. Goodman
                              Ann M. Caldwell
                              Ilene F. Brookler
                              250 Hudson Street, 8th Floor
                              New York, NY  10013
                              Tel: 917-495-4446
                              whitehatrdg@earthlink.net

                              ***Counsel for Plaintiff***

1953185.1