# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| **W.A. SOKOLOWSKI,** Individually and Derivatively on Behalf of **OCWEN FINANCIAL CORPORATION**,<br><br>    Plaintiff,<br><br>  v.<br><br>**WILLIAM C. ERBEY, ET AL.**,<br><br>    Defendants,<br><br>  -and-<br><br>**OCWEN FINANCIAL CORPORATION**, a Florida Corporation,<br><br>    Nominal Defendant. | Civil No. 9:14-CV-81601(WPD) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS ALTISOURCE ASSET MANAGEMENT CORPORATION AND ALTISOURCE RESIDENTIAL CORPORATION'S MOTIONS TO DISMISS [D.E. 74, 77]**

## <u>TABLE OF CONTENTS</u>

Page

I.    PRELIMINARY STATEMENT ......................................................................1

II.   STATEMENT OF THE FACTS ....................................................................3

    A.   Ocwen's Business and Affiliates ......................................................3

        1.   Altisource Portfolio Solutions, S.A. ......................................4

        2.   Altisource Residential Corporation.......................................6

        3.   Altisource Asset Management Corporation.............................8

    B.   RESI and AAMC's Connections to the State of Florida .......................8

    C.   Defendants' Use of the Affiliates for
        Personal Benefit and Related Conflicts .............................................11

III.  ARGUMENT...........................................................................................14

    A.   RESI and AAMC are Subject to Personal Jurisdiction in This Court .................14

        1.   Standard for Specific Jurisdiction............................................14

        2.   §48.193(1)(a), Fla. Stat. – Conducting Business in Florida..................14

        3.   Specific Jurisdiction For Conduct As Aiders and Abettors .................18

        4.   Defendants RESI and AAMC have sufficient minimum
            contacts with Florida to satisfy due process requirements.....................20

    B.   Plaintiff's Complaint Satisfies the Rule 8(a) Pleading Standard .........................22

i

      1.      Plaintiff has Sufficiently Pled a Cause of Action for Aider and Abettor Liability Against AAMC and RESI.................................................23

               i.      *Plaintiff has pleaded that the Primary Defendants breached their fiduciary duties to shareholders*...........................*23*

               ii.     *Plaintiff adequately alleges AAMC and RESI's knowledge of the breaches of fiduciary duties*............................*24*

               iii.    *RESI and AAMC "substantially assisted in the Individual Defendants' breach of fiduciary duties*.......................*26*

               iv.    *Defendants' Remaining Arguments Fail*.........................................*27*

   C.      Plaintiff has Sufficiently Pled a Cause of Action for Unjust Enrichment Against RESI and AAMC.................................................28

   D.      Plaintiff's Continuous Ownership of Ocwen Shares Confer Standing to Pursue These Claims ............................................................31

IV.     CONCLUSION....................................................................................................35

ii

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allied Capital Corp. v. GC–Sun Hldgs., L.P.,*
    910 A.2d 1020 (Del. Ch. 2006)..................................................................19

*Am. Honda Motor CO., Inc. v. Motorcycle Info. Network, Inc.,*
    390 F. Supp. 2d 1170 (M.D. Fla. 2005).....................................................30

*American Dental Ass'n v. Cigna Corp.,*
    605 F.3d 1283 (11th Cir.2010) ..................................................................22

*American Univ. of the Caribbean, N.V. v. Caritas Healthcare, Inc.,*
    484 Fed. Appx. 322 (11th Cir. 2012)..........................................................15

*Aquent LLC v. Stapleton,*
    65 F. Supp. 3d 1339 (M. D. Fla. 2014)..................................................23, 25

*AXA Equitable Life Ins. Co. v. Infinity Financial Group, LLC,*
    608 F. Supp. 2d 1349 (S.D. Fla. 2009) .......................................................18

*Banco Inversion, S.A. v. Celtic Fin. Corp., S.A.,*
    907 So. 2d 704 (Fla. Dist. Ct. App. 4th Dist. 2005) .......................4, 15, 20

*In re Bank of New York Deriv. Litig.,*
    320 F.3d 291 (2d Cir. 2003).................................................................33, 35

*Bateson v. Magna Oil Corp.,*
    414 F. 2d 128 (5th Cir. 1969) ....................................................................35

*Batur v. Signature Props. of Nw. Fla., Inc.,*
    903 So. 2d 985 (Fla. Dist. Ct. App. 2005) .................................................19

*Beck v. Deloitte & Touche,*
    144 F.3d 732 (11th Cir. 1998) ....................................................................28

*Bell Atlantic Corp. v. Twombly,*
    127 U.S. 1955 (2007)..................................................................................22

*Burger King Corp. v. Rudzewicz,*
    471 U.S. 462 (1985).....................................................................................20

*Bystrowski v. Perry,*
    1992 WL 161047 (M.D. Fla. 1992) ...........................................................22

iii

*Carib-USA Ship Lines Bahamas Ltd. V. Dorsett*,
  935 So. 2d 1272 (Fla. 4th DCA 2006) ...................................................................20

*Carsanaro v. Bloodhound Techs., Inc.*,
  63 A.3d 618 (Del. Ch. 2013)...................................................................18, 19

*Cenco Inc. v. Seidman & Seidman*,
  686 F.2d 449 (7th Cir. 1982) .................................................................28

*Chenault v. Walker*,
  36 S.W.3d 45 (Tenn. 2001)....................................................................18

*Court-Appointed Receiver of Lancer Management Group LLC v. Lauer*,
  Civ. No. 05-60584, 2008 WL 906274 (S. D. Fla., 2008) ................................ *passim*

*Demos v. Landmark at Hillsboro Condo. Ass'n*,
  47 So. 3d 971 (Fla. Dist. Ct. App. 4th Dist. 2010) ................................15

*Dinsmore v. Martin Blumenthal Assocs., Inc.*,
  314 So.2d 561 (Fla. 1975)....................................................................15

*Dussouy v. Gulf Coast Inv. Corp.*,
  660 F.2d 594 (5th Cir. 1981) .................................................................31

*eLandia Int'l, Inc. v. Ah Koy et al.*,
  690 F.Supp.2d 1317 (S.D. Fla. 2010) ................................................4, 23

*In re Engle Cases*,
  45 F. Supp. 3d 1351 (M.D. Fla. 2014)....................................................31

*Ensign Corp. v. Interlogic Trace, Inc.*,
  1990 U.S. Dist. LEXIS 17147 (S.D.N.Y. Dec. 19, 1990) ......................34

*Execu-Tech Bus. Sys, Inc. v. New Oji Paper Co.*,
  752 So.2d 582 (Fla. 2000)..............................................................14, 15, 20

*Florida Power Corp. v. City of Winter Park*,
  887 So.2d 1237 (Fla. 2004)...................................................................29

*Ford Motor Co. v. Atwood Vacuum Mach. Co.*,
  392 So. 2d 1305 (Fla. 1981)..................................................................20

*Forman v. Davis*,
  371 U.S. 178 (1962)............................................................................31

*Gahn v. Holiday Property Bond Ltd.*,
  826 So. 2d 423 (Fla. App. 2002)............................................................15

iv

*Gibbs v. PrimeLending,*
  381 S.W.3d 829 (Ark. 2011)........................................................................................18

*Groom v. Bank of America,*
  08-cv-2567, 2012 WL 50250 (M.D. Fla. Jan. 9, 2012) ........................................27

*Hamilton Partners, L.P. v. Englard,*
  11 A.3d 1180 (Del. Ch. 2010)...................................................................................19

*Hill v. Hoover Co.,*
  899 F. Supp. 2d 1259 (N.D. Fla. 2012)....................................................................31

*Holt v. Wells Fargo Bank, N.A.,*
  32 So. 3d 194 (Fla. Dist. Ct. App. 4th Dist. 2010) ..........................................15, 26

*Hoover v. Allen,*
  180 F. Supp. 263 (S.D.N.Y. 1960)............................................................................35

*Hush Little Baby, LLC v. Chapman,*
  2015 U.S. Dist. LEXIS 37265 (M.D. Fla. Mar. 24, 2015) .....................................21

*Instituto Bancario Italiano SpA v. Hunter Eng'g Co.,*
  449 A.3d 210 (Del. 1982) ....................................................................................18, 19

*Int'l Ins. Co. v. Johns,*
  874 F.2d 1447 (11th Cir. 1989) .................................................................................19

*Int'l Shoe Co. v. Washington,*
  326 U.S. 310 (1945).....................................................................................................20

*Intercoastal Realty, Inc. v. Tracy,*
  706 F. Supp. 2d 1325 (S.D. Fla. 2010) ....................................................................30

*Jet Charter Serv., Inc. v. Koeck,*
  907 F.2d 1110 (11th Cir. 1990) .................................................................................22

*JI-EE Industry Co., Ltd. v. Paragon Metals, Inc.,*
  2010 WL 1141103 (S.D. Fla. 2010) .........................................................................30

*Kreuzfeld A.G. v. Carnehammar,*
  138 F.R.D. 594 (S.D. Fla. 1991)...............................................................................32

*Living Color Enterprises, Inc. v. New Era Aquaculture, Ltd.,*
  Civ. No. 14–62216–CIV, 2015 WL 1526177 (S. D. Fla., 2015)......................26, 27

*Mackey v. Compass Mktg., Inc.,*
  391 Md. 117 (D.Md. 2006).........................................................................................18

v

*Medkser v. Feingold*,
   307 Fed. Appx. 262 (11th Cir. 2008).................................................................29

*Murante v. Pedro Land Inc.*,
   761 F. Supp. 786 (S.D. Fla. 1991) ..................................................................15

*Nova Info. Sys., Inc. v. Greenwich Ins. Co.*,
   365 F.3d 996 (11th Cir. 2004) .......................................................................29

*O'Halloran v. Pricewaterhousecoopers LLP*,
   969 So.2d 1039 (Fla. Ct. App. 2d Dist. 2007) ...............................................27, 28

*Perlman v. Wells Fargo Bank, N.A.*,
   559 Fed. Appx. 988 (C.A.11 (Fla.), 2014)......................................................24, 25

*R&R Games, Inc. v. Fundex Games, Ltd.*,
   2013 U.S. Dist. LEXIS 97621 (M.D. Fla. July 12, 2013) ...................................21

*Razi v. Razavi*,
   No. 5:12–CV–80–Oc–34 PRL, 2012 WL 7801361 (M. D. Fla., 2012)..................26

*Remmes v. Int'l. Flavors & Fragrances, Inc.*,
   389 F. Supp. 2d 1080 (N.D. Iowa 2005).........................................................18

*Roessler v. Novak*,
   858 So.2d 1158 (Fla. Ct. App. 2d Dist. 2003) ......................................................28

*Sculptchair, Inc. v. Century Arts, Inc.*,
   94 F.3d 623 (11th Cir. 1996) ...........................................................................15

*Sokolowski v. Adelson, et al.*,
   2014 WL 3748191 (D. Nev. 2014) ..................................................................33

*State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Ctr., Inc.*,
   427 Fed. Appx. 714 (11th Cir. 2011)................................................................31

*Stephenson v. Kandegger*,
   337 F. Supp. 591 (S.D.N.Y. 1971)..................................................................35

*SunTrust Bank v. O'Brien*,
   Civ. No. 3:09-085/RV/EMT, 2009 WL 1393439 (N.D. Fla. May 18, 2009) ...........1

*Tew v. Chase Manhattan Bank, N.A.*,
   728 F. Supp. 1551 (S.D. Fla. 1990) ................................................................28

*Thomas v. Town of Davie*,
   847 F.2d 771 (11th Cir 1988) ........................................................................31

vi

*United Techs. Corp. v. Mazer,*
    556 F.3d 1260 (11th Cir. 2009) ........................................................21

*Venetian Salami Co. v. Parthenais,*
    554 So. 2d. 499 (Fla. 1989)...........................................................14

*Walden v. Fiore,*
    134 S. Ct. 1115 (2014)................................................................22

*Wendt v. Horowitz,*
    822 So.2d 1252 (Fla. 2002)..........................................................14

*Williams v. Bear Stearns & Co.,*
    725 So.2d 397 (Fla. Ct. App. 5th Dist. 1998) ...............................30

*World-Wide Volkswagen Corp. v. Woodson,*
    444 U.S. 286 (1980)...................................................................20

*In re Zoran Corp. Deriv. Litig.,*
    511 F. Supp. 2d 986 (N.D. Cal. 2007) ........................................33

### STATUTES

Fla. Stat. 607.07401 ................................................................32

Fla. Stat §48.193(1)(a),.............................................................14

Plaintiff W.A. Sokolowski ("Plaintiff") respectfully submits this memorandum of law in opposition to Defendant Altisource Asset Management Corporation's ("AAMC") Motion to Dismiss ("AAMC Motion to Dismiss") and Defendant Altisource Residential Corporation's ("RESI") Motion to Dismiss ("RESI Motion to Dismiss").  D.E. 74, 77.[1]

## V.      PRELIMINARY STATEMENT

Defendants AAMC and RESI challenge personal jurisdiction over them in this proceeding, despite the fact that each of them has aided and abetted breaches of fiduciary duty by the officers and directors of Ocwen Financial Corporation ("Ocwen"), a Florida corporation. Through a complex array of interrelated companies, connected by common controlling management and overlapping stockholders, AAMC and RESI profited significantly from a variety of non-arm's length related-party transactions to the detriment of Ocwen's shareholders. Indeed, despite hollow protests that they had no headquarters or offices in Florida, AAMC and RESI both conducted business in Florida through a variety of means.  Indeed, over 18% of the assets in RESI's portfolio, which are managed by AAMC, are located in Florida, were acquired from and serviced by Ocwen.  Significantly, AAMC and RESI's publicly filed reports and financial statements show the assets held by RESI in Florida and related financial details applicable to these Defendants' activities.  Moreover, RESI's subsidiaries, ARNS Inc. ("ARNS") and NewSource Reinsurance Company Ltd. ("NewSource") conduct business in Florida.  As there is no dispute that these Defendants chose to conduct business related to the ownership, management, and related servicing of properties RESI owned in Florida – in part through their

---

[1] As the Court is aware, Defendants RESI and AAMC filed the motions to dismiss long after the required response dates.  D.E. 64, 65. Plaintiff is cognizant of the Court's reluctance to permit default judgments as stated in its June 26, 2015 Order (D.E. 70) and, in that regard, submits that the late-filed motions should simply be stricken and the case otherwise be permitted to proceed on the merits.  *See SunTrust Bank v. O'Brien,* Civ. No. 3:09-085/RV/EMT, 2009 WL 1393439 (N.D. Fla. May 18, 2009) (dismissing motion for lack of jurisdiction that was filed 28 days after statutory deadline to respond to complaint had passed).

improper relationship with Ocwen and its affiliates – sufficient minimal contacts exist to assert personal jurisdiction.

Simply put, the Individual Defendants[2] engaged in self-dealing non arms-length related party transactions that constituted a breach of their fiduciary duties to Ocwen. AAMC and RESI, close affiliates of Ocwen through common ownership, common officers and overlapping self-dealing contractual relationships, aided and abetted those activities resulting in improper payments to each of their benefit. To suggest that aiding and abetting violations of Florida corporate law, while conducting business through such affiliates, business partners, or other related entities in the state does not subject these Defendants to liability in this jurisdiction, is untenable.

As the New York Department of Financial Services ("NYDFS") recognized in its review of Ocwen's operations, there were widespread conflicts of interest with related parties, including AAMC and RESI. Defendant William Erbey ("Erbey") had not "recused himself from approvals of several transactions with the related parties," despite multiple public statements to the contrary during the relevant period. Thus, on December 19, 2014, in an agreement reached by Ocwen with the NYDFS, Erbey agreed to a complete ban from any further involvement in the management of Ocwen or its affiliated companies, including Defendants AAMC and RESI. This extraordinary and unprecedented punitive action was accompanied by serious penalties and a host of admissions that corroborate the core allegations of breaches of fiduciary duty which are at the heart of this action. The fallout from Defendants' actions, as detailed in the Complaint, have resulted in devastating consequences to Ocwen – including over $2 billion in regulatory

---

[2] Capitalized terms shall have the same meaning as in the First Amended Derivative Complaint ("Complaint"). D.E. 25.

penalties, increased regulatory oversight, ongoing litigation costs, damages to the Company's reputation and questions regarding its ability to be an ongoing and viable company.

Although Defendants raise no substantive challenge to Plaintiff's claims of the Individual Defendants' breaches of fiduciary duty, they contest the sufficiency of only some elements of Plaintiff's allegations as to the aiding and abetting claims. Given the overlapping management, directors, stockholders and control exercised by Defendant Erbey, and their involvement in the interested and conflicted transactions, Defendants' AAMC and RESI's challenges as to their knowledge of and substantial assistance to the underlying claims should be rejected. The aiding and abetting allegations as well as the unjust enrichment claims, easily comply with Rule 8(a).

Contrary to RESI's argument that Plaintiff does not have standing, Plaintiff properly alleges that he "has been a continual holder of Ocwen stock and [has] been an Ocwen stockholder at all relevant times referenced herein." ¶30.[3] For the purpose of these derivative claims, the complaint further alleges that the "Relevant Period" is "approximately May 2, 2013 through the present." ¶2. As the core of the misconduct involved continuing and ongoing wrongdoing, occurred after Plaintiff became a shareholder of Ocwen, Plaintiff has standing and RESI's argument is without merit. Federal Rule of Civil Procedure 23.1 simply requires that "[t]he complaint must … allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's shares or membership later devolved on it by operation of law." Fed. R. Civ. P. 23.1(b)(1). Thus, RESI's argument that Plaintiff lacks standing must fail.

## VI.   STATEMENT OF THE FACTS[4]

---

[3] Use of "¶" refers to paragraphs in the Complaint, filed February 11, 2015. D.E. 25.

[4] Defendants have submitted separate self-serving cursory affidavits for each company from Stephen Gray purportedly demonstrating the lack of personal jurisdiction. Although this one-sided evidentiary submission is improper on a motion to dismiss, Plaintiff has submitted indisputable evidence from the

### A.   Ocwen's Business and Affiliates

During the relevant period, Ocwen, a corporation organized under the laws of the State of Florida (¶31), operated as the fourth-largest servicer of mortgages in the United States, and the largest non-bank mortgage servicer.   Ocwen generates revenue principally from fees earned as a percentage of the unpaid principal balance ("UPB") of loans it services.   In December 2012, following a review of Ocwen's operations, the NYDFS found that Ocwen had violated an existing agreement regarding its servicing practices.   As a result, Ocwen entered into a Consent Order with the NYDFS, pursuant to which Ocwen agreed to install a Monitor and follow strict protocols meant to protect homeowners and to prevent Ocwen from engaging in certain interested party transactions.   ¶¶85-91.

### 1.   Altisource Portfolio Solutions, S.A.

In 2009, Ocwen spun off its "Ocwen Solutions" line of business into a separate publicly traded company, Altisource Portfolio Solutions, S.A. ("Altisource").   ¶51.   Following the spin-off Defendant Erbey owned 26% of Altisource's outstanding common stock and served as Altisource's Chairman until he was forced to step down in January 2015.   *Id.*   Coinciding with Ocwen's spin off of Altisource, Ocwen and Altisource entered into several long-term services agreements that would provide Altisource with a constant stream of business from Ocwen.   ¶52. A large percentage of Altisource's revenues – up to 65% – were derived from services it provided to Ocwen.   ¶57.   Altisource provides technology and an array of foreclosure-related

---

public record by way of a Request for Judicial Notice that provides facts contradicting the Gray Affidavit in support of AAMC's Motion to Dismiss (D.E. 77 at Ex. A) and the Gray Declaration in Support of RESI's Motion to Dismiss (D.E. 77-1) (collectively referred to herein as the "Gray Declarations") and demonstrating that these Defendants conduct business in Florida.

Given Defendants' submission of these affidavits, Plaintiff is afforded the opportunity to offer evidence to rebut Defendants' affidavits and where such evidence conflicts with Defendants' affidavits, the Court must construe all reasonable inferences in favor of Plaintiff.   *eLandia Int'l, Inc. v. Ah Koy et al.,* 690 F.Supp.2d 1317, 1327 (S.D. Fla. 2010).

4

services, including asset management, insurance services, residential property valuation, default management services, and origination management services all through other related subsidiaries which, prior to their becoming public, included RESI and AAMC.  ¶57.[5]

After spinning off Altisource as a separate publicly traded company – albeit still inextricably tied to Ocwen – the business venture between Ocwen and Altisource expanded when Altisource created RESI and AAMC in 2012.  Although both companies claim to be based in the U.S. Virgin Islands, their businesses were tied to those of Ocwen, Altisource and several other business ventures they have created within the United States, with their stated purpose being to own and manage rental properties "throughout the United States."  *See* Declaration of Richard A. Speirs in Support of Plaintiff's Opposition ("Speirs Declaration") at ¶2, Ex. 1 at 1).  Below is a graphical representation from AAMC's Form 10-12G filed with the SEC on September 20, 2012 showing how the venture among Ocwen and the related affiliates was structured:[6]



---

[5] Altisource was also created for tax-saving purposes and is incorporated in Luxembourg.  Given Defendant Erbey's larger stake in Altisource than in Ocwen, income earned by Altisource is worth significantly more to Defendant Erbey than income earned by Ocwen.  ¶54.  Ocwen paid Altisource $55.1 million in fiscal 2013, and as of December 31, 2013 there was a net amount payable to Altisource of an additional $3.8 million. ¶58.
[6] *See* Speirs Declaration at ¶3, Ex. 2 at 7.

Thus, RESI and AAMC's own publicly filed documents admit that the various business ventures of Ocwen, Altisource, RESI and AAMC and their financial relationships are inextricably linked.

2.   Altisource Residential Corporation

RESI is a Maryland REIT "focused on acquiring, owning and managing single family rental properties throughout the United States." *See* Speirs Declaration at ¶2, Ex. 1 at 1. RESI acquires single family properties through the acquisition of sub-performing and non-performing loan portfolios. *See* Speirs Declaration at ¶4, Ex. 3 at 1. RESI was formed on December 21, 2012 when it became a standalone publicly traded company after an initial financial contribution from Altisource of $100 million, in exchange for shares that were distributed to Altisource shareholders. *Id.* As of December 31, 2013, Defendant Erbey owned or controlled 5% of RESI's common stock and held 291,167 options to purchase RESI common stock.  ¶59.

RESI remains inextricably tied to Ocwen and their multiple common business ventures. As set forth in the RESI's Form 10-K, it entered into a 15-year servicing agreement with Ocwen, upon becoming a public company. *See* Speirs Declaration at ¶2, Ex. 1 F-23. Pursuant to this agreement, Ocwen is the "exclusive" servicer (through 2014) of RESI's acquired residential mortgage loans and "provide[s] loan modification, assisted deed-in-lieu of foreclosure, assisted deed-for-lease and other loss mitigation programs." *Id.*; *see also*, ¶61. RESI has no employees of its own and its day to day operations are performed by another related company – Defendant AAMC – pursuant to a December 21, 2013 15-year asset management agreement with AAMC. *See* Speirs Declaration at ¶2, Ex. 1 at 9, F-21. Under the asset management agreement, AAMC designs and implements RESI's business strategy subject to oversight by its Board of Directors – which until January 2015 was chaired by Defendant Erbey. *See* Speirs Declaration at ¶2, Ex. 1 at

6

F-21.  AAMC is responsible for, among other duties: (1) performing and administering all of RESI's day-to-day operations, (2) determining investment criteria through RESI's Investment Policy in cooperation with RESI's Board of Directors, (3) sourcing, analyzing and executing asset acquisitions, including RESI's acquisition of sub-performing and non-performing residential mortgage loan portfolios and related financing activities, (4) analyzing and performing sales of properties, (5) overseeing Altisource's renovation, leasing and property management of RESI's single-family rentals, (6) overseeing Ocwen's servicing of RESI's residential mortgage loan portfolios, (7) performing asset management duties and (8) performing corporate governance and other management functions, including financial, accounting and tax management services.  *Id.*

RESI also has a Support Services Agreement with Altisource, wherein Altisource provides human resources, vendor management operations (through AAMC), corporate services, risk management services, quality assurance services, treasury, finance accounting, legal, tax and compliance services.  ¶60; *see also,* Speirs Declaration at ¶2, Ex. 1 at 7.  Even RESI's "principal place of business" is listed at the same address as that of AAMC, where AAMC leases 2,000 square feet of office space from Ocwen. Speirs Declaration at ¶2, Ex. 1 at 35.

For the fiscal year ending December 31, 2014, RESI's net income as reported in its 10-K filed with the SEC was $188.8 million. Speirs Declaration at ¶2, Ex. 1 at 39.  All of RESI's income is derived from properties it acquires directly, or indirectly through Altisource, from Ocwen, a substantial portion of which is in Florida – specifically, 2,160 separate properties with an UPB of approximately $525 million as of December 31, 2014 (making up 18% of RESI's portfolio).  Speirs Declaration at ¶2, Ex. 1 at 4.  Finally, through 2014, RESI had exclusively

engaged Ocwen to service the residential mortgage loans in its portfolio – which would necessarily include its properties in Florida.  *See* Speirs Declaration at ¶2, Ex. 1 at F-23.

       3.     <u>Altisource Asset Management Corporation</u>

Defendant AAMC was spun off from Altisource and incorporated in the U.S. Virgin Islands on March 15, 2012.  ¶62.  AAMC became a stand-alone publicly traded company on December 12, 2012.  *See* Speirs Declaration at ¶4, Ex. 3. (AAMC 2014 10-K at 1).  AAMC maintains its principal place of business in the U.S. Virgin Islands, where it leases 2,000 square feet of office space from Ocwen.  ¶62; *see also,* Speirs Declaration at ¶4, Ex. 3 at 1, F-25.  AAMC's primary business is to provide asset management and certain corporate governance services to institutional investors – however, its primary client since formation has been RESI under a 15-year asset management agreement.  *Id.*

Under its asset management agreement with RESI, AAMC performs RESI's day-to-day operations, defines investment criteria, executes asset acquisitions for RESI, analyzes property sales, oversees Ocwen's servicing of RESI's loans, oversees Altisource's renovation, leasing and property management of RESI's properties, and performs asset management and corporate governance duties.  According to the most recent 10-K filed by AAMC, AAMC's revenues for the year ending December 31, 2014 were $423.3 million and net income was $59.7 million.[7]  Speirs Declaration at ¶4, Ex. 3 at 42.  As of December 31, 2013, Defendant Erbey owned or controlled 27% of AAMC's common stock and 87,350 options to purchase AAMC common stock.  ¶63.

    **B.**    **RESI and AAMC's Connections to the State of Florida**

---

[7] AAMC consolidates RESI's financial results into its publicly reported financial statements.

As is clear from the above, the business operations of RESI are carried out completely by AAMC, and these operations are substantial and continuous in the state of Florida, such that there is no question that this Court has personal jurisdiction over these two Defendants.

First, RESI and AAMC have significant and direct business operations in the State of Florida as a result of its relationships with Ocwen, Altisource and other affiliated companies. Not only do both RESI and AAMC have long term servicing contracts with Ocwen, a Florida corporation, but RESI actually owns considerable amounts of real estate in Florida from which it derives fees and substantial revenues given that the properties constituted 18% of RESI's portfolio (and as a result just as large a percentage of AAMC's management business). In return, RESI, through AAMC, pays certain fees to Ocwen for servicing its Florida properties as well. RESI held 2,160 Florida properties in its portfolio, with an unpaid principal balance of $524.7 million. *See* Speirs Declaration at ¶2, Ex. 1 at 4. The state with the highest concentration of properties in the RESI portfolio is Florida. *Id.* at 21. AAMC reports these same figures as assets it has under management in its 2014 10-K. *See* Speirs Declaration at ¶4, Ex. 3 at 6. Thus, by definition, AAMC is conducting substantial business in Florida simply by managing a substantial volume of assets of RESI in the state.

Second, in 2012, AAMC created ARNS and incorporated it in Delaware as a wholly-owned indirect subsidiary of RESI. ARNS carries out functions for RESI in the United States which it is unable to do as a result of its REIT status. ARNS is considered by RESI to be a "TRS," which is described in RESI's 2014 10-K as follows:

> Even though we elected to be taxed as a REIT, we are subject to some U.S. federal, state and local taxes on our income or property. **A portion of our business is expected to be conducted through, and a portion of our income is expected to be earned in, one or more taxable REIT subsidiaries, each of which we refer to as a "TRS." In general, a TRS may hold assets and engage in activities that the REIT cannot hold, may choose not to hold to maintain**

> **REIT compliance and cannot engage in directly.** Additionally, a TRS may engage in any real estate or non-real estate related business. A TRS is subject to U.S. federal, state and local corporate income taxes.

*See* Speirs Declaration at ¶2, Ex. 1 at 12 (Emphasis added). In fact, ARNS uses the Florida Court system for purposes of securing liens and commencing foreclosure proceedings. *See* Speirs Declaration at ¶5, Ex. 4; *see also*, ¶6, Ex. 5; ¶7, Ex. 6; ¶8, Ex. 7; ¶9, Ex. 8. It is also used by RESI and AAMC to buy and sell property in Florida.[8] *See* Speirs Declaration ¶5, Ex. 4; *see also*, ¶6, Ex. 5; ¶7, Ex. 6; ¶8, Ex. 7; ¶9, Ex. 8. Moreover, in April 2014, ARNS filed an Application by Foreign Corporation for Authorization to Transact Business in Florida with the Florida Department of State, Division of Corporations. *See* Speirs Declaration at ¶10, Ex. 9. In its application to do business in Florida, ARNS lists AAMC as its principal place of business, and Ashlish Pandey (former CEO of RESI and AAMC) and Stephen H. Gray (General Counsel of RESI and AAMC) as its officers/directors. *Id.* at 4. ARNS also has a registered agent in Florida listed on its application which is CT Corporation in Plantation, Florida. ARNS' business is derived 100% from AAMC and its financials consolidated into RESI's financial statements. *See* Speirs Declaration at ¶2, Ex. 1 at F-26.

In addition to ARNS, RESI and AAMC formed a title insurance subsidiary NewSource, in December 2012. NewSource was initially funded with an $18 million investment from ARNS (via a subscription agreement with RESI) and a $2 million investment by AAMC. *See* Speirs Declaration at ¶4, Ex. 3 at 1. Prior to the formation of NewSource, RESI was the exclusive client of AAMC. It is clear that NewSource was formed by AAMC and RESI to perform specific business functions in Florida. In fact, according to AAMC, in 2014 NewSource commenced its reinsurance business during the second quarter of 2014, generating approximately $400,000 of title reinsurance **premiums from Florida alone**. *See* Speirs

---

[8] *See* http://orlando.blockshopper.com/sales/by_city/orlando-baldwin_park

Declaration at ¶11, Ex. 10 at 19. Further, it appears that NewSource derived 100% of its business from reinsurance contracts in Florida in 2014, totaling approximately $5.0 million. Speirs Declaration at ¶4, Ex. 3 at 10.

Undoubtedly, ARNS and NewSource were formed by AAMC, on behalf of RESI, for the purposes of conducting domestic business, a large part of which was in the state of Florida. RESI and AAMC, through the use of these companies, derived substantial fees and income, availed themselves of the Florida laws and Court system to secure liens and properties which were part of RESI's portfolio and managed by AAMC, and used ARNS to purchase and sell property in the state of Florida. AAMC, on behalf of RESI, also contracted for services related to the management, maintenance and operation of the rental properties in RESI's portfolio in Florida as well. Annexed to **both** RESI and AAMC's 2014 10-Ks is the same graphical representation showing the fees and expenses which flow to and from each of the interrelated companies, which necessarily include those that the business venture derived from and expended on their operations in Florida. *See* Speirs Declaration at ¶2, Ex. 1 at F-24; *see also*, ¶4, Ex. 3 at F-26.

### C.      Defendants' Use of the Affiliates for Personal Benefit and Related Conflicts

In a February 26, 2014 letter to Ocwen's general counsel, NYDFS Superintendent Lawsky charged Ocwen with misstating Ocwen's "strictly arms-length business relationship" with its related affiliates, all chaired by Defendant Erbey, and potentially harming borrowers and pushing homeowners "unduly into foreclosure." Lawsky demanded detailed information about the financial interests of Ocwen's officers, directors and employees in the various affiliated companies, as well as documentation showing the nature and extent of business relationships between Ocwen and those other firms. The letter stated, in pertinent part, as follows:

11

The Department's ongoing review of Ocwen's mortgage servicing practices has uncovered a number of potential conflicts of interest between Ocwen and other public companies with which Ocwen is closely affiliated.  Indeed, the fact our review has uncovered to date cast serious doubts on recent public statement made by the company that Ocwen has a "strictly arms-length business relationship" with those companies.  We are also concerned that this tangled web of conflicts could create incentives that harm borrowers and push homeowners unduly into foreclosure.  As such, we are demanding additional information on the issues as part of our review.

Pursuant to the December 4, 2012 Consent Order between Ocwen and the Department, we have engaged an independent on-site compliance monitor at Ocwen to conduct a comprehensive review of Ocwen's servicing operations.  It is in the course of the monitorship that **we uncovered these potential conflicts between and among Ocwen, Altisource Portfolio Solutions, S.A. ("Altisource Portfolio"), Altisource Residential Corporation, Altisource Asset Management Corporation,** and Home Loan Servicing Solutions Ltd., (together the "affiliated companies"), all of which are chaired by William C. Erbey, who also the largest shareholder of each and the Executive Chairman of Ocwen.

Presently, Ocwen's management owns stock or stock options in the affiliated companies.  This raises the possibility that management has the opportunity and incentive to make decisions concerning Ocwen that are intended to benefit the share price of affiliated companies, resulting in harm to borrowers, mortgage investors, or Ocwen shareholders as a result.

Moreover, the DFS letter emphasized the following point:

The Department's review of Ocwen's mortgage servicing practices has also found that Ocwen relies extensively on affiliated companies for its information management system (from the programming of comment codes to functioning as Ocwen's IT help desk), as well as procurement of third party services.  This further demonstrates the interconnected nature of Ocwen's relationship with the affiliated companies.

¶109.

On April 21, 2014, Ocwen received another letter from the NYDFS, questioning the

independence of Altisource's relationship with Ocwen and its online auction site Hubzu, which

is used to auction off properties facing foreclosure.  According to the NYDFS, "Hubzu

appear[ed] to be charging auction fees on Ocwen-serviced properties that [were] up to three

times the fees charged to non-Ocwen customers."  More importantly, the NYDFS also voiced its

12

concerns surrounding the relationship between Ocwen and the affiliated companies "raise[d] significant concerns regarding self-dealing." ¶114.

On August 4, 2014, the NYDFS revealed to Ocwen that it was reviewing a "troubling transaction" with Altisource relating to the provision of force-placed insurance which was "designed to funnel as much as $65 million in fees annually from already-distressed homeowners to Altisource for minimal work." The letter went on to question the "role that Ocwen's Executive Chairman William C. Erbey played in approving this arrangement." ¶120. Then, on October 21, 2014, the NYDFS revealed its concerns as to "serious issues with Ocwen's systems and processes, including Ocwen's backdating of potentially hundreds of thousands of letters to homeowners, likely causing them significant harm." ¶123.

This all culminated with the drastic measures taken by the DFS in December 2014, when Defendant Erbey was forced to step down as Chairman of all five interconnected publicly traded companies in which he owned significant stakes. *See* Speirs Declaration at ¶12, Ex. 11; *see also,* ¶¶4-14, 119-125. As alleged in the Complaint, Defendant Erbey, with the participation of the remaining Individual Defendants and related affiliates, had been self-dealing by steering significant fees from Ocwen to the related affiliates in which they owned a larger percentage of as compared to Ocwen itself, and obtaining tax benefits not otherwise available to Ocwen. ¶¶19, 45, 54, 109. However, as set forth above, these interconnected affiliates companies operated within the United States, and, to a significant extent, in the state of Florida where they conducted significant business and received substantial financial benefits while availing themselves of the protections of the laws of the states in which they were operating.

13

VII.   **ARGUMENT**[2]

    A.   **RESI and AAMC are Subject to Personal Jurisdiction in This Court**[10]

        1.   Standard for Specific Jurisdiction

As set forth below, Defendants RESI and AAMC are subject to personal jurisdiction in Florida under 48.193(1)(a), because they conducted business in Florida through a variety of joint business ventures involving Ocwen and other related entities, and also had sufficient minimum contacts to satisfy the Due Process Clause.

When determining whether it has jurisdiction over a non-resident defendant, a Florida Court must conduct a two-step analysis. *Venetian Salami Co. v. Parthenais*, 554 So. 2d. 499, 502 (Fla. 1989). "First, it must be determined that the complaint alleges sufficient jurisdictional facts to bring the action within the ambit of the [Florida's Long Arm] statute; and if it does, the next inquiry is whether sufficient 'minimum contacts' are demonstrated to satisfy [constitutional] due process requirements." *Wendt v. Horowitz,* 822 So.2d 1252, 1257 (Fla. 2002) *(quoting Execu-Tech Bus. Sys, Inc. v. New Oji Paper Co.,* 752 So.2d 582, 584 (Fla. 2000)).

        2.   §48.193(1)(a), Fla. Stat. – Conducting Business in Florida

A nonresident defendant may be subject to personal jurisdiction in Florida by "operating, conducting, engaging in or carrying on a business *or business venture* in this state or having an office or agency in this state." §48.193(1)(a) (emphasis added). "The activities of the nonresident

---

[9] As an initial matter, both AAMC and RESI seek to join in the motion to stay filed nearly four months ago by Nominal Defendant Ocwen and the Individual Defendants on April 13, 2015.  D.E. 37, 38.  See RESI Motion to Dismiss at 19; AAMC Motion to Dismiss at 2.  These requests must be rejected.  Not only is the attempted joinder untimely, but the facts set forth in the motion to stay do not address any of the claims alleged against AAMC and RESI by Plaintiff.  AAMC and RESI cite no authority or applicable case law in support of their purported request to belatedly join in the motion to stay, and as such, it should not be entertained by this Court.

[10] Plaintiff does not contest the facts that Defendants RESI and AAMC were not incorporated in Florida or maintained their principal places of business within the state of Florida such that they would fall under the General Jurisdictional powers of the Court based on that criteria alone.

must be considered collectively and show a general course of business activity in the State for pecuniary benefit." *Dinsmore v. Martin Blumenthal Assocs., Inc.*, 314 So.2d 561, 564 (Fla. 1975). *Murante v. Pedro Land Inc.,* 761 F. Supp. 786, 789 (S.D. Fla. 1991) (court had jurisdiction over South Carolina defendant who sold fireworks to Florida dealers where those sales constituted 8.6% of company's profits, even where company had no headquarters, offices, or agents in Florida); *see also*, *Demos v. Landmark at Hillsboro Condo. Ass'n,* 47 So. 3d 971, 972 (Fla. Dist. Ct. App. 4th Dist. 2010) (the bare allegation of ownership of property was enough to bring defendants within the jurisdiction of the court without further allegations); *Holt v. Wells Fargo Bank, N.A.,* 32 So. 3d 194, 195 (Fla. Dist. Ct. App. 4th Dist. 2010) (the Florida long-arm statute is more reasonably read as extending personal long-arm jurisdiction to those "holding a mortgage or other lien on" real property in Florida).[11]

There is no question that RESI and AAMC fit squarely within the Florida Statute's definition of carrying on a business venture for pecuniary benefit sufficient to confer long-arm jurisdiction. RESI is a publicly traded REIT with few if any of its own employees. *See* Speirs Declaration at ¶2, Ex. 1 at 1, 13; *see also, infra* at II.A.2. During the relevant period, RESI maintained an exclusive services agreement with Ocwen, a Florida Corporation, under which Ocwen serviced all of the mortgages on the properties in the RESI portfolio – including those in

---

[11] *Accord. Sculptchair, Inc. v. Century Arts, Inc.*, 94 F.3d 623, 627–28 (11th Cir. 1996). *Gahn v. Holiday Property Bond Ltd.,* 826 So. 2d 423 (Fla. App. 2002) (court had jurisdiction where complaint alleged conduct demonstrating developers purposefully availed themselves of using Florida professionals to procure and develop Florida property intended to be offered in their timeshare); *Banco Inversion, S.A. v. Celtic Fin. Corp., S.A.,* 907 So. 2d 704, 708-709 (Fla. Dist. Ct. App. 4th Dist. 2005) (court had jurisdiction where defendant made initial contact and maintained ongoing relationship with plaintiffs for services in Florida); *Execu-Tech Bus. Sys. v. New Oji Paper Co.,* 752 So. 2d 582 (Fla. 2000) (due process satisfied where company fixed wholesale prices throughout the United States, including Florida; fact that plaintiffs did not yet show that company sold product into Florida not dispositive); *American Univ. of the Caribbean, N.V. v. Caritas Healthcare, Inc.,* 484 Fed. Appx. 322 (11th Cir. 2012) (personal jurisdiction found where complaint alleged, *inter alia*, that contract negotiated in Florida, guaranty obligation owed there);

Florida.  Florida has the largest number of properties in RESI's portfolio – constituting over 18% of its total portfolio.  *See* Speirs Declaration at ¶2, Ex. 1 at 21.  In exchange for the servicing fees it pays to Ocwen under the servicing agreement, RESI is able to acquire non-performing assets from Ocwen at a discount from what a typical REO acquisition would cost. Speirs Declaration at ¶2, Ex. 1 at 15.  During the relevant period, Defendant Erbey served as Chairman of both Ocwen and RESI, owned approximately 6% of Ocwen and 5% of RESI respectively, and was allegedly involved in negotiating and procuring the agreement between Ocwen and RESI.  ¶59.

AAMC performs the day-to-day management and operations of RESI as set forth herein. *See infra,* Section II.A.  AAMC's sole purpose is to serve as the exclusive portfolio manager for RESI.  It was responsible for defining investment criteria, executing asset acquisitions for RESI, analyzing property sales, overseeing Ocwen's servicing of RESI's loans, overseeing Altisource's renovation projects throughout the U.S., leasing and managing RESI's properties, and performing asset management and corporate governance duties.  *See, supra*, at II.A.2 and II.A.3. A significant portion of their activity occurs in Florida.  Furthermore, through its wholly owned indirect subsidiary ARNS, AAMC conducts business in Florida.  *See supra*, at II.B.  These business activities include, but are not limited to securing liens on properties owned by RESI and serviced by Ocwen, and serving as the purchaser of real property in Florida on behalf of RESI and AAMC.

Significantly, in or around April 2014, ARNS, through AAMC, filed with the Florida Department of State, Division of Corporations, an "Application for Authorization to Transact Business in Florida."  *See* Speirs Declaration at ¶10, Ex. 9.  In its application, ARNS represents that it first transacted business in Florida on November 19, 2013, lists its principal office address as that of "Altisource Asset Management Corporation", and provides a Florida registered agent.

16

*Id.*  Furthermore, ARNS' officers are former RESI and AAMC Executive Ashish Pandey, and current RESI and AAMC General Counsel Stephen H. Gray.  *Id.* at 4.

Both AAMC and RESI submit only cursory affidavits in support of their motions which omit these significant Florida business activities and contacts with the State.  Affidavit of Stephen Gray in Support of AAMC Motion to Dismiss ("Gray AAMC Declaration"); Declaration of Stephen Gray in Support, D.E. 77-1 ("Gray RESI Declaration").  In Mr. Gray's declarations on behalf of AAMC, Mr. Gray states that AAMC "does not direct the management operation or operating policies of any corporation or business in Florida."  AAMC Gray Declaration at 2.  This statement is contradicted by the fact that AAMC clearly directs the operations and activities of RESI, ARNS as well as NewSource within the State of Florida.  Mr. Gray goes on to state that AAMC "does not own, use possess or hold a mortgage or other lien on any real property in Florida" and that AAMC "does not insure any person, property or risk located in Florida."  *Id.*  It is now clear when presented with a complete picture of RESI and AAMC's U.S. operations that these statements are misleading as well.  ARNS, a company formed to carry out the business of AAMC and RESI in Florida (and elsewhere), and which shares offices, personnel and even its General Counsel,  clearly owns property and holds liens on property in the state of Florida. *See supra*, at Section II.B.  Moreover, NewSource, a business venture between ARNS and AAMC, had revenues of almost $5.0 million resulting from its title insurance business in the state of Florida in 2014.  *See* Speirs Declaration at ¶2, Ex. 1 at 11-12.  Moreover, AAMC's and RESI's published financial statements reflect their business dealings in Florida.  *See supra,* at II.B.

Furthermore, the Gray RESI Declaration (D.E. 77-1) categorically states that RESI does not provide property management services…[and that] RESI contracts with other vendors to

17

provide these services for its portfolio of real estate assets.  *Id.* at 2.  It cannot be contested that AAMC is the entity which provides property and portfolio management services, in the state of Florida, on behalf of RESI, and that "other vendors" equates to affiliated companies formed and owned by RESI to carry out these functions in the U.S. (as well as Ocwen).  Significantly, and not surprisingly, the affidavit is silent as to the 2,160 properties acquired and owned by RESI in Florida alone.

### 3. Specific Jurisdiction For Conduct As Aiders and Abettors

Alternatively, courts throughout the country, including Florida, recognize that where a plaintiff alleges a conspiracy to perform an action giving rise to liability, "if the purposeful act or acts of one conspirator are of a nature and quality that would subject the actor to the jurisdiction of the court, all of the conspirators are subject to the jurisdiction of the court." *Carsanaro v. Bloodhound Techs., Inc.*, 63 A.3d 618, 635 (Del. Ch. 2013) (*quoting Instituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.3d 210, 225–27 (Del. 1982)).[12]  *See also*, *AXA Equitable Life Ins. Co. v. Infinity Financial Group, LLC* , 608 F. Supp. 2d 1349, 1354 (S.D. Fla. 2009) ("Florida law construes the state's long-arm statute to reach all of the alleged participants in a conspiracy, at least one act in furtherance of which is committed in Florida. Florida courts may exercise jurisdiction over parties to a Florida civil conspiracy **even if the alleged civil coconspirator otherwise has no connection to the state.")**  (Emphasis added).

---

[12] *Accord. Remmes v. Int'l. Flavors & Fragrances, Inc.*, 389 F. Supp. 2d 1080, 1093–96 (N.D. Iowa 2005) (interpreting Iowa law as permitting suits under a conspiracy theory of jurisdiction); *Gibbs v. PrimeLending*, 381 S.W.3d 829 (Ark. 2011) (same under Arkansas law); *Mackey v. Compass Mktg., Inc.*, 391 Md. 117 (Md. 2006) (same under Maryland law.); *Chenault v. Walker*, 36 S.W.3d 45 (Tenn. 2001) (same under Tennessee law).

As Delaware courts have held[13] "[i]n cases involving the internal affairs of corporations, aiding and abetting claims represent a context-specific application of civil conspiracy law." *Hamilton Partners, L.P. v. Englard*, 11 A.3d 1180, 1197–98 (Del. Ch. 2010) (*quoting Allied Capital Corp. v. GC–Sun Hldgs., L.P.*, 910 A.2d 1020, 1038 (Del. Ch. 2006)). Thus, "[s]ufficiently pleading a claim for aiding and abetting a breach of fiduciary duty satisfies the first and second elements" for purposes of establishing personal jurisdiction. *Id.* at 1198.

Where a court already has personal jurisdiction over one of the defendants involved in a civil conspiracy (such as aiding and abetting) that is sufficient to establish jurisdiction over the others. *Carsanaro*, 65 A.3d at 636 (*quoting Instituto Bancario*, 449 A.3d at 225). Here there is no dispute that the Court has personal jurisdiction over the Individual Defendants, officers and directors of a Florida Corporation.  Moreover, Plaintiff alleges that AAMC and RESI, as related entities, have played key roles in the furtherance of the breaches of fiduciary duties by the Individual Defendants through their involvement in conflicted and self-dealing transactions. *See supra*, at II.A.  Furthermore, Plaintiff has adequately plead the substantial business activities that took place within Florida, and the substantial revenues that Defendants derived from their business activities in Florida.  *See infra*, at II.B.

Defendants' entire memoranda of law in support of their motions to dismiss are completely devoid of the very substantial and purposeful actions which took place within the state of Florida.  Not once do Defendants, in their motions or Mr. Gray's Declarations, refer to the actions they directed ARNS and NewSource to take within Florida, the substantial revenues and fees derived from ownership and management of the over 2,000 properties in Florida, or the

---

[13] Florida "courts 'rely with confidence upon Delaware law to construe Florida corporate law.'"  *Batur v. Signature Props. of Nw. Fla., Inc.,* 903 So. 2d 985, 994 n.18 (Fla. Dist. Ct. App. 2005) (quoting *Int'l Ins. Co. v. Johns,* 874 F.2d 1447, 1459 n.22 (11th Cir. 1989)); *see also Int'l Ins.,* 874 F. 2d at 1459 n.22 ("Florida courts have relied upon Delaware corporate law to establish their own corporate doctrines") (citing cases).

fact that each of the Defendants shared offices, personnel, officers and directors with a company which is authorized to and in fact does business in Florida.  *See supra*, at II.B.

                4.       Defendants RESI and AAMC have sufficient minimum
                        contacts with Florida to satisfy due process requirements

Plaintiff's allegations, together with the jurisdictionally noticed facts, demonstrate that RESI and AAMC engaged in substantial business activity in the state of Florida since at least 2013.  Such activities easily exceed the minimum contacts required by due process, subjecting RESI and AAMC to personal jurisdiction in Florida.  "Due process requires that a nonresident has sufficient minimum contacts with the forum state such that the maintenance of a suit does not offend 'traditional notions of fair play and substantial justice.'"  *Carib-USA Ship Lines Bahamas Ltd. V. Dorsett*, 935 So. 2d 1272, 1275 (Fla. 4th DCA 2006) *(quoting Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  "In analyzing whether a nonresident has the requisite minimum contacts with a foreign state to justify personal jurisdiction, courts should determine whether the nonresident's 'conduct and connection with the forum State are such that he should reasonably anticipate being hailed into court there.'"  *Id. (quoting World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

In order for a nonresident defendant to anticipate being hailed into a Florida court, it is essential that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within Florida, thus invoking the benefits and protections of its laws.  *Id. (citing Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-75 (1985)).  For purposes of this due process analysis, a defendant's contacts with the form state are "assessed over a period of years prior to the filing of a complaint."  *Id.* at 1276 (citing *Woods*, 739 So. 2d at 621).  *See Execu-Tech Bus. Sys. v. New Oji Paper Co.,* 752 So. 2d 582 (Fla. 2000); *Ford Motor Co. v. Atwood Vacuum Mach. Co.,* 392 So. 2d 1305, 1313 (Fla. 1981); *Banco Inversion, S.A. v. Celtic Fin.*

20

*Corp., S.A.,* 907 So. 2d 704 (Fla. Dist. Ct. App. 4th Dist. 2005); *R&R Games, Inc. v. Fundex Games, Ltd.,* 2013 U.S. Dist. LEXIS 97621, at *19 (M.D. Fla. July 12, 2013) (minimum contacts found where defendant induced and contributed to infringement in Florida even though he did not directly do business in Florida); *Hush Little Baby, LLC v. Chapman*, 2015 U.S. Dist. LEXIS 37265, at *10-11 (M.D. Fla. Mar. 24, 2015) (due process requirement met where defendant communicated with plaintiff's Florida caregivers, which Plaintiff alleges has damaged the relationships between Plaintiff, its business partners, its caregivers, and its customers.)

Defendants RESI and AAMC each have sufficient minimum contacts with Florida such that their respective right to due process will not be violated by requiring them to appear in Florida to defend against Plaintiff's lawsuit because they had substantial contacts with the state in relation to the administration, ownership and management of over 2,000 separate properties located in Florida;[14] because they formed a taxable REIT subsidiary (which was registered to do business within the state of Florida) to perform certain functions in Florida with respect to these properties; and benefitted financially from a series of contracts entered into among each other, with Nominal Defendant Ocwen, as well as entities including ARNS and NewSource from which they garnered substantial revenues from business in Florida. *See supra*, at II.A and B.

The cases relied on by Defendants are inapposite.  For example, in *United Techs. Corp. v. Mazer*, 556 F.3d 1260 (11th Cir. 2009), in support of plaintiff's argument for personal jurisdiction, he merely stated that defendant had lived in Florida and performed several lawsuit-related activities while living in Florida, but nothing more.  However here, unlike *United Techs,* Plaintiff has alleged that Defendants RESI and AAMC conduct business in Florida (¶27) and submitted substantial evidence, contradicting the Gray Declarations and setting forth specific

---

[14] RESI has been acquiring properties in Florida since at least 2012.

facts detailing AAMC's and RESI's business activities in Florida.  It cannot be contested that AAMC is the entity which provides property management services, in the state of Florida, on behalf of RESI, and that "other vendors" (Gray RESI Declaration at ¶4) equates to affiliated companies formed and owned by RESI to carry out these functions in the U.S.

Similarly, Defendants reliance on *Bystrowski v. Perry*, 1992 WL 161047 (M.D. Fla. 1992), is misplaced.  In *Bystrowski,* the court found that there was no personal jurisdiction under the contractual relationship prong of the Florida long-arm statute which is not the basis of jurisdiction here.  1992 WL 161047 at *5.  Here, Plaintiff clearly pleads personal jurisdiction over Defendants RESI and AAMC based on the doing business prong of the Florida long-arm statute.  ¶27.[15]

### B.      Plaintiff's Complaint Satisfies the Rule 8(a) Pleading Standard

Plaintiff's Complaint satisfies the applicable 8(a) standard in that it "plead enough facts to state a plausible basis for the claim."  That is all that is required of Plaintiff at this stage of the litigation.  *Court-Appointed Receiver of Lancer Management Group LLC v. Lauer*, Civ. No. 05-60584, 2008 WL 906274, at *2 (S. D. Fla., 2008) (citing *Bell Atlantic Corp. v. Twombly,* 127 U.S. 1955 (2007), 1964-65). Under the Eleventh Circuit's interpretation of *Ashcroft* and *Twombly*, where there are well-pleaded factual allegations, courts should "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *American Dental Ass'n v. Cigna Corp.,* 605 F.3d 1283, 1290 (11th Cir.2010).  A "complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," so long as it provides the "grounds of…entitlement to relief.'" *Court-Appointed Receiver* 2008 WL 906274, at *2 (internal quotations and citations omitted).  Plaintiff's allegations that RESI and AAMC each played roles

---

[15] For similar reasons, Defendants' arguments based on *Walden v. Fiore*, 134 S. Ct. 1115 (2014) and *Jet Charter Serv., Inc. v. Koeck*, 907 F.2d 1110 (11th Cir. 1990) must also fail.

in assisting and furthering the breaches of fiduciary duties by the Individual Defendants to the detriment of Ocwen and its shareholders, are sufficient to withstand scrutiny at this juncture. On a motion to dismiss, any uncontroverted facts in the complaint must be taken as true. *eLandia* 690 F. Supp. 2d at 1327.

In light of the detailed allegations of the close intertwined relationships among Defendants, it cannot be argued, as RESI and AAMC do, that Plaintiff's fail to satisfy the applicable pleading standard. ¶¶4-25, 51-69, 92-133; *see also*, RESI Motion to Dismiss, at 9; AAMC Motion to Dismiss at 4. Plaintiff's Complaint, in contrast to those discussed in the cases cited by Defendants, is sufficiently detailed, fact-driven and plausible.

      1.     Plaintiff has Sufficiently Pled a Cause of Action
                for Aider and Abettor Liability Against AAMC and RESI

         i.     *Plaintiff has pleaded that the Primary Defendants*
                *breached their fiduciary duties to shareholders*

For purposes of this motion, Defendants effectively waive any argument that Plaintiff has failed to plead an underlying breach of fiduciary duty claim as they submit no substantive argument as to those allegations.[16]  Rather, they have chosen to simply state, in conclusory fashion that they "anticipate [ ] that Individual Defendants will contest the extent to which the complaint properly states causes of action against them." AAMC Motion to Dismiss at 15; RESI Motion to Dismiss at 11.

Under Florida law, there are four elements to the claim of "aiding and abetting a breach of a fiduciary duty": "(1) a fiduciary duty on the part of the primary wrongdoer; (2) a breach of this fiduciary duty; (3) knowledge of the breach by the alleged aider and abettor; and (4) the aider and abettor's substantial assistance or encouragement of the wrongdoing." *Aquent LLC v.*

---

[16] Plaintiff submits that this "anticipatory" argument is invalid and waives any claim these Defendants may have regarding the insufficiency of the underlying breach of fiduciary duty allegations.

*Stapleton*, 65 F. Supp. 3d 1339 (M. D. Fla. 2014).  It is self-evident that the first two elements, pertaining to the underlying breach of fiduciary duty claims, are not only conceded but satisfied. The Individual Defendants owed a fiduciary duty to Ocwen and its shareholders, which they breached by entering into self-dealing related party transactions.  In sum, they "created a conflict in that adverse decisions by Ocwen against homeowners could be made simply to fuel profits" for RESI and AAMC, even where Ocwen suffered direct losses and increased regulatory liabilities. ¶¶12-14.   Indeed, Ocwen negotiated sweetheart deals with AAMC and RESI that resulted in constant flow of business and substantial revenues for the affiliates, by design, and came at a loss to Ocwen while also exposing it to billions of dollars in regulatory penalties. ¶¶19, 59-61. The fines paid by Ocwen, along with Erbey's forced resignations from Ocwen and its four spin-off companies (including AAMC and RESI), shows the extremity of the breaches and the losses it has caused Ocwen.  ¶¶23-25, 32.

ii.      *Plaintiff adequately alleges AAMC and RESI's
knowledge of the breaches of fiduciary duties*

Under Florida law, where defendants are alleged to have been "generally aware" of the primary wrongdoing, the element of "actual knowledge" is satisfied for aiding and abetting claims.   *Coquina Investments,* 2012 WL 4479057, at \*19.   In addition, a plausible inference of "actual knowledge may be shown by circumstantial evidence." *Perlman v. Wells Fargo Bank, N.A.*, 559 Fed. Appx. 988, 993 (C.A.11 (Fla.), 2014).   In the case of RESI and AAMC, controllers such as Erbey, among others, clearly knew about their own misconduct as leaders of Ocwen and their knowledge of the underlying conflicts and self-dealing transactions can be imputed to RESI and AAMC.  ¶60.

Florida courts have held that "actual knowledge" may be assumed where defendants ignore clear signs of a fiduciary breach, or evince partial awareness of it, even absent concrete

24

evidence that they fully realized it. An inference of "actual knowledge" arises where the defendant was at least partly aware of the fiduciary breach. In *Aquent,* plaintiff adequately asserted defendant's "actual knowledge" that a shared employee was stealing trade secrets based on defendant's awareness that such joint employment was in violation of the employee's fiduciary duty to Aquent. 65 F. Supp. 3d at 1350. AAMC and RESI's knowledge was and is more total and direct. Erbey used his position as Chairman and controlling person of the various related entities to engage in self-dealing transactions between Ocwen and AAMC, RESI and other affiliated companies, which clearly breached his fiduciary duty to Ocwen and its shareholders. ¶¶20, 22, 109. In sum, he stood on both sides of the transactions in breach of his fiduciary duties to Ocwen.

Further, in *Court-Appointed Receiver,* the plaintiff adequately pleaded actual knowledge by describing defendant's assistance with efforts "to deceive investors, prepare overstated valuations, and manufacture trades to artificially inflate value." 2008 WL 906274, at *5. As a result, the court denied a motion to dismiss shareholder action aiding and abetting a fiduciary breach. *Id.* By assisting Ocwen and the Individual Defendants in concealing the self-dealing related party transactions, AAMC and RESI helped to "conceal the fact that [Ocwen] was and is improperly misrepresenting…internal controls." ¶¶43(h), 60.

Even the cases cited by Defendants support Plaintiff's position. In *Perlman,* where the Eleventh Circuit affirmed a motion to dismiss, the plaintiff had not only failed to create a plausible inference of knowledge, but also failed to show that enough red flags existed such that an "ordinary prudent person would have been induced to make inquiry or investigate" the potential fiduciary breach. 559 Fed. Appx. at 994. Given that RESI, AAMC and Ocwen had the same Chairman (and other management), that RESI and AAMC relied so heavily on the business

relationships which resulted from the long term non arms-length transactions they were party to, and knowledge of the public statements being made by the Individual Defendants regarding the internal controls in place with respect to interested transactions – RESI and AAMC hardly had to have the discernment of an "ordinary prudent person" to perceive the fiduciary breach involving its own Chairman and others.[17]   As their own insiders were directly involved in the self-dealing transactions – they had the requisite knowledge.

iii.   *RESI and AAMC "substantially assisted in the Individual Defendants' breach of fiduciary duties*

"Substantial assistance" for purposes of aiding and abetting a breach of fiduciary duty occurs when two conditions are met: "defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur," and commits these acts "with a high conscious intent" and a "conscious and specific motivation." *Court-Appointed Receiver* 2008 WL 906274, at *5 (S. D. Fla., 2008); *see also Living Color Enterprises, Inc. v. New Era Aquaculture, Ltd.*, Civ. No. 14–62216–CIV, 2015 WL 1526177, at *7 (S. D. Fla., 2015).  Both of these conditions have been plead with respect to the claims against RESI and AAMC.

Knowing counterparties or negotiators of self-dealing transactions that involve a breach of fiduciary duty incur aider and abettor liability.  *See Razi v. Razavi*, No. 5:12–CV–80–Oc–34 PRL, 2012 WL 7801361 (M. D. Fla., 2012).   In *Razi*, defendant "reviewed most of the transactions…and drafted documents to effectuate the sales" contracts that the primary wrongdoer evaded, in violation of its fiduciary trust. 2012 WL 7801361, at *14.  As such, the court there denied defendants' motion to dismiss the claim for aiding and abetting a breach of fiduciary duty.  *Id.*  The facts here are even more egregious.  Defendant Erbey was negotiating

---

[17] *Arbitrajes Financieros, S.A. v. Bank of America, N.A.*, merely held that aiding and abetting liability should not attach to a defendant who "could not have known about the breach" because the primary wrongdoer "hid its fraud." Nos. 14–10952, 14–11167, 2015 WL 1346096, at *3 (C.A.11 (Fla.), 2015).

26

service and related agreements with RESI and AAMC on behalf of Ocwen, and Altisource, while simultaneously serving as Chairman of the Board of all those entities.  Those negotiations and self-dealing transactions apparently went unquestioned by officers and directors of AAMC and RESI for at least two years until the NYDFS entered into a Consent Decree forcing Erbey to step down as Chairman of all Ocwen-related companies.  RESI and AAMC's direct and multifaceted role as Ocwen's counterparty in a blatant self-dealing breach of fiduciary duty context, further suggests that they acted "with a high conscious intent" and a "conscious and specific motivation." ¶59; *Court-Appointed Receiver* 2008 WL 906274, at *5.  A "specific motivation" is easily discernable where, like here, defendants "personally benefited" from the breach and the primary wrongdoer was one of their "biggest client[s]."[18] *Id*. at *1, 5.[19]

### iv.    *Defendants' Remaining Arguments Fail*

The *in pari delicto* doctrine is an equitable defense by which the courts wash their hands of disputes between joint wrongdoers.  *O'Halloran v. Pricewaterhousecoopers LLP*, 969 So.2d 1039, 1044 (Fla. Ct. App. 2d Dist. 2007).  Thus, where two corporations jointly engage in misconduct, one may not sue its partner on the theory that it was more responsible.  Such is not

---

[18] The "substantial assistance" cases cited by RESI and AAMC are inapposite, even where the court granted a motion to dismiss. In *Living Color*, the court simply affirmed the proposition that a complaint cannot plead scienter where it "does not adequately allege a breach of fiduciary duty" by the primary wrongdoers. 2015 WL 1526177, at *7. Defendants here do not argue that there was no underlying breach. *Groom* is also inapplicable. There, the plaintiff did not create an inference that a bank "affirmatively" assisted a Ponzi scheme, since its complaint merely alleged that it treated the wrongdoer as a regular customer without showing the bank's direct participation in or knowledge of the crime. *Groom v. Bank of America,* 08-cv-2567, 2012 WL 50250, at *4 (M.D. Fla. January 9, 2012). RESI and AAMC went far beyond serving as a conduit for the Individual Defendants' breaches of fiduciary duty, acting as willing participants and counterparties to the non-arm's length contracts from which they benefited substantially from.  *See supra*, at II.

[19] Defendants also argue that Plaintiff has failed to plausibly allege proximate cause.  RESI Motion to Dismiss at 14, AAMC Motion to Dismiss at 17.  First, proving proximate cause is not an element which Plaintiff is required to plead under the doing business prong of the Florida long-arm statute.  *See supra*, at III.A.  Second, Defendants conflate the "harm" that is at issue in this case.  Contrary to their assertions, the harm suffered by AAMC and RESI's actions is to Ocwen, not Plaintiff's monetary investment.  Id. As such, this argument must also fail.

the case here.  Second, Defendants misunderstand the adverse interest doctrine and misapply it to the instant facts.  This doctrine applies in derivative litigation under certain circumstances, and in those circumstances where shareholders seek to sue third parties, the *in pari delicto* doctrine may bar the claim only *if the corporation was a wrongdoer*. *Cenco Inc. v. Seidman & Seidman,* 686 F.2d 449 (7th Cir. 1982). *Cf. Beck v. Deloitte & Touche,* 144 F.3d 732 (11th Cir. 1998) (finding doctrine applicable where bankruptcy trustee stepped into the shoes of the corporation to sue accounting firm on its behalf); *Tew v. Chase Manhattan Bank, N.A.,* 728 F. Supp. 1551 (S.D. Fla. 1990) (same).

But, this doctrine will not apply where the directors and management engage in wrongdoing, and that conduct is not attributable to the corporation.  *Roessler v. Novak*, 858 So.2d 1158, 1161 (Fla. Ct. App. 2d Dist. 2003) (if a corporate agent was 'acting adversely to the corporation's interests, the knowledge and misconduct of the agent are not imputed to the corporation.); *see also, O'Halloran,* 969 So.2d at 1044–45.  Here, the Plaintiffs clearly allege that the conduct resulting in the breaches of fiduciary duties owed to Ocwen were perpetrated by members of it's the board of directors – the Individual Defendants – in the context of self-dealing to Ocwen's detriment.  Accordingly, the interests of the Individual Defendants were adverse to those of Ocwen, and such misconduct cannot be attributed to Ocwen. It follows, then, that RESI and AAMC cannot raise an *in pari delicto* defense to claims brought on Ocwen's behalf. Because the *in pari delicto* doctrine does not apply, the so-called "adverse interest" or "adversity" exception, applies, must fail as well. *Id.*

### C.    Plaintiff has Sufficiently Pled a Cause of Action for Unjust Enrichment Against RESI and AAMC

To state a claim for unjust enrichment under Florida law, a plaintiff must show (1) that it conveyed a benefit upon the defendant, (2) that the defendant was aware of that benefit, (3) that

28

the defendant voluntarily accepted and retained the benefit, and (4) that it would be unjust, under all the circumstances, for the defendant to retain the benefit conveyed. *Nova Info. Sys., Inc. v. Greenwich Ins. Co.*, 365 F.3d 996, 1006–07 (11th Cir. 2004). *See also Florida Power Corp. v. City of Winter Park*, 887 So.2d 1237, 1241 n. 4 (Fla. 2004); Fla. Jur. 2d § 288, Westlaw (database updated May 2015).

Defendants' argument that Plaintiff did not convey a benefit on AAMC or RESI misconstrues the basic nature of a derivative claim asserted on behalf of the Company. The benefit was conveyed by Ocwen and the claim is being asserted derivatively on behalf of Ocwen – not by Plaintiff individually. Indeed, that is the inherent premise of a shareholder derivative suit. *Medkser v. Feingold*, 307 Fed. Appx. 262, 264 (11th Cir. 2008) ("In traditional derivative suits, shareholders sue to enforce a right belonging to the corporation *for which the corporation itself could have brought suit.*"); *Derivative Action*, Black's Law Dictionary (10th ed. 2014) (A derivative action is "[a] suit by a beneficiary of a fiduciary to enforce a right belonging to the fiduciary; esp., a suit asserted by a shareholder on the corporation's behalf against a third party (usu[ally] a corporate officer) because of the corporation's failure to take some action against the third party."). Thus, the correct question is not whether Plaintiff conveyed a benefit on AAMC and RESI, but whether Ocwen did. And, conveniently enough, the Defendants admit that the Plaintiff has alleged "it was Ocwen or the related companies that paid AAMC, not Plaintiff." AAMC Motion to Dismiss at 13.

Accordingly, the benefits bestowed on AAMC and RESI – namely the favorable financial terms conferred under various agreements with Ocwen – were obtained as a result of the receipt of benefits from a series of self-dealing transactions. Such benefits were retained by AAMC and

29

RESI, and this retention is manifestly unjust because of the improper and illegal method by which the benefits were obtained.

AAMC also contends that, because the Plaintiff has alleged a cause of action at law, an equitable unjust enrichment cause of action is prohibited. But, it is well established that "[a] plaintiff is not prevented from asserting an equitable cause of action merely because the plaintiff also *alleged* an adequate legal remedy. Rather, it is the existence of a legal remedy that bars an equitable cause of action." *Intercoastal Realty, Inc. v. Tracy*, 706 F. Supp. 2d 1325, 1331 (S.D. Fla. 2010) (*citing Am. Honda Motor CO., Inc. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1178 (M.D. Fla. 2005)). "[N]othing prevents Plaintiff from pursuing alternative claims [such as] breach of contract and unjust enrichment in separate counts." *Id (citing JI-EE Industry Co., Ltd. v. Paragon Metals, Inc.*, 2010 WL 1141103, *1 (S.D. Fla. 2010)); *Williams v. Bear Stearns & Co.*, 725 So.2d 397, 400 (Fla. Ct. App. 5th Dist. 1998) (holding that a motion to dismiss a claim for promissory estoppel or unjust enrichment on the grounds that an adequate remedy exists at law is premature until such a remedy is proven).  And, none of Defendant's cases are to the contrary. They all stand for the proposition that a Plaintiff who *has* a cause of action at law cannot also *succeed* in a cause of action in equity, not for the proposition that a Plaintiff who has *alleged* a cause of action at law is estopped from *alleging* a cause of action in equity in the alternative.  Indeed, the Federal Rules of Civil Procedure clearly contemplate the contrary. Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate one.").

Finally, AAMC and RESI argue that Plaintiff has failed to allege that no adequate legal remedy exists.  RESI Motion to Dismiss at 15; AAMC Motion to Dismiss at 12.   Plaintiff is not barred from pleading alternative remedies in the complaint and in fact, an argument to the

30

contrary, which Defendants seek to make here, has been rejected by the 11th Circuit. *See Hill v. Hoover Co.*, 899 F. Supp. 2d 1259, 1268 (N.D. Fla. 2012) (*quoting State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Ctr., Inc.*, 427 Fed. Appx. 714, 722 (11th Cir. 2011)) ("[T]he existence of an adequate legal remedy does not preclude the Plaintiff from pleading unjust enrichment in the alternative.").

### D.   Plaintiff's Continuous Ownership of Ocwen Shares Confer Standing to Pursue These Claims

Defendant RESI argues that Plaintiff lacks standing because he has not alleged the precise date(s) upon which he purchased shares of Ocwen stock.  RESI Motion to Dismiss at 17. However, an allegation of the precise date upon which the derivative Plaintiff purchased his shares is not required under Rule 23.1.[20]  *Id.* at 17-19.[21]  *See* Speirs Declaration at ¶13, Ex. 12 (Declaration of W.A. Sokolowski ("Sokolowski  Declaration") at ¶ 2).

Plaintiff specifically alleges in the Amended Complaint that he "has been a continual holder of Ocwen stock and been an Ocwen stockholder at all relevant times referenced herein." ¶30.  For the purpose of these derivative claims, the complaint further alleges that the "Relevant Period" is "approximately May 2, 2013 through the present." ¶2.  As the core of the misconduct involved continuing and ongoing wrongdoing, and the damages underlying the claims alleged

---

[20] RESI premises its entire standing argument on the erroneous conclusion that the earliest date that Mr. Sokolowski could have owned Ocwen stock was September 2013.  RESI Motion to Dismiss at 18, n.6.

[21] Should this Court decline to consider the Sokolowski Declaration in connection with the determination of RESI's motion to dismiss (*see* fn.18), Plaintiff requests leave to file a second amended complaint pursuant to Fed.R.Civ.P. 15(a) to assert the date of initial purchase and lack of knowledge regarding the alleged wrongdoing or to cure any other deficiencies the Court may find.  The court must freely grant leave to amend when justice so requires.  *See In re Engle Cases*, 45 F. Supp. 3d 1351 (M.D. Fla. 2014). An amendment should be allowed unless there is a "substantial reason to deny leave."  *Thomas v. Town of Davie*, 847 F.2d 771, 773 (11th Cir 1988), quoting *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 598 (former 5th Cir. 1981).  The Supreme Court has stated they include "undue delay, bad faith, repeated failure to cure, undue prejudice or futility of the proposed amendment.  *Forman v. Davis*, 371 U.S. 178, 182 (1962).  None of these reasons even arguably applies here and an amendment should be permitted if necessary.

31

occurred after Plaintiff became a shareholder of Ocwen, Plaintiff has standing and RESI's argument is without merit.[22]

Federal Rule of Civil Procedure 23.1 governs derivative litigation and states "[t]he complaint must…allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's shares or membership later devolved on it by operation of law." Fed. R. Civ. P. 23.1(b)(1).[23]  Courts interpret Rule 23.1 to require that a derivative plaintiff be a shareholder at the time of the transaction(s) of which he complains (the "continuous ownership rule") and that the plaintiff retain ownership of the stock as of the time the suit is brought and for the duration of the lawsuit." *E.g., Kreuzfeld A.G. v. Carnehammar*, 138 F.R.D. 594 (S.D. Fla. 1991).  As indicated above, Plaintiff has satisfied both of these requirements.  Rule 23.1 does not require an allegation of the precise date on which Plaintiff first acquired shares.

As is apparent from the Complaint and contrary to RESI's assertions, the core of the alleged wrongful conduct and all of the resulting damages that form the basis for Plaintiff's breach of fiduciary duty and unjust enrichment claims, as well as the entirety of the allegations related to the 2014 Proxy claim, pertain to the relevant period starting on approximately May 2, 2013.  Even assuming as RESI itself notes in seeking dismissal, the Complaint turns in part on the NYDFS Consent Decree that Ocwen entered into on December 5, 2012, requiring Ocwen to hire a corporate monitor to ensure compliance with its prior Agreement on Mortgage Servicing Practices and reform its abusive practices, Plaintiff was a holder of Ocwen stock at that time.

---

[22] In any event, this purported standing issue is illusory.  Plaintiff has been a shareholder of Ocwen commencing on November 5, 2012 and has continuously owned shares of Ocwen stock from that date to and including the present.  *See* Sokolowski Declaration at ¶2.

[23] Fla. Stat. 607.07401 contains a similar requirement and provides: (1) A person may not commence a proceeding in the right of a domestic or foreign corporation unless the person was a shareholder of the corporation when the transaction complained of occurred or unless the person became a shareholder through transfer by operation of law from one who was a shareholder at that time.

¶¶4, 43, 87-91; *see also,* Speirs Declaration at ¶12, Ex. 11. *See supra,* n.21.  Plaintiff's claims and alleged damages also revolve around a December 2013 complaint by, and settlement with, the Consumer Financial Protection Bureau ("CFPB") and 49 states pursuant to which Ocwen was required to pay $2.1 billion (¶¶43, 99-103), which, contrary to RESI's assertion, occurred well *after* Plaintiff first purchased Ocwen stock.

As recognized by the court in *In re Bank of New York Deriv. Litig.*, 320 F.3d 291 (2d Cir. 2003), upon which RESI relies, a plaintiff does not need to have owned stock in the company during the entire course of all relevant events.  Rather, a plaintiff has standing if he or she owned stock in the company "before the core of the allegedly wrongful conduct transpired." *Id.* at 298. Plaintiff easily meets this standard.  Additional allegations from the Complaint confirm that the core of the wrongful conduct at issue occurred after Plaintiff became a shareholder and continued up to and including the date on which this action was commenced.[24]  These allegations include, *inter alia*, the following:

- Throughout the Relevant Period, the Individual Defendants unjustifiably assured stockholders that Ocwen had established a robust set of controls to ensure compliance with regulatory guidelines including the demands of the NY DFS.  ¶11.
- The Individual Defendants' breached their fiduciary duties by failing to implement adequate compliance systems to protect the Company from regulatory risks and improper related-party transactions. ¶13.
- In connection with Ocwen's attempt to acquire $39 billion of MSRs in January 2014, the Individual Defendants' continued failures with respect to regulatory compliance and oversight came under increased scrutiny from regulators. ¶16.
- In February 2014, the NYDFS expressed "concerns about Ocwen's servicing

---

[24] The minimal allegations with respect to events and conduct that occurred prior to the date Plaintiff first purchased Ocwen stock on November 5, 2012 (*e.g.,* ¶¶3, 80, 85) are inserted for contextual purposes rather than as the basis for the claims asserted, which is entirely permissible and does not deprive Plaintiff of standing.  *In re Zoran Corp. Deriv. Litig.*, 511 F. Supp. 2d 986, 1009 (N.D. Cal. 2007) (allegations regarding pre-purchase conduct are permissible).  This case is thus distinguishable from *Sokolowski v. Adelson, et al.,* 2014 WL 3748191 (D. Nev. 2014), upon which RESI relies.  In *Adelson*, the court noted that if plaintiff were to excise all pre-purchase conduct from his complaint, it would contain *only* allegations related to the 2013 and 2014 proxy statements.  Here, as demonstrated above, there are myriad allegations related to the wrongful conduct that occurred well after Mr. Sokolowski first purchased Ocwen stock that are separate and apart from the 2014 proxy claim allegations.

portfolio growth" and also about S.P. Ravi, the Chief Risk Officer at Ocwen, also serving as the Chief Risk Officer at Altisource – a dual role presenting serious conflict of interest issues that had not previously been disclosed. For the NY DFS, this "raised potential conflicts of interest between Ocwen and other public companies with which Ocwen is closely related." ¶17.

- In April 2014, the NYDFS further exposed Ocwen's ongoing lack of controls and oversight over related-party transactions.  ¶20.

- In May 2014, Ocwen disclosed that efforts to comply with regulatory demands had increased its costs substantially for servicing non-conforming loans and these costs were eating into servicing margins. ¶21.

- On August 4, 2014, the NY DFS revealed additional improper related-party transactions. ¶22.

- In October 2014, the NYDFS revealed that Ocwen had engaged in a practice of backdating communications to "potentially hundreds of thousands" of borrowers in violation of the Company's legal and regulatory obligations. ¶ 23.

- On October 21, 2014 Ocwen admitted to the backdating problem, while falsely asserting that the actual number of borrowers affected in New York State was limited and the issue had been completely resolved.  ¶24.

- The Company's regulatory problems are continuing and Ocwen has suffered significant economic damage as a direct result of the wrongdoing alleged herein. ¶25.

Further, in determining whether to grant derivative standing to a plaintiff who acquired stock in the midst of ongoing and continuing alleged wrongdoing, courts have often considered the policies underlying the contemporaneous ownership doctrine and have been particularly cognizant of whether the proposed plaintiff knew of the wrongful conduct before purchasing his or her shares.  *See Ensign Corp. v. Interlogic Trace, Inc.*, 1990 U.S. Dist. LEXIS 17147 (S.D.N.Y. Dec. 19, 1990).  Indeed, both the NY DFS Consent Decree and the $2.1 billion settlement with the CFPB occurred *after* his initial purchase on November 5, 2012.  Likewise, his claim alleging violations of §14(a) of the Exchange Act (Count I) is premised entirely on events (*i.e.,* the issuance and dissemination of Ocwen's 2014 Proxy Statement) occurring well after he became a shareholder and RESI does not contend otherwise. Thus, this is clearly not a case of the court being used to litigate "purchased grievances", the main concern that the contemporaneous ownership rule was designed to prevent.  *See* 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure §1828 (2d Ed. 1986).

Federal courts have held that when a series of wrongful transactions is alleged and some of them transpired before plaintiff became a shareholder and others took place subsequent to that date, the shareholder's action may be maintained on the basis of the later events. *See Stephenson v. Kandegge*r, 337 F. Supp. 591 (S.D.N.Y. 1971). Additionally, numerous courts have held that an entire series of events can constitute a single transaction (the continuing wrong doctrine), entitling a plaintiff to bring suit for injuries suffered by the corporation subsequent to the plaintiff's acquisition of stock as long as *the same series of events* continued after the plaintiff acquired the shares at issue. *Bateson v. Magna Oil Corp.*, 414 F. 2d 128, 130 (5th Cir. 1969) (requirement that a shareholder must have owned stock at the time of the wrong may be satisfied if the wrong is a continuing one; that is, if it spans the plaintiff's ownership, or if new elements in a pattern of wrongful conduct occur after acquisition); *Hoover v. Allen*, 180 F. Supp. 263, 267 (S.D.N.Y. 1960). In other words, a plaintiff who, as here, owned stock throughout the course of the activities that constitute *the primary* basis of the complaint has standing. *In re Bank of N.Y. Derivative Litig.*, 320 F. 3d at 298.

As such, RESI's assertion that Plaintiff lacks standing pursuant to Fed. R. Civ. P. 23(b)(1) is without merit and should be rejected. Alternatively, Plaintiff should be permitted to file an amended complaint to assert that date of his initial purchase of Ocwen stock.

## VIII.  <u>CONCLUSION</u>

For the foregoing reasons, and based on the authority cited, Plaintiff respectfully requests that the AAMC and RESI Motions to Dismiss be denied in their entirety.[25]

---

[25] Should the Court dismiss all or part of Plaintiff's allegations, Plaintiff requests leave to replead. Fed. R. Civ. P. 15(a) (leave to amend shall be granted freely); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962); *In re AMF Bowling Sec. Litig.,* Civ. No. 99-3023 (DC), 2003 U.S. Dist. LEXIS 7389 (S.D.N.Y. May 2, 2003) ("the only possible reasons to reject amendment would be prejudice to the defendant or misconduct by plaintiffs…").

Dated: August 3, 2015                         Respectfully submitted,

                                              **COHEN MILSTEIN SELLERS & TOLL PLLC**


                                              BY: /s/ *Theodore J. Leopold*
                                              Theodore J. Leopold
                                              2925 PGA Boulevard Suite 200
                                              Palm Beach Gardens, FL 33410
                                              Telephone: 561- 515-1400
                                              tleopold@cohenmilstein.com

                                              **COHEN MILSTEIN SELLERS & TOLL PLLC**
                                              Steven J. Toll
                                              1100 New York Avenue NW, Suite 500
                                              Washington, DC 20008
                                              Telephone: 202-408-4600
                                              stoll@cohenmilstein.com

                                              **COHEN MILSTEIN SELLERS & TOLL PLLC**
                                              Richard A. Speirs
                                              (admitted *pro hac vice*)
                                              Daniel B. Rehns
                                              (admitted *pro hac vice*)
                                              88 Pine Street 14th Floor
                                              New York, NY 10005
                                              Telephone: 212-838-7797
                                              rspeirs@cohenmilstein.com
                                              drehns@cohenmilstein.com

                                              **GREENFIELD & GOODMAN, LLC**
                                              Richard D. Greenfield
                                              (admitted *pro hac vice*)
                                              Marguerite R. Goodman
                                              Ann M. Caldwell
                                              Ilene F. Brookler
                                              250 Hudson Street, 8th Floor
                                              New York, NY  10013
                                              Telephone: 917-495-4446
                                              whitehatrdg@earthlink.net

                                              ***Counsel for Plaintiff***

2029327.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served on August 3,

2015 by transmission of Notices of Filing generated by the CM/ECF System on all counsel or

parties of record on the Service List below.

  s/ Theodore J. Leopold
THEODORE J. LEOPOLD (FL Bar No.: 989762)

**Service List**

Jason M. Moff, Esq.
jmoff@kramerlevin.com
John P. Coffey, Esq.
scoffey@kramerlevin.com
Jonathan M. Wagner, Esq.
jwagner@kramerlevin.com
**Kramer Levin Naftalis & Frankel, LLP**
1177 Avenues of the Americas
New York, NY 10036
Phone: (212)-715-9113

Jeffrey B. Crockett, Fla. Bar No. 347401
**Coffey Burlington, P.L.**
2601 South Bayshore Drive, Penthouse
Miami, Florida 33133
Telephone: (305) 858-2900
Facsimile: (305) 858-5261
jcrockett@coffeyburlington.com
vmontejo@coffeyburlington.com
service@coffeyburlington.com

Jeffrey A. Hirsch, Esq.
hirschj@gtlaw.com
**Greenberg Traurig, P.A.**
401 E. Las Olas Blvd., Suite 2000
Fort Lauderdale, FL 33301
Phone: (954)-765-0500
Fax: (954)-765-1477

Edward Soto, Esq.
Edward.soto@weil.com
**Weil, Gotshal & Manges, LLP**
1395 Brickell Avenue, Suite 1200
Miami, FL 33131
Phone: (305) 577-3100

Richard D. Greenfield
whitehatrdg@earthlink.net
**Greenfield & Goodman**
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (917) 495-4446
Facsimile: (917) 745-4158

David P. Ackerman (FBN 374350)
Dana E. Foster (FBN 0185469)
**Ackerman, Link & Sartory, P.A.**
777 S. Flagler Drive, Suite 800 East
West Palm Beach, Florida 33401
Telephone: (561) 838-4100
Facsimile: (561) 838-5305
dackerman@alslaw.com
dfoster@alslaw.com