UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

In Re:

OCWEN DERIVATIVE ACTION
LITIGATION

Master Case  No. 14-CV-81601- WPD

CONSOLIDATED VERIFIED
SHAREHOLDER DERIVATIVE
COMPLAINT

JURY TRIAL DEMANDED

I.      NATURE OF THE ACTION AND INTRODUCTION ................................................. 2

II.     JURISDICTION AND VENUE ............................................................................... 5

III.    PARTIES ....................................................................................................... 6
        A.    Plaintiffs ................................................................................................ 6
        B.    Nominal Defendant ................................................................................. 6
        C.    Defendants ............................................................................................. 6
              1.    The Officer and Director Defendants .................................................. 6
              2.    The Ross Fund Defendants ............................................................... 11
              3.    Beltline Road Insurance Agency, Inc. ............................................... 14
              4.    The Related-Party Transaction Defendants ....................................... 15
                    a.    *Altisource Portfolio Solutions, S.A.* ......................................... 16
                    b.    *Altisource Residential Corporation* .......................................... 24
                    c.    *Altisource Asset Management Corporation* ................................ 27
                    d.    *Home Loan Servicing Solutions* ............................................... 32

IV.     FACTUAL BACKGROUND .................................................................................. 33
        A.    Background of Ocwen's Business ............................................................ 33
        B.    Ocwen's Exponential Growth .................................................................. 36
        C.    Ocwen's Acquisition and Sale of Homeward ............................................ 39
        D.    Ocwen's 2012 Growth Rate Garners Increased Regulator Attention ............ 41
        E.    REALServicing and Ocwen's "Competitive Advantage" ............................. 43
        F.    Ocwen Announces Fiscal 2012 Results and 2013 Quarterly Results;
              Assures Investors Company is Complying with NYDFS Requirements............ 46
        G.    Complaint By the CFPB Demonstrates Ocwen's Recidivist Behavior ............. 53
        H.    The NYDFS Halts Ocwen's Wells Fargo Deal ......................................... 56
        I.    Continuing NYDFS Investigations Uncover Additional Abuses by Ocwen ........ 57
        J.    Ocwen's Improper Grant of Stock Options to Defendant Erbey ................... 61
        K.    Ocwen's Deteriorating Financial Results Due to Compliance-Related
              Problems ............................................................................................... 62
        L.    Defendants' Force-Placed Insurance Scheme ............................................. 67
        M.    Ocwen's Failure to Comply with GAAP ................................................... 69
        N.    NYDFS' Fourth Letter to Ocwen Pertaining to Backdating............................ 71
        O.    The NYDFS and Ocwen Enter Into the December 2014 Consent Order ............ 75
        P.    SEC Findings of Wrongdoing by Ocwen and  HLSS During the Relevant
              Period ................................................................................................... 80
        Q.    California Department of Business Oversight and Investor Complaints............. 81
        R.    Ocwen's Troubles Extend Into 2015 and Beyond ..................................... 84
        S.    False Certifications ............................................................................... 87

V.      DUTIES OF THE INDIVIDUAL DEFENDANTS ....................................................... 88
        A.    Fiduciary Duties...................................................................................... 88
        B.    Control, Access and Authority.................................................................. 91
        C.    Reasonable and Prudent Supervision........................................................ 91
        D.    Code of Business Conduct and Ethics Allegations...................................... 93

i

1.    Ocwen's Code of Conduct ............................................. 93
2.    Ocwen's Code of Business Conduct and Ethics ..................................... 94
3.    Ocwen's Code of Ethics for Senior Financial Officers ......................... 98
E.    Audit Committee Allegations .............................................. 101
F.    Compliance Committee Allegations ........................................ 107
G.    Corporate Governance Guidelines ......................................... 112
H.    Nomination/Governance Committee Allegations ............................... 114
I.    Compensation Committee Allegations .......................................... 116

VI.   DERIVATIVE ALLEGATIONS ..................................................... 119
A.    General Derivative Allegations ........................................... 119
B.    Plaintiffs have Made Pre-Suit Demands Pursuant to Rule 23.1 and the
      Florida Business Corporation Act, § 607.07401 ............................... 120
C.    The Board's Rejection of Plaintiffs' Demands ................................ 126

VII.  OCWEN'S 2013, 2014 and 2015 PROXY STATEMENTS ........................... 130

VIII. DAMAGES SUFFERED BY OCWEN .......................................... 137

IX.   CAUSES OF ACTION ...................................................... 141

Plaintiffs W.A. Sokolowski ("Sokolowski"), Helene Hutt ("Hutt") and Robert Lowinger ("Lowinger") (collectively, "Plaintiffs"), bring this consolidated shareholder derivative action on behalf of nominal defendant Ocwen Financial Corporation ("Ocwen" or "the Company") alleging wrongdoing against certain current and/or now former members of Ocwen's Board of Directors and Ocwen Officers, including William C. Erbey ("Erbey"),  Ronald J. Korn ("Korn"), William H. Lacy ("Lacy"), Robert A. Salcetti ("Salcetti"), Barry N. Wish ("Wish"), Wilbur L. Ross ("Ross") and John V. Britti ("Britti"); certain Ocwen-related entities including Altisource Portfolio Solutions, S.A. ("Altisource"), Home Loan Servicing Solutions Ltd. ("HLSS"), Altisource Residential Corporation ("RESI"), and Altisource Asset Management Corporation ("AAMC") (collectively the "Related-Party Transaction Defendants" or "RPT Defendants"); Altisource subsidiary Beltline Road Insurance Agency, Inc. ("Beltline"); Defendant Ross' private equity fund, WL Ross & Co. LLC ("WLRoss"), and certain related investment funds (collectively the "Ross Fund Defendants").

Plaintiffs make these allegations upon personal knowledge as to their own actions and, as to all other matters, on information and belief based upon the investigation of their undersigned counsel which include, among other things:  (1) a review and analysis of Ocwen's public filings with the SEC; (2) a review of press releases, news articles, and other public statements and reports issued by or concerning Ocwen; and (3) a review of court records and regulatory proceedings, including but not limited to, pleadings and other documents filed in various actions involving Ocwen and SEC Administrative findings.

As required by the Florida Business Corporation Act, § 607.07401 and Rule 23.1, Federal Rules of Civil Procedure, Plaintiff Sokolowski made the first of several pre-suit demands upon

on the Board of Directors of Ocwen (the "Board") on February 11, 2014 with respect to the matters alleged in this Complaint (the "Sokolowski First Demand").  Plaintiff Sokolowski then made a further demand on October 31, 2014 (the "Sokolowski Second Demand").  Defendants failed to take any timely action with respect to the Demands and, subsequently, the Board has continued to ignore Plaintiffs' further demands for action related to these matters.  The specifics of each of the Demands made upon Ocwen's Board are set forth in greater detail below.  Plaintiffs Hutt and Lowinger also made substantively similar and/or related demands upon Ocwen's Board.

## I.    NATURE OF THE ACTION AND INTRODUCTION

1.    This is a shareholder derivative action brought by Plaintiffs on behalf of nominal defendant Ocwen against certain members of the Company's Board of Directors (the "Board") and certain of its executive officers (collectively, the "Individual Defendants" (as defined below)) seeking to remedy the Individual Defendants' violations of federal and state law and breaches of fiduciary duty during the period of May 2, 2013 through the present (the "Relevant Period"), which resulted in, *inter alia,* increased regulatory scrutiny and regulatory sanctions including substantial fines and penalties, exposure to significant potential liabilities from numerous lawsuits, severe damage to Ocwen's business and reputation; and a drastic decline in the Company's stock price.  Plaintiffs allege that certain Defendants also violated their fiduciary duties and exposed Ocwen to substantial harm by concealing from shareholders and the investing public known failures with respect to the Company's compliance with state and federal regulations governing the servicing of mortgage loans, failing to establish adequate internal controls, permitting Ocwen's now former Chairman and Chief Executive Officer ("CEO"), Defendant Erbey, to participate and direct a series of improper self-dealing transactions between

Ocwen and companies in which Defendant Erbey had significant ownership interests and allowing insiders to trade on material adverse inside information.

2.      Notwithstanding both government regulations and multiple regulatory decrees requiring Ocwen's compliance with servicing guidelines, the Board ignored multiple red flags of Ocwen's non-compliance and permitted Ocwen's continued violations of state and federal law including:

- Overcharging and otherwise abusing borrowers while continuing to expand the Company's mortgage servicing rights ("MSR") portfolio;
- Concealing problems the Company had integrating the huge MSR portfolios acquired between 2011 and early 2014, and that it lacked the technical and professional staff required to fairly and competently address delinquent borrowers' concerns. As a result, borrowers were being foreclosed upon improperly at alarming rates;
- The absence of sufficient controls related to document execution, resulting in robo-signing, unauthorized execution, assignment backdating, improper certification and notarization, chain of title irregularities and other related practices affecting the integrity of documents Ocwen was using during the foreclosure process;
- Deficient loss mitigation and loan modification processes which caused the Company to: (a) fail to effectively communicate with borrowers; (b) fail to account for documents submitted by borrowers seeking loss mitigation assistance; (c) fail to address loss mitigation applications in a reasonably timely manner; (d) provide false or misleading reasons for denial of loan modifications; (e) fail to honor terms of loan modifications for transferred accounts; and, (f) backdate hundreds of thousands of letters to borrowers, likely causing them significant harm and exposing the Company to civil liability;
- Repeated failures to respond to requests of regulators, notably the Company's failure to produce documents requested by the California Department of Business Oversight ("CDBO") in the course of a routine statutory evaluation, ultimately endangering its ability to do business and maintain its business license in one of the Company's largest markets, which resulted in substantial fines;
- Insufficient controls related to general borrower account management resulting in misapplication of payments, inaccurate escrow accounting and statements, unnecessary purchasing by borrowers of force-placed insurance at excessive costs and assessment of unauthorized fees and charges;
- Inadequate staffing and poor internal controls related to customer service, as well as deficiencies in control and over-sight of third-party providers, including outside foreclosure counsel;
- Inadequate management control and supervision necessary to ensure the Company's compliance with applicable laws and regulations – specifically

3

pertaining to related-party transactions as noted by the SEC in its January 20, 2016 findings as to Ocwen's dealings with Altisource and HLSS;

- Improperly directing revenues to Ocwen affiliates in which Defendants Erbey and Wish had a financial interest, exposing Ocwen to millions of dollars of potential regulatory and civil liability;

- At all relevant times, Ocwen, as the Individual Defendants knew or should have known, lacked adequate internal controls to ensure that its business practices were in compliance with regulatory requirements and mandates;

- Allowing insiders to sell stock in the open market and back to the Company while in possession of material adverse information regarding Ocwen's financial health; and,

- Engaging in practices which, as detailed herein, resulted in serious Proxy violations during the Relevant Period.

3.      Plaintiffs also allege that Defendant Erbey served as Chairman of Ocwen and owned stock in the RPT Defendants (as defined below) with which Ocwen participated in the improper related-party transactions.  The RPT entities, including Altisource, HLSS, AAMC and RESI are named herein as Defendants for their part in aiding and abetting the Individual Defendants' breaches of fiduciary duties and being unjustly enriched in connection therewith.

4.      Plaintiffs further allege that certain of the Company's officers and directors, namely Defendants Erbey, Wish and Ross sold their personal holdings of Ocwen stock on the open market while having knowledge of material, adverse inside information, in violation of state and federal law and in breach of their fiduciary duties to the Company.

5.      The Ross Fund Defendants (as defined below), who had access to inside information concerning Ocwen because their deputy and managing member, Defendant Ross, at or about the time that he was serving as a Director of Ocwen, sold over $225 million of Ocwen stock in the open market as well as back to the Company at inflated prices in 2013 and 2014 at a point in time when the Company's financial statements were not in compliance with Generally Accepted Accounting Principles ("GAAP").  Notably, the Ross Fund Defendants sold over $72 million of Ocwen stock back to the Company in July 2014 at approximately $37.00 per share.

Just two weeks later, on July 31, 2014, Ocwen publicly disclosed disappointing operating results for the quarter ended June 30, 2014, which resulted in a decline in the price of the Company's stock to $30.17 per share.  Further, on August 12, 2014, Ocwen announced that it had to restate its earnings because of accounting irregularities and problems.   All of the sales during the Relevant Period were made while in possession of material inside information by Defendant Ross regarding these disappointing operating results, which were about to be announced publicly, and material facts regarding the numerous improper related-party transactions entered into by the Company with the knowledge of Defendant Erbey and the other members of the Board.  As a result, the Ross Fund Defendants profited handsomely at the Company's expense and thereby unjustly enriched themselves.

## II.        JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).  In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.  This is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

7.      This Court has jurisdiction over each Defendant because each either is an individual with sufficient minimum contacts with this District, is a corporation conducting business and operating in this District or has, as set forth herein, engaged in tortious conduct that occurred in this District.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and § 1401 because one or more of the Defendants either resides in or maintains executive offices in this

District and a substantial portion of the transactions and wrongs complained of herein, including

Defendants' primary participation in the wrongful acts detailed herein occurred in this District.

### III.     PARTIES

#### A.     Plaintiffs

9.     Plaintiff Sokolowski is now and has been a continuous holder of Ocwen common stock during all relevant times referenced herein.  Plaintiff Sokolowski has held stock in Ocwen since November 2012.  Plaintiff Sokolowski is a citizen of New Jersey.

10.     Plaintiff Hutt is now and has been a continuous holder of Ocwen common stock during all relevant times referenced herein.  Plaintiff Hutt has held stock in Ocwen since 2009. Plaintiff Hutt is a citizen of Vermont.

11.     Plaintiff Lowinger is now and has been a continuous holder of Ocwen common stock during all relevant times referenced herein.  Plaintiff Lowinger has held stock in Ocwen May 2013.  Plaintiff Lowinger is a citizen of New York.

#### B.     Nominal Defendant

12.     Nominal Defendant Ocwen is a corporation organized under the laws of Florida with its principal executive office located at 1000 Abernathy Road NE, Suite 210, Atlanta, Georgia.  Ocwen also maintains a principal office at 1661 Worthington Road, West Palm Beach, Florida 33409.  Ocwen is a publicly traded corporation, the stock of which is listed and traded on the New York Stock Exchange. Ocwen is a Nominal Defendant only, and no claims are asserted against it.

13.     Ocwen is a Nominal Defendant solely in a derivative capacity, and this action is being brought in order to obtain a recovery on its behalf.

#### C.     Defendants

##### 1.     The Officer and Director Defendants

6

14.     Defendant William C. Erbey ("Erbey") co-founded Ocwen and, until January 16, 2015, was at all relevant times, Ocwen's Executive Chairman of the Company's Board of Directors.   Pursuant to an agreement with the New York Department of Financial Services ("NYDFS"), Defendant Erbey was forced to resign from his position at Ocwen, and did so in January 2015.   Previously Erbey served as the CEO of Ocwen from January 1988 to October 2010 and as the President of Ocwen from January 1988 to May 1998.   During the Relevant Period, Defendant Erbey profited both directly and indirectly through sales of Ocwen common stock at inflated prices while in possession of material non-public information.   Defendant Erbey was also a member and Chairman of the Board's Executive Committee during the Relevant Period, which allowed him to exercise additional control over the Board and Individual Defendants. Defendant Erbey was the Chairman of the boards of directors of the RPT Defendants through January 2015, and he profited substantially from the related-party transactions with the RPT Defendants for which he also served as Chairman of the Board throughout the Relevant Period.   From 1983 to 1995, Erbey served as a Managing General Partner of The Oxford Financial Group ("Oxford"), a private investment partnership founded by Defendant Barry Wish, the predecessor of Ocwen.   In fiscal 2013 and 2014, Erbey received total compensation of over $2.9 and $2.08 million, respectively, from Ocwen.   Erbey is a citizen of St. Croix, U.S. Virgin Islands, where he maintains a residence. He is sued herein in his capacity as both as a former officer and a former director of Ocwen and former Chairman of the RPT Defendants.

15.     Defendant Ronald M. Faris ("Faris") has served as a Director of Ocwen since May 2003, as the President of Ocwen since March 2001 and as CEO since October 2010.   In 2013 and 2014, Defendant Faris received total compensation of $1.6 million and $745,000,

respectively, from Ocwen.   Defendant Faris is a citizen of Florida where he maintains a residence. He is sued herein both as an officer and director of Ocwen.  Defendant Faris served as a member of both the Executive Committee and the Compliance Committee during the Relevant Period.

16.     Defendant Ronald J. Korn ("Korn") has served as a Director of Ocwen since May 2003.   Korn is the Chairman of the Audit Committee and a member of the Compensation Committee of the Board.  Korn received total compensation of $133,530 from Ocwen in 2014, which included $73,530 in cash compensation and $60,000 in stock awards.  As of March 2015, Defendant Korn was the beneficial owner of 24,639 shares of Ocwen stock.  Defendant Korn is a citizen of Florida, where he maintains a residence.

17.     Defendant William H. Lacy ("Lacy") has served as a Director of Ocwen since May 2002.[1]   Lacy is the Chairman of the Compensation Committee and a member of the Nomination/Governance Committee of the Board.  In 2014, Lacy received total compensation of $128,530 from Ocwen, which included $68,530 in cash compensation and $60,000 in stock awards.   As of March 2015, Defendant Lacy was the beneficial owner of 14,373 shares of Ocwen stock.  Defendant Lacy is a citizen of Wisconsin, where he maintains a residence.

18.     Defendant Robert A. Salcetti ("Salcetti") has served as a Director of Ocwen since January, 2011.  Salcetti is the Chairman of the Compliance Committee and a member of the Audit Committee and Nomination/Governance of the Board.  In 2014, he received $139,952 in total compensation from Ocwen, which consisted of $79,952 in cash compensation and $60,000

---

[1] On February 19, 2016, Ocwen filed a Form 8-K with the SEC along with an accompanying press release (the "February 19, 2016 8-K") announcing Lacy informed the Board that he does not wish to stand for re-election at the Company's 2016 annual shareholder meeting in May 2016.  Lacy intends to continue to serve as a Director until the Company's annual shareholder meeting.

in stock awards.  As of March 2015, Defendant Salcetti's total beneficial ownership in Ocwen was 10,016 shares.  Defendant Salcetti is a citizen of Texas, where he maintains a residence.

19.     Defendant Barry N. Wish ("Wish") has served as Chairman of the Board since January 2015.[2]  Wish previously served as Chairman Emeritus of the Board from September 1996 to January 2015, and as Chairman of the Board from January 1988 to September 1996. Wish is the Chairman of the Nomination/Governance Committee and is a member of the Executive Committee and the Audit Committee.  Defendant Wish is a co-founder of Ocwen and has served on its Board since 1988.   From 1983 to 1995, Wish served as Managing General Partner of Oxford, which he founded.  As a co-founder of Ocwen and as the founder of Oxford, Defendants Wish and Erbey have a long-standing personal, financial and business relationship. Between November 2012 and November 2013, Wish sold over 1 million shares of Ocwen stock at artificially inflated prices while in possession of material non-public information for proceeds of approximately $50 million.   In 2014, he received $139,952 in total compensation from Ocwen, consisting of $79,952 in cash compensation and $60,000 in stock awards.  As of March 2015, Defendant Wish's total beneficial ownership in Ocwen was 4,151,702 shares, or just over 3% of the outstanding shares in Ocwen.   He is a citizen of Florida, where he maintains a residence.

20.     Defendant Wilbur L. Ross, Jr. ("Ross") served as a director of Ocwen from March 2013 until his resignation in November 2014.  During the Relevant Period, Ross served on the Compliance Committee and the Compensation Committee.  Ross is a citizen of the State of Florida.  For fiscal year 2014, Defendant Ross received $109,002 in total compensation from

---

[2] The February 19, 2016 8-K also stated that Wish informed the Board that he did not wish to stand for re-election at the Company's annual shareholder meeting in May 2016.  Effective March 15, 2016, Wish will resign as the Chair of the Board.  Wish intends to continue to serve as a Director until the Company's annual shareholder meeting.

Ocwen, including cash compensation in the amount of $49,002 and stock options having a value of $60,000.   As of April 2014, Defendant Ross's total beneficial ownership in Ocwen was 1,969,323 shares, or just under 2% of the outstanding shares of Ocwen.   He is named as a defendant herein only with respect to the period of time that he served as an Ocwen director.

21.    Defendant John V. Britti ("Britti") has served as the Company's Executive Vice President & Chief Investment Officer since June 2014.   Defendant Britti previously served as Ocwen's Chief Financial Officer ("CFO") from March 2012 until June 2014.   He has worked at Ocwen since January 2011.   Defendant Britti is a citizen of Georgia.   As of March 2015, Defendant Britti's total beneficial ownership in Ocwen was 94,741 shares.

22.    Defendants Erbey, Faris, Korn, Lacy, Salcetti, Wish and Ross are referred to herein as the "Director Defendants."   Each Director Defendant is named as a Defendant only with respect to the period in which each served on the Board of Ocwen.   Defendants Erbey, Faris and Britti are referred to herein as the "Officer Defendants."   The Director Defendants and the Officer Defendants are at times referred to herein collectively as the "Individual Defendants."

23.    Each member of the Ocwen Board knew of the business practices and course of conduct outlined herein and had specific knowledge of the mandatory regulatory and legal requirements for servicing mortgage loans and the ongoing governmental investigations into the Company's misconduct.   Nevertheless, in the face of such specific knowledge regarding past and ongoing wrongdoing, the Individual Defendants breached their fiduciary duties by failing to implement or maintain adequate internal controls and systems to prevent the continuing and systematic violations of federal, state and local consumer protection laws and regulations and abusive loan servicing and foreclosure practices and/or to require the Company's management to do so. Thus, each of them knowingly, recklessly, and/or with gross negligence caused the

10

Company to violate such laws and engage in the alleged wrongdoing.  In the case of the Individual Defendants other than Defendants Erbey and Wish to whom they placed their loyalty, they participated and/or acquiesced in such conduct to maintain their favor and keep their positions as Directors and all of the substantial personal benefits that inured to them as a result.

24.     Each of the Individual Defendants was well-informed about and/or actively participated in the wrongdoing alleged herein, as well as deceived the investing public and federal and state regulators. They abdicated their respective stewardship responsibilities to the Company by acquiescing and/or participating in the wrongdoing alleged herein and by placing their loyalty to Defendant Erbey above their loyalty to Ocwen and its shareholders.

25.     The members of the Ocwen Board, each of whom was personally appointed or approved by Defendant Erbey while he was still in office, received hundreds of thousands of dollars in fees and other compensation as well as very liberal "reimbursement of expenses."  In addition, they received stock options potentially worth millions of dollars at the times they were granted.

26.     In addition to the common law claims alleged herein, this action charges the Individual Defendants with directly participating in violations of §14 (a) of the Securities Exchange Act of 1934 and Rule 14a-9 thereunder.  Plaintiffs seek to recover for Ocwen the damages caused and currently being caused to the Company by the Individual Defendants as a consequence of such violations of law.

2.     The Ross Fund Defendants

27.     Defendant Ross is also the Chairman and Chief Executive Officer of WL Ross & Co, LLC ("WLRoss"), a private equity firm, founded in 1997 and headquartered in New York. In 2007, WLRoss organized Homeward Residential Holdings, Inc. (at the time it was known as American Home Mortgage Servicing, Inc. ("AHMSI").  Defendant Ross served as the Chairman

11

of the Board of AHMSI and thereafter Homeward until that company was acquired by Ocwen in December 2012 for an aggregate purchase price of $766 million.  Homeward was in the business of loan servicing and, at or around the time of its acquisition, its loan servicing portfolio consisted of in excess of 575,000 loans with an outstanding principal balance of approximately $150 billion. Through the purchase by Ocwen, Homeward became a wholly-owned subsidiary of Ocwen. Prior to its acquisition by Ocwen, Homeward was one of the largest independent mortgage loan servicers in the United States.  At the time of its acquisition in 2012, Homeward maintained a wholly-owned subsidiary, AIA.  AIA was formed in 2008 as a shell company and did business under the name Beltline Road Insurance Agency, Inc. ("Beltline") (a named Defendant herein).  As set forth herein, Ocwen's purchase of Homeward and Beltline was key to their implementation of a force-placed insurance scheme which has resulted in costly litigation and reputational harm to Ocwen as well as substantial potential liability.

28.    WLRoss played a key role in Ocwen's acquisition of Homeward.  The Homeward acquisition was paid for by Ocwen with $588 million in cash and $162 million in Ocwen Series A Perpetual Convertible Preferred Stock ("Series A Preferred").  The preferred stock was set to pay a dividend of 3.75% per annum on a quarterly basis.   Soon after the acquisition of Homeward was completed, Defendant Ross was elected as a Director of Ocwen.

29.    In September 2013, with knowledge of material adverse information regarding Ocwen's financial viability, Defendant Ross, on behalf of the Ross Funds, sold over 3 million shares of Ocwen common stock, for proceeds of over $157 million.  This sale took place at a time where Ocwen's financials were not in compliance with GAAP.

30.    Not long after, on July 14, 2014, Ocwen entered into a repurchase agreement with certain funds managed and controlled by WLRoss (and indirectly, by Defendant Ross), which

12

held the Ocwen preferred shares, pursuant to which the outstanding shares of Ocwen's Series A Preferred were converted into common stock and immediately cancelled. The aggregate purchase price paid by Ocwen to WLRoss and its funds was $72.1 million. Although Ocwen's 2014 Proxy Statement lists Ross as an "independent director," the foregoing clearly proves that he is not.

31.     Defendant WLR Recovery Fund III, L.P. ("Fund III") is a Delaware limited partnership with an address located at 1166 Avenue of the Americas, New York, New York 10036. Defendant Fund III's general partner is WLR Recovery Associates III LLC, whose managing member is WL Ross Group, L.P. ("WL Ross Group"), whose general partner is El Vedado LLC ("El Vedado"). Defendant Ross is the managing member of El Vedado and, therefore, exercises control over Fund III. Fund III received 4,946 shares of Series A Preferred as part of the Homeward transaction.

32.     Defendant WLR Recovery Fund IV, L.P. ("Fund IV") is a Delaware limited partnership with an address located at 1166 Avenue of the Americas, New York, New York 10036. Defendant Fund IV's general partner is WLR Recovery Associates IV LLC ("WLR Recovery Associates"), whose managing member is WL Ross Group. Accordingly, Defendant Ross exercises control over Fund IV. Fund IV received 41,527 shares of Series A Preferred as part of the Homeward transaction.

33.     Defendant WLR/GS Master Co-Investment, L.P. ("GS Co-Invest Fund") is a Cayman Islands limited partnership with an address located at 1166 Avenue of the Americas, New York, New York 10036. Defendant GS Co-Invest Fund's general partner is WLR Master Co-Investment GP, LLC, whose managing member is WL Ross Group. Accordingly, Defendant

Ross exercises control over GS Co-Invest Fund. GS Co-Invest Fund received 2,883 shares of Series A Preferred as part of the Homeward transaction.

34. Defendant WLR AHM Co-Invest, L.P. ("AHM Co-Invest Fund") is a Delaware limited partnership with an address located at 1166 Avenue of the Americas, New York, New York 10036. Defendant AHM Co-Invest Fund's general partner is WLR Recovery Associates and, therefore, Defendant Ross exercises control over AHM Co-Invest Fund. AHM Co-Invest Fund received 12,457 shares of Series A Preferred as part of the Homeward transaction.

35. Defendant WLR IV Parallel ESC, L.P. ("Parallel Fund") is a Delaware limited partnership with an address located at 1166 Avenue of the Americas, New York, New York 10036. Defendant Parallel Fund's general partner is Invesco WLR IV Associates LLC, whose managing member is Invesco Private Capital, Inc., whose Chief Executive Officer is defendant Ross. Accordingly, Defendant Ross exercises control over defendant Parallel Fund. Parallel Fund received 187 shares of Series A Preferred as part of the Homeward transaction.

36. The Ross Fund Defendants, during the course of a shareholder derivative action brought in New York State court captioned *Lowinger v. Ross*, Index No. 651440/2015 (N.Y. Sup. Ct.), stipulated on the record in a hearing before the New York court to assertion of personal jurisdiction over them in Florida for purposes of this action.

37. Defendants WLRoss, Fund III, Fund IV, GS Co-Invest, AHM Co-Invest Fund and Parallel Fund are collectively referred to herein as the "Ross Fund Defendants" or "Ross Funds."

       3.    Beltline Road Insurance Agency, Inc.

38. Defendant Beltline Road Insurance Agency, Inc. ("Beltline") is a Texas corporation with its principal executive office located at 1525 S. Belt Line Rd., Coppell, Texas 75019. Formerly a wholly-owned subsidiary of Homeward, and then Ocwen, Beltline is now a wholly owned subsidiary of Defendant Altisource and is registered to do business in Florida.

39.     After Ocwen's purchase in 2012 of Homeward, and its subsidiary, Defendant Beltline, Ocwen soon thereafter sold Beltline to Altisource in a transaction valued at $86 million by the NYDFS.  By 2013, regulators, including the NYDFS, had begun cracking down on practices engaged in by Ocwen and other banks and mortgage servicing companies, of saddling homeowners with overpriced and unnecessary force-placed insurance.  In order to avoid the rules prohibiting those practices, Ocwen used shell insurance agencies like Defendant Beltline.

40.     In August 2014, the NYDFS had been investigating Ocwen's relationship with Altisource and Beltline and announced that Beltline had been used to record commissions from force-placed insurance in connection with the scheme to funnel over $65 million to Defendant Altisource, as discussed in greater detail herein.

### 4.     The Related-Party Transaction Defendants

41.     In addition to Ocwen, Defendant Erbey served as Chairman of the Board and the largest shareholder of four other companies engaged in related aspects of residential home foreclosure, REO and liquidated properties which were spun-off from and do substantial business with Ocwen.  Specifically, Erbey served, until January 16, 2015, as Chairman of the Board of Directors of Altisource, which runs Hubzu.com, a real-estate site that bills itself as "the easy way to buy and sell homes online" and where a former homeowner's now bank-owned property can join thousands of others for a quick sale.  He was also the founder of HLSS, which exists only as a holding company that purchases assets from Ocwen and served as its Chairman from December 2010 through January 2015.  He also served as Chairman of the Board of Directors of Defendant AAMC, which offers reinsurance and title services, since March 2012. Finally, he also served as Chairman of Defendant RESI, which "re-purposes" homes as rental properties after acquiring them through a foreclosure auction or directly from the foreclosed

15

home's investors. Defendants Altisource, HLSS, AAMC and RESI are referred to herein as the "Related-Party Transaction Defendants" or "RPT Defendants."

a.     *Altisource Portfolio Solutions, S.A.*

42.     On August 10, 2009, Ocwen spun off its "Ocwen Solutions" line of business into Defendant Altisource Portfolio Solutions, S.A. ("Altisource"), a separate publicly traded company incorporated under the laws of Luxembourg with its principal executive office purportedly located at 40, Avenue Monterey, L-2163 Luxembourg, Grand Duchy of Luxembourg. Altisource provides Ocwen with its mortgage servicing platform called REALServicing as well as foreclosure related services. Approximately 8% of Ocwen's mortgage servicing business is in Florida. Defendant Erbey served as the Chairman of Altisource until January 16, 2015. As of March 24, 2014, Defendant Erbey owned or controlled approximately 29% of Altisource's common stock and held 873,501 options to purchase Altisource common stock, all of which were exercisable. As of March 23, 2015, Defendant Erbey controlled approximately 32.44% of Altisource's outstanding common stock.

43.     Following Altisource's separation from Ocwen, these companies remained inextricably linked. The principal business activities of all of the RPT Defendants, not just Altisource, were substantially derived from their relationships with Ocwen as directed by Defendant Erbey. Upon Altisource's separation from Ocwen, Ocwen entered into several long-term agreements with Altisource all of which allow Altisource to profit from Ocwen's determination to foreclose on a mortgage. Specifically, Ocwen entered into a Services Agreement, a Technology Products Services Agreement, an Intellectual Property Agreement and a Data Center and Disaster Recovery Services Agreement with Altisource. Ocwen and Altisource have also entered into a Master Services Agreement pursuant to which Altisource provides certain loan origination services to Ocwen's lending subsidiaries.

2112706.1

44.     Pursuant to the Master Services Agreement, "Altisource provides various business process outsourcing services, such as valuation services and property preservation and inspection services, among other things."  Altisource's website (http://www.altisource.com) represents that many of these services are provided "nationwide" and represents that it conducts a portion of its operations in all 50 states.  Similarly, Ocwen and Altisource entered into a "Support Services Agreement," whereby Ocwen and Altisource provide each other services "in such areas as human resources, vendor management, corporate services, accounting, tax matters, risk management, law and consumer psychology."  Ocwen's business is dependent on many of the services and products provided by Altisource under these long-term agreements.

45.     Most of Altisource's revenues are derived from services it provides to Ocwen. Altisource's principal revenue source is mortgage servicing technologies – in essence mortgage servicing computer applications – that are leased by Ocwen.  According to Altisource, "Ocwen purchases certain mortgage services and technology services from us under the terms of the master services agreements and amendments to the master services agreements," which extend into 2025.

46.     Altisource, incorporated in Luxembourg, was also created for tax-saving purposes.  In its Annual Report filed with the SEC on Form 10-K for fiscal year 2013 (the "Altisource 2013 Form 10-K"), Altisource stated that its effective tax rate was 6% - approximately half of Ocwen's 11.9% effective rate.  Likewise, for fiscal year 2012, Altisource's effective tax rate was 7.0%, which is less than a quarter of the 29.7% effective tax rate paid by Ocwen.  Given Defendant Erbey's larger stake in Altisource compared to Erbey's stake in Ocwen, income earned by Altisource is worth significantly more to Defendant Erbey than income earned by Ocwen.

47.     When Ocwen determines, through its use of Altisource's REALServicing platform, to foreclose on a loan, Altisource steps in to provide an array of foreclosure-related services, including asset management, insurance services, residential property valuation, default management services, and origination management services.   Altisource's asset management operations involve services such as REO asset management, title insurance, property preservation, and the operation of the Hubzu consumer real estate portal.

48.     Altisource additionally operates Hubzu, an online auction site for the sale of homes facing foreclosure and investor-owned properties following foreclosure.  A substantial portion of Ocwen's "real estate owned" ("REO") and short-sale properties, many of which are part of the portfolio of Defendant RESI and are managed by Defendant AAMC, are marketed on Hubzu.  The vast majority of Hubzu listings are of Ocwen-serviced properties owned or managed by one of the RPT Defendants.   Hubzu markets homes for sale in Florida and nationwide.

49.     Altisource also has a number of wholly-owned subsidiaries that are Florida corporations, including REALHome Services and Solutions, Inc., Premium Title Services, Inc. and Portfolio Management Outsourcing Solutions, LLC.  Premium Title Services, Inc. is licensed to do business in Florida and delivers comprehensive title and settlement services in Florida. Through REALHome Services and Solutions, Inc., Ocwen engages real estate agents to act as the sellers' agents for many of the listings in Hubzu, an online auction site that markets a substantial portion of Ocwen's properties. Altisource's subsidiaries, which are incorporated in Florida and elsewhere, operate essentially as agents of Altisource without a separate and distinct corporate structure.

18

50.     Moreover, as set forth above, Defendant Erbey engineered the sale of Beltline by Ocwen to Altisource for $86 million in 2013.  Despite claiming to have effective internal controls governing interested party transactions and recusal, Defendant Erbey was at the core of the negotiations and sale of Beltline to Altisource.  Furthermore, it became public in 2014 that Ocwen, with Defendant Erbey as its Chairman, steered as much as $65 million in revenues to Altisource by way of Beltline.  Given that Altisource's total net income for 2013 was just $130 million, the additional revenue from the force-placed insurance scheme significantly benefited Altisource shareholders, particularly its largest shareholder, Defendant Erbey.

51.     Ocwen's 2014 Proxy Statement, filed on May 11, 2015, reveals that Ocwen subleases office space to Altisource at various locations, including space located in Ocwen's West Palm Beach, Florida offices.  Additionally, Altisource operated a facility in Miramar, Florida until its closure in or about 2009 and also maintained operations at 1661 Worthington Road, Suite 100, West Palm Beach, Florida, 33409 until its spin-off from Ocwen.

52.     As set forth in the Altisource 2014 Form 10-K Ocwen accounted for 60% of Altisource's revenue in 2014.  Since its separation from Ocwen in 2009, Ocwen has been Altisource's largest customer.  As Altisource acknowledges in its 10-K, loss of Ocwen as a customer or a significant reduction in the volume of services Ocwen purchases from Altisource would significantly reduce Altisource's revenue and materially adversely affect its operations.

53.     In its 2014 Proxy Statement, Ocwen states that for the year ended December 31, 2013, the Company generated $22.7 million under the agreements with Altisource.  Ocwen also paid expenses to Altisource in the amount of $55.1 million, and as of December 31, 2013 there was a net amount payable to Altisource of $3.8 million.  In the 2015 Proxy Statement, Ocwen states that for the fiscal year ended December 31, 2014, the Company generated revenues of

$43.1 million under agreements with Altisource.  Ocwen also paid expenses to Altisource of $101.5 million, and as of December 31, 2014, there was a net amount payable to Altisource of $4.9 million.

54.     On or about September 8, 2014 Altisource was named as a defendant in a federal securities law class action captioned *In re Altisource Portfolio Solutions, S.A., Securities Litigation*, No. 9:14-81156 (S.D. Fla.). Altisource is defending this class action on the merits. A Third Amended Complaint was filed on October 15, 2015 that alleges, among other things, that Altisource maintains offices throughout the United States, including in this District and that Altisource has substantial business operations in West Palm Beach, Florida.  By Order entered on December 22, 2015, the District Court denied in substantial part the motion to dismiss filed by Altisource.

55.     In addition to the long term contractual relationships described herein, Altisource and Ocwen had overlapping executives and management personnel as more fully discussed below.  Most notably, Altisource's Chief Risk Officer concurrently, and secretly, also served as Ocwen's Chief Risk Officer.  The clear conflict of interest posed by this dual role was well known throughout both companies and was particularly known to Defendant Erbey and the other Individual Defendants.  As alleged in the *Altisource Portfolio Solutions Securities Litigation*, former employees of both Altisource and Ocwen have confirmed that other executives and managers also worked for both companies during the period of April 25, 2013 through December 21, 2014, and the companies jointly operated and staffed important departments, including payroll, accounting, human resources and IT, all contrary to the public representations that the two companies were "independent" and operated at arm's length and all in breach of the Individual Defendants' fiduciary duties.

56.     In short, according to a former Director of Valuations at Altisource, while it may have technically been a separate entity from Ocwen, the separation was fictional and said "with a wink."  As this former Altisource employee explained, "we basically worked for Ocwen," but were told not to "say it out loud or write it in an e-mail."

57.     As the December 19, 2014 Consent Order between Ocwen and the NYDFS (discussed below) revealed (the "December 2014 Consent Order"), Altisource, Ocwen and Defendant Erbey improperly operated with "widespread conflicts of interests" and engaged in self-dealing transactions to enrich Erbey and other senior Altisource and Ocwen executives by, among other things, requiring Ocwen's captive borrowers to use, and ultimately pay for loan services performed by Altisource, in conjunction with RESI and AAMC, at above market rates.

58.     The December 2014 Consent Order, and additional evidence set forth in the NYDFS letters discussed herein, also reveal that Defendant Erbey, Chairman of both Ocwen and Altisource, who by all accounts, "ha[d] the last word on all important decisions," lied about his recusal from conflicted transactions.  Specifically, the Consent Order confirmed the allegations set forth in the August 4 NYDFS Letter, and found (as Ocwen admitted) that Erbey refused to "recuse[] himself from approvals of several transactions" involving Ocwen and Altisource, and, instead, personally approved a "pass through" agreement for force-placed insurance services that caused struggling Ocwen borrowers to pay Altisource $65 million per year for little or no work. Erbey's habitual failure to recuse himself from such conflicted related-party transactions was recently confirmed by the SEC as part of its ongoing investigation into Ocwen and the related companies, including Altisource.

59.     Specifically, in a January 20, 2016 "Order Instituting Cease-and-Desist Proceedings, Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings,

21

and Imposing Remedial Sanctions and a Cease-and-Desist Order" (the "2016 SEC Order"), the SEC found that Ocwen had no "written related party transactions policies or procedures" in place despite numerous public statements to the public and regulators to the contrary.  The SEC found that Ocwen had made numerous false statements concerning Defendant Erbey's recusal from conflicted party transactions with both Altisource and HLSS directly.  The 2016 SEC Order found that Erbey had participated in the approval of several related-party transactions between 2012 and 2014, stating that "[a]lthough the Chairman had a practice of recusing himself from certain negotiations and approvals of related party transactions, that practice was inconsistent and ad hoc."  In fact, Defendant Erbey stated to the SEC that despite the repeated representations to the contrary, he believed he "had the right" to alter the terms of any related-party transactions and "say, 'No, this isn't going to happen.'"  An Order containing identical findings and finding wrongdoing on the part of HLSS was issued by the SEC on October 5, 2015.[3]

60.   Altisource's admittedly conflicted dealings with Ocwen are also evidenced through Altisource's practice of routinely overcharging Ocwen borrowers for services.  Contrary to Ocwen's and Altisource's representations that Altisource charged Ocwen customers "market rates" based on specific objective criteria, the conflicted business relationship between the two companies allowed Altisource to charge auction fees for Hubzu, the Altisource subsidiary used by Ocwen as its principal online auction site for the sale of its borrowers' homes facing

---

[3] *See also, In re Altisource Portfolio Solutions, S.A. Securities Litigation*, C.A. No. 14-81156-CIV-WPD (S.D. Fla.), Second Omnibus Order on Motion to Dismiss, wherein this Court held, in denying Altisource's motion to dismiss, "While Altisource may not have been involved in the transactions described in the SEC Release, Erbey's improper conduct in approving transactions with HLSS in his Ocwen-capacity certain provides a basis for inferring that he acted similarly with respect to Altisource.  The Court finds that …the TAC sufficiently pleads the material falsity of the statements regarding Erbey's recusal from related-party transactions."  The same inference is appropriate for Erbey's role with respect to the transactions Ocwen entered into with RESI and AAMC.

foreclosure and investor-owned properties following foreclosure, "that are up to three times the fees charged to non-Ocwen customers."   Indeed, the underlying HTML code for Hubzu's website actually queries whether Ocwen is the seller of the property being listed on Hubzu.  For those properties where Ocwen is the seller, the auction fees paid to Hubzu were higher.

61.    In the December 2014 Consent Order, Ocwen admitted that, "[i]n certain circumstances, [Altisource subsidiary] Hubzu has charged more for its services to Ocwen than to other customers – charges which are then passed on to borrowers and investors."  Hubzu was not the only Altisource service charging above-market rates to Ocwen and its customers.  Ocwen and Altisource former employees have confirmed that Altisource regularly charged above market rates to Ocwen customers for other services as well, including real estate appraisals.

62.    The December 2014 Consent Order also revealed that Ocwen's "technology systems" and "core servicing functions," which were provided exclusively by Altisource through REALServicing, "were inadequate and ineffective," knowingly accelerated foreclosures, and denied loan modifications through, among other things, an egregious backdating of letters (discussed below), and violated the law to the detriment of Ocwen's struggling borrowers.  The identity of REALServicing as the cause of Ocwen's servicing deficiencies was further confirmed in a court-filed report issued by Joseph Smith, the independent monitor retained to ensure compliance with a 2012 National Mortgage Settlement between Ocwen and 49 state attorneys general and other regulators (the "NMS Monitor").  The NMS Monitor's December 16, 2014 Report on Ocwen (the "NMS Monitor December Report"), confirmed, through admissions by Ocwen as well as the independent conclusion of a consultant retained by the NMS Monitor, that it was Altisource's REALServicing platform that caused Ocwen's letter backdating and

23

"create[d] a material impact on the accuracy of the letter[s]," wrongfully forcing people out of their homes for failure to comply with falsely accelerated foreclosure deadlines.

63.     The December 2014 Consent Order also contains an exculpatory provision (the "Exculpatory Provision") purportedly preventing the Company from obtaining any indemnification or contribution from other Defendants with respect to the $150 million which Ocwen was required to pay pursuant to the terms of the NYDFS Consent Order and associated settlement.

64.     In 2016, the SEC found that in December 2012, Ocwen had entered into an agreement to borrow $75 million from Altisource as an unsecured bridge loan to serve as part of the consideration paid by Ocwen for acquisition of another mortgage servicer – Homeward Residential, Beltline's parent company.  While Defendant Erbey purportedly recused himself from voting as Chairman of Altisource, he did review and approve the Ocwen Board presentation before it was circulated to the Altisource Board of Directors for a vote, once again exhibiting the intermingling and involvement by Defendant Erbey in related-party transactions, despite representations and purported "policies" preventing such actions.

65.     Finally, Altisource is now under investigation by SEC once again as disclosed by Ocwen in its 2015 Form 10-K, filed on February 29, 2016, resulting from fees and expenses derived in connection with liquidated loans and REO properties.  Altisource has publicly announced and advised the SEC that it was delaying the filing of its 2015 Form 10-K and will hold a conference call on March 10, 2016 to discuss the investigation by the SEC.

b.     *Altisource Residential Corporation*

66.     Defendant RESI was incorporated in Maryland and maintains its principal place of business in the U.S. Virgin Islands at 402 Strand Street, Frederikseted Virgin Islands 00840-3531.  RESI was formed on December 21, 2012 when it became a standalone publicly traded

company after an initial financial contribution from Altisource of $100 million, in exchange for shares that were distributed to Altisource shareholders. As of December 31, 2013, Defendant Erbey owned or controlled 5% of RESI's common stock and held 291,167 options to purchase additional RESI common stock. RESI's Annual Report filed with the SEC on Form 10-K for fiscal year 2013 reported that Altisource contributed $100 million of equity to RESI in exchange for shares that were distributed to Altisource shareholders.

67.     RESI remains inextricably tied to Ocwen and their multiple common business ventures. RESI is a Maryland REIT focused on acquiring, owning and managing single family rental properties throughout the United States. RESI acquires single family properties through the acquisition of sub-performing and non-performing loan portfolios – in many cases, these are real estate owned ("REO") assets of mortgage servicers, including Ocwen. On December 21, 2012, RESI entered into a long-term master service agreement with Ocwen and Altisource in which RESI agrees to provide property management; leasing and construction management services associated with the acquired single-family rental REO assets following foreclosure.

68.     As set forth in RESI's 2014 Form 10-K, it entered into a 15-year servicing agreement with Ocwen, upon becoming a public company. Pursuant to this agreement, Ocwen is the "exclusive" servicer (through 2014) of RESI's acquired residential mortgage loans and "provide[s] loan modification, assisted deed-in-lieu of foreclosure, assisted deed-for-lease and other loss mitigation programs." RESI has no employees of its own and its day to day operations are performed by another related company – Defendant AAMC – pursuant to a December 21, 2013 15-year asset management agreement with AAMC. Under the asset management agreement, AAMC designs and implements RESI's business strategy subject to oversight by its Board of Directors – which, until January 2015, was chaired by Defendant

25

Erbey.  AAMC is responsible for, among other duties: (1) performing and administering all of RESI's day-to-day operations, (2) determining investment criteria through RESI's Investment Policy in cooperation with RESI's Board of Directors, which included Defendant Erbey, (3) sourcing, analyzing and executing asset acquisitions, including RESI's acquisition of sub-performing and non-performing residential mortgage loan portfolios and related financing activities, (4) analyzing and performing sales of properties, (5) overseeing Altisource's renovation, leasing and property management of RESI's single-family rentals, (6) overseeing Ocwen's servicing of RESI's residential mortgage loan portfolios, (7) performing asset management duties and (8) performing corporate governance and other management functions, including financial, accounting and tax management services.

69.    RESI also has a Support Services Agreement with Altisource, wherein Altisource provides human resources, vendor management operations (through AAMC), corporate services, risk management services, quality assurance services, treasury, finance accounting, legal, tax and compliance services.  Even RESI's "principal place of business" is listed at the same address as that of AAMC, where AAMC leases 2,000 square feet of office space from Ocwen.  These services provided by Altisource, include the use of the Hubzu platform.  Notably, it is this platform and the practices of Ocwen and Altisource, which are at the core of the SEC's most recent investigation into these entities, as announced February 29, 2016.

70.    For the fiscal year ending December 31, 2014, RESI's net income as reported in its 10-K filed with the SEC was $188.8 million.  All of RESI's income is derived from properties it acquires directly, or indirectly through Altisource, from Ocwen, a substantial portion of which is in Florida – specifically, 2,160 separate properties with an UPB of approximately $525 million as of December 31, 2014 (making up 18% of RESI's portfolio).  Finally, through 2014, RESI

had exclusively engaged Ocwen to service the residential mortgage loans in its portfolio – which included its properties in Florida.

71.     Additionally, as set forth in the Company's 2013 Form 10-K, Ocwen entered into a 15-year servicing agreement with a RESI operating partnership, Altisource Residential, L.P. Pursuant to this agreement, Ocwen agreed to "service residential mortgage loans acquired by [Residential] and provide loan modification, assisted deed-in-lieu of foreclosure, assisted deed-for- lease and other loss mitigation programs."

72.     According to RESI's 2014 Form 10-K, the RESI business model is dependent on a steady supply of non-performing and REO properties.  RESI pays fees to Ocwen in connection with the REO and non-performing assets its portfolio (as set forth below) – which is what the SEC is now investigating as announced earlier this month.

c.     *Altisource Asset Management Corporation*

73.     Defendant Altisource Asset Management Corporation was incorporated in the U.S. Virgin Islands on March 15, 2012 and maintains its principal place of business in the U.S. Virgin Islands at 402 Strand Street, Frederiksted Virgin Islands 00840-3531.  AAMC is an asset management company providing portfolio management and corporate governance services to RESI.

74.     AAMC serves as RESI's asset manager.  Under its asset management agreement with RESI, AAMC performs RESI's day-to-day operations, defines investment criteria, executes asset acquisitions for RESI, analyzes property sales, oversees Ocwen's servicing of RESI's loans, oversees Altisource's renovation, leasing and property management of RESI's properties, and performs asset management and corporate governance duties.  As of April 13, 2015, Defendant Erbey owned or controlled 30.7% of AAMC's common stock and 85,755 options to purchase AAMC common stock.

27

75.    After spinning off Altisource as a separate publicly traded company – albeit still inextricably tied to Ocwen – the business venture between Ocwen and Altisource expanded when Altisource created RESI and AAMC in 2012.  Although both companies claim to be based in the U.S. Virgin Islands, their businesses were tied to those of Ocwen, Altisource and several other business ventures they have created within the United States, with their stated purpose being to own and manage rental properties "throughout the United States."  Below is a graphical representation from AAMC's Form 10-12G filed with the SEC on September 20, 2012 showing how the venture among Ocwen and the related affiliates was structured:



76.    Thus, RESI and AAMC's own publicly filed documents admit that the various business ventures of Ocwen, Altisource, RESI and AAMC and their financial relationships are inextricably linked.  Both RESI and AAMC have long-term service contracts with Ocwen, and Ocwen services the loans which make up RESI's portfolio, which are managed by AAMC. Plaintiffs allege that these agreements and fees derived therefrom are the result of non-arm's length transactions engaged in by Ocwen and AAMC and RESI, which Defendant Erbey acting as Chairman stood on both sides of the transactions.

77.     According to Ocwen's 2013 Form 10-K, on December 31, 2013, the Company entered into a "support services agreement" with AAMC, whereby Ocwen agreed to "provide business development, analytical and consulting and administrative services to AAMC."

78.     Defendants RESI and AAMC have significant ties to the State of Florida and within this District which subject them to the jurisdiction of this Court.  In addition, RESI and AAMC are inextricably tied to the related-party transactions which were entered into by Ocwen and the RPT Defendants which have harmed Ocwen and its shareholders at the hands of the Individual Defendants and others named herein.

79.     RESI and AAMC have significant and direct business operations in the State of Florida and within this District as a result of its relationships with Ocwen, Altisource and other affiliated companies.  Furthermore, RESI and AAMC have committed tortious acts in Florida, namely aiding and abetting the breaches of fiduciary duties of the Individual Defendants as set forth herein.  Not only do both RESI and AAMC have long term servicing contracts with Ocwen, but RESI actually owns considerable amounts of real estate in Florida and, upon information and belief, within this District, from which it derives fees and substantial revenues given that the properties constituted 18% of RESI's portfolio (and as a result just as large a percentage of AAMC's management business).  In return, RESI, through AAMC, pays certain fees to Ocwen for servicing its Florida properties as well.  RESI held 2,160 Florida properties in its portfolio, with an unpaid principal balance of $524.7 million.  The state with the highest concentration of properties in the RESI portfolio is Florida.  AAMC reports these same figures as assets it has under management in its 2014 10-K.  Thus, by definition, AAMC is conducting substantial business in Florida and within this District simply by managing a substantial volume of assets of

RESI in the state.  Presumably, the fees and services related to these activities were transactions controlled, arranged and approved by Defendant Erbey.

80.     In 2012, AAMC created ARNS and incorporated it in Delaware as a wholly-owned indirect subsidiary of RESI.  ARNS carries out functions for RESI in the United States which it is unable to do as a result of its REIT status.  ARNS is considered by RESI to be a "TRS," which is described in RESI's 2014 10-K as follows:

> Even though we elected to be taxed as a REIT, we are subject to some U.S. federal, state and local taxes on our income or property. **A portion of our business is expected to be conducted through, and a portion of our income is expected to be earned in, one or more taxable REIT subsidiaries, each of which we refer to as a "TRS." In general, a TRS may hold assets and engage in activities that the REIT cannot hold, may choose not to hold to maintain REIT compliance and cannot engage in directly.** Additionally, a TRS may engage in any real estate or non-real estate related business. A TRS is subject to U.S. federal, state and local corporate income taxes.

81.     In fact, ARNS uses the Florida courts for purposes of securing liens and commencing foreclosure proceedings on behalf of RESI relating to properties serviced by Ocwen.  ARNS is also used by RESI and AAMC to buy and sell property in Florida which, in many instances, is serviced by Ocwen.[4]  Moreover, in April 2014, ARNS filed an Application by Foreign Corporation for Authorization to Transact Business in Florida with the Florida Department of State, Division of Corporations.  In its application to do business in Florida, ARNS lists AAMC as its principal place of business, and Ashlish Pandey (former CEO of RESI and AAMC) and Stephen H. Gray (General Counsel of RESI and AAMC) as its officers/directors.  ARNS also has CT Corporation, a registered agent located in Plantation, Florida, listed on its application.  ARNS' business is derived 100% from AAMC and its financials consolidated into RESI's financial statements.

---

[4] *See* http://orlando.blockshopper.com/sales/by_city/orlando-baldwin_park

82.     In addition to ARNS, RESI and AAMC formed a title insurance subsidiary, NewSource, in December 2012.  NewSource was initially funded with an $18 million investment from ARNS (via a subscription agreement with RESI) and a $2 million investment by AAMC. Prior to the formation of NewSource, RESI was the exclusive client of AAMC.  It is clear that NewSource was formed by AAMC and RESI to perform specific business functions in Florida. In fact, according to AAMC, in 2014 NewSource commenced its reinsurance business during the second quarter of 2014, generating approximately $400,000 of title reinsurance **_premiums from Florida alone_**, some of which undoubtedly was generated within the District.  Further, it appears that NewSource derived 100% of its business from reinsurance contracts in Florida in 2014, totaling approximately $5.0 million, the majority of which was derived from Ocwen serviced properties.

83.     Undoubtedly, ARNS and NewSource were formed by AAMC, on behalf of RESI, for the purposes of conducting domestic business, a large part of which was in the State of Florida.  RESI and AAMC, through the use of these companies, derived substantial fees and income, availed themselves of the Florida laws and Court system to secure liens and properties which were part of RESI's portfolio and managed by AAMC, and used ARNS to purchase and sell property in the State of Florida.  AAMC, on behalf of RESI, also contracted for services related to the management, maintenance and operation of the rental properties in RESI's portfolio in Florida as well.  Annexed to **_both_** RESI and AAMC's 2014 10-Ks is the same graphical representation showing the fees and expenses which flow to and from each of the interrelated companies, which necessarily include those that the business venture derived from and expended on their operations in Florida, largely in connection with managing the portfolio of

Ocwen-serviced properties, and largely in connection with the management and ownership of non-performing REO and foreclosed properties.

d.    *Home Loan Servicing Solutions*

84.    Defendant HLSS was incorporated in the Cayman Islands and maintains its principal place of business at 190 Elgin Avenue, Georgetown, Grand Cayman KY1-9005, Cayman Islands.  According to Altisource, Defendant Home Loan Servicing Solutions' "primary objective is the acquisition of mortgage servicing rights and related servicing advances, loans held for investment and other residential mortgage related assets."   HLSS primarily acquires MSRs from Ocwen and then contracts with Ocwen to service the loans.  As of April 20, 2015, Defendant Erbey owned or controlled 1% of HLSS's common stock.

85.    As set forth in the Company's 2013 Form 10-K, between March 5, 2012 and December 31, 2013, Ocwen sold HLSS the rights to MSRs and related servicing advances for loans with a UPB of $202.3 billion.

86.    In addition, Ocwen and HLSS have agreed to provide each other with professional services, "including valuation analysis of potential MSR acquisitions, treasury management services, … legal licensing and regulatory compliance support services, risk management services and other similar services."

87.    For the year ended December 31, 2013, Ocwen generated revenues of $0.6 million under agreements with HLSS.  During that same period, Ocwen paid expenses of $2.0 million, and as of December 31, 2013 the net amount payable to HLSS by Ocwen was $59.5 million.

88.    From 2012 to 2014, HLSS represented that to avoid potential conflicts of interest, it required it Chairman, Erbey, who was also Ocwen's Chairman, to recuse himself from transactions with Ocwen and other related parties.  However, the 2016 SEC Release, found that

32

contrary to these representations, HLSS had no written policies or procedures on recusals for related-party transactions and that Erbey personally approved many of the transactions between HLSS and Ocwen.

89.     As referenced above, on October 5, 2015 the SEC charged HLSS with making material misstatements about its handling of related party transactions, including with Ocwen, and the value of its primary assets, as well as for having inadequate internal accounting controls. HLSS agreed to pay a $1.5 million penalty to settle the SEC charges and agreed to cease and desist from disclosure and books and recordkeeping violations.   Identical allegations and findings of related-party transactions were set forth in the SEC's Cease and Desist Order issued against Ocwen in January 2016.

90.     In addition to the direct claims asserted against them herein, each of the RPT Defendants identified above, all of whom were companies controlled by Defendant Erbey through his stock ownership and positions as Chairman, collectively and individually knew of and substantially assisted in the course of conduct resulting in the breaches of the fiduciary duties and other violations by the Individual Defendants complained of herein.

## IV.   FACTUAL BACKGROUND

### A.   Background of Ocwen's Business

91.     Ocwen is the largest non-bank mortgage servicer of subprime loans in the United States (and third largest mortgage servicer overall), collecting payments on nearly $455 billion in loans as of the fourth quarter of 2013.  The Company has two operating segments, Servicing and Lending.  Through its Servicing segment, Ocwen provides residential and commercial mortgage loan servicing, special servicing, and asset management services to owners of mortgage loans and foreclosed real estate in the United States and internationally.   The Company's Lending segment is involved in originating and purchasing conventional and government insured

2112706.1

residential forward and reverse mortgage loans primarily through its correspondent lending arrangements.

92.     Ocwen has profited over the years from buying high-risk mortgages from banks and then extending higher interest rate loans to already indebted and cash-strapped homeowners. The Company would also sometimes delay entering payments received until the grace periods had expired, charging borrowers late fees to build up large delinquency balances, and then threaten foreclosure if those delinquency balances were not paid.  The Company and its subsidiaries had been under heightened scrutiny from regulators for years for these and other allegedly abusive practices, but the large-scale MSR offloading by large banks and other entities resulting from the National Mortgage Settlement (as discussed below) further incentivized the Individual Defendants' misconduct by making it exponentially more profitable - at least for the short-term.  Between late 2012 and early 2014, Ocwen spent billions of dollars to expand its portfolio of MSRs by aggressively acquiring assets from larger banks that were anxious to eliminate their mortgage servicing units, as questionable foreclosure practices were attracting regulatory scrutiny.   This rapid expansion and growth is illustrated with the transactions in the chart below:

| Counterparty | Acquisition Type | Date | Loan Count | MSR UPB (in billions) |
|---|---|---|---|---|
| Saxon | Asset | May 2010 | 38,000 | $ 6.9 |
| HomeEq | Platform | September 2010 | 134,000 | 22.4 |
| Litton | Platform | September 2011 | 245,000 | 38.6 |
| Saxon | Asset | April 2012 | 132,000 | 22.2 |
| JPMorgan | Asset | April 2012 | 41,200 | 8.1 |
| Bank of America | Asset | June 2012 | 51,000 | 10.1 |
| Homeward | Platform | December 2012 | 421,000 | 77.0 |
| ResCap | Platform | February 2013 | 1,740,000 | 183.1 |
| Ally | Asset | April - August 2013 | 466,900 | 87.5 |
| OneWest | Asset | August 2013 - March 2014 | 299,000 | 69.0 |
| Greenpoint | Asset | December 2013 | 31,400 | 6.3 |

93.     Ocwen acquired many of these MSRs from regulated financial services companies, which had traditionally serviced mortgage loans.   These companies shed their servicing responsibilities as they came under increasing regulatory scrutiny because of shoddy and abusive servicing practices.   Regulators began to demand greater capital requirements for banks that serviced mortgages.   Regulators also obtained a $25 billion settlement in February 2012 (the "National Mortgage Settlement" or "NMS") with five of the then-largest bank mortgage servicers (GMAC/ResCap, Bank of America, Citi, JP Morgan and Wells Fargo).   The NMS also required these servicers to implement changes in how they serviced mortgage loans, handled foreclosures and provided information to bankruptcy courts.    Moreover, capital requirements proposed by Basel III, or the Third Basel Accord, a global, voluntary regulatory standard on bank capital adequacy, stress testing, and market liquidity risk, made it difficult and less profitable for banks to retain servicing rights on loans they originated.

94.     As regulators became critical of the rising number of foreclosures and lenders' treatment of delinquent borrowers following the 2008 financial crisis and housing collapse, in 2009 Ocwen began the first of four separate company spin-offs.   These spin-off companies, which do business with each other and with Ocwen, were purportedly created to provide technology and perform various services for Ocwen, including management of its foreclosed properties, while appearing, on the surface, to be separate and independent entities from Ocwen.

95.     As set forth above, in August 2009, Ocwen spun off its REO and related business operations to Altisource, a publicly traded company that derives its revenues largely from providing mortgage foreclosure services to Ocwen.    In 2010, Ocwen spun off HLSS, a publicly traded company created to acquire MSRs, rights to fees, and other income from servicing loans from Ocwen, which in return hires Ocwen to collect its loan payments. In 2013, Ocwen spun off

two more publicly traded companies:  RESI, which purchases REO non-performing loans and foreclosed homes, many from Ocwen, to turn into rental homes; and AAMC, which serves as the asset manager for RESI's portfolio in exchange for a large quarterly incentive fee.

96.    Defendants Erbey and Wish continue to hold equity in Ocwen's four affiliated publicly-traded spin-offs:  Altisource, AAMC, RESI and HLSS.  Indeed, Erbey is one of the largest shareholders in each of the four spin-offs and chaired all five of the publicly-traded companies, until his resignation from all five in January 2015 pursuant to a settlement with the NYDFS.  As a result, Defendants Erbey and Wish had conflicting obligations to Ocwen and each of the four spin-offs during the Relevant Period, all of which continue to derive significant revenues and earnings in large part from their ongoing and substantial, but conflicted, business dealings with Ocwen.

**B.    Ocwen's Exponential Growth**

97.    On August 24, 2011, Ocwen asked the NYDFS to approve an acquisition of Litton Loan Servicing from The Goldman Sachs Group, Inc.  However, in a September 1, 2011 letter to Ocwen, the NYDFS expressed serious concerns about whether "the post-acquisition entity, which would become the twelfth largest mortgage servicer in the United States with a significant portfolio of distressed loans, would be able to effectively handle the increased servicing volume and comply with HAMP requirements, internal loss mitigation policies and procedures, and laws and regulations governing mortgage loan servicing and foreclosure activities.

98.    As a result, Ocwen and the NYDFS entered into an Agreement on Mortgage Servicing Practices ("NYDFS Agreement") designed to correct robo-signing and other abusive and illegal foreclosure and servicing practices carried out by the Company and its subsidiaries.  Specifically, the Agreement on Mortgage Servicing Practices required Ocwen to: (1) establish

36

and maintain sufficient capacity to properly board and manage a significant portfolio of distressed loans; (2) engage in sound document execution and retention practices to ensure that mortgage files were accurate, complete and reliable; and (3) implement a system of robust internal controls and oversight with respect to mortgage servicing practices performed by its staff and third-party vendors.

99.     The NYDFS conditioned its issuance of a "No Objection" letter in connection with the Litton acquisition "upon Ocwen's commitment to adhere, and in the case of any portfolio serviced by a different Ocwen subsidiary or affiliate, to cause to adhere to" the Agreement on Mortgage Servicing Practices.

100.    On December 15, 2011, the Agreement on Mortgage Servicing Practices was amended ("December 2011 Amendment") to prevent Ocwen from, among other things, charging borrowers penalties, fees, costs and interest as a result of delays in court appearances caused by the closure of the law firm of Steven J. Baum, one of Ocwen's New York foreclosure counsel, following widespread allegations of improper foreclosure practices by the firm. Notwithstanding such illegal conduct and malpractice, Ocwen has not pursued Baum for the recovery of the damages he has caused the Company, thus wasting its assets. Speaking about the December 2011 Amendment to the Agreement, NYDFS Superintendent Lawsky stated that it "sets a new higher standard for the residential mortgage servicing industry, whose troubling foreclosure and servicing practices we have been investigating along with other regulators across the country."

101.    On the heels of its announced plans to acquire MSR assets from Saxon, Ocwen disclosed on November 9, 2011 in its quarterly report filed with the SEC on Form 10-Q for the period ended September 30, 2011 that it had entered into an agreement with JPMorgan Chase to purchase MSR for approximately 82,000 non-prime mortgage loans with a UPB of

2112706.1

approximately $15 billion, or 14% of the total UPB of Ocwen's servicing portfolio as of September 30, 2011.

102.    In late 2011, Ocwen announced and began to close on a series of transactions which dramatically increased the size of its servicing portfolio including a purchase of 82,000 non-prime mortgage loans with a UPB of approximately $15 billion from J.P. Morgan Chase & Co. and 53,100 mortgage loans owned by a government-sponsored enterprise ("GSE") with an aggregate UPB of approximately $10.7 billion.

103.    On May 3, 2012, during the Company's conference call with analysts and investors to discuss Ocwen's financial results for the first quarter of 2012, Defendant Faris reiterated with respect to the servicing standards set forth under the National Mortgage Settlement that "these rules and practices present expansion opportunities as financial institutions will look to subservice more business to specialty servicers with scalable capacity and a demonstrated ability to meet compliance requirements. . . .   Ocwen is a pioneer in principal reduction modifications and we have developed substantial process technology and unique product offerings to support principal. . . ."

104.    By the end of the second quarter of 2012, the Company's MSR portfolio had grown by nearly 83%, from approximately $70.8 billion in UPB as of June 30, 2011, to approximately $128 billion in UPB as of June 30, 2012.  However, as described herein, as Ocwen grew exponentially, the Individual Defendants were not implementing a system of robust internal controls and oversight with respect to its mortgage servicing practices. Moreover, they were not making any serious effort to comply with the agreements made with regulators.  On December 12, 2011, *The Wall Street Journal* published an article profiling the Company titled "Thinking Deeply On Risky Lending," commenting on Ocwen's astronomical growth, the

38

article reported that "[t]he recent deals will make Ocwen the largest subprime servicer, responsible for roughly one in five subprime mortgages" and "the ninth-largest servicer overall, with $150.6 billion in loans[,]" rendering "[t]he company . . . more than tripled in size since the end of 2009, when it serviced $48.8 billion in mortgages and ranked seventh in subprime servicing."

### C.   Ocwen's Acquisition and Sale of Homeward

105.    In 2007, WLRoss organized Homeward Residential Holdings, Inc. (at the time it was known as American Home Mortgage Servicing, Inc. ("AHMSI"). Homeward was in the business of loan servicing, and at or around the time of its acquisition, its loan servicing portfolio consisted of in excess of 575,000 loans with an outstanding principal balance of approximately $150 billion. Homeward was one of the largest independent mortgage loan servicers in the United States. After the purchase by Ocwen in 2012, Homeward became a wholly-owned subsidiary of Ocwen. At the time of its acquisition, Homeward maintained a wholly-owned subsidiary, AIA, as a shell company which did business under the name Beltline Road Insurance Agency, Inc. Ocwen's purchase of Homeward and Beltline was key to their implementation of a self-dealing force-placed insurance scheme which has resulted in considerable litigation and reputational harm to Ocwen since Beltline saddled homeowners with burdensome and excessive insurance premiums which mortgage servicers like Ocwen, were prohibited from charging directly.

106.    Homeward was acquired by Ocwen in December 2012 for an aggregate purchase price of $766 million. The Homeward acquisition was paid for by Ocwen with $588 million in cash and $162 million in Ocwen preferred stock, paid to WLRoss.

107.    In March 2013, in another related-party transaction, Ocwen sold its Homeward diversified fee-based businesses to Altisource for an aggregate purchase price of $87 million in

2112706.1

cash.  As part of this transaction, Ocwen sold its investment in two subsidiaries of Homeward, Defendant Beltline and Power Default Services, Inc., to Altisource.

108.    Ocwen's sale of Beltline to Altisource closed the same month that the Federal Housing Finance Agency ("FHFA") formally proposed banning force-placed insurance commissions to banks and other mortgage servicers, such as Ocwen.  The FHFA's proposal would prevent banks or mortgage servicers servicing loans owned or insured by Fannie Mae and Freddie Mac, such as Ocwen, from receiving payments from force-placed insurers.  Altisource and Beltline, however, would, at least create the appearance of being immune from this proposed ban on commissions.

109.    The sale of Beltline to Altisource also closed the same month that the NYDFS reached a settlement with Assurant, Inc., which had an existing force-placed insurance arrangement with Ocwen.  Under the terms of the Agreement, Assurant agreed to lower the cost of many of the insurance policies it sells and to eliminate improper and unfair practices designed to inflate premiums, including paying commissions to banks or mortgage servicers on the policies they provide and using reinsurance companies affiliated with the mortgage companies.

110.    Against this backdrop, and as more fully described in ¶¶181-86 below, the Individual Defendants, Altisource and Beltline, with Defendant Erbey's knowledge, participation and approval, put into place a complex arrangement, replacing Assurant with SWBC as Ocwen's managing general agent charged with managing Ocwen's force-placed insurance program and negotiating premiums with insurers.   This arrangement was structured to funnel as much as $65 million in annual fees and commissions from Ocwen borrowers' force-placed insurance business to, ultimately, Beltline and Altisource, and indirectly, to Defendant Erbey, thus skirting both the proposed FHFA regulations and the restrictions on Assurant resulting from its Consent Order

40

with the NYDFS.  This arrangement benefitted Altisource, Beltline and Defendant Erbey at the expense of Ocwen and its shareholders.

### D.     <u>Ocwen's 2012 Growth Rate Garners Increased Regulator Attention</u>

111.   On June 13, 2012, following complaints about Ocwen's servicing practices, the NYDFS conducted an examination of the Company to assess its compliance with the 2011 Agreement on Mortgage Servicing Practices. The examination preliminarily identified gaps in the servicing records of certain loans and indicated Ocwen's non-compliance with the Agreement, including in some instances, failing to send out the required 90-day notice before commencing foreclosure proceedings and/or failing to demonstrate that it even had standing to bring the foreclosure actions.  The examination also revealed significant deficiencies in Ocwen's servicing practices, including indications that, in some instances, it failed to provide the single point of contact for borrowers; pursued foreclosure against borrowers seeking a loan modification, failed to conduct an independent review of denials of loan modification, failed to ensure that borrower and loan information was accurate and current, and failed to ensure that prior modifications efforts were not rendered futile upon transfer of a servicing file to or from Ocwen.

112.   In October 2012, despite the fact that the Individual Defendants' awareness that the Company was already not in compliance with its commitments to regulators, they caused Ocwen to announce two additional transactions which would expand its servicing portfolio considerably – the purchase of Homeward's loan origination and servicing business was announced on October 3, 2012, and Ocwen's submission of a $3 billion winning bid on ResCap's loan servicing platform.  The ResCap transaction alone would have accounted for an increase in Ocwen's portfolio of over $370 billion in UPB.

41

113.    On December 5, 2012, Superintendent Lawsky announced that the NYDFS was requiring Ocwen to hire a monitor to ensure compliance with its prior Agreement on Mortgage Servicing Practices and reform its practices.  According to Superintendent Lawsky, "It is not enough to have banks and mortgage servicers sign an agreement promising to reform their businesses. The best unrealized reforms won't protect homeowners.  To protect homeowners facing the risks of losing their homes, we must ensure that the companies are actually living up to their promises."

114.    Due to these alleged potential violations of the NYDFS Agreement, Ocwen and the NYDFS entered into a further agreement titled "Consent Order Under New York Banking Law §44" ("NYDFS 2012 Consent Order").  As part of the NYDFS 2012 Consent Order, Ocwen consented to the installation of an "independent on-site monitor" tasked with conducting "a comprehensive review . . . of Ocwen's servicing operations, including its compliance program and operational policies and procedures." In furtherance of its continued efforts to ensure that Ocwen was sufficiently protecting the rights of homeowners, the NYDFS required Ocwen to install the Monitor "so that [it] can be sure that the reforms are implemented and homeowners have a real chance to avoid foreclosure."

115.    As part of the NYDFS 2012 Consent Order, Ocwen vowed to cooperate fully with the Monitor and agreed that, in the event of Ocwen's breach of the NYDFS 2012 Consent Order, the NYDFS could pursue "all the remedies available under the New York Banking and Financial Services Laws and may use any and all evidence available to the Department for all ensuring hearings, notices, orders, and other remedies that may be available."

116.    By entering into the NYDFS 2012 Consent Order, Ocwen was able to proceed with closing on the Homeward acquisition in December 2012 as planned (*see supra*).  As a

42

result, Ocwen managed to almost double the UPB of its residential servicing portfolio (an increase of 99.3% during fiscal year 2012) from $102.2 billion to $203.7 billion.

117.    Each of the Individual Defendants knew of the NYDFS Agreement, NYDFS 2012 Consent Order and general requirements imposed by regulators.  Nevertheless, as outlined herein and despite the appointment of the Monitor in December 2012, the Company's abusive practices continued unabated, about which conduct each of the Individual Defendants knew or should have known given their prior and then-current intimate knowledge of the Company's misconduct and the governmental investigations.

### E.    REALServicing and Ocwen's "Competitive Advantage"

118.    Throughout the Relevant Period, Defendants Erbey, Faris and Britti, with full knowledge of Ocwen's inability to abide by and comply with the necessary regulatory requirements to which it time and time again agreed to adhere, touted its competitive advantage over others in the industry as a result of REALServicing – the mortgage servicing platform leased from Altisource.  Defendants Britti and Erbey, throughout 2013, repeatedly spoke of REALServicing's scalability aspects, which allowed Ocwen to service a non-performing loan at a fraction of the cost of its competitors.

119.    For example, during a May 21, 2013 presentation at the Barclay's High Yield and Syndicated Loan Conference, Defendant Britti stated that Ocwen has "the lowest cost platform in the industry," which provided the Company with "a substantial cost advantage."  In particular, Defendant Britti suggested that it cost Ocwen just $250 per year to service a non-performing loan, or 70% less than the $800 a year spent by Ocwen's competitors.  Defendant Erbey echoed these sentiments during an August 1, 2013 conference call with analysts and investors discussing the Company's financial results for the period ended June 30, 2013, stating that "Ocwen's cost to service non-performing loans is 70% lower than the industry average," and

that REALServicing allows Ocwen "to manufacture new capacity more efficiently and effectively than other servicers." Defendants Britti and Erbey knew that such claimed cost savings could have only taken place through the use of, *inter alia*, robo-signing and other computerized treatment of mortgage loans on a wholesale basis in disregard of the individual rights and circumstances of the underlying borrowers.

120.   Notably, following the closing of the ResCap acquisition, which included ResCap's proprietary servicing platform, FiServ, Ocwen announced its plans to transition all of ResCap's loans to Altisource's REALServicing platform, which according to the Officer Defendants, "demonstrates the unique scalability of our technology."

121.   Defendant Faris again referenced the cost savings associated with REALServicing during the December 2013 Conference, stating that the Company would realize a significant cost reduction by transitioning the ResCap portfolio from FiServ to REALServicing:  "We're paying more than we need to for technology.  There is [sic] certain technologies that hang off of the ResCap platform that we'll be able to shutter once we complete that transition."  Further, in the Company's February 27, 2014 Press Release, Defendant Faris stated that the Company was "nearing the end of [its] integration of the legacy ResCap loans onto Ocwen's servicing platform," and that this integration "will allow [Ocwen] to substantially lower expenses and reduce the operating complexities of running multiple platforms."

122.   To allay any concerns that the lower costs associated with REALServicing would come at the expense of compliance and the rights of individual borrowers, the Individual Defendants assured stockholders that the transition from FiServ to REALServicing would result in increased efficiencies and reduced costs while maintaining the Company's ability to comply with all applicable regulations.  For example, during the October 31, 2013 Conference

44

Call, Defendant Faris falsely stated that "[i]ntegration costs have been somewhat higher than expected **as we have been careful to assure excellent customer service and strong compliance throughout the transfer process**." Defendant Faris also misrepresented during the December 2013 conference that the transition would result in "significant **reductions** in [Ocwen's] compliance burden."

123.    Each of the Officer Defendants knew of the Agreement on Mortgage Servicing Practices, the Consent Order, and the applicable regulatory requirements imposed by regulators. Nevertheless, as outlined herein, the Company's abusive practices continued unabated, about which conduct each of the Officer Defendants knew or should have known given their prior knowledge of the Company's misconduct and governmental investigations. As Ocwen grew exponentially, the Officer Defendants, in breach of their fiduciary duties, failed to implement a system of robust internal controls and oversight with respect to its mortgage servicing practices. The Director Defendants, aware of the prior compliance issues and red flags, failed to oversee the implementation of adequate internal controls at Ocwen.

124.    Premised on these assurances, Ocwen continued to grow at a staggering rate throughout 2013. In addition to the completion of the ResCap acquisition in February 2013, Ally Financial announced in March that it was selling a separate portfolio of MSR to Ocwen with an UPB of $90 billion. Furthermore, in June 2013, Ocwen entered into an agreement with OneWest Bank, F.S.B. ("OneWest") to purchase additional MSR with an approximate UPB of $78 billion. And in June 2013, Ocwen disclosed an agreement for an additional purchase of $8.3 billion of MSR from Greenpoint Mortgage Funding, Inc. ("Greenpoint").

**F.**     **Ocwen Announces Fiscal 2012 Results and 2013 Quarterly Results; Assures Investors Company is Complying with NYDFS Requirements**

125.    On February 28, 2013, Ocwen announced its financial results for the fourth quarter and full year 2012 in a press release.  During conference call with analysts and investors that took place that same day, despite knowing that Ocwen was not complying with NYDFS regulations, Defendant Faris reassured investors and stated "We continue to cooperate with the New York State Department of Financial Services to ensure compliance with the servicing standards agreement we signed in 2011."

126.    On March 1, 2013, the Company filed its Form 10-K with the SEC (the "2012 Form 10-K"), which included a description of the relationships between Ocwen and its affiliated companies. After warning that Defendant Erbey (along with other officers and directors) had obligations to Ocwen as well as to Altisource due to his position as Chairman of Altisource and his significant ownership of Altisource common stock, the Company assured shareholders by representing that it has taken appropriate steps to ensure that a conflict does not in fact arise:

> We have adopted policies, procedures and practices to avoid potential conflicts involving significant transactions with related parties such as Altisource, including Mr. Erbey's recusal from negotiations regarding and credit committee and board approvals of such transactions. We will also seek to manage those potential conflicts through dispute resolution and other provisions of our agreements with Altisource and through oversight by independent members of our Board of Directors.

127.    The 2012 Form 10-K also included by reference the discussion of the section entitled "Business Relationships and Related Transactions" from the 2013 Proxy Statement, which was filed with the SEC on April 3, 2013. The 2013 Proxy Statement stated, in relevant part, that "Due to the nature of Mr. Erbey's obligations to each of the companies [Altisource, Residential, AAMC, and HLSS], he recuses himself from decisions pertaining to any related transactions.

46

128.    Moreover, the 2012 Form 10-K also discussed the relationship between Ocwen and Altisource, and stated in relevant part:

> For purposes of governing certain of the ongoing relationships between Ocwen and Altisource after the Separation, and to provide for an orderly transition to the status of two independent companies, we entered into certain agreements with Altisource.
>
> Certain services provided by Altisource under these contracts are charged to the borrower and/or loan investor. Accordingly, such services, while derived from our loan servicing portfolio, are not reported as expenses by Ocwen. These services include residential property valuation, residential property preservation and inspection services, title services and real estate sales.
>
> Our business is currently dependent on many of the services and products provided under these long term contracts which are effective for up to eight years with renewal rights. We believe the rates charged under these agreements are market rates as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers. (Emphasis added).

129.    The 2012 Form 10-K also discussed the Consent Order, and the Company assured shareholders that it would comply with the regulatory investigations:

> Separately, on December 5, 2012, we entered into a Consent Order with the NYDFS in which we agreed to the appointment of a Monitor to oversee our compliance with the Agreement on Servicing Practice.
>
> A process is underway with respect to the selection and appointment of a Monitor by the NYDFS, and we intend to continue to cooperate with respect thereto…we are cooperating with and providing requested information to each of the agencies involved in the foregoing actions.

130.    The 2012 Form 10-K was signed by defendants Erbey, Faris, Korn, Lacy, Salcetti, Wish and Britti, and reiterated the Company's previously announced financial results and financial positions. In addition, the 2012 Form 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Faris and Britti stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

47

131.    As set forth in more detail below, the Officer Defendants not only continued their pattern of lying to investors by concealing the fact that they never intended to comply with the Consent Order, but their abusive practices intensified, thus causing the Company to incur billions of dollars in regulatory fines, penalties and civil liability.

132.    On May 8, 2013, the Company filed a Form 10-Q with the SEC (the "2013 1Q 10-Q") which was signed by Defendant Britti and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-Q contained signed SOX certifications by defendants Britti and Faris, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financing.

133.    The 2013 1Q 10-Q also falsely reassured investors that Ocwen was continuing to cooperate with the NYDFS and the terms of the consent order by stating: "on December 5, 2012, we entered into a Consent Order with the NYDFS in which we agreed to the appointment of an independent Monitor to oversee our compliance with the Agreement on Servicing Practices. Ocwen's understanding is that NYDFS has selected the firm which will act as the Monitor, and we intend to continue to cooperate with the NYDFS and the Monitor once the NYDFS and the Monitor finalize the terms of the engagement."

134.    The 2013 1Q 10-Q also stated the following with respect to certain services provided to Ocwen by Altisource:

> Certain services provided by Altisource under these contracts are charged to the borrower and/or loan investor. Accordingly, such services while derived from our loan servicing portfolio, are not reported as expenses by Ocwen. These services include residential property valuation, residential property preservation and inspection services, title services and real estate sales.

> Our business is currently dependent on many of the services and products provided under these long term contracts which are effective through 2025. The

contracts include renewal provisions. We believe the rates charged under these agreements are market rates as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers. (Emphasis added).

135.    The 2013 2Q 10-Q also stated the following regarding the Company's internal control over financial reporting:

**Controls and Procedures**

Our management, under the supervision of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and15d-15(e) of the Exchange Act), as of March 31, 2013. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of March 31, 2013, our disclosure controls and procedures (1) were designed and functioning effectively to ensure that material information relating to Ocwen, including its consolidated subsidiaries, is made known to our Chief Executive Officer and Chief Financial Officer by others within those entities, particularly during the period in which this report was being prepared and (2) were operating effectively in that they provided reasonable assurance that information is required to be disclosed by Ocwen in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the Chief Executive Officer or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.

No change in our internal control over financial reporting (as defined by Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act) occurred during the fiscal quarter ended March 31, 2013 that has materially affected, or is likely to materially affect, our internal control over financial reporting.

136.    On August 6, 2013, the Company filed a Form 10-Q with the SEC (the "2013 2Q 10-Q") which was signed by Defendant Britti and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-Q contained signed SOX certifications by Defendants Britti and Faris, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financing.

49

137.    The 2013 2Q 10-Q reiterated Defendant Erbey's position as chairman of the Board of Altisource, HLSS, RESI and AAMC and disclosed that Erbey owned and/or controlled 13% of the common stock of Ocwen, approximately 23% of Altisource's common stock, 9% of RESI's common stock, 25% of AAMC's common stock and 1% of HLSS's common stock.

138.    The 2013 2Q 10-Q also stated the following:

Our business is currently dependent on many of the services and products provided under these long term contracts which are effective through 2025. The contracts include renewal provisions. We believe the rates charged under these agreements are market rates as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers. (Emphasis added).

139.    The 2013 2Q 10-Q also stated the following regarding the Company's internal control over financial reporting:

**Controls and Procedures**

Our management, under the supervision of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and15d-15(e) of the Exchange Act), as of June 30, 2013. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of June 30, 2013, our disclosure controls and procedures (1) were designed and functioning effectively to ensure that material information relating to Ocwen, including its consolidated subsidiaries, is made known to our Chief Executive Officer and Chief Financial Officer by others within those entities, particularly during the period in which this report was being prepared and (2) were operating effectively in that they provided reasonable assurance that information is required to be disclosed by Ocwen in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the Chief Executive Officer or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.

No change in our internal control over financial reporting (as defined by Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act) occurred during the fiscal quarter ended June 30, 2013 that has materially affected, or is likely to materially affect, our internal control over financial reporting. (E ensure that material information relating to Ocwen, including its consolidated subsidiaries, is

50

made known to our Chief Executive Officer and Chief Financial Officer by others within those entities, particularly during the period in which this report was being prepared and (2) were operating effectively in that they provided reasonable assurance that information is required to be disclosed by Ocwen in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the Chief Executive Officer or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.

No change in our internal control over financial reporting (as defined by Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act) occurred during the fiscal quarter ended June 30, 2013 that has materially affected, or is likely to materially affect, our internal control over financial reporting. (Emphasis added).

140.   The 2013 2Q 10-Q once again attributed Ocwen's growth potential to its purported "low cost, high-quality servicing platform," which can be "quickly scale[d] . . . to handle acquired loan portfolios."

141.   On September 26, 2013, the Company received a letter from the SEC concerning its 2013 2Q 10-Q. Specifically, the SEC questioned the size of the reserve Ocwen established under the Proposed Regulators' Settlement:

We note the Company established a reserve of $66.4 million as of June 30, 2013 under the Proposed Regulators' Settlement. Please tell us and revise future filings, to address whether there is an exposure to loss in excess of the amount accrued and what the reasonably possible loss or additional loss may be. We reference ASC 450-20- 50 paragraph 3.

142.   In a letter dated October 10, 2013, Ocwen responded to the SEC as follows:

The Company continues to engage with the Multi-State Mortgage Committee of the Conference of State Banking Regulators, the Consumer Finance Protection Bureau and various state Attorneys General in connection with certain foreclosure related matters and is in the process of completing definitive settlement documents in connection with a proposed settlement therewith. As a result, the Company has assessed the likelihood of loss in excess of the amount accrued for the Proposed Regulators' Settlement as remote. In future filings, if the matter has not been settled and the Company determines that there is at least a reasonable possibility that an exposure to loss exists in excess of the amount accrued, it will disclose an estimate of such additional loss or range of loss or a statement that such an estimate cannot be made.

51

2112706.1

143.    On November 5, 2013, the Company filed a Form 10-Q with the SEC (the "2013 3Q 10-Q"), which was signed by Defendant Britti and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-Q contained signed SOX certifications by defendants Britti and Faris, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financing.

144.    The 2013 3Q 10-Q also reiterated the Company's entry into the 2012 Consent Order and reassured investors that the Company intended to cooperate with the NYDFS and the Monitor during its investigation.

145.    The 2013 3Q 10-Q reiterated Defendant Erbey's position as chairman of the Board of Altisource, HLSS, RESI and AAMC and disclosed that Erbey owned and/or controlled 13% of the common stock of Ocwen, approximately 23% of Altisource's common stock, 4% of RESI's common stock, 9% of AAMC's common stock and 1% of HLSS's common stock

146.    The 2013 3Q 10-Q also stated the following with respect to the rates charged by Altisource to Ocwen which ultimately get passed down to the borrowers:

> Our business is currently dependent on many of the services and products provided under these long term contracts which include renewal provisions. We believe the rates charged under these **agreements are market rates** as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers. (Emphasis added).

147.    The 2013 3Q 10-Q also stated the following regarding the Company's internal control over financial reporting:

**Controls and Procedures**

Our management, under the supervision of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and

procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act), as of September 30, 2013. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of September 30, 2013, **_our disclosure controls and procedures (1) were designed and functioning effectively_** to ensure that material information relating to Ocwen, including its consolidated subsidiaries, is made known to our Chief Executive Officer and Chief Financial Officer by others within those entities, particularly during the period in which this report was being prepared and (2) were operating effectively in that they provided reasonable assurance that information is required to be disclosed by Ocwen in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the Chief Executive Officer or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.

No change in our internal control over financial reporting (as defined by Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act) occurred during the fiscal quarter ended June 30, 2013 that has materially affected, or is likely to materially affect, our internal control over financial reporting.

(Emphasis added).

148.    On December 3, 2013, during his opening statements to analysts and investors at an event in Palm Beach, Defendant Erbey emphasized to the audience that he was personally abiding by the rules put in place to avoid the potential conflicts between Ocwen and its affiliated Companies:

> One of the things I'd like to stress again is that the strategic allies are not affiliates, that each company has its own separate board of directors, a majority of whom are independent, and we have robust related party transaction approval process. Any related party transaction between the companies, I actually re[c]use myself from that position and we make all of our – reportedly, we make contracts between all of the companies publicly available to you on our website.

### G.     Complaint By the CFPB Demonstrates Ocwen's Recidivist Behavior

149.    On December 19, 2013, the CFPB, joined by 49 states and the District of Columbia, filed a Complaint in the United States District Court for the District of Columbia, alleging that Ocwen, HRH and Litton had violated, among other laws, the Unfair and Deceptive Acts and Practices laws of the plaintiff states and the Consumer Financial Protection Act of 2010

by deceiving consumers about their loans and engaging in illegal foreclosures (the "CFPB Complaint").  According to the CFPB Complaint, investigators found evidence that, among other things, Ocwen repeatedly gave borrowers false or misleading information, did not honor trial mortgage modifications begun by previous servicers, wrongly charged fees, and denied mortgage loan modifications to eligible borrowers.  During a conference call held with reporters that day, CFPB director Richard Cordray stated that "[t]oo often, trouble began as soon as the loan was transferred to Ocwen," adding that "Ocwen made troubled borrowers even more vulnerable to foreclosure." At all times material, the Individual Defendants knew or should have known of such practices.

150.    That same day, Ocwen, the CFPB and the 49 states and the District of Columbia entered into a simultaneous Consent Judgment, approved by the Company's Board, which was also filed in the United States District Court for the District of Columbia on December 19, 2013, under which Ocwen agreed to fund a ***$2.1 billion*** mortgage settlement for mortgage servicing abuses (including $2.0 billion in first-lien principal reduction and $125 million for cash payments to borrowers whose loans had been foreclosed on).  According to the CFPB, Ocwen took advantage of borrowers "at every stage of the process."  The $2.1 billion settlement far exceeded the $1.5 billion in revenues the Company took in during the first nine months of 2013.

151.    The wide-reaching abuses alleged in the CFPB Complaint included charging unauthorized fees, failing to promptly credit borrowers' loan payments, forcing them into expensive insurance policies, improperly denying loan modifications, failing to honor loan modifications, giving false and misleading information to borrowers whose loans had been transferred from other servicers and robo-signing foreclosure documents, many, if not most, of

the same abusive practices that were the subject of the NYDFS prior Consent Orders and the reason for the appointment of an independent monitor in December 2012.

152.    Under the December 2013 Consent Judgment, Ocwen was required to improve its oversight of its attorneys, bolster training for its employees, refrain from making collection calls when a borrower's application for a modification was pending, and increase its staff.  The 2013 Consent Judgment contained "Examination Findings" which yet again indicated the wide-ranging and profound deficiencies in Ocwen's mortgage servicing practices, including:

> a.    Lack of controls related to document execution, including evidence of robo-signing, unauthorized execution, assignment backdating, improper certification and notarization, chain of title irregularities, and other related practices affecting the integrity of documents relied upon in the foreclosure process;
>
> b.    Deficiencies in loss mitigation and loan modification processes, including but not limited to:
>
>> i.    Failure to effectively communicate with borrowers regarding loss mitigation and other foreclosure avoidance alternatives:
>>
>> ii.    Failure to account for documents submitted in tandem with application for loss mitigation assistance;
>>
>> iii.    Lack of reasonable expedience in approving or denying loss mitigation applications;
>>
>> iv.    Providing false or misleading reasons for denial of loan modifications; and,
>>
>> v.    Failure to honor the terms of loan modifications for transferred accounts and continued efforts to collect payments under the original note terms.
>
> c.    Lack of controls related to general borrower account management, including but not limited to:
>
>> i.    Misapplication of borrower payments;
>>
>> ii.    Inaccurate escrow accounting and statements; and
>>
>> iii.    Assessment of unauthorized fees and charges.
>
> d.    Inadequate staffing and lack of internal controls related to customer service;
>
> e.    Deficiencies in control and oversight of third-party providers, including but not limited to, local foreclosure counsel;
>
> f.    Deficiencies in document maintenance processes, including but not limited to, failure to produce documents requested in tandem with examinations; and,
>
> g.    Deficiencies in management control and supervision necessary to ensure compliance with applicable laws and regulations.

153.    The servicing reforms set forth in the Consent Judgment (and the National Mortgage Settlement) were also incorporated into Ocwen's 2011 Agreement with the NYDFS, pursuant to the Agreement's provision stating that, in the event Ocwen "agrees with any other regulator to adopt greater consumer protections or other more rigorous standards than are contained in this Agreement, such other provisions shall be incorporated by reference herein."

### H.    The NYDFS Halts Ocwen's Wells Fargo Deal

154.    On January 22, 2014, Ocwen announced that it had agreed to purchase MSRs related services relating to a portfolio of 184,000 loans with an unpaid principal balance of $39 billion for $2.7 billion from Wells Fargo Bank N.A. ("Wells Fargo").

155.    On February 6, 2014, citing the Company's potential inability to handle any additional loan servicing given prior alleged abuses, the NYDFS placed Ocwen's $39 billion acquisition of Wells Fargo MSRs on indefinite hold.

156.    On February 11, 2014, *The Financial Times* reported that mortgage-backed securities investors such as PIMCO and BlackRock were considering taking legal action against Ocwen for any forced reductions in principal they suffered as a result of Ocwen's misconduct.  If these legal actions were successful, they would have recourse against Ocwen for the $2 billion in principal reduction they face under the 2013 Consent Judgment.

157.    On February 18, 2014, the Company disclosed that it would indefinitely postpone its previously announced purchase of MSRs from Wells Fargo.

158.    The next day, February 19, 2014, the CFPB's deputy director, Steve Antonakes, sharply criticized the entire third-party mortgage servicing industry, stating that firms were still treating consumers poorly, despite years of pressure from government agencies to improve their behavior.  The CFPB was threatening to crack down on the "shell games" it charged were being

56

played amongst servicers, "where the first servicer says the transfer ended all of its responsibility to consumer and the second servicer says it got a data dump missing critical documents."  Mr. Antonakes further stressed that force-placed insurance was to be used as a "last resort, rather than using it as a profit center that feeds off consumers' distress."  Noting that "the notion that government intervention has been required to get the mortgage industry to perform basic functions correctly – like customer service and record keeping – is bizarre ... but regrettably necessary" and that "business as usual has ended in mortgage servicing."  The comments were perceived by investors to be directed largely at Ocwen, which CFPB data demonstrated had received more consumer complaints in 2012 and 2013 than any other third-party mortgage servicer.

159.    The Wells Fargo transaction was ultimately abandoned on or about November 13, 2014 when the parties "mutually decided" that it could not take place in the face of Superintendent Lawsky's disapproval of it.

I.    **Continuing NYDFS Investigations Uncover Additional Abuses by Ocwen**

160.    In a February 26, 2014 letter to Ocwen's general counsel, Timothy Hayes, NYDFS Superintendent Lawsky charged Ocwen with misstating Ocwen's purportedly  "strictly arms-length business relationship" with HLSS and other affiliates, all chaired by Defendant Erbey, and potentially harming borrowers and pushing homeowners "unduly into foreclosure." Lawsky demanded detailed information about the financial interest of Ocwen's officers, directors and employees in the various affiliated companies, as well as documentation showing the nature and extent of business relationships between Ocwen and those other firms.  The letter stated, in pertinent part, as follows:

> The Department's ongoing review of Ocwen's mortgage servicing practices has uncovered a number of potential conflicts of interest between Ocwen and other public companies with which Ocwen is closely affiliated.  Indeed, the fact our

review has uncovered to date cast serious doubts on recent public statement made by the company that Ocwen has a "strictly arms-length business relationship" with those companies.  We are also concerned that this tangled web of conflicts could create incentives that harm borrowers and push homeowners unduly into foreclosure.  As such, we are demanding additional information on the issues as part of our review.

***Pursuant to the December 4, 2012 Consent Order between Ocwen and the Department, we have engaged an independent on-site compliance monitor at Ocwen to conduct a comprehensive review of Ocwen's servicing operations.  It is in the course of the monitorship that we uncovered these potential conflicts between and among Ocwen, Altisource Portfolio Solutions, S.A. ("Altisource Portfolio"), Altisource Residential Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions Ltd., (together the "affiliated companies"), all of which are chaired by William C. Erbey, who also the largest shareholder of each and the Executive Chairman of Ocwen.***

As you recall, Altisource Portfolio's Chief Risk Officer was removed as a result of the monitor's review.  During its review, the Monitor discovered that Ocwen's Chief Risk Officer also served as the Chief Risk Officer of Altisource Portfolio, and reported directly to Mr. Erbey in both capacities.  This individual seems not to appreciate the potential conflicts of interest posed by this dual role, which was particularly alarming given his role as Chief Risk Officer.  He told the Monitor that Ocwen paid his entire salary, but he did not know and had apparently never asked which company paid his risk management staff.  Indeed, it remains unclear whether Altisource Portfolio paid any compensation for the Chief Risk Officer's services.  Although he has since been removed as Altisource Portfolio's Chief Risk Officer, his and Ocwen's failure to affirmatively recognize this conflict demonstrates that the relationship between Ocwen and the affiliated companies warrants further examination.

Presently, Ocwen's management owns stock or stock options in the affiliated companies.  This raises the possibility that management has the opportunity and incentive to make decisions concerning Ocwen that are intended to benefit the share price of affiliated companies, resulting in harm to borrowers, mortgage investors, or Ocwen shareholders as a result.

161.    The letter further noted that:

The Department's review of Ocwen's mortgage servicing practices has also found that Ocwen relies extensively on affiliated companies for its information management system (from the programming of comment codes to functioning as Ocwen's IT help desk), as well as procurement of third party services.  This further demonstrates the interconnected nature of Ocwen's relationship with the affiliated companies.

58

162.   As reported by *Bloomberg* on February 27, 2014, "[a]s of mid-February, American homeowners had filed more than 9,000 mortgage-related complaints against Ocwen – the highest number of any non-bank servicer," citing data from the CFPB.  *Bloomberg* also reported that "[i]n January [2014], the Treasury Department issued a report on the performance of servicers in the government's Home Affordable Modification Program that started in 2009," noting that "Ocwen was responsible for 79,156 loan modifications that later defaulted, the highest of any servicer," and that "Ocwen's 30 percent re-default rate was the third highest."

163.   On February 27, 2014, the Company reported earnings per share substantially lower than expected; *i.e.* $0.75 – a $0.07, on revenues of just $556 million.  Attributing the shortfall to the Company's inability to integrate the large MSR portfolios it had acquired between 2001 and early 2014, the release quoted Defendant Faris as stating in pertinent part that "[c]onsolidation" was needed to "allow [Ocwen] to substantially lower expenses and reduce the operating complexities of running multiple platforms."   At no time did he acknowledge the massive and negative impact on the Company caused by the wrongdoing referred to herein or the regulatory consequences thereof.

164.   On March 3, 2014, the Company filed its Annual Report on Form 10-K with the SEC for fiscal 2013, signed by Defendants Erbey, Faris, Korn, Lacy, Wish, and Salcetti (as well as a former director, Defendant Ross) and certified by Defendant Faris under the Sarbanes Oxley Act of 2002 as to the veracity of its contents and the Company's effective internal controls.  The Form 10-K stated in pertinent part:

> Our business is currently dependent on many of the services and products provided under these long-term contracts which include renewal provisions.  *We believe the rates charged under these agreements are market rates as they are materially consistent with one or more of the following:  the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers.*

59

165.    On April 17, 2014, HLSS issued a press release and held a conference call to discuss the forthcoming release of the Company's first quarter 2014 financial results.  During the conference call, Defendant Erbey disclosed that the NYDFS' indefinite hold on Ocwen's acquisition of MSRs was not limited to Wells Fargo.  Rather, the NYDFS had placed on indefinite hold the transfer of all large MSR portfolios.  During the conference call, Defendant Erbey stated that "[u]ntil we resolve – this related to Ocwen – until we resolve New York State, we are not acquiring any new [MSR] portfolios at all.  As a matter of fact, the entire market quite frankly is just – nothing is really being put on for bid right now.  So the whole market has basically stopped until that gets resolved."

166.    On April 21, 2014, Ocwen received a letter from Superintendent Lawsky, questioning the independence of Altisource's relationship with Ocwen and its online auction site Hubzu, which is used to auction off properties facing foreclosure.  According to Superintendent Lawsky, Altisource had an eight-year agreement to manage distressed and repossessed homes in Ocwen's $435 billion servicing portfolio.   Superintendent Lawsky also claimed that the agreement required that Ocwen properties be listed and marketed through Hubzu, even if a distressed borrower had already signed a contract for a short sale.  As of, March 2015, Defendant Erbey owns or controls approximately 32.44% of Altisource's stock and 16.9% of Ocwen's. According to Superintendent Lawsky's April 21, 2014 letter, "Hubzu appear[ed] to be charging auction fees on Ocwen-serviced properties that [were] up to three times the fees charged to non-Ocwen customers," and the higher fees "ultimately [got] passed on to the investors and struggling borrowers who [were] typically trying to mitigate their losses and [were] not involved in the selection of Hubzu as the host site."   Superintendent Lawsky's letter also stated the

60

relationship between Ocwen, Altisource and Hubzu "raise[d] significant concerns regarding self-dealing."

J.      **Ocwen's Improper Grant of Stock Options to Defendant Erbey**

167.    In a Form 8-K filed with the SEC on April 22, 2014, the Company disclosed that following the receipt of a shareholder letter raising concerns over stock option grants to Defendant Erbey, that day Defendant Erbey surrendered one million of the two million stock options granted to him on August 21, 2012.  The 500,000 performance-based options and 500,000 extraordinary performance-based options, which had an exercise price of $24.38, had been granted by the Board to Erbey under the Company's 2007 Equity Incentive Plan.   On May 2, 2014, *The Wall Street Journal* disclosed that the Company had received a letter on April 28, 2014 from the SEC "informing the company that it was under investigation" in connection with the stock grant. It appears that the SEC's investigation of the stock options was resolved in the January 2016 SEC order discussed below.

168.    The improper issuance of these stock options to Defendant Erbey further reflect self-dealing, conflicts of interests and Erbey's domination and control of the Board and the Compensation Committee whose members breached their fiduciary duties to Ocwen and its shareholders out of misguided loyalty to Defendant Erbey and in breach of their duty of loyalty owed to Ocwen.

169.    The Compensation Committee breached their fiduciary duties by awarding Defendant Erbey one million stock options under the 2007 Compensation Plan, which resulted in a SEC investigation and fine. This was a gross failure of the role and duties of the Compensation Committee and the Board and further reflects the dereliction of their duties and control by Defendant Erbey.

61

**K.      Ocwen's Deteriorating Financial Results Due to Compliance-Related Problems**

170.    On March 3, 2014, the Company filed its Form 10-K with the SEC (the "2013 Form 10-K") disclosing the Company's performance for the full year of 2013. The 2013 Form-10-K reiterated the conflicts of interest between Defendant Erbey and Altisource and restated the careful steps that the Company takes to ensure that a conflict does not in fact arise:

> We do a substantial amount of business with Altisource, HLSS, AAMC and Residential. Conflicts may arise between us and one or more of these entities because of our ongoing agreements with them and because of the nature of our respective businesses.
>
> Our executive Chairman is the Chairman of Altisource, HLSS, AAMC and Residential. As a result, he has obligations to us as well as to Altisource, HLSS, AAMC and Residential and could have, could appear to have or could be alleged to have conflicts of interest with respect to matters potentially or actually involving of affecting us and Altisource, HLSS, AAMC and Residential, as the case may be. Our Executive Chairman currently has significant investments in Altisource, HLSS, AAMC and Residential and certain of our other officers and directors own stock or options in one or more of Altisource, HLSS, AAMC and Residential. Such ownership interests could create, appear to create or be alleged to create conflicts of interest with respect to matters potentially or actually involving or affecting us and Altisource, HLSS, AAMC and Residential, as the case may be.
>
> We have adopted policies, procedures and practices to avoid potential conflicts with respect to our dealings with Altisource, HLSS, AAMC and Residential, ***including our Executive Chairman recusing himself from negotiations regarding, and approvals of, transactions with these entities. We also manage potential conflicts of interest through oversight by independent members of our Board of Directors*** (independent directors constitute a majority of our Board of Directors), and we will seek to manage these potential conflicts through dispute resolution and other provisions of our agreements with Altisource, HLSS, AAMC and Residential. There can be no assurance that such measures will be effective, that we will be able to resolve all potential conflicts with Altisource, HLSS, AAMC or Residential, as the case may be, or that the resolution of any such conflicts will be no less favorable to us than if we were dealing with a third party that had none of the connections we have with these businesses.
>
> (Emphasis added).

62

171.   The 2013 Form 10-K also discussed the Consent Order, and the Company continued to falsely assured shareholders that it would comply with the regulatory investigations:

> Separately, on December 5, 2012, we entered into a Consent Order with the NY DFS in which we agreed to the appointment of a Monitor to oversee our compliance with the Agreement on Servicing Practices. The Monitor began its work in 2013 and we continued to cooperate with the Monitor. We devote substantial resources to regulatory compliance, and we incur, and expect to incur, significant ongoing costs with respect to compliance in connection with the Agreement on Servicing Practices and the work of the Monitor. In early February 2014, the NY DFS requested that OLS put an indefinite hold on an acquisition from Wells Fargo Bank, N.A. (Wells Fargo) of MSRs and related servicing advances relating to a portfolio of approximately 184,000 loans with a UPB of approximately $39.0 billion. The NY DFS expressed an interest in evaluating further our ability to handle more servicing. We have agreed to place the transaction on indefinite hold. We are cooperating with NY DFS on this matter.
>
> In addition, on December 19, 2013, we reached an agreement, which was subject to court approval, involving the CFPB and various state attorneys general and other state agencies that regulate the mortgage service industry. On February 26, 2014, the United States District Court for the District of Columbia entered a consent judgment approving the agreement.

172.   In addition, the Individual Defendants also repeated their prior statements concerning Ocwen's ability to comply with its regulatory obligations at a lower cost than its peers through REALServicing. For instance, Ocwen's 2013 Form 10-K stated that it is "an industry leader in terms of [its] cost to service nonperforming loans," and that these "substantial cost advantages are primarily a result of proprietary technology and processes." The 2013 Form 10-K also stated that REALServicing allows Ocwen "to operate in a compliant manner in an increasingly complex and highly regulated environment."

173.   The 2013 Form 10-K was signed by each of the Individual Defendants, and reiterated the Company's previously announced financial results and financial positions. In addition, the 2013 Form 10-K contained signed certifications pursuant to SOX by Defendants

Faris and Britti stating that the information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

174.    In the SOX Certifications accompanying the 2013 Form 10-K, Defendants Faris and Britti each certified that they are "responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant to have:

> d. "Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared";

> e. "Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;"

> [and]

> f. "Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation."

175.    On May 1, 2014, the Company reported first quarter 2014 financial results that fell well short of what the Individual Defendants had led the investment community to expect, citing the mounting costs of addressing the regulatory crackdown.  As reported by *The Wall Street Journal* that day, "[a]mid the scrutiny, Ocwen has ramped up spending on technology and compliance," noting that "Ocwen on Thursday said such costs helped fuel a 44% surge in overall expenses during the quarter from the same quarter a year earlier," and quoting Defendant Faris as explaining during a conference call held with investors that day that "[t]he bar ha[d] been raised

substantially because of the additional activities and documentation now required," *The Wall Street Journal* noted that, as a result, the "$551.3 million [in revenues] posted was less than the $569.4 million that analysts surveyed by Thomson Reuters expected," and Ocwen's net income of $75.8 million, or $0.54 per share, was also far less than the "$1 a share" that "[a]nalysts [had] expected" based upon the information Defendants Erbey and Faris had previously communicated to the investing public.  Quoting Defendant Erbey, *The Wall Street Journal* stated that "[g]oing forward,] … compliance [would] be among the most important factors determining long-term success in the servicing business."

176.    On May 2, 2014, the Company filed its quarterly financial report on Form 10-Q ("2014 1Q 10-Q") with the SEC for the first quarter 2014, certified by Defendant Faris under the Sarbanes Oxley Act of 2002 as to the veracity of its contents and the Company's effective internal controls.  In addition to repeating the Company's false and misleading financial results from the May 1, 2014 press release, the 2014 1Q 10-Q stated that Ocwen "believe[d] the rates charged under [the agreement with related companies such as Altisource were market rates as they [were] materially consistent with one or more of the following:  the fees charged by Altisource to other customers for comparable services and the rates Ocwen [paid] to or observe[d] from other service providers."

177.    The Form 2014 1Q Form 10-Q also stated the following regarding the Company's internal control over financial reporting:

**Controls and Procedures**

Our management, under the supervision of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and15d-15(e) of the Exchange Act), as of March 31, 2014. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of March 31, 2014, our disclosure controls and procedures (1) were designed and functioning effectively to ensure

65

that material information relating to Ocwen, including its consolidated subsidiaries, is made known to our Chief Executive Officer and Chief Financial Officer by others within those entities, particularly during the period in which this report was being prepared and (2) were operating effectively in that they provided reasonable assurance that information is required to be disclosed by Ocwen in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the Chief Executive Officer or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.

No change in our internal control over financial reporting (as defined by Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act) occurred during the fiscal quarter ended March 31, 2013 that has materially affected, or is likely to materially affect, our internal control over financial reporting.

178.    On or about May 21, 2014, Reuters reported that a number of companies collecting payments on home loans, including Ocwen, were attempting damage control by increasingly demanding that borrowers in litigation sign non-disparagement clauses if they want the terms on their mortgages eased. In some cases, servicers were also demanding the clauses be inserted in loans modified outside of litigation. Those clauses prohibit customers from printing or posting anything negative about the companies.

179.    Not surprisingly, Superintendent Lawsky responded strongly to the damage control tactics, stating "[r]eports that Ocwen is imposing a gag rule for certain struggling homeowners – preventing them from criticizing the company – are troubling and deeply offensive. We will investigate this issue immediately." Superintendent Lawsky further went on to state, "Servicers have a responsibility to act in the best interest of borrowers and investors – not to try and sweep shoddy practices under the rug or muzzle struggling homeowners."

180.    On July 31, 2014, Ocwen announced its financial results for the second quarter 2014, the period ended June 30, 2014.  Ocwen reported net income of $67 million, or $0.48 per

diluted share, $0.30 lower than the market had been led to expect, blaming the decline on the rising costs of complying with regulations required by the Consent Decree.

> ### L.   Defendants' Force-Placed Insurance Scheme

181.   On August 4, 2014, the NYDFS issued a third letter to Ocwen ("the August 4th Letter") stating that it was reviewing what it called a "troubling transaction" with Altisource relating to the provision of force-placed insurance which was "designed to funnel as much as $65 million in fees annually from already-distressed homeowners to Altisource for minimal work." The letter went on the question the "role that Ocwen's Executive Chairman William C. Erbey played in approving this arrangement," which the letter stated "appear[ed] to be inconsistent with public statements Ocwen ha[d] made, as well as representations in [the] Company's SEC filings." The Department's on-going investigation had revealed that mortgage servicers were setting up affiliated insurance agencies to collect commissions on force-placed insurance, and funneling all of their borrowers' force-placed business through their own agencies, in violation of the anti-inducement provisions of applicable New York insurance law.   The investigation revealed that the servicers' own insurance agencies had an incentive to purchase force-placed insurance with high premiums because the higher the premiums, the higher the commissions kicked back by insurers to the servicers or their affiliates.

182.   The August 4th Letter stated that the facts established by documents provided by Ocwen to the Monitor indicated that, in August 2013, Ocwen appointed an Altisource subsidiary, Defendant Beltline, licensed to do business in Florida, as its exclusive insurance representative, purportedly to negotiate and place a new force-placed insurance program for Ocwen.   Ocwen's existing force-placed arrangement with the insurer Assurant was set to expire in March 2014, and Beltline's stated task was to find an alternative arrangement.   In January 2014, Altisource provided a memo to the Credit Committee of Ocwen Mortgage Servicing, Inc., recommending,

among other things, replacing Assurant with SWBC as Ocwen's managing general agent. SWBC would then be charged with managing Ocwen's force-placed insurance program, including negotiating premiums with insurers.   As part of this arrangement, Altisource recommended itself to provide fee-based services to SWBC.

183.   Altisource's proposal was presented to the Credit Committee of Ocwen Mortgage Servicing, Inc., which consisted of Richard Cooperstein, Ocwen's Chief Financial Officer, Duo Zhang, Ocwen's Vice President of Quantitative Analytics, and Defendant Erbey.   Through e-mails dated January 15 and 16, 2014, Cooperstein, Zhang and Defendant Erbey approved of this related-party arrangement and the direct benefit that would flow to Altisource.   Based on Defendant Erbey's approval, and without any further consideration by other Ocwen directors or executives, Ocwen executed contracts formalizing this force-placed arrangement on June 1, 2014.   As outlined herein and admitted by Ocwen in the December 2014 NYDFS Consent Order, this was just one of several transactions with related parties approved by Defendant Erbey without the mandated independent oversight, evidencing a complete lack of internal controls and in direct contradiction of Ocwen's public disclosures.

184.   As a result of Ocwen's new force-placed insurance arrangement, Altisource generated significant revenue while doing very little work.   Instead, Ocwen hired Altisource to design its new force-placed program in order to allow Altisource to profit at the expense of mortgage holders with Defendant Erbey, receiving a direct benefit from Ocwen's transaction with SWBC. Specifically, the contracts provided for Ocwen to give its force-placed insurance business to SWBC. SWBC does the work of negotiating premiums, preparing policies, and handling renewals and cancellations. For these services, SWBC receives commissions from insurers. SWBC then passes on a portion of those commissions, constituting 15% of net written

68

premium on the policies, to Altisource's subsidiary Beltline, for "insurance placement services." These fees amounted to roughly $60 million per year for Altisource.

185.     Altisource was also paid a substantial fee for providing a technology support that it was already obligated to provide.  This fee relates to monitoring services, whereby Ocwen pays a company to monitor whether its borrowers' insurance remains in effect.  Prior to 2014, Ocwen was paying ten cents per loan per month to Assurant for monitoring.  In the new arrangement, however, Ocwen agreed to pay double the prior amount – twenty cents per loan per month now paid to SWBC, for each of the approximately 2.8 million borrowers serviced by Ocwen.  SWBC, in turn, agreed to pass on fifteen out of that twenty cents to Altisource, or an estimated $5 million per year.  Altisource provided only one service in exchange for this fee: granting SWBC access to Ocwen's loan files.  Altisource, though, only has access to Ocwen's loan files through its own separate services agreements with Ocwen, which appear to contractually obligate Altisource to provide this access to business users designated by Ocwen to receive such access.

186.     In addition, the contracts require SWBC to use Altisource to provide loss draft management services for Ocwen borrowers; to pay Altisource $75 per loss draft for these services; and to pay Altisource an additional $10,000 per month for certain other services.

**M.**     **Ocwen's Failure to Comply with GAAP**

187.     On August 12, 2014, the Company disclosed that it would be forced to restate its audited fiscal 2013 and unaudited Q1 2014 financial results, citing accounting improprieties and stating that its financial statements for those periods, including statements concerning the effectiveness of its internal controls, should no longer be relied upon.  Describing the initial determination of the accounting improprieties, Ocwen stated in pertinent part as follows:

The changes we are contemplating principally relate to the valuation methodology of our Financing Liability – MSRs Pledged in connection with certain rights to receive servicing fees, excluding ancillary income, with respect to certain mortgage servicing rights ("Rights to MSRs"), a Level 3 asset, sold to a third party, Home Loan Servicing Solutions, Ltd. ("HLSS").  At March 31, 2014, the Financing Liability – MSRs Pledged, the valuation of which is the cause of the restatement, had a reported carrying value of $634.4 million, or approximately 10% of the total liabilities. We have not had any additional sales of Rights to MSRs in 2014.

*      *      *

Following the release of our earnings for the Second Quarter of 2014, and in consultation with Deloitte & Touche LLP, we determined to adopt the changes which are driven by a re-examination of an accounting convention first adopted in 2012 with the completion of the first Rights to MSR's sale transaction to HLSS.  The accounting convention applied a narrow (5%) range to valuations obtained from a third-party valuation expert in determining the carrying value of our Financial Liability – Pledged MSRs related to our sales of Rights to MSR's.  Effective as of June 30, 2014, the Company has stopped using a range.

70

188.    Prior to these revelations, however, Defendants Wish, Ross and Erbey sold more than $62 million worth of Ocwen common stock at inflated prices while in possession of material non-public information, thus avoiding substantial losses they would have incurred but for their illegal insider trading.

| | Date | Type of Sale | # of shares Disposed | Price | Total Amount $ |
|---|---|---|---|---|---|
| **Erbey** | | | | | |
| | 11/5/2013 | Indirect Sale (via Salt Pond Holdings)) | 11,015 | $51.72 | $569,695.80 |
| **Wish** | | | | | |
| | 3/13/2013 | Indirect Sale (via Wischo, Inc.) | 202,600 | $40.44 | $8,192,434.90 |
| | 3/14/2013 | Indirect Sale (via Wischo, Inc.) | 297,400 | $40.72 | $12,108,968.14 |
| | 8/7/2013 | Indirect Sale (via Wischo, Inc.) | 300,000 | $50.29 | $15,085,710.00 |
| | 11/20/2013 | Indirect Sale (via Wischo, Inc.) | 183,674 | $53.57 | $9,838,791.69 |
| | 11/21/2013 | Indirect Sale (via Wischo, Inc.) | 66,326 | $53.41 | $3,542,537.99 |
| **Ross** | | | | | |
| | 9/23/2013 | Indirect Sale (via Ross Funds) | 3,145,640 | $50.19 | $157,879,671.60 |
| | 7/14/2014 | Indirect Sale (via Ross Funds) | 1,950,296 | $37.00 | $72,160,952.00 |

**N.    NYDFS' Fourth Letter to Ocwen Pertaining to Backdating**

189.    On August 18, 2014, the Company filed a Form 10-Q with the SEC (the "2014 2Q 10-Q") which reiterated the Company's previously announced quarterly financial position and set forth the restated amounts for Fiscal Year 2013 and the first quarter of 2014.  In addition the 2014 2Q 10-Q stated that management determined that a material weakness in internal control over financial reporting existed as of December 31, 2013, and that management

71

concluded that the Company's internal control over financial reporting was not effective as of June 30, 2014.

190.    The 2014 2Q 10-Q further disclosed that the Company received a subpoena from the SEC on June 12, 2014 requesting that Ocwen produce documents relating to its business dealings with Altisource, HLSS, AAMC, Residential and the interests of Ocwen's directors and executive officers in those companies. The Company further disclosed that the SEC plans to serve Ocwen with another subpoena in connection with the amendments to the Company's financial statements for the fiscal year ended December 31, 2013 and the quarter ended March 31, 2014.   The information requested by the SEC implies that the Individual Defendants, in breach of their fiduciary duties, allowed Defendant Erbey to engage in serious and flagrant self-dealing.

191.    Following this disclosure, on August 28, 2014, Moody's downgraded Ocwen Loan Servicing, LLC's servicer quality (SQ) assessments from SQ2- to SQ3+ both as a primary servicer of subprime residential mortgage loans and as a special servicer of residential mortgage loans4. Moody's also lowered the Company's component assessment for loan administration from above average to average. According to Moody's, the lowered assessments reflected the heightened regulatory scrutiny of Ocwen by the NYDFS and the SEC.

192.    Ocwen's troubles, however, were far from over. On October 21, 2014, the NYDFS issued a fourth letter to Ocwen, this time regarding "serious issues with Ocwen's systems and processes, including Ocwen's backdating of potentially hundreds of thousands of letters to homeowners, likely causing them significant harm."   The NYDFS' review of Ocwen's mortgaging servicing practices revealed that borrowers were receiving letters denying a mortgage loan modification that were dated more than thirty days prior to the date Ocwen

actually mailed the letters.  The borrowers were given thirty days from the date of the denial letter to appeal that denial, but those 30 days had already elapsed by the time they received the backdated letter.  In other cases, Ocwen's systems showed that borrowers facing foreclosure received letters with a date by which to cure their default and avoid foreclosure – but the cure date was months prior to receipt of the letter.  The NYDFS believed that "[t]he existence and pervasiveness of these issues raise critical questions about Ocwen's ability to perform its core functions of servicing loans."

193.    The October 21, 2014, the NYDFS issued a fourth letter to Ocwen accuses the Company of failing to investigate or address the backdating issue even when an employee questioned the accuracy of Ocwen's letter dating processes and alerted the Company's Vice President of Compliance.  Despite the fact that the Individual Defendants knew or should have known of such events, Ocwen did nothing and the employee raised the issue again five months later, but Ocwen has, to this day, failed to address it, more than a year after the issue was first discovered.  Worse, Ocwen falsely represented to the Monitor that (1) the issue was isolated to letters of a specific type; (2) the problem affected only 6,100 letters; (3) Ocwen discovered the issue in April or May, 2014; and (4) Ocwen implemented changed to its systems in May 2014 that resolved the problem.

194.    After the Monitor began independently investigating, and under pressure from NYDFS, Ocwen admitted in a memorandum dated September 10, 2014, that the backdating problem was not an isolated event and that changes to its systems in May, 2014 did not fully resolve the problem.  However, Ocwen still identified only a fraction of the instances of backdating that had already been uncovered by the Monitor.  Further, the memorandum falsely repeated the assertion that Ocwen initially discovered the backdating issue in April 2014, when

in fact, upon further investigation and persistent questioning by the Monitor, it was determined that one of Ocwen's employees had identified the problem in November 2013 and informed senior management, including the Company's Vice President of Compliance. Notwithstanding being informed of the backdating, there is no indication that the Individual Defendants did anything to investigate or remedy the problem in November 2013 or thereafter, nor did they cause the Company to alert regulators, borrowers, shareholders or other interested parties. Five months had elapsed when the same employee was forced to raise the issue again.

195.    The backdating issue, among others, starkly illustrates the culture of corruption and abject failure by the Ocwen Board and senior management to discharge their fiduciary duties and ignore "red flags" regarding the Company's compliance failures. Indeed, it is clear that Ocwen's Board and senior management failed to conduct a proper investigation to ensure that the issue was promptly resolved or take any steps whatsoever to remedy the harm already done to borrowers and others. Superintendent Lawsky's letter concludes:

> "The stakes for borrowers and investors are enormous. If the Department concludes that it cannot trust Ocwen's systems and processes, then it cannot trust Ocwen to comply with the law. If Ocwen cannot demonstrate immediately that it is capable of properly servicing borrowers' needs, the Department intends to take whatever action is necessary to ensure that borrowers are protected."

196.    On December 16, 2014, *The Wall Street Journal* and others reported that the Monitor for the Office of Mortgage Settlement Oversight ("OMSO"), Joseph A. Smith, Jr., accused the Company of providing unreliable information about its business practices in the first half of 2014. The Monitor, who was charged with being the overseer for banks' and mortgage servicers' compliance with the $25 billion National Mortgage Settlement[5] stated in his latest

---

[5] Ocwen became part of the National Mortgage Settlement in December 2013, following its acquisition of Residential Capital LLC's servicing business. Residential Capital was a unit of Ally Financial Inc., which was one of five banks included in the national settlement.

report that Ocwen's internal review group ("IRG") process had serious deficiencies, questioning the independence and integrity of IRG's operations.   The probe into the Company's review process started after an Ocwen employee informed the OMSO of the shortcomings in May, 2014. After interviewing nine Ocwen employees and reviewing thousands of documents, Mr. Smith concluded he could not rely on the work of the internal monitoring group at Ocwen.

O.      **The NYDFS and Ocwen Enter Into the December 2014 Consent Order**

197.    On December 19, 2014, Ocwen reached a settlement with the NYDFS related to its investigation and entered into a *second* Consent Order pursuant to New York Banking Law §44 ("December 2014 Consent Order" or "NYDFS Settlement") with the NYDFS to reflect the terms of the settlement.   Pursuant to the December 2014 Consent Order, Ocwen agreed to the following:

*Settlement Summary of Monetary Provisions*

- Ocwen will pay a civil monetary penalty of $100 million to the NYDFS by December 31, 2014, which will be used by the State of New York for housing, foreclosure relief and community redevelopment programs;
- Ocwen will also pay $50 million as restitution to current and former New York borrowers in the form of $10,000 to each borrower whose home was foreclosed upon by Ocwen between January 2009 and December 19, 2014, with the balance distributed equally among borrowers who had foreclosure actions filed, but not completed, by Ocwen between January 2009 and December 19, 2014.

*Settlement Summary of Non-Monetary Provisions*

*Borrower Assistance*

Beginning 60 days after December 19, 2014, and for two years, Ocwen will:

- Provide upon request by a New York borrower a complete loan file at no cost to the borrower;
- Provide every New York borrower who is denied a loan modification, short sale or deed-in-lieu of foreclosure with a detailed explanation of how this determination was reached; and

75

- Provide one free credit report per year, at Ocwen's expense, to any New York borrower on request if Ocwen made a negative report to any credit agency from January 1, 2010, and Ocwen will make staff available for borrowers to inquire about their credit reporting, dedicating resources necessary to investigate such inquiries and correct any errors.

### Operations Monitor

- The NYDFS will appoint an independent Operations Monitor to review and assess the adequacy and effectiveness of Ocwen's operations. The Operation Monitor's term will extend for two years from its engagement, and the NYDFS may extend the engagement another 12 months at its sole discretion;
- The Operations Monitor will recommend and oversee implementation of corrections, and establish progress benchmarks when it identifies weaknesses;
- The Operations Monitor will report periodically on its findings and progress. The currently existing monitor will remain in place for at least three months and then for a short transitional period to facilitate an effective transition to the Operations Monitor.

### Related Companies

- The Operations Monitor will review and approve Ocwen's benchmark pricing and performance studies semi-annually with respect to all fees or expenses charged to New York borrowers by any related party;
- Ocwen will not share any common officers or employees with any related party and will not share risk, internal audit or vendor oversight functions with any related party;
- Any Ocwen employee, officer or director owning more than $200,000 equity ownership in any related party will be recused from negotiating or voting to approve a transaction with the related party in which the employee, officer or director has such equity ownership, or any transaction that indirectly benefits such related party, if the transaction involves $120,000 or more in revenue or expense.

### Corporate Governance

- Ocwen will add two independent directors who will be appointed after consultation with the Monitor and who will not own equity in any related party;
- As of January 16, 2015, William C. Erbey will step down as an officer and director of Ocwen, as well as from the boards of

76

Ocwen's related companies;

- The Operations Monitor will review Ocwen's current committees of the Board of Directors and will consult with the Board relating to the committees. This will include determining which decisions should be committed to independent directors' oversight, such as approval of transactions with related parties, transactions to acquire mortgage servicing rights, sub-servicing rights or otherwise to increase the number of serviced loans, and new relationships with third-party vendors;

- The Board will work closely with the Operations Monitor to identify operations issues and ensure that they are addressed. The Board will consult with the Operations Monitor to determine whether any member of senior management should be terminated or whether additional officers should be retained to achieve the goals of complying with this Consent Order.

### MSR Purchases

- Ocwen may acquire mortgage servicing rights ("MSRs") upon (a) meeting benchmarks specified by the Operations Monitor relating to Ocwen's onboarding process for newly acquired MSRs and its ability to adequately service newly acquired MSRs and its existing loan portfolio, and (b) the NYDFS's approval, not to be unreasonably withheld;

- These benchmarks will address the compliance plan, a plan to resolve record-keeping and borrower communication issues, the reasonableness of fees and expenses in the servicing operations, development of risk controls for the onboarding process, and development of a written onboarding plan assessing potential risks and deficiencies in the onboarding process.

198.   In a December 22, 2014 press release issued by the NYDFS announcing the settlement, the NYDFS summarized its investigation of Ocwen's misconduct as follows:

### NYDFS' Investigation of Ocwen's Misconduct

\*       \*       \*

In 2010 and 2011, NYDFS participated in a multistate examination of Ocwen, as well as entities ultimately acquired by Ocwen. The examination of Ocwen identified, among other things, deficiencies in Ocwen's servicing platform and loss mitigation infrastructure, including (a) robo-signing, (b) inaccurate affidavits and failure to properly validate document execution processes, (c) missing documentation, (d) wrongful foreclosure, (e) failure to properly maintain books and records, and (f) initiation of foreclosure actions without proper legal standing.

77

Accordingly, Ocwen and NYDFS entered into an Agreement on Mortgage Servicing Practices on September 1, 2011. In June 2012, the Department conducted a surprise examination of Ocwen to assess its compliance with the 2011 Agreement, and uncovered significant violations. Consequently, on December 5, 2012, Ocwen entered into a Consent Order with NYDFS, which required Ocwen to retain an independent compliance monitor for two years.

During the course of the Monitor's review, it identified numerous and significant additional violations of the 2011 Agreement, as well as New York State laws and regulations. For example, a limited review by the Monitor of 478 New York loans that Ocwen had foreclosed upon revealed 1,358 violations of Ocwen's legal obligations, or about three violations per foreclosed loan. These violations included:

- failing to confirm that it had the right to foreclose before initiating foreclosure proceedings;

- failing to ensure that its statements to the court in foreclosure proceedings were correct;

- pursuing foreclosure even while modification applications were pending ("dual tracking");

- failing to maintain records confirming that it is not pursuing foreclosure of service members on active    duty;   and,

- failing to assign a designated customer care representative.

The Department and the Monitor also identified, among other issues, (a) inadequate and ineffective information technology systems and personnel, and (b) widespread conflicts of interest with related parties.

In the course of its review, the Monitor determined that Ocwen's information technology systems are a patchwork of legacy systems and systems inherited from acquired companies, many of which are incompatible. A frequent occurrence is that a fix to one system creates unintended consequences in other systems. As a result, Ocwen regularly gives borrowers incorrect or outdated information, sends borrowers backdated letters, unreliably tracks data for investors, and maintains inaccurate records.

Ocwen's core servicing functions rely on its inadequate systems. Specifically, Ocwen uses comment codes entered either manually or automatically to service its portfolio; each code initiates a process, such as sending a delinquency letter to a borrower, or referring a loan to foreclosure counsel. With Ocwen's rapid growth and acquisitions of other servicers, the number of Ocwen's comment codes has

78

ballooned to more than 8,400 such codes. Often, due to insufficient integration following acquisitions of other servicers, there are duplicate codes that perform the same function.

Despite these issues, Ocwen continues to rely on those systems to service its portfolio of distressed loans. Ocwen's reliance on technology has led it to employ fewer trained personnel than its competitors. For example, Ocwen's Chief Financial Officer recently acknowledged, in reference to its offshore customer care personnel, that Ocwen is simply "training people to read the scripts and the dialogue engines with feeling." Ocwen's policy is to require customer support staff to follow the scripts closely, and Ocwen penalizes and has terminated customer support staff who fail to follow the scripts that appear on their computer screens. In some cases, this policy has frustrated struggling borrowers who have complex issues that exceed the bounds of a script and have issues speaking with representatives at Ocwen capable of addressing their concerns. Moreover, Ocwen's customer care representatives in many cases provide conflicting responses to a borrower's question. Representatives have also failed in many cases to record in Ocwen's servicing system the nature of the concerns that a borrower has expressed, leading to inaccurate records of the issues raised by the borrower.

The Department's review of Ocwen's mortgage servicing practices also uncovered a number of conflicts of interest between Ocwen and four other public companies (the aforementioned "related companies"), all of which are chaired by Mr. Erbey, who is also the largest individual shareholder of each and the Executive Chairman of Ocwen.

Despite Mr. Erbey's holdings in these companies, Mr. Erbey has not in fact recused himself from approvals of several transactions with the related parties. Mr. Erbey, who owns approximately 15 percent of Ocwen's stock, and nearly double that percentage of the stock of Altisource Portfolio, has participated in the approval of a number of transactions between the two companies or from which Altisource received some benefit, including the renewal of Ocwen's forced placed insurance program in early 2014. Ocwen's close business relationship with related companies is particularly evident in its relationship with Altisource Portfolio, which has dozens of subsidiaries that perform fee-based services for Ocwen. In one example, Altisource Portfolio subsidiary Hubzu, an online auction site, hosts nearly all Ocwen auctions. In certain circumstances, Hubzu has charged more for its services to Ocwen than to other customers — charges which are then passed on to borrowers and investors. Moreover, Ocwen engages Altisource Portfolio subsidiary REALHome Services and Solutions, Inc. as its default real estate agency for short sales and investor-owned properties, even though this agency principally employs out-of-state agents who do not perform the onsite work that local agents perform, at the same cost to borrowers and investors.

Conflicts of interest are also evident at other levels of the Ocwen organization.

For example, during its review, the Monitor discovered that Ocwen's Chief Risk Officer concurrently served as the Chief Risk Officer of Altisource Portfolio. The Chief Risk Officer reported directly to Mr. Erbey in both capacities. This individual seemed not to appreciate the potential conflicts of interest posed by this dual role, which was of particular concern given his role as Chief Risk Officer.

P.    **SEC Findings of Wrongdoing by Ocwen and HLSS During the Relevant Period**

199.    On January 20, 2016 the SEC issued an Order Instituting Cease-and-Desist Proceedings, Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order, in the action captioned *In the Matter of Ocwen Financial Corp.,* Release No. 76938 (previously defined as the "2016 SEC Order"). The 2016 SEC Order found, among other things, that Defendant Erbey "repeatedly approved transactions between Ocwen and HLSS in both his Ocwen- and HLSS-related capacities." Furthermore, "due to internal accounting control deficiencies, Ocwen had either no documentation or insufficient documentation of approvals of five transactions between Ocwen and HLSS."

200.    In addition, the SEC found that Ocwen had "materially misstated its net income for three quarters in 2013 and the first quarter of 2014 by relying on HLSS' improper valuation of rights to mortgage servicing rights ("Rights to MSRs") that were acquired from Ocwen and still accounted for by Ocwen as a financial liability." This was due to the fact that the Rights to MSRs assigned by HLSS were not fair value estimates.

201.    As a result of these findings, Ocwen was forced to pay a penalty in the amount of $2 million to the SEC, and also cease-and-desist the conduct resulting in the violations set forth in the 2016 SEC Order.

2112706.1

Q.      **California Department of Business Oversight and Investor Complaints**

202.    On January 8, 2013, the CDBO commenced a routine investigation into the servicing practices of Ocwen pursuant to Financial Code section 50302, which requires the commissioner to examine the records, documents and affairs of each licensee under the California Residential Mortgage Lending Act ("CRMLA") to ensure compliance with its provisions.

203.    Based on its review, the Commissioner made several reasonable requests for documents and files to Ocwen, including through a lawfully issued administrative subpoena. Repeatedly, Ocwen refused to produce the requested documents which incurred the maximum penalty under the statute of $1,000.00 in each instance and risked suspension of its license to conduct business in California.

204.    On October 3, 2014, Ocwen was served with the Accusation by the Commissioner charging the Company with numerous violations under California law and seeking a suspension of its mortgage servicing license in California. *See Commissioner of Business Oversight v. Ocwen Loan Servicing, LLC,* OAH No. 2014100930.  Thereafter, on or about January 23, 2015, Ocwen and the CDBO entered into a Consent Order ("CDBO Consent Order"), which, among other terms, prohibited Ocwen from acquiring any additional MSRs secured by properties in California until the CDBO is satisfied.  Furthermore, it requires that Ocwen satisfactorily respond to the requests made in the course of a regulatory exam and that Ocwen undergo a full compliance review by an independent third-party.  Ocwen was required to pay for the review, which was to be comprehensive review on how Ocwen's practices comply with state law and regulations, including the CRMLA and the California Homeowner Bill of Rights.  In addition, the auditor will also oversee implementation of corrective measures to address deficiencies and

81

weaknesses identified in the course of the review.  Furthermore, Ocwen will be required to pay a penalty of $2.5 million within 10 days of entering the Consent Order.

205.   In addition to the CDBO investigation and settlement, as well as the costs associated with the compliance review by the independent third party auditor, Ocwen is also the subject of securities fraud litigation brought by private litigants captioned *In re Ocwen Financial Corporation Securities Litig*ation, 14-Civ-81057-WPD (S.D. Fla) (the "Ocwen Securities Class Action").  The Ocwen Securities Class Action, defended by the same counsel as represents Ocwen and certain of the Individual Defendants named herein, is premised on the allegations of the Individual Defendants' false statements to investors and the public in the name of the Company regarding, *inter alia*, its compliance with the strict regulations governing mortgage loan servicing, the NMS Settlement terms, the consent orders and judgments entered into by Ocwen, applicable state and federal statutes and the related party transactions and businesses discussed herein.  In an Order dated December 22, 2015, this Court sustained certain claims asserted by the securities class action plaintiffs against Ocwen and directors and officers of the Company.

206.   The Company has also received requests from large investors for Ocwen to remove itself as servicer of billions of dollars of mortgages backing mortgage-backed securities the investors own.  As set forth in an article in *The Wall Street Journal* on January 27, 2015, the investor group, which constitutes 25% of the holders of the purportedly $82 billion of securities at issue, the letter from investors alleges generally that Ocwen's regulatory problems and bad servicing practices was in direct conflict with the interests of investors and borrowers.

207.   On March 2, 2015, the Company issued a press release updating shareholders on its fourth quarter 2014 financial results. The press release stated the following:

82

Atlanta, GA (March 2, 2015) - Ocwen Financial Corporation, "Ocwen" or the "Company", (NYSE: OCN), a leading financial services holding company, today reported significant updates about the Company.

As previously disclosed on February 5, 2015 in its Company Update to Stakeholders, Ocwen expects to report a loss for the fourth quarter and 2014 fiscal year.

In that Form 8-K filing, the Company disclosed the following items related to its fourth quarter results.

- It recorded an additional $50 million expense related to its New York Department of Financial Services Settlement.
- The Company expects to increase expenses related to uncollectable receivables and other servicing expenses by approximately $64 million.
- The Company expects the expense for third party monitoring costs in the fourth quarter of 2014 to be approximately $13 million.

In addition to these previously disclosed items, the Company anticipates that its fourth quarter results will be impacted by the following non-recurring items:

- A $370 – $420 million non-cash charge to write-off goodwill.
- The creation of a $15 million reserve relating to its remediation plan to address issues around certain erroneously dated borrower correspondence.

The above financial data is preliminary, based upon the Company's estimates and subject to completion of the Company's financial closing procedures. Moreover, this data has been prepared on the basis of currently available information. The Company's independent registered public accounting firm has not audited or reviewed, and does not express an opinion with respect to, this data. This data does not constitute a comprehensive statement of the Company's financial results for the year ended December 31, 2014, and the Company's final numbers for this data may differ materially from these estimates.

Ocwen will file a Form 12b-25 with the U.S. Securities and Exchange Commission for an extension of time enabling the Company to file its 2014 Form 10-K on or before March 17, 2015, without penalty. Ocwen requires this extension to complete its goodwill valuation analysis and its financial closing procedures and to ensure appropriate disclosure of various recent events impacting the Company.

Upon finalizing fourth quarter and full year 2014 results the Company expects to host a call with the investment community.

### R.   Ocwen's Troubles Extend Into 2015 and Beyond

208.   Throughout 2015, the Company began executing on its previously announced plans to sell certain assets, reduce interest rate risk, and further improve liquidity.  Such steps included:

- On March 2, 2015 the Company entered into an amendment to its $1.3 billion Senior Secured Term Loan (SSTL) to remove certain restrictions on asset sales and permanently increase a financial covenant. Ocwen has agreed to an accelerated repayment schedule for cash received from asset sales. "We are pleased with the actions of our term loan investors. They have been supportive of Ocwen and recognize the importance and benefit of executing on our strategy. Additionally, their willingness to enter into an amendment with Ocwen is an affirmation that the Company is, and always has been, in compliance with all of its SSTL covenants." said Ronald M. Faris, President and Chief Executive Officer of Ocwen.
- The Company signed a letter of intent with a buyer on the sale of mortgage servicing rights (MSRs) on a portfolio consisting of approximately 277,000 performing Agency loans owned by Fannie Mae with a total unpaid principal balance of approximately $45 billion. Subject to a definitive agreement, approvals by Fannie Mae and FHFA and other customary conditions, Ocwen expects the transaction to close by mid-year and the loan servicing to transfer over the course of the second half of 2015.
- Including its previously announced $9.8 billion MSR sale to Nationstar, Ocwen is on track to sell Agency MSRs relating to approximately $55 billion of unpaid principal balance in the next six months for prices significantly above its estimated carrying value at December 31, 2014. Ocwen currently anticipates that these transactions will generate approximately $550 million of proceeds over the next six months and accelerate Ocwen's strategy to reduce the size of its Agency servicing portfolio.
- Ocwen awarded a sale of non-performing and performing loan assets to an undisclosed buyer. The transaction is subject to typical closing conditions, including finalizing due diligence and a definitive agreement. Total proceeds are expected to be approximately $40 million, and the Company expects the transaction to close by the end of March. The book value of the assets is approximately $26 million.
- On February 27, 2015, the Company entered into an agreement with a global financial institution to provide replacement financing on Ocwen's $450 million OFSART servicing advance facility should the existing lender seek not to refinance the facility upon its maturity in June 2015. This agreement is subject to definitive documentation and other customary funding conditions.

209.    In its Company Update to Stakeholders on February 5, 2015, Ocwen provided

numerous updates on the Company. These included, but were not limited to:

- Based on Ocwen's current engagements with state regulators, the Company is not aware of nor anticipating any material fines, penalties or settlements. Ocwen still expects to resolve two open legacy matters for a total of less than $1 million. Ocwen is not aware of any pending or threatened actions to suspend or revoke any state licenses.
- Since January 1, 2015, Ocwen has had an average daily cash balance of over $215 million and continues to forecast that it will have sufficient liquidity going forward.
- Ocwen believes that the SSTL amendment shows that there is no event of default and there has not been any event of default under Ocwen's SSTL. Ocwen has publicly refuted a number of times the allegations made by a purported noteholder of certain Home Loan Servicing Solutions advance financing notes which admits it is pursuing a strategy of shorting Ocwen's stock. Ocwen continues to vigorously defend itself against the claims of this short seller.
- In addition to the $55 billion in transactions noted above, the Company continues to look at additional asset sales and plans to complete other small or large transactions throughout the year.
- The Company no longer expects to execute its first call rights transaction in the first quarter of 2015, but it still anticipates closing call right transactions in the year. In the near-term, we believe this strategy will still generate positive gains for the Company, although they are likely to be lower than initially forecasted.

210.    On February 27, 2015, Ocwen commented on its receipt of two notices that would

terminate the Company as the servicer of two private label RMBS trusts relating to 0.07% of

Ocwen's overall servicing portfolio. These two trusts were part of the 119 transactions

referenced in the February 5, 2015 Company Update to Stakeholders, which stated "[w]e

anticipate that these terminations will result in a $0.5 million gain for Ocwen as the recovery of

deferred servicing fees will more than offset the loss of the servicing asset."  The Company has

also learned that the same trustee concluded its voting process for at least one other RMBS trust

(of the 119) and in that case, the certificate holders elected to retain Ocwen as the servicer:

- Ocwen has hired Moelis & Company and Barclays Capital Inc. to support the Company and to advise regarding adjustments to its capital structure, as

2112706.1

appropriate. Additionally these advisors are helping the Company explore its strategic options.

211.     Therefore, as a result of the Individual Defendants' wrongdoing, Ocwen has been forced to sell off billions of dollars of its assets to try to right itself.

212.     On March 18, 2015, Ocwen filed a Form 8-K with the SEC disclosing the following:

> Ocwen Financial Corporation ("the Company") expects that it will file its Annual Report on Form 10-K for the fiscal year ended December 31, 2014 on or before Monday, March 23, 2015, but there can be no assurance that it will be able to do so. The Company continues to analyze and review Home Loan Servicing Solutions, Ltd.'s ("HLSS") ability to continue to meet its obligations to fund new servicing advances. A failure by HLSS to fund new serving advances could have a material negative impact on the Company's financial condition. Additionally, the Company is clarifying for its auditor the appropriateness of adding back the $150 million New York Department of Financial Services charge as an extraordinary item for certain covenant calculations in one of its advance financing facilities (OMART).

213.     On March 23, 2015 the Company announced that, on March 18, 2015, the Company received a deficiency letter from New York Stock Exchange Regulation, Inc. indicating that the Company was not in compliance with the continued listing standards of the New York Stock Exchange as a result of its failure to timely file its Annual Report on Form 10-K for the fiscal year ended December 31, 2014. The Company was also unable to provide an expected date on which it planned to file its Annual Report.

214.     Furthermore, on February 29, 2016, in its 2015 Form 10-K, Ocwen disclosed the commencement of a new investigation by the SEC into the Company's practices regarding fees and expenses charged in connection with liquidated loans and REO properties.  That same day, Defendant Altisource announced that it was delaying the filing of its 2015 10-K and thereafter announced that it would be holding a conference call on March 10 to discuss the investigation.

These allegations appear directly related to the intertwined businesses of Ocwen, Altisource, AAMC and RESI.

215.    The Individual Defendants, with full knowledge of the laws and regulations concerning mortgage loan servicing, caused the Company to incur massive expense in connection with the undisclosed improper related-party transactions and the issuance of false financial statements.

### S.    False Certifications

216.    As senior officers of Ocwen, Defendants Erbey, Faris and Britti, among others in management, had extensive duties to ensure the accuracy and completeness of financial information disseminated to investors.

217.    As noted in American Institute of Certified Public Accountants ("AICPA") auditing standard, Section 110.03, a public company's management is responsible for preparing financial statements in accordance with GAAP:

> "The financial statements are management's responsibility…   Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management.  The auditor's knowledge of these matters and internal controls is limited to that acquired through the audit. Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility."

218.    In Accounting Series Release 173 (July 2, 1975), the SEC reiterated the duty of management to present a true representation of a company's operations:

> "[I]t is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations."

87

2112706.1

219.     Pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") and SEC rules promulgated thereunder, the chief executive officer and chief financial officer of reporting corporations, such as Ocwen, are required to certify as to the accuracy and completeness of a company's financial statements.

220.     At all relevant times, Ocwen's senior management, including but not limited to Defendants Erbey and Faris and the members of the Board's Audit Committee, repeatedly opined that internal controls over financial reporting were adequate, despite the fact that there was no check on Defendant Erbey's behavior, and despite the tangled web of conflicts between and among Ocwen and related entities identified herein, as well as other serious wrongful and illegal conduct as referred to herein directed by Defendant Erbey, and acquiesced in by each of the other Individual Defendants.  Notwithstanding such wrongdoing, the Individual Defendants unjustifiably executed in 2012, 2013 and 2014 "clean certifications" pursuant to Sections 302 and 906 of SOX.  These certifications falsely and deceptively stated, *inter alia,* that the Company had disclosed all significant deficiencies and material weaknesses in the design for operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information. As such, the Individual Defendants are liable to the Company as a result of their false certifications.

## V.     DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.     Fiduciary Duties

221.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  By reasons of their positions as officers and/or directors and fiduciaries and because of their ability to control the business and corporate affairs of Ocwen, the Individual Defendants owe the Company and its stockholders the

2112706.1

fiduciary obligations of trust, loyalty, good faith, candor and due care, and were required to do their utmost to control and manage the affairs of Ocwen in a fair, just, honest and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of Ocwen and its stockholders so as to benefit all stockholders equally, and not in furtherance of their own personal interests or benefit.

222.    Each officer and director of Ocwen owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had and have a duty of candor; i.e.  to promptly disseminate accurate and truthful information regarding the Company's operations, finances, performance, management, projections, and forecasts so that the market price of Ocwen's stock would be based on truthful and accurate information and that the Company's shareholders would be appropriately informed thereof.

223.    In failing to fulfill these duties, the Individual Defendants repeatedly and continuously, throughout the Relevant Period, made material misstatements of fact regarding the Company's compliance with regulatory obligations, its competitive advantages in complying with these obligations at a significant discount over competitors and commitments that it did not place the self-dealing transactions between Ocwen and its network of related companies above the interests of homeowners whose mortgages Ocwen serviced.  Specifically, in the Company's filings with the SEC, press releases, investor presentations and other public documents, Defendants misrepresented and omitted material information in breach of their fiduciary duty of disclosure regarding:

- The reduced costs to Ocwen associated with integrating newly acquired MSR's into the REALServicing platform and that the platform provided Ocwen with a competitive advantage over other servicers;
- The effectiveness of the REALServicing platform in maintaining regulatory compliance in the Company's servicing functions;
- That Ocwen adopted policies and procedures to ensure that potential conflicts of interest are avoided when it came to the related companies, including Altisource and HLSS.
- The purported "market rates" being charged by the related companies comparable to other market participants.
- Ocwen's general ability to adhere to applicable state, federal and local regulations pertaining to the servicing of mortgages.
- Development and enhancement of a compliance management system at Ocwen.
- The conflicts of interest and improper business dealings between Ocwen and the related companies, and Defendants' characterizations that the Company had been "very complete and open" and provided "full disclosure" of those dealings.

224.  Material facts have now been disclosed regarding Ocwen's materially misleading statements during the Relevant Period, including that:

- Altisource's REALServicing platform was inferior to platforms such as FiServ because it prevented Ocwen from testing for all of the NMS compliance protocols and also resulted in the letter-backdating issue described herein.
- According to the December 22, 2014 Consent Order, Defendant Faris admitted that Ocwen's use of the REALServicing platform resulted in regularly giving borrowers incorrect and outdated information, sending borrowers backdated letters, unreliably tracking loans for investors and generally failed to maintain accurate records.
- As observed by the NYDFS in its 2014 communications, Ocwen did not have the appropriate or sufficient controls in place to prevent the Company's related-company transactions from causing harm to homeowners.
- In April 2014, the NYDFS found that Altisource's subsidiary, Hubzu, was charging Ocwen inflated rates that were up to three times larger than they were charging non-Ocwen related customers.  This was admitted to by Defendant Faris in the December 2014 Consent Order.
- The NYDFS found, in the April and August 2014 Letters to Ocwen, that the Company lacked sufficient controls to prevent the related-party transactions from causing harm to homeowners.  Furthermore, Defendant Faris admitted in the December 2014 Consent Order that no such written policy existed that required potentially conflicted employees, officers, or

90

directors to recuse themselves from involvements in transactions with the related companies.

- The SEC found that Ocwen had no written or other policies and procedures in place governing related-party transactions, Ocwen improperly entered into related-party transactions with Altisource and HLSS during the Relevant Period, and improper valuation under GAAP resulted in Ocwen materially misstating its financial results in 2013 and 2014.

### B.    Control, Access and Authority

225.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Ocwen, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various misleading public statements disseminated by the Company.

226.    Because of their advisory, executive, managerial and directorial positions, each of the Individual Defendants during the period in which they held their respective positions had access to adverse, non-public information about Ocwen's lack of compliance with regulatory guidelines, financial condition, operations and misleading representations and had a duty to refrain from selling Ocwen stock while in possession of such undisclosed material adverse information.

227.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Ocwen, and was at all times acting within the course and scope of such agency.

### C.    Reasonable and Prudent Supervision

228.    To discharge their duties, the officers and directors of Ocwen were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the business and financial affairs of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

(i) ensure that the Company complied with applicable legal obligations, requirements and regulations, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(ii) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii) remain informed as to how Ocwen conducted its operations and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws;

(iv) ensure that Ocwen was operated in a diligent, honest and prudent manner in compliance with applicable laws, rules and regulations;

(v) properly and accurately guide investors and analysts as to the true financial condition of the Company, including making accurate statements about the Company's operations and financial results;

(vi) implement adequate internal controls to ensure that the Company complied with all regulatory and legal requirements …; and,

(vii) establish and implement appropriate risk assessment and risk management procedures.

229.   Ocwen's improper web of interconnected and affiliated business entities, pervasive consumer protection violations, failures to adhere to servicing regulations and the various consent orders, judgments and settlements described herein, and personal benefits received by the Individual Defendants was not the result of a rogue employee or division, but instead, notwithstanding Ocwen's Code of Business Conduct and Code of Ethics for Senior Financial Officers, reflected a Company-wide, "anything goes" business philosophy, directed, encouraged and aggressively pursued by Defendant Erbey. Such philosophy was aimed at increasing Ocwen's revenues and profits through unscrupulous business practices, as well as improper charges and improper business activities of related entities at the expense of

compliance with laws and regulations designed to protect both borrowers, investors and the Company, without due regard to the long-term consequences of such wrongdoing.  Upon information and belief, the widespread abusive practices and illegal activities described herein were well known to senior management and the entire Board, and were knowingly pursued despite their knowledge of its illegality and/or cover-up and the inevitable harm to Ocwen and its shareholders.  By knowingly, recklessly or negligently permitting these business practices and strategies to continue, notwithstanding Ocwen's well-publicized codes of behavior and ethics, the Board adopted it as Company policy, and committed a sustained and systematic failure of compliance oversight in breach of each Board member's fiduciary duty of loyalty and good faith.

        **D.**      **Code of Business Conduct and Ethics Allegations**

                1.      Ocwen's Code of Conduct

230.    The Company's Board established the Codes of Conduct and published them, despite knowing that they were not being and would not be followed.  The Company's May 12, 2015 Proxy Statement assured Ocwen's shareholders that:

> "We have adopted a Code of Business Conduct and Ethics that applies to our Directors, officers and employees as required by the New York Stock Exchange rules.  We have also adopted a Code of Ethics for Senior Financial Officers that applies to our Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer.  Any waivers from either the Code of Business Conduct and Ethics or the Code of Ethics for Senior Financial Officers must be approved by our Board of Directors or a Board Committee and must be promptly disclosed to you."

231.    The obligations established by Ocwen's Codes of Conduct were breached by the Individual Defendants, including but not limited to the massive and ongoing costs of investigating misconduct, implementing remedial measures and defending existing and future class action and other lawsuits and further damaging the Company's reputation and goodwill, all of which amounts cannot presently be calculated.

232.     Indeed, contrary to Defendant Faris' introductory letters and the Company's Code of Business Conduct and Ethics, the Board members used every means at their disposal (a) to frustrate the investigations of the CFPB, the NYDFS, the CDBO and other regulatory entities and to delay, as long as possible, any reckoning, (b) to delay public disclosure of the wrongful conduct of the Board and senior management as described herein; and (c) to avoid ultimate accountability for such wrongdoing including failing to act on Plaintiffs' pre-suit demands as referred to below.  From the time of the wrongdoing alleged herein to the present, the Board and senior management of the Company specifically breached their fiduciary obligations to "not just to comply with the laws and regulations that apply to our business … [but also] to abide by the highest principles of business ethics" as specifically mandated by the Code of Business Conduct and Ethics. In fact, the Board's Compliance Committee, which was charged with "oversight of the Company's compliance with applicable laws, rules and regulations governing its consumer-oriented businesses (including applicable state and Federal consumer financial protection laws and regulations)", abjectly failed and continues to fail in carrying out the responsibilities which it has been assigned. Indeed, there is no evidence that such Committee even functions with any effectiveness or real oversight or could be considered to be independent since Defendant Faris is one of only two members and he had and has significant conflicts of interest as a member of the Company's senior management.

2.     Ocwen's Code of Business Conduct and Ethics

233.     Furthermore, Ocwen's Code of Business Conduct and Ethics ("Code of Conduct") was adopted on November 2, 2002 and last reviewed and approved on November 3, 2015.  The Code of Conduct is published on Ocwen's website and referenced in its Proxy Statements.  The Code of Conduct, applicable to all Ocwen employees and all members of the

Company's Board of Directors, describes the purported policies of conduct followed by Ocwen in conducting its business operations.

234.    The Code of Conduct is approved by the Board of Directors and each of them was directly responsible for approving and causing the publication of the misrepresentations set forth therein.   Compliance with the Code of Conduct is purportedly overseen by the senior-most executive of internal audit and the Company's general counsel.

235.    In a letter prefacing the Code of Conduct, dated as of November 3, 2015, Defendant Faris, Ocwen's President and Chief Executive Officer, falsely represented that "[o]ur goal is not just to comply with the laws and regulations that apply to our business; we also strive to abide by the highest principles of business ethics."   His misrepresentations continued: "The purpose of the Code is to reinforce and enhance the Company's commitment to an ethical way of doing business.   The guidance set forth herein underscores Ocwen's long-standing tradition of high ethical standards and should be read in conjunction with the policies and procedures that provide more detailed guidance regarding specific issues."   As set forth herein, contrary to these representations and assurances, as Defendant Faris knew from his own complicity therein, the Company had been and was engaged in a massive scheme of consumer financial abuses, unethical ways of doing business and securities fraud.   The Individual Defendants knowingly or recklessly permitted these abuses to occur over a period of at least five years, or passively acquiesced therein, with full knowledge of the risks to Ocwen inherent in their deliberate strategy.

236.    The Code of Conduct, as referenced and incorporated in the 2015 Proxy Statement, contained numerous representations, which the Individual Defendants knew, or should have known were false, including the following:

95

- Ocwen Financial Corporation and its subsidiaries ("Ocwen" or the "Company") are committed to the highest standards of business conduct in our relationship with each other and with our customers/clients, suppliers, shareholders and others. *This requires that we conduct our business in accordance with all applicable laws and regulations and in accordance with the highest standards of business ethics.* (Code of Conduct, p. 5 of 21) (emphasis added).

- Ocwen employees and members of the Board are expected to dedicate their best efforts to Company business *and to avoid any conflicts with the interests of Ocwen. (Id.)*

- In order to maintain the highest degree of integrity in the conduct of Ocwen's business and to maintain your independent judgment, you must avoid any activity or personal interest that creates or appears to create a conflict between your interests and the interests of the Company. *A conflict of interest occurs when your private interests interfere in any way, or even appear to interfere, with the interest of the Company as a whole.* A conflict situation can arise when you take actions or have interests that make it difficult for you to perform your company work objectively and effectively. You should never act in a manner that could cause you to lose your independence and objectivity or that could adversely affect the confidence of our customer/clients, suppliers, directors or fellow employees in the integrity of Ocwen or its procedures. *(Id.)*(emphasis added).

- *Financial Interests in Other Businesses*: Ocwen employees, members of the Board, and their immediate families may not have an ownership interest in any other enterprise if that interest compromises or appears to compromise the employee's loyalty to Ocwen. (*Id.*, p. 6 of 21).

- *Insider Trading*: You are prohibited by Company policy and the law from buying or selling securities of the Company at a time when in possession of "material nonpublic information." (*Id.*, p. 12 of 21).

- *Fair Dealing*: Ocwen depends on its reputation for quality, service and integrity. The way we deal with our customer/clients, competitors and suppliers mold our reputation, builds long-term trust *and ultimately determines our success.* You should endeavor to deal fairly with the Company's customers/clients, suppliers, competitors, directors and employees. *We must never take unfair advantage of others through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair dealing practice.* *Id.,* pp. 13-14 of 21) (emphasis added).

237. As outlined above, the Individual Defendants violated the Company's Code of

Conduct in a systematic and sustained series of illegal and abusive business practices, dual

ownership of affiliated entities that created rampant conflicts of interest and lack of objectivity

96

and independence.  In addition, certain of the Individual Defendants have been accused, in separate lawsuits, of securities fraud and Defendants Erbey, Wish and Ross have been accused of insider trading violations.  In short, despite the tenets of the Company's Code of Conduct, the Individual Defendants left ethics, integrity and fair dealing by the wayside in their quest for ever higher revenues and thus, higher compensation and ever more lucrative incentives for themselves, in breach of their fiduciary duties to Ocwen.

238.    Further, the Code of Conduct provides that "[i]f you know of or suspect a violation of applicable laws or regulations, the Code, or the Company's related policies, you must immediately report that information to the Conduct and Ethics line … the Senior-most Executive of Human Resources or a manager in the Human Resources Department, the Senior-most Executive of Internal Audit and/or the General Counsel … failure to report a suspected violation of the Code is itself a violation of the Code …". (*Id.*, p. 20 of 22). Thus, to the extent any of the Individual Defendants passively acquiesced in or failed to report known or suspected violations of the Code of Conduct by others, that is itself a violation of the Code of Conduct and breach of fiduciary duty. In the context of the Board's touting of the Code of Conduct in the Proxy Statement, its members were obligated to disclose the appointment of a so-called "Special Litigation Committee" of the Board, represented by severely conflicted counsel, which had already compiled a significant body of evidence to the effect that the Individual Defendants had already violated the letter and spirit of the Code of Conduct.

239.    Each member of  Ocwen's Board, among others, was  required to and, upon information and belief, did execute the following statement which appears at the end of the Code of Conduct:

2112706.1

## ACKNOWLEDGMENT FORM

I have received and read the Ocwen Code of Business Conduct and Ethics, and I understand its contents.  I agree to comply fully with the standards, policies and procedures contained in the Code and the Company's related policies and procedures.  I understand that I have an obligation to report to the Senior-most Executive of Internal Audit and/or the General Counsel or any of the other resources identified herein this code (sic) of any suspected violations of the Code of which I am aware.  I acknowledge that the Code is a statement of policies for business conduct and does not, in any way, constitute an employment contract or an assurance of continued employment.

240.    Notwithstanding the execution of the foregoing statement, Defendant Erbey, the members of the Audit and Compliance Committees and each of the other Individual Defendants knowingly failed to adhere to "the standards, policies and procedures contained in the Code and the Company's related policies and procedures" and thereby breached their respective fiduciary and contractual duties owed to Ocwen.  Moreover, each of the Individual Defendants who executed the foregoing statement, despite their personal knowledge of the wrongdoing alleged herein, failed to fulfill his/her "obligation to report to the Senior-most Executive of Internal Audit and/or the General Counsel … any suspected violation of the Code of which I am aware." Upon information and belief, none of the Individual Defendants made any such report.

3.    Ocwen's Code of Ethics for Senior Financial Officers

241.    Ocwen's Code of Ethics for Senior Financial Officers (the "Code of Financial Ethics") was adopted on November 7, 2002 and last reviewed and approved on February 17, 2016.  The Code of Financial Ethics is published on Ocwen's website and incorporated by reference in its Proxy Statements, including Ocwen's May 12, 2015 Proxy Statement.  The Code of Financial Ethics, applicable to the Company's Chief Executive Officer, Chief Financial Officer, and Chief Accounting Officer (collectively the "Senior Financial Officers"), sets forth specific policies to guide the Company's Senior Financial Officers in the performance of their

duties.  The Code of Financial Ethics supplements the Code of Conduct and creates additional obligations for the Company's Senior Financial Officers.

242.    The Code of Financial Ethics states the Ocwen "is committed to full and accurate financial disclosure in compliance with applicable laws, rules and regulations and to maintaining its book and records in accordance with applicable accounting policies, laws, rules and regulations."

243.    The Code of Financial Ethics stresses the importance of compliance with applicable rules and regulations, and references the creation of a culture of high ethical standards, the antithesis of what was actually occurring at the Company.  The Code states:

> Ocwen is committed to conducting our business in accordance with all applicable laws, rules and regulations and in accordance with the highest standards of business ethics.  As a Senior Financial Officer, you must comply with applicable laws.  In addition, you also have leadership responsibilities that include creating a culture of high ethical standards and commitment to compliance, maintaining a work environment that encourages employees to raise concerns and promptly addressing employee compliance concerns.

244.    The Code of Financial Ethics, like the Code of Conduct, stresses the importance of independent judgment and the avoidance of actual or perceived conflicts of interest, stating:

> In order to maintain the highest degree of integrity in the conduct of Ocwen's business and your independent judgment, you must avoid any activity or personal interest that creates or appears to create a conflict between your interests and the interests of Ocwen.  A conflict of interest occurs when your private interests interfere in any way, or even appear to interfere, with the interests of Ocwen as a whole.  A conflict situation can arise when you take actions or have interests that make it difficult for you to perform your company work objectively and effectively.  You must respond to any conflict of interest situation in accordance with Ocwen's Codes of Ethics and its Related Party Transaction Approval Policy.

245.    As set forth above, Ocwen's Senior Financial Officers, namely Defendants Faris and Britti, violated the Company's Code of Financial Ethics in a systematic and in a sustained manner, misrepresented or failed to disclose the true financial and operating condition of the

Company, failed to issue financial statements and Company reports in compliance with GAAP, and participated in or acquiesced in violations of federal securities laws, state and federal consumer financial protection laws and regulations and other applicable laws. The Company's Senior Financial Officers, as well as all of the other Individual Defendants, failed entirely to create a culture of high ethical standards and commitment to compliance, subjecting Ocwen and its shareholders to billions of dollars in damages, lost market value of their stock holdings, as well as expensive, time consuming and on-going governmental and regulatory investigations and substantial potential civil liability from both pending and potential future class action and other litigation.

246.   Each the Company's Senior Financial Officers was required to and, upon information and belief, did execute the following statement which appears at the end of the Code of Financial Ethics:

## ACKNOWLEDGMENT FORM

I have received and read the Code of Ethics for Senior Financial Officers, and I understand its contents.  I agree to comply fully with the standards, policies and procedures contained in the Code of Ethics and the Company's related policies and procedures.  I understand that I have an obligation to report to the Senior-most Executive of Internal Audit or the Audit Committee of the Board of Directors any suspected violations of the Code of Ethics of which I am aware.  I certify that, except as fully disclosed in accordance with the terms of this Code of Ethics, I have not engaged in any transactions or activities that would constitute an actual or apparent conflict with the interests of the Company.  I further certify that, except as noted below, I am otherwise in full compliance with the Code of Ethics and any related policies and procedures.

247.   Notwithstanding the execution of the foregoing statement, each of Ocwen's Senior Financial Officers knowingly failed to adhere and fully comply with "the standards, policies and procedures contained in the Code of Financial Ethics and the Company's related policies and procedures."  Moreover, each of these Senior Financial Officers who executed the

foregoing statement, despite his/her personal knowledge of the wrongdoing alleged herein, failed to fulfill his/her "obligation to report to the Senior-most Executive of Internal Audit or the Audit Committee of the Board of Directors any suspected violation of the Code of Ethics of which I am aware." Each of the Company's Senior Financial Officers falsely certified that "I am otherwise in full compliance with the Code of Ethics and any related policies and procedures" as well as that "I had not engaged in any transactions or activities that would constitute and actual or apparent conflict with the interests of the Company."

### E.   <u>Audit Committee Allegations</u>

248.   Defendants Korn, Wish and Salcetti (the "Audit Committee Defendants") owed specific heightened duties as members of the Board's Audit Committee at the time of the alleged wrongdoing.  Pursuant to the Audit Committee's Charter, in effect for many years and last amended and adopted on February 24, 2014, these Defendants are responsible for being the Board's front line in the oversight of internal controls and legal compliance, accurate financial reporting and accounting and enforcement of Ocwen's Code of Conduct and Code of Financial Ethics.

249.   During the Relevant Period, Ocwen's Audit Committee Charter stated, in substance:

> The purpose of the Audit Committee (the "Committee" of the Board of Directors (the "Board") of Ocwen Financial Corporation (the "Company") is to provide assistance to the Board in fulfilling its legal and fiduciary obligations with respect to matters involving the accounting, auditing, financial reporting, internal control and legal compliance functions of the Company and its subsidiaries.  This includes, without limitation, (a) assuming the Board's oversight of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the Company's independent auditors' qualifications and independence and (iv) the performance of the Company's independent auditors and the Company's internal audit function, and (b) preparing the report required to be prepared by the Committee pursuant to the rules of the Securities and Exchange Commission (the "SEC") for inclusion in the Company's annual proxy statement.

250.    Both before and since being charged with responsibility to investigate the claims made in Plaintiffs' Demands to the Board as referred to below, the Audit Committee has abjectly and knowingly, with the advice of conflicted legal counsel, failed to fulfill the foregoing responsibilities.

251.    In particular, during the period of the wrongdoing alleged herein, the members of the Audit Committee failed to fulfill their oversight responsibilities with respect to the accounting and financial reporting processes of the Company, including the integrity of the financial statements and other financial information, which they knew or should have known were not accurate, were not properly audited by an independent auditor and suffered material control shortcomings.

252.    Moreover, each of the members of the Audit Committee serving at the times of the wrongdoing alleged herein was personally aware or should have been aware that the Company was not in compliance with legal and regulatory requirements including, *inter alia*, federal securities laws, GAAP accounting standards, state consumer protection laws and mortgage servicing practices and federal consumer financial protection laws, rules and regulations.  At all relevant times, the members of the Audit Committee had total access to all documents and information bearing upon the Company's operations including the information relevant to the wrongdoing referred to herein.  In addition to each of such members of the Audit Committee being members of the Board, they were charged with specific responsibilities that enhanced their access to such documents and information pursuant to the Audit Committee Charter which required them to, *inter alia*:

## DUTIES AND RESPONSIBILITIES OF THE AUDIT COMMITTEE

a.    Obtain and review at least annually the Company's internal audit plan, internal audit budget and risk management report;

\*    \*    \*

d.    Obtain and review at least annually the report of the independent auditors describing:

    i.    the independent auditors' internal quality-control procedures;

    ii.    any material issues raised by the most recent internal quality-control review, by a peer review or by any inquiry or investigation by any governmental or professional authority of the independent auditors, within the preceding five years, respecting one or more independent audits carried out by the independent auditors, and any steps taken to deal with any such issues; and

    iii.    all relationships between the independent auditors and the Company (including a description of each category of services provided by the independent auditors to the Company and a list of the fees billed for each such category);

\*    \*    \*

f.    Review the annual audit plan of the Company's independent auditors, including the scope of the audit, and monitor such plan's progress and results during the year;

g.    Review the results of the year-end audit of the Company by the independent auditors, including any significant matters regarding internal controls over financial reporting that have come to their attention during the conduct of the audit;

h.    Meet to review and discuss with management and the independent auditors the Company's annual audited financial statements and "Management's Discussion and Analysis disclosures, and recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K;

i.    Meet and review and discuss with management and the independent auditors, the Company's quarterly financial statements, Management's Discussion and Analysis and the results of independent auditor's review of the quarterly financial statements;

j.    Review with management, the Company's independent auditors' and the Vice President of the Company's internal auditing department, the following:

    i.    critical accounting policies and such other accounting policies of the Company as are deemed appropriate for review by the Committee prior to any interim or year-end filings with the SEC or other regulatory body, including any financial reporting issues

103

which could have a material impact on the Company's financial statements;

ii.    any significant changes in the Company's selection or application of accounting principles;

iii.    alternative treatments of financial information that have been discussed by the independent auditors and management, ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the auditors;

iv.    all other material written communications between the independent auditors and management; and

v.    the effect of off-balance sheet structures on the financial statements of the Company;

k.    Review with the chief executive officer and chief financial officer and independent auditors, the following:

i.    all significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize, and report financial data, including any material weaknesses in internal controls identified by the Company's independent auditors;

ii.    any fraud, whether or not material, that involved management or other employees who have a significant role in the Company's internal controls; and

iii.    any significant changes in internal controls over financial reporting, including any corrective actions with regard to significant deficiencies and material weaknesses.

l.    Review:

i.    the adequacy and effectiveness of the Company's accounting and internal control policies and procedures on a regular basis, including the responsibilities, budget and staffing of the Company's internal audit function, through inquiry and discussions with the Company's internal auditors and management of the Company; and

ii.    any required report prepared by management, and attested to by the Company's independent auditors, regarding the effectiveness of the Company's internal controls over financial reporting and stating management's responsibility to establish and maintain such internal controls, prior to its inclusion in the Company's annual report;

m.    Review with management the Company's administrative, operational and accounting internal controls, including any special steps adopted in light of the discovery of material control deficiencies, and evaluate whether the Company is operating in accordance with its prescribed policies, procedures and codes of conduct;

104

n.      Receive periodic reports from management to assess the impact on the Company of significant accounting or financial reporting developments that may have a bearing on the Company;

o.      Establish and maintain free and open means of communication between and among the Board, the Committee, the Company's independent auditors, the Company's internal auditing department and management, including providing such parties with appropriate opportunities to meet separate and privately with the Committee on a periodic basis;

p.      Discuss guidelines and policies governing the process by which senior management of the Company assess and manage the Company's exposure to risk, as well as the Company's major financial risk exposures, including the Company's credit risk, liquidity risk, regulatory risk, operational risk and enterprise risk, and the steps management has taken to monitor and control such exposures;

q.      Meet regularly with the Chief Risk Officer to discuss the Company's policies and procedures for risk management, to understand how the Chief Risk Officer and other members of senior management assess and manage the Company's exposure to risk, including the Company's major financial risk exposures, and to understand the risks that are primarily monitored by other Board committees, such as the regulatory risks monitored by the Compliance Committee;

r.      Meet regularly with the Company's internal auditors and the independent accountants to discuss the scope and plan for the internal audit and include management in its review of accounting and financial controls, assessment of business risks and legal and ethical compliance programs;

s.      Meet at least annually with the general counsel, and outside counsel when appropriate, to review legal and regulatory matters, including any matters that may have a material impact on the financial statements of the Company;

t.      Prepare the report required by the rules of the SEC to be included in the Company's annual proxy statement;

u.      Establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters;

v.      Discuss significant, complex or unusual transactions with management and the independent auditor;

w.      Report regularly to the Board on its activities, as appropriate.  In connection therewith, the Committee should review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the performance and independence of the Company's independent auditors or the performance of the internal audit function.

2112706.1

253.    Additionally, the Audit Committee is responsible for approving and closely monitoring all related party transactions. According to the 2013 Proxy and 2014 Proxy:

> Related persons are required to obtain the approval of the Audit Committee of the Board of Directors for any transaction or situation that may pose a conflict of interest. In considering a transaction, the Audit Committee will consider all relevant factors including (i) whether the transaction is in the best interests of Ocwen; (ii) alternatives to the related person transaction; (iii) whether the transaction is on terms comparable to those available to third parties; (iv) the potential for the transaction to lead to an actual or apparent conflict of interest and any safeguards imposed to prevent such actual or apparent conflicts and (v) the overall fairness of the transaction to Ocwen. The Audit Committee will periodically monitor any approved transactions to ensure that there are no changed circumstances that would render it advisable for the Company to amend or terminate the transaction.

254.    By knowingly and recklessly failing to ensure internal controls were in place and regulatory guidelines adhered to, and by allowing Defendant Erbey to exercise unbounded discretion and personal autonomy over the Company's operations, as well as the operations of the affiliated entities identified herein, and allowing Defendants Erbey and Wish to maintain conflicting financial interests, all of which resulted, among other things, in certain of the wrongdoing described above, which is continuing through the present, the Audit Committee Defendants as well as those directors newly appointed to the Audit Committee breached their fiduciary duties of loyalty and good faith owed to the Company.

255.    Throughout the Relevant Period, Defendants Korn, Salcetti and Wish, as members of the Audit Committee, breached their fiduciary duties to Ocwen by: (i) failing to conduct oversight pertaining to the adequacy and the effectiveness of the Company's internal controls over public reporting of transactions and the Company's engagement in transactions, including mortgage-servicing practices that violated applicable regulations and laws; (ii) consciously disregarding their duties to monitor such controls over reporting and engagement in transactions; (iii) consciously disregarding their duties to ensure that they and other officers,

106

directors and employees of Ocwen protected corporate assets, engaged in fair dealing, avoid using corporate opportunities for personal gain and avoid conflicts of interest; and (iv) causing the Company to misrepresent its financial results in violation of GAAP.

256.    In light of the widespread nature of the wrongdoing referred to herein, the members of the Audit Committee effectively acquiesced therein and were (and are) personally responsible for the cover-up of such wrongdoing. As such, they (as well as other members of the Board including those more recently appointed) were not and could never be considered independent or disinterested persons capable of investigating in good faith the wrongdoing claimed by Plaintiffs herein and in their respective demand letters sent to the entire Board.

257.    Moreover, upon information and belief, despite their knowledge of ongoing investigations of the Company's illegal practices, neither the members of the Audit Committee nor the Board as a whole commenced any serious internal investigation of the wrongdoing as alleged by Plaintiffs. Moreover, consistent therewith, they continued to appoint Deloitte & Touche LLP ("D&T") (now known as Deloitte LLP) as Ocwen's auditor rather than appoint a truly independent auditor who would expose such wrongdoing, D&T having failed to do so throughout the relevant period.

F.    Compliance Committee Allegations

258.    Pursuant to the Company's 2013, 2014 and 2015 Proxy Statements, the Compliance Committee "provides assistance to the Board of Directors with (i) establishment and oversight of our compliance function, including our compliance management system, and (ii) oversight of our compliance with applicable laws, rules and regulations governing its consumer-oriented businesses, including Federal consumer financial laws and applicable state laws."

259.    During the Relevant Period, Defendant Salcetti, Ross and Faris served on the Board's Compliance Committee (collectively "the Compliance Committee Defendants").

Additionally, the 2014 Proxy Statement claims that Defendant Faris is the Company's President and CEO and is a member of the Compliance Committee because "we believe the Compliance Committee benefits from his deep knowledge of industry regulation and compliance practices as well as his many years of experience working with industry regulators." The Compliance Committee Defendants owed specific heightened duties to Ocwen and its shareholders as members of the Board's Compliance Committee at the time of the alleged wrongdoing. Pursuant to the Compliance Committee Charter, in effect for many years and last amended and adopted on December 1, 2015, these Defendants are or were responsible for ensuring that the Company functioned in compliance with the laws, rules and regulations governing its consumer-oriented businesses, including applicable state and Federal consumer financial protection and securities laws and regulations.

260.    The Compliance Committee Charter states as follows:

> The purpose of the Compliance Committee (the "Committee") of the Board of Directors (the "Board") of Ocwen Financial Corporation and its subsidiaries (together, the "Company") is to provide assistance to the Board with (i) establishment and oversight of the Company's compliance function, including the Company's compliance management system, and (ii) oversight of the Company's compliance with applicable laws, rules and regulations governing its consumer-oriented businesses (including applicable state and Federal consumer financial protection laws and regulations).

261.    Each of the members of the Compliance Committee serving at the times of the wrongdoing alleged herein was personally aware or should have been aware that the Company was not in compliance with legal and regulatory requirements including, *inter alia*, applicable state and federal consumer financial protection laws and regulations and the multiple agreements and consent decrees made with Ocwen's regulators, which were regularly breached by the Company. At all relevant times, the members of the Compliance Committee had total access to all documents and information bearing upon the Company's operations including the information

relevant to the wrongdoing referred to herein.  In addition to each of such members of the Compliance Committee being members of the Board, they were charged with specific responsibilities that enhanced their access to such documents and information pursuant to the Compliance Committee Charter which required them to, *inter alia*:

## <u>DUTIES AND RESPONSIBILITIES OF THE COMPLIANCE COMMITTEE</u>

a.      Review the status of the Company's compliance with Federal consumer financial laws, applicable state laws and internal policies, procedures and controls;

b.      Receive and oversee the assessment of internal and external data and reports relating to the Company's compliance programs;

c.      Create criteria for the Company's Compliance Management Committee, which consists of the Chief Compliance Officer, the Chief Executive Officer, the Chief Risk Officer, executive members representing each line of consumer business, general members from the office of the general counsel and the audit department and compliance liaisons from each consumer business unit;

d.      Oversee the activities of the Company's Compliance Management Committee, including review of internal data and reports prepared by the Compliance Management Committee;

e.      Appoint the Company's Chief Compliance Officer, who shall serve as the Chair of the Compliance Management Committee and shall not report to or be under the day-to-day supervision of Company management responsible for operations, financial reporting, financial performance, shareholder or investor relations, loan production or similar revenue or income- related functions;

f.      Assure the independence of the Chief Compliance Officer, including assuring that the Chief Compliance Officer has direct access to the chairperson of the Committee at all reasonable times and has the responsibility to report to the Committee at every meeting of the Committee and at such other times as the Committee may request or direct;

g.      Receive periodic reports, no less than quarterly, from the Chief Compliance Officer and the Company's General Counsel regarding (i) pending or threatened government investigations, examinations, inquiries, demands or proceedings and material litigation, in each case which cover or would be expected to cover compliance with consumer financial laws and/or involve allegations of potentially unlawful, unfair or discriminatory acts and practices, (ii) details and factual information regarding any material claim or pattern of claims alleging that the Company is not in compliance with Federal consumer financial laws and/or applicable state laws or may be engaged in a pattern of unfair, deceptive, abusive, discriminatory acts of practices and (iii)regulatory developments relevant to the Company's business;

h.      Review and approve, at least annually, the Company's formal written compliance plan and policy statements and directives related to

compliance with applicable Federal consumer financial laws and applicable state laws;

   i. Review new consumer financial products or services or Company strategies, to determine degree of compliance function participation (including consideration of fair lending or antidiscrimination laws);

   j. Oversee the resourcing of compliance functions at the Company, including staffing, systems and monitoring;

   k. Oversee the formulation and implementation of the Company's compliance management system, consisting of four interdependent control components, (i) Board and management oversight, (ii) written compliance program, (iii) response to consumer complaints, and (iv) compliance audit function;

   l. Periodically review the Company's consumer complaint intake and resolution function, in light of risk of violation of state laws and Federal consumer financial laws and related risks to consumers;

   m. Request reports from the Chief Compliance Officer, the Company's General Counsel and management regarding the preparation, implementation and updating of the Company's compliance policies, procedures, training and controls;

   n. Receive and, when appropriate, meet to discuss, reports on any annual or periodic internal compliance reviews conducted by the Company, including requiring a copy of any report (and supporting notes and schedules) prepared by the Company in connection with any such review to be submitted to the Committee;

   o. Ensure that the full Board receives reports and materials as necessary from time to time regarding significant compliance issues.

   p. Hire and retain outside consultants, auditors or legal counsel as needed to assist the Committee in carrying out its duties and responsibilities;

   q. Order, direct and oversee any annual or periodic independent compliance audit that the Committee deems necessary or appropriate, conducted by an independent firm deemed competent by the Committee to conduct such a compliance audit;

   r. Review the results of any such compliance audit with the independent auditing firm, including any significant matters regarding risk of non-compliance with Federal consumer financial laws and related risk of harm to consumers (including, but not limited to, any identified risk to consumers related to unfair or discriminatory acts or practices);

   s. Review all state and Federal regulatory examination reports and oversee any necessary corrective actions; and

   t. Undertake such other activities as are necessary or incidental to carrying out the foregoing duties and responsibilities.

  262. The Compliance Committee Charter further requires that the Committee members evaluate, on an annual basis, its performance under the Charter, including at least the following:

the adequacy, appropriateness and quality of the information and recommendations presented by the Committee to the Board, the manner in which they were discussed or debated, and whether the number and length of meetings of the Committee were adequate for the Committee to complete its work in a thorough and thoughtful manner.  The Compliance Committee is required to deliver to the Board a report setting forth the results of its annual evaluation, including any recommended changes to the Company's or the Board's policies or practices.

263.    The Compliance Committee Defendants, directly and/or through subordinates, blatantly violated the Company's Compliance Policy by, *inter alia*, participating and/or acquiescing in the ongoing wrongdoing and/or failing to have in place adequate internal controls and oversight to prevent the widespread wrongdoing and violation of state and federal consumer financial protection, mortgage servicing and securities laws and regulations and other wrongdoing as set forth  herein including agreements and consent decrees with the Company's regulators. Such wrongdoing was systemic and ongoing, all of which has caused Ocwen billions of dollars in damages to date and is subjecting it to further damages, fines, penalties and injunctive relief.   That the Compliance Committee Defendants failed to fulfill their responsibilities is evidenced by, *inter alia*, the settlement with the NYDFS of December 22, 2014 pursuant to which the Company effectively acknowledged the Individual Defendants' systemic and widespread regulatory failings, as described herein.

264.    Furthermore, Defendant Faris' involvement and participation on the Compliance Committee at the time of the alleged wrongdoing described herein presents a clear conflict of interest and makes clear that the Compliance Committee put form over substance and was nothing more than another arm of Management under the influence and control of management, as opposed to an independent entity.

111

2112706.1

### G. Corporate Governance Guidelines

265. Ocwen's Corporate Governance Guidelines were adopted by the Board on November 7, 2002, and last reviewed and approved February 17, 2016.  Purportedly, the Corporate Governance Guidelines "reflect the Board's commitment to monitor the effectiveness of policy and decision making both at the Board and management level, with a view to enhancing long-term stockholder value."  However, contrary to these representations, and as demonstrated above, the Board members, once again, placing form over substance, failed to effectively monitor either policy or decision-making, instead breaching their fiduciary duties by participating in, acquiescing in and/or failing to prevent widespread abusive practices, rampant conflicts of interest and a myriad of other wrongdoing, as alleged herein.  Further, contrary to the Corporate Governance Guidelines that a "director is expected to spend the time and effort necessary to properly discharge such director's responsibilities," the Individual Defendants (as well as all currently sitting members of the Board) had neither the time, nor the inclination, to devote to their duties as Directors, thus enabling the wrongdoing to occur and to continue unabated to the present.

266. Pursuant to the Corporate Governance Guidelines, in order to build long-term value for the Company's stockholders, the Board was duty-bound to monitor the performance of the Company (in relation to its goals, strategy and competitors) and the performance of Ocwen's Executive Chairman, Defendant Erbey, and the Chief Executive Officer, Defendant Faris.  The Corporate Governance Guidelines further state:

> The Board is also responsible for assuring that the Company's management and employees operate in a legal and ethically responsible manner.  When it is appropriate or necessary, it is the Board's responsibility to remove the Chief Executive Officer and to select his or her successor.

267.   Each of the Individual Defendants breached the Company's Corporate Governance Guidelines by, *inter alia*, their participation and acquiescence in the wrongdoing alleged herein, failing to implement sufficient internal controls to prevent and/or minimize the alleged wrongdoing and failing to adequately and objectively investigate with independent counsel the alleged wrongdoing and remove those responsible in the face of numerous and ongoing investigations and lawsuits.   All members of Ocwen's Board have failed and are currently failing to fulfill such responsibilities.

268.   Ocwen's current and previous Board of Directors Corporate Governance Guidelines further state, in pertinent part:

"Independence of the Board. The Board shall be comprised of a majority of directors who qualify as independent directors ("independent Directors") under the listing standards of the New York Stock Exchange (the "NYSE") and applicable law.

The Board shall review annually the relationships that each director has with the Company (directly or as a partner, shareholder or officer of an organization that has a relationship with the Company or otherwise).   Following such annual review, only those directors who the Board affirmatively determines have no material relationship with the Company (directly or as a partner, shareholder or officer of any organization that has a relationship with the Company or otherwise) will be considered Independent Directors, subject to additional qualifications prescribed under the listing standards of the NYSE or under applicable law.   The Board may adopt and disclose categorical standards to assist it in determining director independence.

269.   As a result of direct and indirect Ocwen shareholdings, including his direct and indirect holdings in the related entities with which Ocwen does business, identified above, Defendant Erbey controlled and appears to still control every aspect of the Company's business including, *inter alia*, all nominations to the Company's Board of Directors.   Although the Guidelines proclaim that a majority of Board members should be independent, none of the Ocwen directors is, in fact, free of the control and/or influence of Defendant Erbey. As to those

113

appointed before and during the Relevant Period, each of them owes his appointment, power and lucrative compensation package to Defendant Erbey, who has either directly caused each of them to be appointed to the Board or has acquiesced in their appointments as directors. This is true despite his resignation as Executive Chairman by reason of his shared culpability with the other Individual Defendants and his personal stockholdings.   Thus, each of Ocwen's directors continues to owe fealty to Defendant Erbey and will take no action contrary to his personal interests. Even if the nominally independent Board members satisfy the rather lax and purely technical "standards" for independence set by the Exchange Act and the New York Stock Exchange, the reality is that each director owes personal fealty to Defendant Erbey and, thus, cannot seriously be considered independent notwithstanding such "standards." By acting as they did, all of his colleagues on the Board put their personal loyalty to Defendant Erbey before their respective duties of loyalty to Ocwen and its shareholders.

270.    Further, despite certain Guidelines regarding self-evaluation purportedly designed to ensure compliance with Company policies and procedures, the Board and the Nomination/Governance Committee failed to meaningful evaluate Board members' performance and/or to take action to ensure that the Individual Defendants, particularly Defendant Erbey, were fulfilling their fiduciary obligations to the Company and had no conflicts of interest. Upon information and belief, no such evaluations were ever performed.

### H.    Nomination/Governance Committee Allegations

271.    During the Relevant Period, the members of Ocwen's Nomination/Governance Committee were the following:  Defendants: Wish, Lacy and Salcetti.

272.    Ocwen's Nomination/Governance Committee Charter, in effect during the period relevant herein and last amended and adopted June 2, 2015, provides as follows:

The purposes of the Nomination/Governance Committee (the "Committee") of the Board of Directors (the "Board") of Ocwen Financial Corporation (the "Company") shall be to recommend to the Board individuals qualified to serve as directors of the Company and on committees of the Board: to advise the Board with respect to the Board composition, procedures and committees; to develop and recommend to the Board a set of corporate governance principles applicable to the Company; and to oversee the evaluation of the Board and the Company's management.

273.   The Nomination/Governance Committee's duties with respect to Board Candidates and Nominees included, among other things:

a.   To establish procedures for evaluating the suitability of potential director nominees proposed by management or shareholders.

\*          \*          \*

c.   To review the suitability for continued service as a director of each Board member when his or her term expires and when he or she has a significant change in status, including but not limited to an employment change, and to recommend whether or not the director should be renominated.

194.   The Nomination/Governance Committee was also charged with oversight of the Board Committees, including a duty to establish special committees to address ethical, legal or other matters that arise.   The Charter provides, in pertinent part, as follows with respect to the goals and responsibilities of the Committee with respect to the committee structure of the Board:

(a) To make recommendations to the Board regarding the size and composition of each standing committee of the Board of Directors, including identification of individuals qualified to serve as members of a committee, including the Committee, and to recommend individual directors to fill any vacancy that might occur on a committee, including the Committee.

(b)  To monitor the functioning of the committees of the Board and to make recommendations for any changes, including the creation and elimination of committees.

\*          \*          \*

(d)   To recommend that the Board establish such special committees as may be desirable or necessary from time to time in order to address ethical, legal

115

or other matters that may arise.  The Committee's power to make such a recommendation under this Charter shall be without prejudice to the right of any other committee of the Board, or any individual director, to make such a recommendation at any time.

274.    With respect to Corporate Governance, the Nomination/Governance Committee

had the following specific responsibilities:

(a)    To develop and recommend to the Board a set of corporate governance principles for the Company, which shall be consistent with any applicable laws, regulations and listing standards.
(b)    To review periodically, and at least annually, the corporate governance principles adopted by the Board to assure that they are appropriate for the Company, and to recommend any desirable changes to the Board.
(c)    To consider any other corporate governance issues that arise from time to time, and to develop appropriate recommendations for the Board.

275.    The Committee was further responsible "for overseeing the evaluation of the

Board as a whole and the management of the Company, including the Chief Executive Officer.

The Committee will prepare and assist each other committee's self-evaluation to determine

whether such committees are functioning effectively.  The Committee shall establish procedures

to allow it to exercise these oversight functions."

276.    Notwithstanding its duties under the Nomination/Governance Committee Charter,

neither the Committee nor the Board itself made any serious evaluation of the director nominees

or sitting directors, particularly in terms of their performance, effectiveness and amount of time

available to fulfill their stewardship responsibilities.  Thus, each of the director defendants who

were members of the Nomination/Governance Committee breached their respective duties under

the Committee Charter.

I.    **Compensation Committee Allegations**

277.    At all relevant times, the members of Ocwen's Compensation Committee were

Defendants Lacy and Korn.

116

278.     Ocwen's Compensation Committee Charter, in effect during the Relevant Period

and last amended and adopted June 2, 2015, provides as follows:

> The purposes of the Compensation Committee (the "Committee") of the Board of Directors (the "Board") of Ocwen Financial Corporation (the "Company") shall be to oversee the Company's compensation and employee benefit plans and practices, including its executive compensation plans and its incentive compensation and equity-based plans; and to produce an annual report on executive compensation for inclusion in the Company's proxy statement in accordance with all applicable rules and regulations.

279.     Among the specific responsibilities of the Individual Defendants who were

members of the Compensation Committee were, *inter alia*, the following:

> a.      To review at least annually the goals and objectives of the Company's executive compensation (other than with respect to the Executive Chairman and the Chief Executive Officer) and to make recommendations to the Board with respect to such executive compensation in light of such goals and objectives.
>
> b.      To review and approve annually the corporate goals and objectives applicable to the compensation of the Executive Chairman and the Chief Executive Officer, evaluate annually the performance of the Executive Chairman and the Chief Executive Officer in light of such goals and objectives, and either as a Committee or together with the other independent directors on the Board (as directed by the Board), determine and approve each of the Executive Chairman's and the Chief Executive Officer's compensation levels based on their respective evaluations.  In determining the long-term incentive component soft each of the Executive Chairman's and the Chief Executive Officer's compensation, the Committee shall consider all relevant factors, including the Company's performance and relative stockholder return …
>
> c.      To evaluate annually the appropriate form and amount of compensation for Board and Committee service by members of the Board.

280.     With respect to Incentive Compensation and Equity-Based Plans, the

Compensation Committee was responsible "[t]o review at least annually the goals and objectives

of the Company's incentive compensation and equity-based plans and, to the extent such plans

are subject to Board approval, make recommendations to the Board with respect to such plans in

light of such goals and objectives."

117

281.     The Compensation Committee was also specifically charged with evaluating the Company's compensation policies in relation to risk management.   The Compensation Committee Charter directs the Committee members:

> "To review and consider the Company's policies and practices of compensating its employees, including non-executive officers, as they relate to risk management practices and risk-taking incentives, and whether risks arising from the Company's compensation policies and practices for its employees are reasonably likely to have a material adverse effect on the Company."

282.     The members of the Compensation Committee failed to align the compensation of senior executive management and the Board with appropriate risk management practices and risk taking incentives, and instead permitted a structure where short term profits and related-party transactions were permitted to override sound and ethical business practices and decision-making.  The Board and senior management was handsomely compensated without meaningful evaluation as to such members' performance in relation to stockholder value and long-term performance incentives. As such, each member of the Compensation Committee breached his duties pursuant to the committee charter.

283.     Furthermore, as set forth above, the members of Compensation Committee breached their fiduciary duties including their duty of loyalty to the Company by awarding Defendant Erbey one million stock options under the 2007 Compensation Plan that he was ultimately forced to return due to a violation of the Company's stock option plan.  That violation was brought to the Committee's attention by an Ocwen shareholder after which the SEC commenced an investigation into such award.  This was a gross failure of the role and duties of the members of the Compensation Committee and further reflects the dereliction of their duties and control by Defendant Erbey.

284.     As noted in the Company's 2013 and 2014 Proxy Statements:

**Risk Management and Oversight Process**

Our Board of Directors and each of its Committees are involved in overseeing risk associated with the Company. The Board of Directors and the Audit Committee monitor Ocwen's credit risk, liquidity risk, regulatory risk, operational risk and enterprise risk by regular reviews with management and internal and external auditors. In its periodic meetings with the internal auditors and the independent accountants, the Audit Committee discusses the scope and plan for the internal audit and includes management in its review of accounting and financial controls, assessment of business risks and legal and ethical compliance programs. The Board of Directors and the Nomination/Governance Committee monitor the Company's governance and succession risk by regular reviews with management. The Board of Directors and the Compensation Committee monitor the Company's compensation policies and related risks by regular reviews with management. The Board of Directors and the Compliance Committee monitor the Company's regulatory compliance and related risks by regular reviews with management. The Board of Directors' role in risk oversight is consistent with the Company's leadership structure with the President and Chief Executive Officer and other members of senior management, such as our Chief Risk Officer and our Chief Compliance Officer, having responsibility for assessing and managing the Company's risk exposure, and the Executive Chairman, the Board of Directors and its Committees providing oversight in connection with these efforts.

## VI.    DERIVATIVE ALLEGATIONS

### A.    General Derivative Allegations

285.    Plaintiffs bring this action derivatively in the right and for the benefit of Ocwen to redress the breaches of fiduciary duty, waste of corporate assets, unjust enrichment and other wrongful conduct by the Individual Defendants and other Defendants as alleged herein.

286.    Plaintiffs own and have continuously owned common stock in Ocwen beneficially during the period of the wrongdoing alleged herein and are and were shareholders of Ocwen at the time of the transgressions complained of.

287.    Plaintiffs will adequately and fairly represent the interests of Ocwen and its shareholders in enforcing and prosecuting its rights, and has retained counsel experienced in prosecuting this type of action.

2112706.1

288.    The wrongful acts complained of herein have subjected and will continue to subject Ocwen to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

289.    The wrongful acts complained of herein were unlawfully concealed from Ocwen shareholders.

**B.     Plaintiffs have Made Pre-Suit Demands Pursuant to Rule 23.1 and the Florida Business Corporation Act, § 607.07401**

290.    Plaintiff Sokolowski made a pre-suit demand on the Board as required by Fed. R. Civ. P. 23.1. A copy of the Sokolowski First Demand is attached hereto as **Exhibit 1**. The Sokolowski First Demand and the allegations therein are incorporated herein by reference.

291.    Ultimately, after more than four months passed, and with the Board taking no action within 90 days (as required by Chapter 607 of the Florida Business Corporation Act, §607.07401) to even consider the claims set forth in the February Demand Letter, Sokolowski's Counsel was informed on June 13, 1014 that the Board had retained counsel, Carlton Fields Jorden & Burt ("Carlton Fields"), to represent its members (each of the Individual Defendants) in connection with the February Demand Letter.

292.    After further inquiry, Sokolowski's Counsel learned that the Board had retained Sam Salerio, Jr. and the firm Carlton Fields to represent it in connection with the Sokolowski First Demand.  Sokolowski's Counsel then inquired of Mr. Salerio to assess the *bona fides* of the Board's belated response (including the appointment of a so-called special litigation committee or "SLC") and the retention of counsel. The inquiry was made in one of Mr. Sokolowski's Counsel, Mr. Richard Greenfield's, e-mail to Mr. Salerio dated June 27, 2014 as follows:

> I understand from Jason Moff's e-mail of June 13 that your firm has been retained by Ocwen's Board of Directors "to advise the Board on the formation and membership of a [special litigation] committee, to advise the committee with respect to its investigation, and to advise the committee with respect to its

120

recommendation to the Board about its response to the allegations in [my] February 11, 2014 letter" to Ocwen's Board.

In connection with that retention, I would appreciate it if you would kindly send to me a copy of the Board's resolutions establishing the special litigation committee ("SLC"), identifying its members, setting forth its mandate and providing for your firm's retention. Moreover, given the substantial passage of time since my letter to the Board of February 11, I trust that you will be kind enough to provide me with answers to the following questions as soon as possible:

1.    Were you or a representative of your firm present at any portion of any meeting of members of Ocwen's Board of Directors where the Demand Letter was discussed?

2.    What criteria were used by the Board to determine which of its members would be appointed to serve as the members of the so-called SLC?

3.    Who participated in the determination of such criteria?

4.    Were there any factors or facts that the Board considered that might serve to disqualify any individual Ocwen Director from serving on the SLC?

5.    What process did the Board utilize to select those of its members who would be appointed to serve as the members of the SLC?

6.    Did anyone investigate each of the proposed members of the SLC to determine whether there were any facts or circumstances which would disqualify any of such members from serving? If so, who performed such investigation and when?

7.    Has your firm, the SLC and/or Ocwen's Board commenced the investigation of the allegations set forth in the Demand Letter?

8.    If so, when did such investigation commence?

9.    Will your firm and/or the members of the SLC attempt to calculate the extent of the economic and non-economic damages alleged in the Demand Letter?

10.   Will your firm or the SLC be taking any action as to any remedial measures which address any of the wrongdoing alleged in the Demand Letter?

11.   Which persons played a role in the selection of you and/or your firm to advise the Board and/or the SLC?

121

12.    When did you first learn that you and/or your firm were being considered to represent the SLC, the entire Board of Directors or any of the Ocwen Directors in connection with the Demand Letter? From whom did you learn this fact?

13.    What steps were taken to insure that there were no facts or circumstances that might justify disqualification of you and/or your firm from acting as counsel to the SLC or the Board? By whom and when?

14.    Assuming your firm performed a conflict check before being considered for the assignment ultimately accepted by you, when was such conflict check performed and by whom?

15.    Have you or any member of the SLC shared any of the facts that you have uncovered and/or your conclusions relating to the Demand Letter, directly or indirectly, with any member of the Ocwen Board?

I look forward to receiving your responses very shortly.

293.    In turn, despite the fact that the questions posed by Mr. Greenfield addressed the legitimacy of the Board's response, Mr. Salerio wrote back as follows:

Thank you for your email. As you may be aware, our firm's engagement on this matter is recent. We are in the beginning stages of our work. I do not have client authority to respond to the questions you pose below. In candor, I would have a difficult time recommending a response to these requests at this early stage, because our involvement here is recent and many of your questions at least implicate issues of attorney-client privilege and work product that need to be considered.

294.    The issues that Mr. Salerio raised in an attempt to avoid responding to all of the questions were addressed by Mr. Greenfield in his response of July 2, 2014:

Very few of the questions I directed to you implicate issues of privilege or work product, and, even if they do, your responses can easily av[o]id divulging privileged communications and/or work product. They are fact-based questions going to the bona fides of the process used to select the members of the SLC, your firm, *etc*. As such, I cannot imagine that you will be unable to obtain your clients' permission to respond.

295.    Mr. Salerio repeated his refusal to provide any information that could establish the *bona fides* of his appointment or the belated investigation his firm was commencing:

> As noted below, we are not prepared to recommend responding to these requests
> at this early stage or our engagement.  We will be completing some initial work
> over the next week or so, and will reach out to you thereafter.

296.    Despite his promise to provide the factual background for the appointment by the Board of the SLC and retention of counsel, neither Mr. Salerio nor anyone else on behalf of the Board has ever provided *any* of the requested information.   The failure to establish the legitimacy of the Board's purported response to the Sokolowski First Demand is *prima facie* evidence that such response is a sham established solely for the purposes of creating a "whitewash" of the Individual Defendants' wrongdoing and to provide a staging platform for the eventual motions to stay and/or dismiss that have now been filed by defendants in this and other pending shareholder derivative suits.

297.    The sham nature of the SLC and the process undertaken by Carlton Fields in furtherance of a "whitewash" of the wrongful conduct of the Defendants named herein is explained by, *inter alia*, the fact that Carlton Fields, purportedly "independent counsel," was receiving its direction from the Company's conflicted attorneys, including Sean Coffey, Esq. of the law firm of Kramer Levin Naftali & Frankel LLP ("Kramer Levin"), who were also simultaneously counsel for certain Individual Defendants (including Defendant Erbey) in this litigation, as well as counsel for the Company and certain officers and directors in the securities fraud class action, and other litigation.   Indeed, such direction was for the purpose of, as indicated above, establishing a pretext for delay and for seeking an indefinite stay of any shareholder litigation (such as this one) and for an ultimate motion to dismiss based upon an SLC investigation conducted by Board members who were tainted due to their roles in the alleged misconduct.   Particularly members of the audit committee who were appointed to the SLC.   In addition, Carlton Fields was apparently not independent, as it was selected by the Board (including those of the Individual Defendants most culpable in the wrongdoing described

123

herein), rather than by the SLC. The Board and its counsel knew or should have known that, under prevailing circumstances, particularly Carlton Fields' dual representation of both the Board and the SLC, its members should not have appointed Carlton Fields to investigate Plaintiff Sokolowski's demands.[6]

298.    Such appointment of Carlton Fields, seriously conflicted counsel, did not and could not create an atmosphere conducive to an independent review and judgment with respect to Plaintiff Sokolowski's Demands by so-called independent directors, particularly when those same directors were all culpable and had very substantial personal liability for such wrongdoing. Indeed, although the Board could have looked for other means to address such demands to insulate its members decision making process with respect to the demands from the influence of those under suspicion, the Board and Kramer Levin did not do so.  Notwithstanding its dual representation, Carlton Fields was (and remains) willing to wear "two hats" regardless of what is in Ocwen's best interests.[7]  By so acting, it has aided and abetted the Individual Defendants in their underlying defense of Plaintiffs' claims as set forth herein and in their demand letters.

299.    Since its creation by the Board, the SLC has failed to act in the best interests of the Company and has repeatedly allowed counsel for the Company and its officers and directors, including the Individual Defendants named herein, Kramer Levin, to speak on its behalf, despite the fact that such Company counsel owes a duty of undivided loyalty to the very parties that are the subject of Plaintiffs' demands and the claims alleged herein.  As such, Kramer Levin's role in

---

[6] Given its retention by the Board, likely at the recommendation of the Board's counsel, Kramer Levin, and its consultation with Kramer Levin, Carlton Fields, instead of being neutral and objective, was and remains an advocate for the members of Ocwen's Board as of the time it was initially retained. It is no surprise that Carlton Fields would not respond to any of Mr. Greenfield's questions as to the circumstances of its retention.

[7] In light of the absence of *a bona fide* investigation of the demands of Plaintiff Sokolowski and other Ocwen shareholders, the money paid to Carlton Fields for its time and expenses for carrying out its "investigation" has been a waste of the Company's assets.

speaking for the SLC, a committee purportedly comprised of independent and disinterested directors with purportedly separate and independent counsel of its own, constitutes a clear conflict of interest and raises serious doubts as to the SLC's ability to conduct an independent and objective investigation and evaluation of Plaintiffs' demands and the claims herein.

300.    Subsequent to the Sokolowski First Demand and even during the sham (and wholly concealed) SLC process, the Individual Defendants continued their wrongdoing. As referred to above, in August, 2014, Superintendent Lawsky expressed concerns about the way Ocwen was said to have routed insurance fees though one of the Erbey-controlled affiliates of Ocwen after having earlier halted the Company's proposal to acquire the right to service approximately $39 billion in mortgages of Wells Fargo.

301.    In the wake of such ongoing conduct in breach of the fiduciary and other duties of the Individual Defendants, on October 31, 2014, Plaintiff supplemented, *nunc pro tunc*, the Sokolowski First Demand.  A copy of the Sokolowski Second Demand setting forth additional demands is attached hereto as **Exhibit 2**.  The Sokolowski Second Demand and the allegations contained therein are incorporated herein by reference.

302.    Notwithstanding the longstanding efforts of Superintendent Lawsky and the Monitor, Mr. Smith, to eradicate its nefarious business practices, the Board continued with "business as usual." As recently as December 17, 2014, *The Palm Beach Post* reported that Mr. Smith had, once again, complained that the Company had "produced unreliable information about its business practices."

303.    Further, as of February 29, 2016, as announced in Ocwen's 2015 10-K, the Company disclosed the existence of a new investigation commenced by the SEC into the Company's practices regarding fees and expenses charged in connection with liquidated loans

and REO properties.  These practices are directly related to the intertwined businesses of Ocwen, Altisource, AAMC and RESI.

304.    In making the demands set forth in each of the his pre-suit demands on Ocwen's Board, Plaintiff Sokolowski was in no way conceding the disinterestedness or independence of any of the Ocwen directors for all purposes and forever.  Rather, the pre-suit demands were made by Mr. Sokolowski to give the Board the opportunity to cause the Company to assert the claims directly, in the first instance, that Plaintiffs now asserts derivatively.   However, over two years have passed with no action from the Company or the SLC.

305.    In the Sokolowski First Demand, Plaintiff Sokolowski stated:

"Although this letter demands that you cause the Company to sue yourselves, several of your former colleagues on the Board and D&T, my client does not concede your independence for all purposes or going forward (*see Scattered Corp. v. Chicago Stock Exch*, 701 A. 2d 70 (Del. 1997).  Rather, my client is simply giving the Board the initial opportunity to cause Ocwen to commence the demanded litigation itself.

306.    Demands were also made upon the Board of Ocwen by counsel for Hutt and Lowinger.  Those letters, with exhibits, are attached hereto as **Exhibits 3-6**.

C.    **The Board's Rejection of Plaintiffs' Demands**

307.    On March 23, 2015, more than a year after the Sokolowski First Demand, and after steadfastly refusing to provide any information as to the *bona fides* of the SLC, its counsel or its purported investigation, on March 23, 2015 Plaintiffs received a letter from Charles M. Rosenberg of Carlton Fields "Mr. Rosenberg"), counsel to the SLC, announcing that while no conclusion of the Demands was in sight, and, inexplicably, that the SLC's investigation was being stopped altogether, it was "not in the best interests of the Company to proceed with a lawsuit based on your allegations at this time."  A true and correct copy of the March 23, 2015 Demand Refusal letter is attached hereto as **Exhibit 7**.

308.     Specifically, despite the SLC being given the express authority to investigate the claims alleged in the Demands and to make a decision on whether to proceed on Plaintiffs' claims, the SLC decided to "defer" reaching any decision regarding the Demands, halt its "investigation" completely, all without an end-date for when a decision would ever be reached. Thus, more than a year after the Sokolowski First Demand requesting that his claims against the Individual Defendants (and others) be investigated, and for the damages to the Company remedied, the only action to result was the inexplicable indefinite deferment of any decision.  For instance, the March 23, 2015 letter states: "the committee has determined that it will continue to monitor actively the Other Matters and will revisit its decision not to proceed with the claims as these matters proceed and when and if there is a material change in the litigation landscape against the Company."  This indefinite deferment and unjustifiable pretext for no action being taken by the SLC is unrelated to the merits of Plaintiffs' claims and, by the SLC's own admission, it "has come to no such determinations of fact or law."

309.     The Demands describe egregious misconduct by the Individual Defendants, and the fallout from such wrongdoing is affecting the Company's very own viability, as described herein. Plaintiffs have the right to have the investigation into their Demands performed, and a conclusion provided, in a reasonable timeframe and manner so that the damages incurred by the Company can be appropriately remedied. This dilatory tactic by the SLC, represented by seriously conflicted counsel, Carlton Fields, a failure to make any determination as to the merits of Plaintiffs' claims, when it has expressly been given the authority to do so, is not, and could not possibly be in good faith. Accordingly, because the SLC has made the decision to "defer" reaching any conclusion, stop its investigation of the Demands and can give no definitive date for a conclusion, the Plaintiffs' Demands are deemed refused.

127

310.    Furthermore, pursuant to Chapter 607 of the Florida Business Corporation Act, §607.07401 (2) "A complaint in a proceeding brought in the right of a corporation must be verified and allege with particularity the demand made to obtain action by the board of directors and that the demand was refused or ignored by the board of directors for a period of at least 90 days from the first demand unless, prior to the expiration of the 90 days, the person was notified in writing that the corporation rejected the demand, or unless irreparable injury to the corporation would result by waiting for the expiration of the 90-day period."  More than 90 days has elapsed since each of the Plaintiffs' respective demand letters were sent to the Board and, over two years later, it has taken no action either to act upon such' demands nor has it rejected them. As such, Plaintiffs' demands are deemed rejected as a matter of law.[8]

311.    The March 23, 2015 Letter also gives insight into an SLC process that raises serious concerns regarding its good faith and reasonableness.  As outlined in the letter, a three person SLC was purportedly formed on May 14, 2014, comprised of two unnamed directors and defendant Lacy, who lacked the requisite independence and disinterestedness to properly act as an SLC member because he is explicitly implicated in the wrongdoing alleged in the Demands. Thereafter, on February 19, 2015, nine months after the SLC was formed and its purported "investigation" of the Demands was initiated, Defendants Korn and Salcetti were replaced on the SLC with directors Phyllis R. Caldwell ("Caldwell") and DeForest Black Soaries ("Soaries"). Thus, the three person SLC is currently comprised of one member, defendant Lacy, who was directly implicated in and personally liable for the very claims he is tasked with investigating, and two other members, Caldwell and Soaries, who did not partake in the investigation of the

---

[8] Moreover, the sham process set in motion by the Board and Kramer Levin, including the appointment of Carlton Fields, is sufficient grounds alone to demonstrate that Plaintiffs' demands were *de facto* rejected *ab initio*.

demands but, according to the March 23, 2015 letter, were "apprised of the work that the Committee and its counsel have done to date." These deficiencies in the SLC process, together with the unwaivable conflicts of Carlton Fields, partly explain why Plaintiffs were refused at every turn in their requests for the most basic facts regarding the SLC, its formation, etc. and, on their face, preclude an inference of good faith and reasonableness on the part of the SLC and its now halted "investigation."

312.   The SLC's decision to halt the investigation and defer any decision with respect to pursuit of Plaintiffs' claims, and the rationale therefore as set forth in the March 23, 2015 letter, overlooked (a) the harm already caused to Ocwen based upon regulatory fines and penalties imposed and agreed upon, as well as the Company's purchase of its own stock at inflated prices; (b) that the Company is threatened with prejudice because of the SLC's failure to obtain appropriate tolling agreements from the defendants named herein and other potentially culpable parties including its auditor; and (c) the SLC's acquiescence in and *de facto* approval of, *inter alia*, agreements with regulators and others which enable the Defendants to insert provisions into settlement agreements and consent decrees potentially prejudicing the Company's interests, and its ability to seek legal redress, such as has already taken place with respect to the December 2014 Consent Order and Settlement, as outlined above.

313.   On October 29, 2015, counsel for Plaintiff Lowinger wrote to Mr. Rosenberg to inquire as to: (i) what, if any, steps had been taken by the SLC since its March 23, 2015 letter to Plaintiff Lowinger; (ii) if the SLC had not yet taken any material steps to proceed with the investigation, what date or event would cause the SLC to fully investigate the claims; and (iii) whether the SLC had obtained tolling agreements from any potential defendants.

129

314.    On November 3, 2015, Mr. Rosenberg responded informing Plaintiff Lowinger's counsel that, on October 8, 2015, the SLC determined to resume its investigation as a result of material changes in the pending and threatened litigation against the Company. Mr. Rosenberg noted that the SLC anticipated completing its investigation on or about March 31, 2016, but stated that "due to the scope of the investigation and the potential for material developments in the Other Matters, additional time may ultimately be required."    Mr. Rosenberg's letter, however, failed to: (a) state if tolling agreements have been reached with potentially culpable parties to protect Ocwen's claims against them; (b) address either the claims for damages against the Ross Funds relating to Ocwen's purchase of stock from those defendants or the claims arising from the Company already incurring over $180 million in fines and costs arising from Ocwen's settlement of the NYDFS' claims; and (c) address the claim that the Company's entry into the Exculpatory Provision as part of the NYDFS Settlement constituted a breach of fiduciary duty by the Director Defendants or is otherwise void as against public policy.

**VII.    OCWEN'S 2013, 2014 and 2015 PROXY STATEMENTS**

315.    At all relevant times, each of the Individual Defendants, because of their advisory, executive, managerial, and directorial positions, had access to adverse, non-public information about the Company's financial condition and operations, including the wrongdoing alleged herein.

316.    At all relevant times, each of the Individual Defendants, because of their advisory, executive, managerial, and directorial positions, had access to adverse, non-public information about the Company's financial condition and operations, including the wrongdoing alleged herein.  Each of the Individual Defendants, because of their positions of control and authority as officers and directors of Ocwen, directly and/or indirectly, exercised control over the contents of

the various public statements issued by the Company, including Ocwen's 2015 Proxy Statement issued and disseminated by the Director Defendants and in their name.[9]

317.    Upon information and belief, each of the directors serving as of the date of the issuance of Ocwen's 2013, 2014 and 2015 Proxy Statements personally approved the substantive content of the  Proxy Statements and/or indirectly controlled their content, including with respect to the misrepresentations contained therein and omissions therefrom.

318.    Throughout the Relevant Period, the Individual Defendants' public statements, including but not limited to those contained in the Company's annual Proxy Statements filed pursuant to Section 14(a) of the Securities Exchange Act of 1934 for the years 2013, 2014 and 2015, repeatedly summarized defendant Erbey's ownership in the RPT Defendants and falsely misrepresented that defendant Erbey recused himself from any decisions pertaining to any transactions between Ocwen and the RPT Defendants.

319.    On April 3, 2013, Ocwen filed a Proxy Statement pursuant to Section 14(a) of the Securities Exchange Act of 1934 (the "2013 Proxy") stating the following with respect to Defendant Erbey and his relationship with the RPT Defendants:

> Mr. Erbey currently serves as Executive Chairman of Ocwen and Chairman of Altisource, HLSS, Altisource Residential Corporation ("Residential") and Altisource Asset Management Corporation ("AAMC"). As a result, he has obligations to the Company as well as to Altisource, HLSS, Residential and AAMC. As of December 31, 2012, Mr. Erbey owned or controlled more than 13.1% of Ocwen's common stock, 23.4% of Altisource's common stock, 2% of HLSS ordinary shares, 23% of Residential's common stock and 23% of AAMC's common stock. ***Due to the nature of Mr. Erbey's obligations to each of the companies, he recuses himself from decisions pertaining to any related transactions.*** (Emphasis added).

---

[9] Defendant Erbey had resigned from the Board prior to the issuance of the Company's 2015 Proxy Statement but continued to have influence over its contents through his legal counsel and otherwise.

320.    The 2013 Proxy was false and misleading as it failed to disclose to investors that defendant Erbey did not recuse himself from decisions involving the Ocwen Affiliates and in fact, as set forth in further detail herein, approved related party transactions without any involvement or review by the Board or its Committees.

321.    On April 22, 2014, Ocwen filed its 2014 Proxy Statement stating the following with respect to Defendant Erbey and his relationship with the Ocwen Affiliates:

> Mr. Erbey currently serves as Executive Chairman of Ocwen and as non-executive Chairman of Altisource Portfolio Solutions S.A. ("Altisource"), Altisource Residential Corporation ("Residential") and Altisource Asset Management Corporation ("AAMC"). As a result, he has obligations to the Company as well as to Altisource, Residential and AAMC. As of December 31, 2013, Mr. Erbey owned or controlled approximately 13% of Ocwen's common stock, 26% of Altisource's common stock, 5% of Residential's common stock and 27% of AAMC's common stock. As of December 31, 2013, Mr. Erbey also held 4,620,498  options to purchase Ocwen's common stock, of which 2,845,498 were exercisable, and he held 873,501 options to purchase Altisource common stock, 291,164 options to purchase Residential common stock and 87,350 options to purchase AAMC common stock, all of which were exercisable. Mr. Erbey is also the non-executive Chairman of Home Loan Servicing Solutions ("HLSS") and owned approximately 1% of HLSS' ordinary shares as of December 31, 2013. We do not consider Mr. Erbey to have a direct or indirect material interest under applicable Securities and Exchange Commission rules in our transactions with HLSS. ***Due to the nature of Mr. Erbey's obligations to each of the companies, he recuses himself from decisions pertaining to any transactions between them.*** (Emphasis added).

322.    The 2014 Proxy was false and misleading as it failed to disclose to investors that Erbey did not recuse himself from decisions involving the Ocwen Affiliates and, in fact, as set forth herein, approved related party transactions without any involvement or review by the Board or its Committees, including but not limited to transactions involving Altisource and Beltline with respect to the provision of force-placed insurance and transactions and wrongdoing involving HLSS as outlined in the SEC Cease and Desist Order with HLSS entered in October 2015, as more fully described herein.

323.     Ocwen issued the false and deceptive 2014 Proxy Statement just one day after the NYDFS raised concerns pertaining to the possibility of self-dealing in an April 21, 2014 letter. As more fully discussed herein at ¶166, the April 21, 2014 letter raised concerns and questions surrounding Ocwen's use of Altisource's subsidiary, Hubzu, which serves as a real estate auction site for Ocwen properties.

324.     On or about May 12, 2015, the Individual Defendants, except for Erbey and Ross who were no longer members of the Board, caused the issuance and dissemination of Ocwen's Notice of Annual Meeting and Proxy Statement ("2015 Proxy Statement") announcing and soliciting shareholder votes in connection with Ocwen's Annual Meeting of Shareholders held on June 2, 2015.   Despite federal disclosure requirements, the 2015 Proxy Statement was deceptive and failed to disclose the facts set forth herein in neutral, non-pejorative terms including the particularized wrongdoing of and neutral facts about the Board member Defendants and related-company relationships as described herein, including the mismanagement of the Company's operations and covering up the Company's lack of internal controls, failure to exercise appropriate oversight duties, failure to take action to remedy the charging of unauthorized and excessive fees, deceiving consumers regarding alternatives to foreclosures of their homes and providing false and otherwise deceptive information about the status of foreclosure proceedings, permitting in-house and outside counsel to stonewall investigators of the CFPB, the conduct of defendant Erbey and others in the Company's senior management, directly and through the Company's Litton Loan Servicing LP subsidiary, the practices which required their mortgage borrowers to purchase force-placed insurance at excessive cost while taking kickbacks from the insurers, the failure of the non-management members of the Board to fulfill their most fundamental fiduciary duties by, *inter alia*, providing superficial and

133

perfunctory services as directors and devoting insufficient time to the Company's business, as well as the extent to which each of the director nominees who had served during the period of alleged wrongdoing  had subjected the Company to class action and other litigation as a result of the wrongdoing described herein.

325.     Furthermore, the Proxy Statement failed to disclose key facts including that Ocwen had opted to pursue business relationships with the related companies despite known facts regarding conflicts of interests and regulatory shortcomings that would result from those dealings.   Specifically, the Defendants failed to disclose, *inter alia*, that Altisource's REALServicing platform was inferior to other servicing platforms that were not owned by the related companies because it prevented Ocwen from testing for all of the NMS compliance protocols and also resulted in the letter-backdating issues; the related company business dealings resulted in regularly giving borrowers incorrect and outdated information, sending borrowers backdated letters, unreliably tracking loans for investors and generally failed to maintain accurate records; because of comingling of employees and resources between Ocwen and the Erbey controlled related companies, Ocwen did not have the appropriate or sufficient controls in place to prevent the Company's related-company transactions from causing harm to homeowners and to Ocwen shareholders; the related companies were charging Ocwen inflated rates that were up to three times larger than they were charging non-Ocwen related customers for the purpose of improperly funneling revenue to the related companies for the benefit of Defendant Erbey and others who held substantial stakes in the related companies; and that Ocwen had no written policy that required potentially conflicted employees, officers, or directors to recuse themselves from involvements in transactions with the related companies or, to the extent any such policies were in place, they were disregarded or followed only on an ad-hoc basis.; and, that the Chief

Risk Officer of Ocwen was also simultaneously serving as the chief risk officer of Altisource, including in connection with numerous related-party transactions where Ocwen's and Altisource's interests were in conflict.   Had the facts described herein been disclosed in the 2015 Proxy Statement, Ocwen's shareholders would have been able to make an informed decision about reelecting the director defendants Faris, Korn, Lacy, Wish and Salcetti, each of whom were reelected in 2015 and together constitute a majority of the current Board in control of the Company.

326.    The 2015 Proxy Statement, while disclosing the creation of a Special Litigation Committee, failed to disclose the content of the demand letters the Committee was tasked with evaluating, the existence of the shareholder derivative litigation, or otherwise outline the alleged wrongdoing asserted by Ocwen shareholders against Defendant Erbey and the director defendants named herein who were nominated for reelection in 2015. In addition, the Proxy Statement identifies the members of the SLC as being Messrs. Lacy, Soaries and Ms. Caldwell, while failing to disclose that Mr. Soaries and Ms. Caldwell were only substitute appointments to the SLC on or about January 21, 2015, a full nine months after the SLC was originally established, and more importantly, after much of the SLC's investigation had been done under the direction of interested directors who are named as Defendants herein.  The Proxy Statement omits the fact that the SLC, as originally, constituted, consisted of Lacy, a named defendant in the shareholder derivative litigation, and two unnamed members who were replaced without explanation.

327.    The 2015 Proxy Statement, like the 2013 and 2014 statements, sets forth various representations that the Board (including each of the nominees named as Defendants herein) followed the Company policies, including the Code of Business Conduct and Ethics, the Code of

Ethics for Senior Financial Officers, the Corporate Governance Guidelines and each of the Committee Charters identified above. Indeed, each of these Company policies and Committee Charters was specifically incorporated by reference in the 2013, 2014 and 2015 Proxy Statements, which directed shareholders to Ocwen's website to view these Company policies and guidelines in their entirety. Each of the representations, as set forth in these Company policies and identified above, was false and misleading so as to lead Ocwen's shareholders to believe that the nominees for re-election who are named as Defendants herein, followed the Company policies and fulfilled their fiduciary duties. As outlined herein, this representation was false and misleading as the Individual Defendants routinely failed to follow Company policies and otherwise grossly mismanaged the Company and breached their fiduciary duties.

328. In addition, the 2015 Proxy Statement made various representations regarding the Independent Review Committee, established in February, 2015, and its written charter, pursuant which the Committee purportedly provides assistance to the Board in connection with the review, approval and oversight of related party transactions pursuant to the Company's Related Party Transaction Approval Policy. The 2015 Proxy Statement represents, with respect to the Company's Risk Management and Oversight Process, that "[t]he Independent Review Committee reviews and approves related party transactions." These representations were intended to and did convey to shareholders that an independent review and analysis occurred with respect to related party transactions pursuant to which the interests of Ocwen and its shareholders were protected when, in fact, their interests were not and had not been protected in connection with numerous related party transactions as outlined herein. The 2015 Proxy Statement failed to disclose that there had been no written policies or procedures in place regarding related party transactions and that any policies or practices that did exist with respect

2112706.1

to the recusal of conflicted directors were flawed, inconsistent and ad hoc, at best.  The 2015 Proxy Statement failed to disclose Ocwen's failure to devise and maintain appropriate internal controls sufficient to ensure that the Executive Chairman recused himself from all approvals regarding potential conflicts of interest in Ocwen's related party transactions.

329.   The 2015 Proxy Statement further failed to disclose that Ocwen had been erroneously valuing its financing liability on certain mortgage servicing rights sold to HLSS, and that Ocwen had materially misstated its financial results for the last three quarters in 2013 and the first quarter of 2014.   These Proxy Statements failed to disclose the fact, which was known or should have been known to the Individual Defendants, that these misstatement resulted from an internal accounting controls failure that caused Ocwen to rely on a valuation methodology that did not conform to GAAP.  Specifically, Ocwen relied on HLSS' improper valuation of rights to mortgage servicing rights ("Rights to MSRs") that were acquired from Ocwen and still accounted for by Ocwen as a financial liability.  The Proxy Statements failed to disclose that although it reported that it accounted for the Rights to MSRs at amortized cost and that the carrying value of the Rights to MSRs "approximate[d] fair value," the valuation for the Rights to MSRs assigned by HLSS was not a fair value estimate.

330.   Ocwen's Board, management and its Audit Committee failed to adequately review whether HLSS's valuation methodology, upon which Ocwen relied, complied with GAAP and failed to give sufficient independent consideration to the automatic use of estimates derived from HLSS's valuation methodology.

## VIII.   DAMAGES SUFFERED BY OCWEN

331.   The Board and senior management of Ocwen, including Defendant Erbey, in particular, failed to act in accordance with any legitimate exercise of business judgment and consistently with the fiduciary duties owed by them to Ocwen and its shareholders.

332.    Ocwen's directors utterly failed to implement validly functioning reporting and controls to prevent Ocwen's serious and ongoing violations of federal, state and local consumer financial protection laws, rules and regulations and abusive tactics and practices. Through the domineering influence of Defendant Erbey, the Board acquiesced in the Company's reckless acquisition of large portfolios of serviced mortgages which it was functionally ill-equipped to manage. Notwithstanding the public disclosure of much of the wrongdoing set forth herein, Ocwen's Board has failed to take steps to make fundamental and meaningful changes in the Company's culture and corporate governance consistent with the fiduciary duties of the members of Ocwen's Board.  Indeed, even the presence of new directors has not been able to reverse the courses of action set in motion by the Individual Defendants. As a result, the wrongdoing, and resultant damages are continuing to escalate and Defendant Erbey continues to improperly benefit from his continuing relationship with Ocwen through its Erbey-controlled affiliates.

333.    As a result of the Individual Defendants' breaches of their fiduciary duties as described herein, Ocwen has already settled claims with regulatory agencies throughout the country in an amount exceeding of $2 billion to date, and has been exposed and continues to be exposed to substantial injury to its reputation and corporate goodwill, as well as to ongoing governmental investigations and enforcement actions, potential criminal and civil liability, including investor lawsuits and potential loss of licenses and approvals necessary to engage in the servicing and lending businesses.  Moreover, as a consequence of the December 22, 2014 settlement with the NYDFS, the Company is being required to pay $150 million in penalties and other compensation and will have to absorb substantial additional expenses, probably well-exceeding $150 million, as a result of the compliance-related aspects of such settlement.

2112706.1

334.    As a direct result of the wrongdoing referred to herein and the Individual Defendants' concealment thereof in filings with the SEC and otherwise, investors have been defrauded and the Company has been named as a defendant in the Ocwen Securities Class Action.

335.    The Company also has been caused to expend tens of millions of dollars in the defense of pending securities and consumer class action lawsuits and the ongoing and concluded investigations referred to herein. As a direct consequence, Ocwen has incurred and will continue to incur substantial costs of defending against such litigation and investigations and, ultimately, resolving them with Ocwen's funds, despite the fact that the underlying wrongdoing was and is the responsibility of the Individual Defendants named herein.

336.    Ocwen has suffered and will continue to suffer substantial harm to an extent not yet fully capable of determination, including the significant deterioration in the market value of the Company.

337.    The wrongdoing of each of the Individual Defendants and RPT Defendants, as described herein, was an essential link in the damages caused and being caused to Ocwen and its shareholders as a result thereof.  As a direct and proximate result of such wrongdoing, Ocwen has expended and will continue to expend large sums of money to comply with subpoena requests and to cooperate with the CFPB, NYDFS, CDBO and other regulatory investigations, the ongoing monitoring and to conduct any further investigations and respond to further requests for information that may be necessary.   Additionally, an adverse finding by any of the regulatory agencies investigating Ocwen could result in additional fines, sanctions and disciplinary actions against the Company.  Moreover, the investigation of at least certain of the underlying claims and the manner of the investigation purportedly being carried out by the members of the SLC,

139

aided and abetted by the related companies, has been a waste of the Company's assets since such investigation was not and is not for Ocwen's benefit but solely for the benefit of the Individual Defendants who are the alleged wrongdoers.

338.    For a period of many years, Ocwen's senior management and members of the Board became knowledgeable of, but nevertheless concealed, definitive and material information with respect to the Company's repeated violations of federal and state consumer financial protection laws and regulations, conflicts of interest and other wrongful conduct as described herein.   By such concealment, the Individual Defendants have subjected the Company to additional investor litigation and massive consumer and other claims.

339.    Because the Company's Board suffers massive conflicts of interest due to the personal culpability of Defendant Erbey and other members of the Board, the members of the Board are not capable of advancing solely the Company's interests and not their own.   Based upon the facts and circumstances described herein, it is clear that the members of Ocwen's Board are not dealing with Plaintiffs' claims objectively, independently, and solely in the Company's best interests.   Indeed, they, through their already-conflicted counsel, have caused the formation of the SLC (initially, solely from among the Director Defendants), purportedly to carry out unbiased and independent investigations of the wrongdoing alleged in Plaintiffs' pre-suit demands and those of other Ocwen shareholders.

340.    Ocwen has been severely damaged by these repeated revelations of misconduct with its stock price falling by more than 73% in 2014 alone, ending the year at only $15 per share.  As of February 5, 2015, Ocwen shares traded as low as $7.66 per share. As of the close of trading on March 7, 2016, its shares traded at $2.76 per share, reflecting the continuing deterioration of the Company as a result of years of misconduct by the Individual Defendants.

2112706.1

341.     Should the Company's interests continue to be represented as they are at present, Ocwen will be irreparably harmed.

## IX.     CAUSES OF ACTION

### COUNT I

(For Violations of §14(a) of the Exchange Act against the Director Defendants)

342.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.  They make such claims individually and derivatively on behalf of Ocwen.

343.     The claims asserted herein arise from the Director Defendants' violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 in connection with the issuance of the Company's Proxy Statements for the 2013, 2014 and 2015 Annual Meetings of Shareholders and such Defendants' corruption of the Company's suffrage process during such years.

344.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of ant security (other than an exempted security)registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

345.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

346.    Here, Ocwen's 2013, 2014 and 2015 Proxy Statements disseminated during the Relevant Period violated § 14(a) and Rule 14a-9 because they omitted material facts or misrepresented material facts.  The 2013, 2014 and 2015 Proxy Statements were reviewed and issued by the Director Defendants in their names, and in the exercise of reasonable care, the Director Defendants issued and disseminated each of the Proxy Statements at issue should have known that they were each materially false and misleading particularly in connection with the proposed re-election of Defendants Faris, Korn, Lacy, Wish and Salcetti.

347.    Ocwen shareholders voting in the annual meetings of shareholders as to their re-election were entitled to know the neutral, non-pejorative, material facts regarding their conduct and that of Defendant Erbey in connection with the Company's 2013 and 2014 Proxy Statements.

348.    The misrepresentations of material facts in and omission of material facts from Ocwen's 2013, 2014 and 2015 Proxy Statements were an essential link in, *inter alia,* the re-election of the director Defendants in such years,  the accomplishment of the continuation of the Individual Defendants' allowance of self-dealing transactions and relationships which continued to harm Ocwen, the concealment of Defendant Erbey's involvement in approving and forcing upon the Board the self-dealing transactions involving the Ocwen Affiliates, and the misstatement of Ocwen's net income by relying on related-parties' improper valuation methodologies for the purpose of personally profiting off the related party transactions at the expense of Ocwen and its shareholders.

349.    The omissions of facts from and the false and misleading statements in the 2013, 2014 and 2015 Proxy Statements were material because a reasonable shareholder would have considered them important in deciding how to vote on the various matters set forth in the Proxy

142

Statements for shareholder action, particularly the re-election of Defendants Faris, Korn, Lacy, Wish and Salcetti. In addition, a reasonable shareholder would consider the omitted information as significantly altering the "total mix" of information made available in the respective Proxy Statements.

350.    The Company was damaged and the corporate suffrage process was corrupted as a result of the material misrepresentations and omissions in Ocwen's 2013, 2014 and 2015 Proxy Statements.

## COUNT II

(Against the Ross Fund Defendants for Violation of Section 20A(a) of the Exchange Act)

351.    Plaintiffs repeat and re-allege each of the allegations set forth above as if fully set forth herein.

352.    This Count is brought pursuant to Section 20A(a) of the Exchange Act derivatively on behalf of Ocwen against the Ross Fund Defendants based upon their September 2013 sale of Ocwen common stock on the open market and their July 2014 sale of Ocwen common stock to the Company while in possession, through Defendant Ross, of materially adverse non-public information concerning the Company's fiscal quarters ending June 30, 2013 and June 30, 2014, respectively, and the Company's operations more generally during those time periods, which had not previously been disclosed publicly.

353.    Defendant Ross served as a member of the Company's Board and was privy to the Company's material non-public information and also served as a representative of the Ross Fund Defendants and, therefore, Defendant Ross's knowledge of any material non-public information may be imputed to the Ross Fund Defendants.

143

354.    The Ross Funds' sale of Ocwen common stock constituted a "manipulative and deceptive device" prohibited by Section 10(b) of the Exchange Act (15 U.S.C. §78j(b)) and Rules 10b-5 and 10b5-1 promulgated thereunder by the SEC (17 C.F.R. §§240.10b- 5 and 240.10b5-1) because Defendant Ross had a fiduciary relationship with Ocwen and it involved: (a) the sale of a security of Ocwen, (b) on the basis of material nonpublic information about Ocwen, (c) in breach of a duty of trust or confidence that Ross and the Ross Funds and Defendant Ross owed directly, indirectly, or derivatively, to Ocwen and the shareholders of Ocwen.

355.    Ocwen, contemporaneously with the Ross Fund Defendants' sales, acquired Ocwen common stock which it would not have purchased but for Defendant Ross' service as an Ocwen director.

356.    Ocwen has been damages and pursuant to Section 20A(b)(1), is entitled to recover the profits gained or loss avoided in the transaction by the Ross Fund Defendants.

357.    This claim for relief has been brought within five years after the date of the last transaction which is the subject of the violation.

## COUNT III

(Against The Director Defendants for Breach of Fiduciary Duty, Waste of Corporate Assets Gross Mismanagement and Breach of Duty of Loyalty)

358.    Plaintiffs repeat and re-allege each of the allegations set forth above as if fully set forth herein.

359.    The Director Defendants all owed and/or owe fiduciary duties to the Company and its shareholders to exercise candor, good faith and loyalty.  By reason of their fiduciary relationships, the Director Defendants specifically owed and owe Ocwen the highest obligation of good faith and loyalty in the management and administration of the affairs of the Company,

144

including the oversight of Ocwen's compliance with federal and state consumer financial protection laws and regulations, avoidance of conflicting loyalties and business relationships and compliance with company Codes of Conduct and tenants of corporate governance. The Director Defendants breached their fiduciary duties by failing to comply with federal and state consumer protection financial laws and regulations, as well as the Company's own Codes of Conduct, subjecting the Company to substantial penalties and fines, liabilities to investors and otherwise forcing the Company to adhere to additional and more stringent consumer protection laws than other mortgage servicing companies.

360.    Each member of the Director Defendants had specific fiduciary duties as defined by the Company's key corporate governance documents and principles, and as set forth above, they largely ignored. Had they been discharged in accordance with the Board's very specific obligations as set forth therein, the misconduct and consequent harm to the Company would not have occurred.

361.    The Director Defendants further breached their fiduciary duties owed to the Company by failing to act in good faith, in the best interests of Ocwen and with the care an ordinarily prudent person in similar position would exercise in connection with the Company's repurchasing Ocwen common stock from the Ross Funds and through Ocwen's Stock Repurchase Program when the Director Defendants knew or should have known that the purchases were unwarranted and the prices paid excessive in light of the undisclosed problems at Ocwen.

362.    The Director Defendants, primarily due to their fealty to Defendant Erbey whose interests they put before those of the Company, consciously violated their corporate responsibilities and intentionally breached their fiduciary duties to protect the rights and interests

145

of Ocwen and its shareholders.  These breaches of fiduciary duty include, but are not limited to, allowing materially inadequate controls over the Company's policies and practices and the effectiveness of the Company's financial reporting with respect to, among other things, the way Ocwen accounted for the sale of mortgage-servicing rights to related company HLSS, as well as participating in and/or allowing Defendant Erbey to engage in self-dealing transactions at the expense of borrowers, mortgage investors, the Company itself and Ocwen shareholders.

363.   The Director Defendants further breached their fiduciary duties by misrepresenting the Company's business operations and financial condition in Form 10-Qs and Form 10-Ks and other documents filed with the SEC, thereby subjecting the Company to the Securities Class Action and multiple government investigations.

364.   The Director Defendants further breached their fiduciary duties by allowing the Company to be downgraded by Moody's as both a primary servicer of subprime residential mortgage loans and as a special servicer of residential mortgage loans and by allowing the Company's securities to be at risk of delisting due to the failure to timely filed Ocwen's Form 10-K and Annual Reports.

365.   The Director Defendants also wasted corporate assets by repeatedly failing to comply with various federal and state consumer financial protection laws, thus, causing the Company to incur millions of dollars of fines and penalties, as well as establishing and funding the sham SLC proceeding, the only potential beneficiary thereof being the Individual Defendants.

366.   The Director Defendants further wasted corporate assets by approving and/or allowing the Company to engage in Defendant Erbey's self-dealing transactions with Ocwen Affiliates, which resulted in Defendant Erbey improperly receiving numerous and very

146

substantial unjustifiable benefits and payments to the detriment of the Company and its shareholders.

367.   As a direct and proximate result of the Individual Defendants' conscious failure to perform their fiduciary obligations, gross mismanagement and misconduct as alleged herein, they have caused the Company to waste valuable corporate assets, unjustly enrich Defendant Erbey and the related-party entities and expend Ocwen's corporate funds unnecessarily.

**COUNT IV**

(Against the Director Defendants For Breaches of Fiduciary Duty
With Respect to the Exculpatory Provision Contained in the NYDFS Settlement)

368.   Plaintiffs repeat and re-allege each of the allegations contained above as if fully set forth herein.

369.   Plaintiffs bring this claim derivatively on behalf of Ocwen against the Director Defendants with respect to the Exculpatory Provision contained in the NYDFS Settlement.

370.   The Director Defendants owed Ocwen a duty to act in good faith, with the care an ordinarily prudent person in a like position would exercise in similar circumstances and in a manner he or she reasonably believes to be in the best interests of the Company.

371.   Including the Exculpatory Provision within the NYDFS Settlement entered into in December 2014 which, unless set aside, could prevent the Company from obtaining reimbursement from the Director Defendants or others with respect to the $150 million Ocwen was required to pay pursuant to the NYDFS Settlement constituted a breach of the duties which the Director Defendants owed to the Company and an improper and unjustified personal benefit to those of the Director Defendants covered by the Exculpatory Provision.

372.   The Director Defendants do not qualify for the safe harbor from liability afforded by Fla. Stat. §607.0831 because, among other things, the Exculpatory Provision of the NYDFS

147

Settlement agreement was neither approved by a vote of disinterested shareholders nor was it fair and reasonable to Ocwen at the time the transaction was authorized by the self-interested and conflicted Board.

373.    Ocwen has been damaged by the Exculpatory Provision contained in the NYDFS Settlement to the extent it prevents the Company from seeking reimbursement or indemnification and is entitled to an order declaring the Exculpatory Provision invalid or, in the alternative, recovery of the Company's damages from that breach of duty to the extent the relevant provision is deemed enforceable or not contrary to public policy.

## COUNT V

(Against the Officer Defendants for Breach of Fiduciary Duty)

374.    Plaintiffs repeat and re-allege each allegation contained above as if fully set forth herein.

375.    Plaintiffs bring this claim derivatively on behalf of Ocwen against the Officer Defendants for breach of fiduciary duty.

376.    The Officer Defendants all owed and/or owe fiduciary duties to the Company and its shareholders to exercise candor, good faith and loyalty.  By reason of their fiduciary relationships, the Officer Defendants specifically owed and owe Ocwen the highest obligation of good faith and loyalty in the management and administration of the affairs of the Company, including the oversight of Ocwen's compliance with federal and state consumer financial protection laws and regulations, avoidance of conflicting loyalties and business relationships and compliance with company Codes of Conduct and tenets of corporate governance.  The Officer Defendants breached their fiduciary duties by failing to comply with federal and state consumer protection financial laws and regulations, as well as the Company's own Codes of Conduct,

subjecting the Company to substantial penalties and fines, liabilities to investors and otherwise forcing the Company to adhere to additional and more stringent consumer protection laws than other mortgage servicing companies.

377. Each member of the Officer Defendants had specific fiduciary duties as defined by the Company's key corporate governance documents and principles, and as set forth above, they largely ignored. Had they been discharged in accordance with the very specific obligations as set forth therein, the misconduct and consequent harm to the Company would not have occurred.

378. The Officer Defendants further breached their fiduciary duties owed to the Company by failing to act in good faith, in the best interests of Ocwen and with the care an ordinarily prudent person in similar position would exercise in connection with the Company's failure to implement and maintain proper internal controls, accurate reporting mechanisms for financial results, and inability to comply with requirements, including GAAP.

379. The Officer Defendants, primarily due to their fealty to Defendant Erbey whose interests they put before those of the Company, consciously violated their corporate responsibilities and intentionally breached their fiduciary duties to protect the rights and interests of Ocwen and its shareholders. These breaches of fiduciary duty include, but are not limited to, allowing materially inadequate controls over the Company's policies and practices and the effectiveness of the Company's financial reporting with respect to, among other things, the way Ocwen accounted for the sale of mortgage-servicing rights to related company HLSS, as well as participating in and/or allowing Defendant Erbey to engage in self-dealing transactions at the expense of borrowers, mortgage investors, the Company itself and Ocwen shareholders.

380.    The Officer Defendants further breached their fiduciary duties by misrepresenting the Company's business operations and financial condition in Form 10-Q's and Form 10-K's and other documents filed with the SEC, thereby subjecting the Company to the Securities Class Action and multiple government investigations.

381.    The Officer Defendants further breached their fiduciary duties by allowing the Company to be downgraded by Moody's as both a primary servicer of subprime residential mortgage loans and as a special servicer of residential mortgage loans and by allowing the Company's securities to be at risk of delisting due to the failure to timely filed Ocwen's Form 10-K and Annual Reports.

382.    The Officer Defendants also wasted corporate assets by repeatedly failing to comply with various federal and state consumer financial protection laws, thus, causing the Company to incur millions of dollars of fines and penalties, as well as establishing and funding the sham SLC proceeding, the only potential beneficiary thereof being the Individual Defendants.

383.    The Officer Defendants further wasted corporate assets by approving and/or allowing the Company to engage in Defendant Erbey's self-dealing transactions with RPT Defendants, which resulted in Defendant Erbey improperly receiving numerous and very substantial unjustifiable benefits and payments to the detriment of the Company and its shareholders.

384.    As a direct and proximate result of the Officer Defendants' conscious failure to perform their fiduciary obligations, gross mismanagement and misconduct as alleged herein, they have caused the Company to waste valuable corporate assets, unjustly enrich Defendant Erbey and the related-party entities and expend Ocwen's corporate funds unnecessarily.

## COUNT VI

(Against the Individual Defendants for Contribution)

385.    Plaintiffs repeat and re-allege each allegation contained above as if fully set forth herein. Plaintiffs bring this claim derivatively on behalf of Ocwen against the Officer Defendants for contribution under Florida law with respect to damages suffered by the Company arising out of and in connection with the NYDFS Settlement.

386.    The Officer Defendants are joint and severally liable for damage caused to Ocwen arising out of and in connection with NYDFS Settlement and events leading up to it. Ocwen as a corporate entity can only act through its representatives, which included the Officer Defendants who through their deliberate and willful actions caused Ocwen to be subject to damages pursuant to the NYDFS Settlement, and their wrongful conduct underlying it. Accordingly, the Officer Defendants are jointly and severally liable to Ocwen.

387.    Ocwen has paid more than its *pro rata* share of damages caused to the Company arising out of and in connection with the NYDFS Settlement and is, therefore, entitled to contribution from the Officer Defendants.

388.    The Exculpatory Provision contained in the NYDFS Settlement to the extent it applies to these claims against the Officer Defendants is unenforceable because it is contrary to public policy and, as well, because it was not properly approved by either Ocwen's directors or shareholders and, therefore, does not preclude contribution from the Individual Defendants.

## COUNT VII

(Against The Individual Defendants for Unjust Enrichment)

389.    Plaintiffs repeat and re-allege each of the allegations set forth above as if fully set forth herein.

151

2112706.1

390.    Each of the Individual Defendants was and is being unjustly compensated by Ocwen with compensation packages and otherwise despite the failure of their stewardship of the Company and their personal implication in the wrongdoing set forth herein.

391.    In addition, as set forth above, on various dates beginning in November 2012 and ending in November, 2013, Defendants Erbey, Wish and Ross sold shares of Ocwen stock at fraudulently inflated prices for proceeds in excess of $200 million while in possession of material inside information not disclosed to Ocwen's shareholders or the investing public generally.  As such, Defendants Erbey, Wish and Ross were unjustly enriched.

392.    Moreover, Defendant Erbey was unjustly enriched through the direct and indirect compensation and other improper benefits he received as Chairman of the four Ocwen related-party transaction entities with which Ocwen conducted business, despite Defendant Erbey's conflicts of interests – namely, RESI, Altisource, AAMC and HLSS.

393.    Defendant Erbey profited unjustly from business directed to the foregoing entities as described above, and has retained such profits.

394.    The Individual Defendants should be required to account for and repay the Company therefor together with their earnings thereupon.

395.    The Individual Defendants should be enjoined from directly or indirectly receiving and retaining any unjustly paid compensation or any unjust benefits received.

## COUNT VIII

(Against the Individual Defendants for Breach of the Duty of Candor)

396.    Plaintiffs repeat and re-allege each of the allegations set forth above as if fully set forth herein.

397.    Each of the Individual Defendants, at the time of the issuance and dissemination of the Company's 2013, 2014 and 2015 Proxy Statements, the Company's year-end and

152

quarterly SEC filings on Forms 10-K and 10-Q, respectively, and the Company's Form 8-K reports, filed during the Relevant Period, by reason of the fact that such filings were and are materially false and misleading, as described herein, breached his or her respective duties of disclosure and candor owed to Ocwen, Plaintiffs, and the Company's other shareholders.

398.    For the reasons set forth with respect to Plaintiffs' claims, they are entitled to relief and such damages as they may prove at trial.

## COUNT IX

(Against the Individual Defendants for Indemnification)

399.    Plaintiffs repeat and re-allege each allegation contained above as if fully set forth herein. Plaintiffs bring this claim derivatively on behalf of Ocwen against the Individual Defendants for indemnification under Florida law with respect to damages suffered by the Company arising out of and in connection with the NYDFS Settlement and otherwise as described herein.

400.    As a corporate entity that can only act through its representatives, the Company is without fault and is merely vicariously, constructively, derivatively or technically liable for the wrongful acts of the Individual Defendants.

401.    The Individual Defendants are at fault as a result of engaging in a wrongful course of conduct which resulted in damage to the Company in connection with the NYDFS Settlement and otherwise as described herein.

402.    The Individual Defendants as officers and directors of Ocwen owed and owe fiduciary duties to the Company and, therefore, a special relationship exists between Ocwen and the Individual Defendants.

2112706.1

403.    Ocwen is entitled to be indemnified by the Individual Defendants for all damages arising out of and in connection with the NYDFS Settlement and otherwise as described herein.

404.    The Exculpatory Provision contained in the NYDFS Settlement to the extent it applies to these claims against the Individual Defendants is unenforceable because it is contrary to public policy or not properly approved by either Ocwen's directors or shareholders and, therefore, does not preclude indemnification from the Individual Defendants.

## COUNT X

(Against the RPT Defendants for Aiding and Abetting The Individual Defendants' Breaches of Fiduciary Duty)

405.    Plaintiffs repeat and re-allege each of the allegations set forth above as if fully set forth herein

406.    The RPT Defendants knew and substantially assisted in the wrongful conduct which resulted in the breaches of the Individual Defendants' respective duties of loyalty to Ocwen by, *inter alia*, proposing and entering into arrangements and conspiring with Ocwen to funnel to Defendants Altisource and Beltline improper force-placed insurance fees.  As such, the RPT Defendants should be held accountable for the wrongful conduct at issue.

407.    Defendant Altisource, through Defendant Erbey and otherwise, additionally knew of and substantially assisted the wrongful conduct alleged by charging inflated Hubzu auction, appraisal and other fees to Ocwen which resulted in the breaches of the Individual Defendants' fiduciary duties owed to Ocwen to lawfully operate the Company's business and comply with all regulatory requirements and consent decrees.

408.    The RPT Defendants unjustly profited through the wrongful conduct set forth herein.

154

409.    The Individual Defendants owed fiduciary duties to Ocwen, including the duties of good faith, due care, candor and loyalty, among others.  The Individual Defendants breached those duties, and the RPT Defendants, with knowledge of those breaches through, among other things, the common ownership and control by Defendant Erbey, the ownership of the stock in the RPT Defendants by Individual Defendants and the Individual Defendants' role as directors and officers of Ocwen, as well as Altisource's knowledge of pricing for comparable services, HLSS' continuous interested party agreements entered into with Ocwen, and RESI and AAMC's deriving of substantial business in the form of fees through their oversight and control of distressed mortgage portfolios controlled by Ocwen, the RPT Defendants provided substantial assistance of those breaches and aided and abetted the Individual Defendants in connection therewith, and as such, are liable to Ocwen for its damages.

## COUNT XI

(Against the RPT Defendants and Defendant Beltline for Unjust Enrichment)

410.    Plaintiffs repeat and re-allege each allegation contained above as if fully set forth herein.

411.    The RPT Defendants received improper fees paid by the Company for, *inter alia*, their roles pursuant to the self-dealing interested-party transactions from which they derived substantial compensation and monies from.  Defendant Beltline received improper fees paid by the Company for, *inter alia*, in connection with the improper funneling of force-placed insurance commissions.  Defendants Altisource, HLSS and Beltline have avoided having to pay a fine in connection with the NYDFS Settlement which, instead, is being borne entirely by the Company.

412.    It would be unconscionable and against the principles of justice, equity and good conscience for RPT Defendants and Defendant Beltline to retain these improper fees and

155

commissions and to allow Ocwen to bear the full fine imposed as a result of the wrongful conduct of the RPT Defendants and Defendant Beltline.

413.    Accordingly, an order should be entered compelling RPT Defendants and Defendant Beltline to disgorge those improper fees and commissions to Ocwen.

## COUNT XII

(Against RPT Defendants and Defendant Beltline for Contribution)

414.    Plaintiffs repeat and re-allege each allegation contained above as if fully set forth herein.

415.    Plaintiffs bring this claim derivatively on behalf of Ocwen against the RPT Defendants and Defendant Beltline for contribution under Florida law with respect to damages suffered by the Company arising out of and in connection with the NYDFS Settlement and the underling wrongful conduct underlying it.

416.    The RPT Defendants and Defendant Beltline are jointly and severally liable for the damage caused to Ocwen arising out of and in connection with the NYDFS Settlement and the underling wrongful conduct underlying it.  The RPT Defendants and Defendant Beltline conspired with Ocwen in not only arranging the improper force-placed insurance agreement and Hubzu auction fees at above market rates as alleged by the NYDFS.

417.    Ocwen has paid more than its *pro rata* share of damages caused to the Company arising out of and in connection with the NYDFS Settlement and is, therefore, entitled to contribution from the RPT Defendants and Defendant Beltline.

418.    The Exculpatory Provision contained in the NYDFS Settlement, to the extent it applies to these claims against the RPT Defendants and Defendant Beltline, is unenforceable because it is contrary to public policy or not properly approved by either Ocwen's directors or

2112706.1

shareholders and, therefore, does not preclude contribution from the RPT Defendants and Defendant Beltline.

## COUNT XIII

(Against Defendants Ross and the Ross Funds for Unjust Enrichment)

419.   Plaintiffs repeat and re-allege each allegation contained above as if fully set forth herein.

420.   Plaintiffs bring this claim derivatively on behalf of Ocwen against Defendants Ross and the Ross Funds for their unjust enrichment.

421.   Defendants Ross and the Ross Funds received and retained an improper benefit from the Company's repurchase of common stock from the Ross Funds upon conversion of the Convertible Preferred Stock owned by the Ross Funds.

422.   It would be unconscionable and against the fundamental principles of justice, equity and good conscience for Defendants Ross and the Ross Funds to retain the improper benefit gained by the Company's purchase of common stock from the Ross Funds.

## COUNT XIV

(Against Defendants Erbey, Ross and Wish for Insider Trading)

423.   Plaintiffs repeat and re-allege each allegation contained above as if fully set forth herein.

424.   Plaintiffs bring this claim derivatively on behalf of Ocwen against Defendants Erbey, Ross and Wish for their sale of Ocwen stock during the Relevant Period while in possession of material adverse information regarding Ocwen's financial health.

425.   Since 2013, and before public disclosure of the wrongdoing alleged herein, Defendants Wish, Ross and Erbey (the "Insider Selling Defendants"), while in possession of

157

material, non-public information regarding the Company's exposure to losses, poor financial and operating results, regulatory problems, improper related-party transactions and other liabilities, sold approximately $279 million in Ocwen stock on the basis of such insider information.

426.    The Insider Selling Defendants each served as members of the Company's Board of Directors during the period of the alleged wrongdoing and were privy to the Company's material non-public information.

427.    Each of the Insider Selling Defendants sold stock in the amounts and on the dates set forth herein.  *See, supra,* ¶186.

428.    The sales by the Insider Selling Defendants, as outlined herein, constitute a breach of their fiduciary duties to the Company.   In addition, the sales violated Ocwen's corporate policies as contained in the Company's Code of Business Conduct and Ethics.

429.    The Code of Conduct states in relevant part: "You are prohibited by Company policy and the law from buying or selling securities of the Company at a time when in possession of 'material nonpublic information'".   The Code of Conduct makes clear what types of information is "material", including information that likely would "affect the market price of a company's securities." It lists examples of material information, including, inter alia, earnings, operating or financial results of the company or its major business units (including estimates of any future earnings or losses, sales results, important personnel changes, business plans, important litigation developments and important regulatory, judicial or legislative actions.   The Code further states that information may be material even if it relates to future, speculative or contingent events and even if it is significant only when considered in combination with publicly available information.

430.    The Code of Conduct also prohibits any employee, officer or director from receiving an improper personal benefit as a result of his or her position in the Company. Similarly, the Code states that employees, officers and directors of Ocwen may not take for themselves opportunities discovered through the use of corporate information or position for personal gain.  Further, with respect to confidential information, the Code prohibits employees and members of the board from using such information for their own personal benefit.

## COUNT XV

(Against Defendant Ross for Breach of Fiduciary Duty)

431.    Plaintiffs repeat and re-allege each allegation contained above as if fully set forth herein.

432.    As alleged herein, Defendant Ross, while in possession of material non-public information regarding the falsehood of public assurances as the integrity and accuracy of the Company's financial statements and other reports filed with the SEC, and public statements in press releases and otherwise, including the falsehood of public assurances of the adequacy of the Company's internal controls, conflict of interest policies and practices and compliance with federal and state consumer financial protection laws, as well as the Company's exposure to losses and liability resulting from their misrepresentations and misconduct, sold approximately $72 million in Ocwen stock back to the Company on the basis of insider information.

433.    At the time of the sales of Ocwen stock to the Company referred to above, Defendant Ross owed to the Company fiduciary duties of good faith, loyalty and care, including the duty not to use material non-public information of the Company for personal advantage, and the duty to refrain from purchasing or selling Company stock based while in possession of, or on the basis of, material non-public information.

159

434.    When the market became more aware of the falsehood of Defendants' public assurances regarding the integrity, accuracy and completeness of the Company's financial reporting in July 2014, and the inadequacy of its internal controls and non-compliance with federal and state consumer financial protection laws and regulations, as more fully alleged herein, the market price of the Company's stock fell substantially.

435.    Because Defendant Ross sold Company stock to Ocwen while in possession of such material, non-public Company information, the Company is entitled to disgorgement from each of them in an amount equal to the losses they avoided through such sales plus accrued interest.

436.    Plaintiffs, on behalf of Ocwen, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    Declaring that Ocwen's 2013, 2014 and 2015 Proxy Statements were false and misleading in violation of §14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder and that the Defendants have breached their respective duties candor in connection therewith;

B.    Declaring that the Individual Defendants have breached their fiduciary duties owed to Ocwen and wasted its assets, as alleged herein, causing substantial damages to Ocwen;

C.    Entering judgment against Defendants and directing Defendants to pay to the Company the amounts by which Ocwen has been damaged or will be damaged by reason of the conduct complained of herein;

D.    Entering judgment against the Defendants and directing them to account for and repay the Company to the extent they have been unjustly enriched by their wrongful conduct, as described herein, together with their earnings upon such amounts;

160

2112706.1

E.      Ordering the Defendant Ross Funds (and through them, Defendant Ross) to pay to Ocwen either (i) the measure of damages provided by Section 20A(b)(1) of the Exchange Act consisting of the loss avoided or profit gained in their July 2014 sales of Ocwen stock; or (ii) restitution for the breach of the duty owed by Defendant Ross, a director of the Company, under Florida law;

F.      Declaring that the Exculpatory Provision in the NYDFS Settlement is either unenforceable against Ocwen and its shareholders suing derivatively on behalf of the Company or otherwise unenforceable as a matter of public policy and allowing Ocwen to obtain contribution and or indemnification;

G.      Ordering the Individual Defendants to cause the Company to take all necessary actions to reform and improve its corporate governance, compliance and internal control procedures for the purpose not only of preventing a recurrence of the failures detailed above, but to optimize such procedures in light of relevant and current best practices;

H.      Ordering the Individual Defendants to cause the Company to develop appropriate procedures for Ocwen's dealings with its affiliated companies identified herein and/or developing appropriate procedures and controls to protect the Company and shareholders from unfair and harmful related-company transactions;

I.      Awarding Ocwen restitution from the Individual Defendants;

J.      Determining and awarding to Ocwen exemplary damages in an amount necessary to punish the Individual Defendants;

K.      Awarding Plaintiffs and their counsel reasonable attorneys' fees, expert fees and other reasonable costs and expenses; and

L.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

Dated: March 8, 2016

| COHEN MILSTEIN SELLERS & TOLL PLLC | GREENFIELD & GOODMAN, LLC |
|---|---|
| BY: /s/ *Richard A. Speirs* | BY: /s/ *Richard D. Greenfield* |
| Richard A. Speirs<br>(admitted *pro hac vice*)<br>Daniel B. Rehns<br>(admitted *pro hac vice*)<br>88 Pine Street, 14TH Floor<br>New York, New York 10005<br>212-838-7797<br>rspeirs@cohenmilstein.com<br>drehns@cohenmilstein.com | Richard D. Greenfield<br>(admitted *pro hac vice*)<br>Marguerite R. Goodman<br>Ann M. Caldwell<br>Ilene F. Brookler<br>250 Hudson Street, 8th Floor<br>New York, New York  10013<br>917-495-4446<br>whitehatrdg@earthlink.net |
| Steven J. Toll<br>(admitted *pro hac vice*)<br>1100 New York Avenue NW, Suite 500<br>Washington, DC 20008<br>202-408-4600<br>stoll@cohenmilstein.com | |
| Theodore J. Leopold<br>2925 PGA Boulevard Suite 200<br>Palm Beach Gardens, Florida 33410<br>561-515-1400<br>tleopold@cohenmilstein.com | |
| *Lead Counsel and Counsel for Plaintiff William A. Sokolowski* | |

162

| | |
|---|---|
| **FARUQI & FARUQI, LLP**<br>　Stuart J. Guber<br>　Timothy J. Peter<br>101 Greenwood Avenue<br>Suite 600<br>Jenkintown, PA 19046<br>215-277-5770<br>sguber@faruqilaw.com<br>tpeter@faruqilaw.com<br><br>　Nadeem Faruqi<br>　Nina M. Varindani<br>685 Third Avenue, 26th Floor<br>New York, New York 10017<br>212-983-9330<br>nfaruqi@faruqilaw.com<br>nvarindani@faruqilaw.com | **ABRAHAM, FRUCHTER & TWERSKY, LLP**<br>　Jeffrey S. Abraham<br>　Philip T. Taylor<br>One Penn Plaza, Suite 2805<br>New York, N.Y. 10119<br>212-279-5050<br>jabraham@aftlaw.com<br>ptaylor@aftlaw.com |
| **HYNES KELLER & HERNANDEZ, LLC**<br>　Michael J. Hynes<br>　Ligaya T. Hernandez<br>1150 First Avenue, Suite 501<br>King of Prussia, Pennsylvania 19406<br>215-277-5770<br>mhynes@hkh-lawfirm.com<br>lhernandez@hkh-lawfirm.com | **VIANALE & VIANALE LLP**<br>　Kenneth J. Vianale (FBN 0169668)<br>　Julie Prag Vianale (FBN 0184977)<br>5550 Glades Road, Suite 500<br>Boca Raton, Florida 33431<br>561-392-4750<br>kvianale@vianalelaw.com<br>jvianale@vianalelaw.com |
| **SHEPHERD FINKELMAN MILLER & SHAH LLP**<br>　Nathan C. Zipperian<br>1625 N. Commerce Parkway, Suite 320<br>Fort Lauderdale, Florida 33326<br>954-515-0123<br>nzipperian@sfmslaw.com | |
| *Counsel for Plaintiff Helene Hutt* | *Counsel for Plaintiff Robert Lowinger* |

2112706.1

## <u>CERTIFICATE OF SERVICE</u>

I, Daniel B. Rehns, Lead Counsel and Counsel for Plaintiff William A. Sokolowski, hereby certify that on this 8th day of March 2016, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will send electronic notice to all counsel of record identified on the ECF docket.

<u>/s/ Daniel B. Rehns</u>
Daniel B. Rehns

2112706.1

## VERIFICATION

I, W.A.Sokolowski, hereby state that: (1) I am and have been the holder of

the common stock of Ocwen Financial Corporation continuously at most of

the times relevant to the wrongs complained of in the Consolidated

Complaint in this action, of which I am one of the plaintiffs. and (2) I hereby

verify that the facts alleged in such Complaint are true to the best of my

knowledge, information and belief.

W.A. Sokolowski _____

# EXHIBIT 1

## GREENFIELD & GOODMAN LLC
### ATTORNEYS AT LAW
**250 Hudson Street**
**8th Floor**
**New York, NY 10013**
**(917) 495-4446**
**Fax (212) 355-9592**
email: whitehatrdg@earthlink.net

## Richard D. Greenfield
*Also admitted to the Maryland*
*and Pennsylvania Bars*

February 11, 2014

Board of Directors
Ocwen Financial Corporation
c/o Paul A. Koches, Secretary
1661 Worthington Road #100
West Palm Beach, FL 33409

Via FedEx Tracking No. 8731-8307-0231

Dear Members of the Board:

I am writing to you on behalf of my client, William A. Sokolowski, who presently owns, and who has owned at relevant times, shares of the common stock of Ocwen Financial Corporation ("Ocwen" or the "Company"). A copy of the relevant page and portion of a recent brokerage statement showing my client's current ownership of Ocwen shares is enclosed with this letter.

On behalf of my client, I demand that the Company sue each of you serving as a director at the time of the Board's issuance and dissemination of the Company's April 3, 2013 Proxy Statement in connection with their conduct as officers and/or directors of Ocwen including, *inter alia*, deceiving the public by failing to disclose material, neutral and non-pejorative facts regarding, *inter alia*, (1) the mismanagement of the Company's operations and covering up the Company's lack of adequate internal controls, (2) the extent to which the nominees for directors who had served through 2012 had subjected the Company to class actions and other litigation as a result of the wrongdoing described herein; (3) such nominees' failure to exercise appropriate oversight duties and to take action to remedy the charging of borrowers unauthorized

EXHIBIT A[1]

fees, deceiving consumers regarding alternatives to foreclosures of their homes and providing false and/or otherwise deceptive information about the status of foreclosure proceedings; permitting in-house and outside counsel for the Company to "stonewall" investigators of the Consumer Financial Protection Bureau (the "Bureau") and otherwise, despite knowing the Company had committed illegal acts and covering them up, thereby causing subtantial harm to Ocwen;[1] (4) the failure of the Board to protect against the expiration of statutes of limitation applicable to claims possessed by the Company without, *inter alia*, investigating such claims, obtaining agreements tolling the running of such statutes of limitation and otherwise; (5) the failure of the Board to comply with federal disclosure laws, thereby leaving the Company vulnerable to being sued by defrauded investors; (6) the conduct of William C. Erbey and other senior officers of the Company, directly and through the Company's Litton Loan Servicing LP subsidiary, in practices which required their mortgage borrowers to purchase force-placed insurance at excessive cost and while taking kickbacks from the insurers; and (7) the failure of the non-management members of the Board to fulfill their most fundamental stewardship responsibilities owed to Ocwen by, *inter alia*, providing superficial and perfunctory services as directors and devoting insufficient time to the Company's business.

As a direct consequence of the Board's failure to disclose material facts in Ocwen's 2013 Proxy Statement, the Company's shareholders were induced to vote at the May 8, 2013 shareholder meeting in favor of the Board's nominees for re-election, to ratify the appointment of Deloitte & Touche ("D&T"), as the Company's outside auditor, despite the fact that D&T's audits were not carried out in conformity with Generally Accepted Auditing Standards ("GAAS") and were in breach of its contractual obligations to Ocwen and to vote in favor of the Board's recommended compensation to officers and directors.

In addition, I demand that you commence suit against those persons and/or entities who have acted together with the Company (including its senior executives not serving as directors) and caused it harm as a result of and/or in connection with the wrongdoing claimed by the Bureau in its December 19,

---

[1] Richard Cordray, Director of the Bureau, said on December 20, 2013 that he believed that Ocwen violated federal consumer financial laws at every stage of the mortgage servicing process. The Bureau's Complaint alleged the Company took advantage of consumers with servicing shortcuts and unauthorized fees, misled consumers about alternatives to foreclosures, provided false or misleading information to consumers about the status of their accounts and denied loan modifications for eligible homeowners. It also sent robo-signed foreclosure documents through the courts.

[2] The actual cost to Ocwen of the settlement with the Bureau has not been made public nor has the amount by which

EXHIBIT A[2]

Case 9:14-cv-81601-LSS   Document 143   Entered on FLSD Docket 03/08/2016   Page 172 of
227
Case 9:14-cv-81601-RLR   Document 1-2   Entered on FLSD Docket 12/24/2014   Page 3 of 12

2013 Complaint as well as the other wrongdoing set forth above. Similarly, the
Company should sue or otherwise appropriately assert claims against D&T to
recover the damages sustained by Ocwen as a result of D&T's failure to
perform its audits of the Company's financial statements in conformity with
GAAS and otherwise fulfill its obligations to Ocwen under and pursuant to its
engagement.

There can be no doubt that each member of the Board who was serving as a
director through at least 2012 was responsible for the aforementioned
wrongdoing. Indeed, in Ocwen's 2013 Proxy Statement, the Board represented
that: "The Board of Directors plays an active role in overseeing management
and representing the interests of the shareholders." Assuming that the first
clause in this statement is accurate, each of you is responsible for the conduct
of the Company and its management as described herein. Similarly, the Proxy
Statement says:

> "We have adopted a Code of Business Conduct and Ethics that applies to
> our Directors, officers and employees as required by the New York
> Stock Exchange rules. We have also adopted a Code of Ethics for Senior
> Financial Officers that applies to our Chief Executive Officer, Chief
> Financial Officer and Chief Accounting Officer. Any waivers from either
> the Code of Business Conduct and Ethics or the Code of Ethics for Senior
> Financial Officers must be approved by our Board of Directors or a
> Board Committee and must be promptly disclosed to you."

Given your personal obligations pursuant to the Code, which appears to have
been breached by each of you and your subordinates, the Company should
hold you accountable for such wrongful conduct and the damages caused to
Ocwen.

All of such conduct has caused and will continue to cause the Company and its
shareholders substantial economic and other damages, including the huge
cost of investigating misconduct, implementing remedial measures, defending
lawsuits, and further damage to its reputation and goodwill in amounts which
cannot be presently calculated.

EXHIBIT A[3]

## False and Misleading 2013 Proxy Statement

Prior to the May 8, 2013 annual meeting of Ocwen shareholders, the Board caused the Company to issue and disseminate a Notice of Annual Meeting and Proxy Statement on April 3, 2013.  Ocwen's directors serving at such time recommended, *inter alia*, that shareholders vote for each of the Board's seven nominees for re-election as directors, for the ratification of the appointment of Ocwen's independent registered public accounting firm, D&T, and to hold an advisory vote on executive compensation ("say-on-pay"), all the while omitting material facts bearing upon these issues and impacting materially as to how the shareholders of the Company would vote thereupon.

The 2013 Proxy Statement describes the supposed process by which director nominees were considered and evaluated, as well as short recitations of the jobs and directorships held by nominees, and membership listings of each of the Committees of the Board in the prior year.  There is no description of crucial actions (and/or material inactivity) taken by these Committees, the manner of selection of nominees, or other vital information regarding the professional competence, accountability and effectiveness of each of Ocwen's directors.  The Proxy Statement contains a most generalized description of each nominee's experience and discloses their respective ownership of Ocwen stock and states:

> *"Nomination/Governance Committee.* The Nomination/Governance Committee of our Board of Directors makes recommendations to our Board of Directors of candidates to serve as Directors and Committee members for our Board of Directors, advises our Board of Directors with respect to Director composition, procedures and Committees, develops and presents our Board of Directors with a set of corporate governance principles and oversees the evaluation of our Board of Directors and our management.
>
> In addition, our Nomination/Governance Committee takes into account our best interests, as well as such factors as experience, knowledge, skills, expertise, integrity, diversity, ability to make independent analytical inquiries, understanding of the Company's business environment and willingness to devote adequate time and effort to Board responsibilities and the interplay of the candidate's experience with the background of other members of our Board of Directors

EXHIBIT A[4]

In evaluating a particular candidate, the Nomination/Governance Committee will consider factors other than the candidate's qualifications including the current composition of the Board of Directors, the balance of management and independent Directors, the need for Audit Committee expertise and the evaluations of other prospective nominees. In connection with this evaluation, the Nomination/Governance Committee determines whether to interview the prospective nominee, and if warranted, one or more members of the Nomination/Governance Committee, and others as appropriate, interview prospective nominees. After completing this evaluation and interview, the Nomination/Governance Committee makes a recommendation to the full Board of Directors as to the persons who should be nominated by the Board of Directors."

Notwithstanding such statements, as you are undoubtedly aware, the Board made no serious evaluation of director nominees or sitting directors, particularly in terms of their performance, effectiveness **and the amount of time available to fulfill their stewardship responsibilities**.

The 2013 Proxy Statement fails to mention the role various directors played in carrying out and/or acquiescing in the wrongful conduct that resulted in the $2.2 billion settlement agreement reached with the Bureau on or about December 19, 2013.[2] In particular, in issuing and disseminating the 2013 Proxy Statement, the Board did not disclose in non-pejorative, neutral terms, the material facts the directors possessed bearing on Ocwen's wrongful conduct, of which conduct each of its directors had personal knowledge as of and prior to April 3, 2013 owing to, *inter alia*, the well-advanced investigations of the Bureau, the Attorney General of the State of New York, in various litigation brought against Ocwen and otherwise.

Had the Board disclosed, *inter alia*, material facts regarding the circumstances that resulted in the foregoing investigations, the roles of Ocwen Board members therein, and the involvement of long-serving directors and/or those in leadership positions on the key committees of the Board in serious

---

[2] The actual cost to Ocwen of the settlement with the Bureau has not been made public nor has the amount by which its historical reported revenues and earnings were inflated by the wrongful conduct as described in the Bureau's Complaint and otherwise.

EXHIBIT A [5]

oversight failures, some or all of the nominees for directors may well not have been re-elected.

While the Board need not criticize itself, it nevertheless could have and should have provided to Ocwen shareholders neutral material facts in non-pejorative terms describing its members' conduct and impacting upon their credibility. Nevertheless, the Board failed to make such disclosures in the Company's 2013 Proxy Statement.

As is disclosed in Ocwen's 2013 Proxy Statement, the members of its Board receive lucrative compensation for serving as directors, as well as fees for their committee assignments, and attendance at meetings. Given the serial misconduct that the Company has engaged in over the years while under the stewardship of the Board, Ocwen's 2013 Proxy Statement should have disclosed the specific neutral facts relating to each nominee's performance and specific activities so that shareholders could make their own informed decisions as to the directors' credibility and whether or not they warranted re-election to the Board.

By way of example, the Proxy Statement states:

> *"Audit Committee.* The Audit Committee of our Board of Directors oversees the relationship with our independent registered public accounting firm, reviews and advises our Board of Directors with respect to reports by our independent registered public accounting firm and **monitors our compliance with laws and regulations applicable to our operations**. Audit Committee oversight also includes the evaluation of significant matters relating to the financial reporting process and our system of internal accounting controls. Additionally, the Audit Committee reviews the scope and results of the annual audit conducted by the independent registered public accounting firm.[3] [emphasis added]

---

[3] Although the Proxy Statement says: " Each member of our Audit Committee is independent as defined in regulations adopted by the Securities and Exchange Commission and the listing standards of the New York Stock Exchange as interpreted by our Board of Directors," such a definition is extremely narrow and cannot be applicable for all purposes. For example, when, as here, each member of the Audit Committee has failed in its critical oversight of Ocwen's operations, none could be considered independent or disinterested for the purposes of considering the demands in this letter.

EXHIBIT A [6]

In purporting to carry out its assigned responsibilities, the members of the Board falsely or otherwise deceptively represented that the Audit Committee "monitors [Ocwen's] compliance with laws and regulations applicable to [the Company's] operations." Either the Audit Committeedid not perform such a significant responsibility or, if it did, it acquiesced for many years in the wrongful conduct engaged in by Ocwen and its subsidiaries. In either case, the members of the Audit Committee were and are responsible for such conduct.

The members of the Audit Committee repeatedly opined that the Company's internal controls over financial reporting were adequate, as attested to annually by D&T, despite the fact that the Company's internal controls were routinely circumvented in order to perpetrate the unlawful activities alleged herein in contravention of GAAP and in violation of, *inter alia*, various state and federal law as documented in the Bureau's Complaint.  Indeed, given the widespread misconduct in which the Company's management was engaged for many years, and the known pattern of wrongdoing which artificially inflated Ocwen's revenues and earnings, it should have been obvious to D&T and the Board's Audit Committee, which is required to "review the adequacy and effectiveness of Ocwen's's internal controls" and even the Company's entire Board, that the Company's internal controls were materially deficient and displayed significant weaknesses.

D&T repeatedly breached its contractual and professional obligations to perform its audits of the Company's financial statements in conformity with GAAS, which D&T was obligated to do pursuant to the terms of its annual engagements by Ocwen.  Such breaches by the Board or the Audit Committee were never disclosed by means of non-pejorative, neutral facts, in the Company's 2013 Proxy Statement even though the information would be highly significant to Ocwen shareholders casting their votes as to the retention of D&T as the Company's auditor. The selection and ultimate ratification of D&T as Ocwen's auditor by the Company's shareholders at the 2013 Annual Meeting caused Ocwen and all its shareholders economic harm since, *inter alia*, D&T is being and was paid by approximately $1.5 million in fees in 2012 for audits that were not conducted in accordance with GAAS. Presumably, it was paid as much for its audit-related services in 2013.

**Corporate Governance and Oversight**
The 2013 Proxy Statement also made material misrepresentations with respect to the governance and oversight provided by the Board and

EXHIBIT A[7]

committees thereof. For example, among the statements made therein, the Board stated deceptively with regard to its newly-formed Compliance Committee (established in March 2013):

> ***Compliance Committee.*** The Compliance Committee of our Board of Directors provides assistance to the Board of Directors with (i) establishment and oversight of our compliance function, including our compliance management system, and (ii) **oversight of our compliance with applicable laws, rules and regulations governing its consumer-oriented businesses including Federal consumer financial laws and applicable state laws.**"
> [emphasis added]

In fact, the Board established such Committee as "window dressing" knowing that the Bureau and various state agencies were actively investigating Ocwen's lack of "compliance with applicable laws, rules and regulations governing its consumer-oriented businesses including Federal consumer financial laws and applicable state laws, " all of which resulted in the Bureau's Complaint of December 19, 2013. In the context of what the Board disclosed about the formation and planned functioning of the Compliance Committee, it should have disclosed the facts and circumstances leading up to its establishment.

In addition to its omissions of material facts regarding the Board's disregard of its oversight responsibilities, the 2013 Proxy Statement misrepresented the extent and nature of the means by which it protected the Company from material harm. In that regard, the Board stated:

> **"Risk Management and Oversight Process**
> **Our Board of Directors and each of its Committees are involved in overseeing risk associated with the Company. The Board of Directors and the Audit Committee monitor Ocwen's** credit risk, liquidity risk, **regulatory risk, operational risk and enterprise risk by regular reviews with management and internal and external auditors.** In its periodic meetings with the internal auditors and the independent accountants, the Audit Committee discusses the scope and plan for the internal audit and includes management in its review of accounting and financial controls, **assessment of business risks and legal and ethical compliance programs.**" [emphasis added]

EXHIBIT A[8]

In fact, the Board was apparently oblivious to "overseeing risk associated with the Company" and, despite purported "regular reviews with management and internal and external auditors [D&T]," the Board acquiesced in long-term and repeated violations of law such as those identified in the Bureau's Complaint.

**Excessive Compensation**
The 2013 Proxy Statement described historical compensation packages for the senior officers and directors of the Company. In 2012, the Board provided incredibly excessive incentive and other compensation to Ocwen's senior officers, including Messrs. Erbey, Britti and Van Vlack. Such compensation was based, in substantial part, on the historical reported financial results of the Company which were artificially induced by, *inter alia*, the wrongful conduct as described in the Bureau's Complaint and the booking of revenues derived from illegal activities.

If the Company had reserved for the likely penalties, fines and expenses for which it was and will be responsible as a result of such wrongdoing as set forth in the Bureau's Complaint and otherwise, such reported financial results would have been materially reduced. Similarly, had D&T performed its audits as it should have done, it would have known (and may well have known) of Ocwen's illegal and otherwise wrongful conduct as set forth therein.

The 2013 Proxy Statement, in describing the Board's compensation philosophy, falsely stated with respect to Ocwen's compensation programs: "Pursuant to these programs, the Company seeks to compensate the named executive officers for achieving strategic business goals." In fact, such excessive and unjustified compensation was designed to provide incentives to the senior officers as well as Board members to violate the law in the conduct of the Company's business operations. In connection therewith, at the 2013 Annual Meeting, and in reliance on the Board's deceptive Proxy Statement, Ocwen shareholders followed the Board's recommendations with respect to the Company's compensation packages.

On behalf of my client, I demand that the Board cause Ocwen to issue and disseminate to the Company's shareholders its forthcoming 2014 Proxy Statement in full compliance with federal disclosure laws and the Board's duty of candor. To the extent that it does not issue and disseminate a corrective Proxy Statement for the 2014 annual meeting of Ocwen shareholders and

EXHIBIT A[9]

Case 9:14-cv-81601-LSS   Document 143   Entered on FLSD Docket 03/08/2016   Page 179 of
227
Case 9:14-cv-81601-RLR   Document 1-2   Entered on FLSD Docket 12/24/2014   Page 10 of 12

otherwise comply with the foregoing requirements, on behalf of my client, I
hereby demand that Ocwen sue each of you for injunctive relief and to recover
the Company's damages in connection therewith.

## Claims Against the Company

In addition to the now-settled claims of the Bureau, as a result of the
malfeasance and failure of oversight by the Board, Ocwen has been named as a
defendant in numerous cases throughout the country. As a consequence
thereof and your personal wrongdoing, the Company has sustained and will
sustain many hundreds of millions of dollars to resolve such claims and to
defend against them. On behalf of my client, I demand that the Company sue
you for its damages.

## The Demands Contained Herein

Although this letter demands that you cause the Company to sue yourselves,
several of your former colleagues on the Board and D&T, my client does not
concede your independence for all purposes or going forward (see *Scattered
Corp. v. Chicago Stock Exch.*, 701 A.2d 70 (Del. 1997) ). Rather, my client is
simply giving the Board the initial opportunity to cause Ocwen to commence
the demanded litigation itself.

In sending you this letter and providing the Board with the first opportunity
to cause Ocwen to commence the demanded litigation, I recognize that the
demands are likely to be rejected in whole or in part, directly or
constructively. Should these demands be rejected, as seems most likely given
the Board's conduct, my client has authorized the commencement of
derivative litigation on Ocwen's behalf. In such event I am prepared to discuss
with the Company's counsel various means pursuant to which the prosecution
of the its claims derivatively will not assist those who are concurrently suing
Ocwen for damages. In that regard, during the pendency of any such litigation,
my client will only pursue discovery which does not cause the Company or
witnesses allied with it to provide testimony/evidence that will potentially
cause harm to Ocwen's best interests.

EXHIBIT A[0]

I look forward to hearing from you or your counsel within thirty days.

Sincerely yours,

Richard D. Greenfield

Enclosure
CC: Mr. William A. Sokolowski

RDG:gw

EXHIBIT A[1]

EXHIBIT 2

## GREENFIELD & GOODMAN LLC
### ATTORNEYS AT LAW
### 250 Hudson Street
### 8th Floor
### New York, NY 10013
### (917) 495-4446
### email: whitehatrdg@earthlink.net

## Richard D. Greenfield
*Also admitted to the Maryland*
*and Pennsylvania Bars*

October 31, 2014

Board of Directors
Ocwen Financial Corporation
c/o Sam J. Salario, Jr., Esquire

Via e-mail: ssalario@cfjblaw.com

Members of the Board:

I am writing to you on behalf of my client, William A. Sokolowski, a shareholder now and at all
relevant times of Ocwen Financial Corporation ("Ocwen" or the "Company").

The purpose of this letter is to supplement, *nunc pro tunc*, the letter that I sent to you on
February 11, 2014 (the "Demand Letter"), to reflect the claims of wrongdoing as alleged in the
letter from Supt. Benjamin M. Lawsky to Timothy Hayes, Ocwen's General Counsel (the "Lawsky
Letter"), a copy of which is appended hereto.

The Lawsky Letter, copies of which were contemporaneously sent to each of you, sets forth not
only continuing claims of wrongdoing by the Company's management including its Vice
President of Compliance, but an ongoing cover-up of such wrongdoing. Moreover, the Lawsky
Letter highlights Ocwen's failure to have in place appropriate systems, controls and procedures
to address the specific mortgage servicing issues identified by the Monitor and the Department
of Financial Services and, thus, implicates your stewardship responsibilities and your failure to
fulfill them appropriately.

In light of the foregoing, I hereby demand that you immediately take steps to address the serious
issues not only as referred to in the Demand Letter but, as well, in the Lawsky Letter. Your failure
to timely and appropriately address these issues in a comprehensive manner subjects the
Company to substantial legal and other expenses related to Mr. Lawsky's ongoing investigation.
Moreover, the continuing wrongdoing and your failure to address it appropriately may yet cause

EXHIBIT B<sup>1</sup>

substantial additional damages to Ocwen should further sanctions be imposed. As such, I hereby demand that, should you not take the necessary remedial steps, that Ocwen sue each of you personally, as well as its Vice President of Compliance, for your and his continued breach of duties to the Company.

Sincerely yours,

Richard D. Greenfield

Enclosure
RDG:gw

EXHIBIT B[2]

EXHIBIT 3

**FARUQI & FARUQI** LLP
ATTORNEYS AT LAW

NEW YORK   CALIFORNIA   DELAWARE   PENNSYLVANIA

STUART J. GUBER
sguber@faruqilaw.com

September 3, 2014

**VIA EMAIL AND OVERNIGHT MAIL**

Sean Coffey, Esq.
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036

      Re:    **Supplement to the June 3, 2014 Shareholder Demand on the Board of Ocwen Financial Corporation**

Dear Mr. Coffey:

    This firm, along with Hynes Keller & Hernandez, LLC, represents Helene Hutt (the "Stockholder"), a beneficial shareholder of 200 shares of Ocwen Financial Corporation ("Ocwen" or the "Company"). In light of information that has been publicly disclosed since the Stockholder's demand dated June 3, 2014 (the "June Demand"), I write on behalf of the Stockholder to expand the demand on the Company's Board of Directors (the "Board") to take action to remedy breaches of fiduciary duties by certain officers and directors of the Company.

    As you are aware on August 7, 2014, the Board formed a Special Litigation Committee (the "SLC") to investigate the allegations in the June Demand. The Stockholder hereby requests the Board resolution or other documentation: (i) determining that a SLC should be formed; (ii) forming the SLC; (iii) identifying the SLC's members; (iv) setting forth the SLC's duties and responsibilities; (v) indicating the scope of the SLC's authority; (vi) relating to any actions the SLC has taken to date, including the retention of legal counsel and/or other consultants, to conduct any investigation or perform other tasks on behalf of the SLC; and (vii) regarding the anticipated time frame for any such investigation. In part, we request this information in order to be able to confirm that the SLC members are in fact independent. As you know, if the members of the SLC are found to lack independence or are otherwise interested in the transactions or activities complained of, the Company would have wasted valuable resources.

Mr. Sean Coffey
September 3, 2014
Page 2

In addition, the Stockholder would like to know whether other shareholder demands have been made on the Board which pertain to the breaches of fiduciary duty that are set forth herein and/or in the June Demand. This information will help ensure that multiple shareholders do not engage in duplicative efforts that could ultimately be avoided by the various shareholders working collectively. This is more efficient and less costly for the shareholders and the Company.

We are also expanding the June Demand to include the latest information regarding (i) Ocwen's disappointing second quarter results; (ii) an additional letter to Ocwen from the New York State Department of Financial Services ("NYSDFS") concerning further self-dealing at the Company; (iii) the Company's restatement of its financial statements for the fiscal year ended December 31, 2013 and quarter ended March 31, 2014; (iv) the Securities and Exchange Commission ("SEC") subpoena served on the Company in June 2014 and the anticipated second subpoena; and (v) Moody's Investors Service's ("Moody's") downgrade of Ocwen Loan Servicing, LLC's servicer quality assessment.

The Stockholder continues to believe that the following officers and/or directors of Ocwen violated the core fiduciary duty principles of loyalty, good faith and due care, causing Ocwen to suffer damages: Executive Chairman of the Board William C. Erbey ("Erbey"); President, Chief Executive Officer and Director Ronald M. Faris ("Faris"); Chief Investment Officer and Executive Vice President John V. Britti ("Britti")[1]; and Directors Ronald J. Korn, William H. Lacy, Wilber L. Ross, Jr., Robert A. Salcetti, and Barry N. Wish (collectively, the "Officers and Directors"). The Stockholder contends that in addition to the allegations in the June Demand, the Officers and Directors further breached their fiduciary duties to the Company as detailed below.

## Ocwen's Disappointing Second Quarter Results

In a press release issued on July 31, 2014, the Company announced its financial results for the second quarter of 2014. Although Ocwen's revenues and income from operations had increased from the same period in 2013, Ocwen's earnings had declined due to "significant compliance and regulatory-related costs and higher interest expense." Ocwen's pre-tax earnings for the quarter were $77.2 million, a 12% decline from the prior year. The compliance and regulatory-related costs cited in the press release are likely a result of regulatory action related to Ocwen's misconduct servicing mortgages, misconduct which led to the settlement reached on December 19, 2013, among the Company, the Consumer Financial Protection Bureau (the "CFPB") and officials from 49 states and the District of Columbia, the details of which were set forth in detail in the June Demand.

The decline in Ocwen's second quarter earnings is yet another example of how the Officers' and Directors' failure to fulfill their fiduciary duties has harmed the Company.

---

[1]  Britti was not included as among the Officers and Directors in the June Demand.

Mr. Sean Coffey
September 3, 2014
Page 3

**Self-Dealing at Ocwen**

In addition to his role as Executive Chairman of the Board of Ocwen, Erbey is the Chairman of the following companies with which Ocwen has extensive business relationships: Altisource Portfolio Solutions, S.A. ("Altisource"), Altisource Residential Corporation ("Residential"), Altisource Asset Management Corporation ("AAMC"), and Home Loan Servicing Solutions ("HLSS"). Erbey has economic interests in all of these entities.

As noted in our June Demand, Benjamin Lawsky ("Lawsky"), the Superintendent of the NYSDFS, wrote to Ocwen in February and in April regarding business dealings between Ocwen and some of those related companies. On August 4, 2014, Lawsky wrote yet another letter to Ocwen concerning a "troubling transaction" involving a related company, Altisource, and force-placed insurance. Through its investigation and information obtained by the independent monitor that the NYSDFS ordered Ocwen to hire in 2012, the NYSDFS found that Ocwen and Altisource created a complex arrangement which "appears designed to funnel as much as $65 million in fees annually from already-distressed homeowners to Altisource for minimal work."

The NYSDFS found that in August 2013, Ocwen appointed Beltline Road Insurance Agency, Inc. ("Beltline"), an Altisource subsidiary, as its exclusive insurance representative. Beltline's purported role was to negotiate and place a new force-placed insurance program for Ocwen, as the Company's existing program was set to expire. Altisource provided the Credit Committee of Ocwen Mortgage Servicing, Inc. with a memo which recommended that Ocwen's managing general agent be replaced with Southwest Business Corporation ("SWBC"), an unaffiliated insurance agent. SWBC's role would be to manage Ocwen's force-placed insurance program, including negotiating premiums with insurers. Altisource recommended itself to the Credit Committee to provide fee-based services to SWBC. According to Lawsky's letter, SWBC was apparently "a pass-through" to enable Altisource to receive commissions and fees without directly contracting with Ocwen.

Lawsky expressed concern that Erbey and the two other members of the Company's Credit Committee, non-directors Duo Zhang and Robert Cooperstein, approved the transaction without any involvement or review by other directors. According to the NYSDFS, Erbey's role in approving the complex arrangement appeared to be inconsistent with the Company's public statements and its representations made in SEC filings. The letter also noted that a month after the transaction was approved, the Company received the February letter in which the NYSDFS identified facts that "'cast serious doubts on recent public statements made by the company that Ocwen has a 'strictly arms-length business relationship' with those companies,' and [ ] specifically referenced the multiple roles played by Mr. Erbey as an area of concern.'" Regardless, Lawsky wrote, Ocwen proceeded to execute contracts which formalized the new force-placed arrangement. The NYSDFS's investigation thus far suggests that "Ocwen hired Altisource to design Ocwen's new force-placed program with the expectation and intent that Altisource would use the opportunity to steer profits to itself."

Mr. Sean Coffey
September 3, 2014
Page 4

      The NYSDFS reached the conclusion that "[t]he Department and its Monitor have uncovered a growing body of evidence that Mr. Erbey has approved a number of transactions with the related companies, despite Ocwen's and Altisource's public claims—including in SEC filings—that he recuses himself from decisions involving related companies." The letter requests additional information about this arrangement.

      The arrangement addressed in Lawsky's August letter, the business dealings between Ocwen and Altisource, and Erbey's alleged misstatements are likely to once again land Ocwen in trouble with regulators. Moreover, after the letter was released, the Company's stock dropped approximately 2.5% to close at $26.98 per share from the prior closing of $27.68 per share on Friday, August 1, 2014, further harming the Company.

      The substance of Lawsky's August 4, 2014 and February letters form part of the basis of the claims made in the securities class action lawsuits (described more fully below), which were filed after the Company announced that it would be restating its financials.

## Ocwen's Restatements and the Securities Class Actions

      On August 12, 2014, the Company filed a Form 8-K with the SEC in which it disclosed that it would restate its financial statements for the fiscal year ended December 31, 2013 and the quarter ended March 31, 2014. According to the Form 8-K, the Company anticipated that it would determine that there was a material weakness in the adequacy of its internal controls related to how it monitors and implements the impact of applicable accounting conventions. The material weakness related to the way in which Ocwen accounted for the sale of mortgage-servicing rights to related company HLSS. The Company expected that the adjustments would result in an increase in pre-tax income for the year ended December 31, 2013, of approximately $17 million and a reduction in pre-tax income in the first quarter of 2014 by a corresponding amount.

      On this news, the Company's stock declined almost 4.5% to close at $25.16 per share, down from the closing price of $26.34 per share the day before, and the Company lost over $133 million in market capitalization.

      Since the restatements were announced, three securities class action lawsuits have been filed against the Company, Erbey, Faris and Britti (collectively "Defendants") in the United States District Court for the Southern District of Florida. The cases are *Tuseo v. Ocwen Financial Corp.*, No. 14-cv-81064-KAM, *United Union of Roofers, Waterproofers & Allied Workers Local Union No. 8 v. Ocwen Financial Corp.*, No. 14-cv-81057-WPD, filed on August 12, and *Frechter v. Ocwen Financial Corp. ("Frechter")*, No. 14-cv-81076-KLR, filed on August 18 (collectively, the "Securities Class Actions"). The Securities Class Actions allege that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) and thereby caused

Mr. Sean Coffey
September 3, 2014
Page 5

purchasers of Ocwen common stock from May 2, 2013 through August 11, 2014, to suffer damages.

Specifically, the Securities Class Actions allege that the Company and certain of its officers and directors made materially false and misleading statements in SEC filings and public statements concerning Ocwen's related-party transactions amongst other things. Those statements led Ocwen's stock price to be artificially inflated, causing plaintiffs to suffer damages when the truth was revealed.

## SEC Subpoenas

The Company disclosed in its Form 10-Q for the second quarter of 2014 that it received a subpoena from the SEC on June 12, 2014. The subpoena requested that Ocwen produce documents relating to its business dealings with Altisource, HLSS, AAMC, Residential and the interests of Ocwen's directors and executive officers in those companies. The Company further disclosed that the SEC plans to serve Ocwen with another subpoena in connection with the amendments to the Company's financial statements for the fiscal year ended December 31, 2013 and the quarter ended March 31, 2014.

The information requested by the SEC implies that the Officers and Directors have engaged in the type of self-dealing that is a serious breach of their fiduciary duties, especially in light of the NYSDFS's recent findings and the allegations set forth in the complaints of the Securities Class Actions.

## Moody's Downgrades

On August 28, 2014, Moody's downgraded Ocwen Loan Servicing, LLC's servicer quality (SQ) assessments from SQ2- to SQ3+ both as a primary servicer of subprime residential mortgage loans and as a special servicer of residential mortgage loans. Moody's also lowered the Company's component assessment for loan administration from above average to average. According to Moody's, the lowered assessments reflected the heightened regulatory scrutiny of Ocwen by the NYSDFS and the SEC, as described more fully above and in the June Demand.

In its announcement of the downgrades, Moody's noted that "[b]ased on their findings, these agencies could restrict Ocwen's activities, levy monetary fines, or take additional actions that could negatively affect the company's financial strength and servicing stability."

Mr. Sean Coffey
September 3, 2014
Page 6

**Damages to Ocwen and Shareholder Demand**

The Stockholder repeats and realleges all of the actions and demands set forth in her June Demand as if set forth herein and maintains that the Officers and Directors breached their fiduciary duties by, among other things, (i) engaging in significant and systemic misconduct that required the Company to adhere to expensive and onerous regulatory requirements; (ii) participating in and/or allowing self-dealing transactions; and (iii) making false and/or misleading statements in its SEC filings.

The foregoing actions are clearly not the product of a good faith exercise of business judgment as they constitute a breach of fiduciary duties by the Officers and Directors and unjustly enriched Erbey at the expense of Ocwen and its shareholders.

Moreover, as a result of these breaches of fiduciary duties by the Officers and Directors, the Company has been forced to restate its financial statements for the fiscal year ended December 31, 2013 and the quarter ended March 31, 2014; has suffered several declines in its stock price, disappointing second quarter earnings results, and servicer quality assessment downgrades; and has been subject to the Securities Class Actions and regulatory investigations from which it has, and will continue to incur, costs and expenses in order to defend itself.  In this year alone, the Company has lost 53% of its market cap value, due in large part to the Officers' and Directors' egregious misconduct.

On behalf of the Stockholder, I hereby demand that the Board take action against the Officers and Directors to recover the damages described herein and in the June Demand for the benefit of the Company.  If the Company does not commence appropriate action within a reasonable period of time, the Stockholder will commence a shareholder derivative action on behalf of the Company to obtain appropriate relief.  This Stockholder Demand also serves to put all affected entities and individuals identified herein on notice of their document preservation and collection responsibilities.

Very truly yours,

Stuart J. Guber

cc: Ligaya Hernandez (via email only)
    Michael Hynes (via email only)

EXHIBIT 4

**AF&T**

ABRAHAM, FRUCHTER & TWERSKY, LLP

September 30, 2014

**By Federal Express**

Board of Directors
Ocwen Financial Corporation
2002 Summit Boulevard, 6th Floor
Atlanta, Georgia 30319

      **Re:**    **Demand Upon the Board of Directors to Investigate Claims, Initiate Legal
Action and Take Necessary and Appropriate Remedial Measures**

To the Board of Directors of Ocwen Financial Corporation:

      This firm represents Dr. Robert Lowinger, who is, and was at all times relevant to the
issues addressed in the letter, a shareholder of Ocwen Financial Corporation ("Ocwen" or the
Company"). This letter is being written pursuant to Fla. Stat. §607.07401 and is intended to act
as a demand upon the Company's Board of Directors (the "Board").

**I.**      **Summary of Relevant Facts**

      Ocwen specializes in servicing subprime or delinquent loans and it has greatly expanded
its business in the years since the housing collapse. The Company is currently the largest
nonbank servicer, but also the fourth-largest mortgage servicer overall in this country. The
nature of its business makes Ocwen subject to multiple layers of state and federal regulation.

      On or about September 1, 2011, the Company entered into an Agreement on Mortgage
Servicing Practices (the "Mortgage Servicing Agreement") with the New York State Department
of Financial Services (the "NYDFS"). The NYDFS required the Mortgage Servicing Agreement
prior to Ocwen's acquisition of Litton Loan Servicing LP ("Litton") in order to protect
consumers from improper practices prevalent in the industry such as: robo-signing, which refers
to affidavits which are not attested to upon personal knowledge; weak internal controls and
oversight that compromise the accuracy of foreclosure documents; unfair and improper practices
in connection with loss mitigation, including improper denials of loan modifications; and the
imposition of improper fees.

      Similarly in June 2012, the NYDFS commenced an investigation into Ocwen's
compliance with the Mortgage Servicing Agreement revealing that Ocwen was, among other
things: (i) failing to comply with certain borrower notice requirements under New York law; (ii)
engaging in foreclosures without sufficient allegations that Ocwen possessed standing to

Board of Directors of Ocwen Financial Corporation
September 30, 2014
Page 2

foreclose; and (iii) engaging in foreclosures without sufficient documentation.  Accordingly, on October 5, 2012, Ocwen entered into a Consent Order (the "Consent Order") with the NYDFS providing for an independent monitor to be assigned to the Company for a two year period to conduct a comprehensive review of Ocwen's mortgage servicing files and practices.  The specific areas the monitor was to oversee included: (i) the adequacy of Ocwen's staffing levels for delinquent loans; (ii) the robustness or established policies and procedures governing loss mitigation programs, foreclosure alternatives and dual-tracking; (iii) the fairness of service fees and foreclosures charges; (iv) the accuracy of borrower account information; (v) Ocwen's compliance with state and federal law; and (vi) a review of borrower complaints.  The compliance monitor was also responsible for submitting reports, proposing corrective measures and reviewing Ocwen's compliance therewith.  Ocwen was additionally required to submit progress reports of its own detailing all actions taken to secure compliance with the Consent Order.

In or about October 2012, the Company acquired Homeward Residential Holdings, Inc. ("Homeward"), another mortgage servicer, from WL Ross and its corporate affiliates.  The purchase price was approximately $243 million of which $162 million was paid with the Company's Series A Preferred Stock the terms of which allowed for conversion into shares of Common Stock at the lower of 110% of: (a) $28.90 per share (*i.e.*, $31.79 per share); or (b) the 30 day volume weighted average price prior to the issue date, subject to certain adjustments.  In March 2013, following consummation of the merger, Wilbur L. Ross, Jr. of WL Ross & Co. joined the Company's Board.

Ocwen's acquisition of Homeward was part of the Company's bullish story for potential future growth which focused on acquiring mortgage servicing rights from, among others, banks which did not want to be involved in servicing troubled mortgage loans.  This included the acquisition on February 15, 2013 of servicing and other assets from Residential Capital, LLC ("ResCap"), adding $269 billion of unpaid principal balance ("UPB") to the Company's servicing portfolio and $1.5 billion of related servicing advance receivables as of March 31, 2013.

Thus, in a February 28, 2013 conference call with securities analysts, William C. Erbey, the Company's co-founder and Executive Chairman, described Ocwen as being "in the middle rather than the end of the opportunity that has been brought about by the mortgage crisis."  Mr. Erbey went on to describe the main driver of Ocwen's growth as being the desire of banks "to reduce the regulatory burdens associated with servicing highly delinquent portfolios" and that as a result, the Company "continue[s] to see new interest from banks in sub-servicing, especially for nonperforming loan portfolios.  We are in discussion with several banks, and we expect substantial additional business in the coming months."

On June 13, 2013, Ocwen entered into a mortgage servicing rights purchase and sale agreement (the "Purchase Agreement") with OneWest Bank, FSB, a federal savings bank, to purchase approximately $78 billion in UPB of mortgage servicing rights.  The aggregate purchase price was reported to be approximately $2.53 billion.

Board of Directors of Ocwen Financial Corporation
September 30, 2014
Page 3

On August 1, 2013, Ocwen issued a press release reporting increased earnings for the fiscal quarter ended June 30, 2013. The press release continued the growth story and quoted Mr. Erbey as stating that:

> Ocwen's recently announced acquisition of OneWest Bank's $78 billion servicing portfolio combined with other large bank transfers points toward continued growth as banks strategically reposition their mortgage servicing operations. Our current pipeline of potential new business opportunities on a probability-weighted basis exceeds $400 billion in unpaid principal balance (UPB). Moreover, regulatory and market trends, including greater prospects for GSE legislation and more private capital flowing into mortgage credit, provide excellent long-term prospects for Ocwen. We continue to build capacity in anticipation of further acquisitions to meet our obligations to our clients, borrowers, RMBS investors and shareholders.

On September 9, 2013, Ocwen filed a Form 8-K with the Securities and Exchange Commission ("SEC") containing investor presentation materials being utilized in connection with meetings with current and prospective investors. Prominent among the points in the materials was that Ocwen enjoyed both substantial growth prospects and the "lowest operating costs for non-performing mortgage servicing."

On September 23, 2013, Ocwen entered into a purchase agreement with funds affiliated with Mr. Ross including WLR Recovery Fund III, L.P., WLR Recovery Fund IV, L.P., WLR/GS Master Co-Investment, L.P., WLR AHM Co-Invest, L.P. and WLR IV Parallel ESC, L.P. (collectively the "WL Ross Funds"), to purchase 3,145,640 shares of Ocwen common stock to be issued upon the conversion of 100,00 shares of Series A Preferred Stock. The total purchase price was $158,744,254.93 or approximately $50.46 per share.

On or about October 31, 2013, the Board approved a stock repurchase program for up to $500 million of Ocwen outstanding common stock. The stock repurchase program, however, excluded the purchase of any common stock issued in connection with a conversion of the Series A Preferred Stock.

On November 12, 2013, Ocwen filed a Form 8-K with the SEC containing investor presentation materials being utilized in connection with meetings with current and prospective investors. The promotional materials continued to tout the Company's growth prospects as well as its low operating costs.

On December 19, 2013, the Company resolved an investigation by the United States Consumer Financial Protection Board ("CFPB"), for years of systemic and significant servicing errors, by entering into a consent decree with the CFPB (the "CFPB Consent Decree"), subject to Court approval, providing for the Company: (1) to refund approximately $125 million to people who have already lost their homes; (2) provide $2 billion in relief to current homeowners who are underwater and in danger of losing their homes; and (3) to adhere to significant new homeowner protections through greater oversight and a court mandate.

Board of Directors of Ocwen Financial Corporation
September 30, 2014
Page 4

The Company sought to downplay the significance of the CFPB Consent Decree on its operations. Thus, in a Form 8-K filed with the SEC discussing the CFPB Consent Decree, the Company stated that: (1) the cash payments agreed upon were ones which were being shared by others and were previously reserved for with the reserve fund expected to cover all but approximately $0.5 million of Ocwen's portion of the consumer relief fund payment; (2) the relief provided to homeowners was designed to provide positive net present value outcomes for mortgage loan investors with principal forgiveness not involving an expense to Ocwen other than the operating expense incurred in arranging the modification, which is part of Ocwen's role as loan servicer; and (3) the regulatory guidelines agreed upon with the CFPB were ones which "Ocwen is presently subject to substantially the same guidelines and oversight with respect to the portion of its servicing portfolio acquired from ResCap in early 2013."

On January 22, 2014, the Company issued a press release announcing that it had entered into an agreement with Wells Fargo Bank, N.A. ("Wells Fargo") for the purchase of residential mortgage servicing rights on a portfolio consisting of 184,000 loans with a total principal balance of $39 billion. Two weeks later, on February 6, 2014, the Company issued another press release announcing that the NYDFS had requested that the Well Fargo transaction be put on hold pending the resolution of the NYDFS' concerns over Ocwen's servicing portfolio growth. To date, the Wells Fargo transaction continues to be placed on indefinite hold.

On or about February 26, 2014, Benjamin M. Lawsky, Superintendent of the NYDFS, addressed a letter (the "February 26th Letter") to the Company's General Counsel, Timothy Hayes, seeking documents and information concerning transactions with the Company's affiliates stating, in relevant part, that:

> The Department's ongoing review of Ocwen's mortgage servicing practices has uncovered a number of potential conflicts of interest between Ocwen and other public companies with which Ocwen is closely affiliated. Indeed, *the facts our review has uncovered to date cast serious doubts on recent public statements made by the company that Ocwen has a "strictly arms-length business relationship" with those companies.* We are also concerned that this tangled web of conflicts could create incentives that harm borrowers and push homeowners unduly into foreclosure. As such, we are demanding additional information on these issues as part of our review.

> Pursuant to the December 4, 2012 Consent Order between Ocwen and the Department, we have engaged an independent on-site compliance monitor at Ocwen to conduct a comprehensive review of Ocwen's servicing operations. It is in the course of the monitorship that we uncovered these potential conflicts between and among Ocwen, Altisource Portfolio Solutions, S.A. ("Altisource Portfolio"), Altisource Residential Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions Ltd. (together, the "affiliated companies"), all of which are chaired by William C. Erbey, who is also the largest shareholder of each and the Executive Chairman of Ocwen.

Board of Directors of Ocwen Financial Corporation
September 30, 2014
Page 5

As you recall, Altisource Portfolio's Chief Risk Officer was removed as a result of the Monitor's review. During its review, the Monitor discovered that Ocwen's Chief Risk Officer also served as the Chief Risk Officer of Altisource Portfolio, and reported directly to Mr. Erbey in both capacities. This individual seemed not to appreciate the potential conflicts of interest posed by this dual role, which was particularly alarming given his role as Chief Risk Officer. He told the Monitor that Ocwen paid his entire salary, but he did not know and had apparently never asked which company paid his risk management staff. Indeed, it remains unclear whether Altisource Portfolio paid any compensation for the Chief Risk Officer's services. Although he has since been removed as Altisource Portfolio's Chief Risk Officer, his and Ocwen's failure to affirmatively recognize this conflict demonstrates that the relationship between Ocwen and the affiliated companies warrants further examination.

***Presently, Ocwen's management owns stock or stock options in the affiliated companies. This raises the possibility that management has the opportunity and incentive to make decisions concerning Ocwen that are intended to benefit the share price of affiliated companies, resulting in harm to borrowers, mortgage investors, or Ocwen shareholders as a result.*** [Emphasis added.]

On February 27, 2014, Ocwen issued a press release reporting net income of $105.3 million, or $0.74 per share, for the fourth quarter of 2013 compared to net income of $65.3 million, or $0.47 per share, for the fourth quarter of 2012.  In addition, the press release disclosed that Ocwen had repurchased 1,125,707 shares of its common stock for a total outlay of $60 million.  Finally, the press release sought to reassure shareholders and investors about the potential negative repercussions of the announced NYDFS investigation by quoting Mr. Erbey as stating that:

We are working cooperatively with the New York Department of Financial Services to address its concerns that led to an indefinite hold on our transaction with Wells Fargo. Longer-term we believe developments remain positive for our business, particularly in three areas. First, prepayments continue to trend lower, lengthening the duration of our assets. Secondly, Ocwen's continued ability to help homeowners with foreclosure alternatives along with an improving economy continues to drive down delinquencies on loans we service and further slows prepayments. Lastly, the OASIS financing that we just closed should enhance our prime origination business. Oasis enables us to reduce our exposure to prepayment risk and lower our cost of capital disadvantage vis-à-vis commercial banks.

In reaction to the February 27, 2014 press release, Ocwen's stock closed that same day at $38.47 per share up 4.6% from the previous day's close of $36.76 per share.

Board of Directors of Ocwen Financial Corporation
September 30, 2014
Page 6

On May 1, 2014, Ocwen issued a press release reporting that the Company had net income of $75.8 million, or $0.54 per share, for the first quarter of 2014 compared to net income of $45.1 million, or $0.31 per share, for the first quarter of 2013.  The press release once again sought to reassure investors with respect to the pending NYDFS investigation by quoting Ron Faris, Ocwen's CEO as stating that: "Ocwen continues to work cooperatively with the New York Department of Financial Services to address their concerns that led to an indefinite hold on our Wells Fargo transaction."  However, at the same time, Ocwen for the first time acknowledged that regulatory requirements were exerting pressure on Ocwen's operating results.  Thus, the press release quoted Faris as stating that:

> [N]ew requirements and the associated investments have raised costs for the industry, including Ocwen. This places an increased premium on operational scale and proficiency in operations, two areas of competitive strength for Ocwen.

This disclosure of increased costs arising from regulatory compliance issues and the effect on the Company's operating results was a surprise to Ocwen's public shareholders and investors.  On the day of this announcement, Ocwen's stock which had previously closed at $37.90 per share declined to close at $35.08 per share.

On or about July 14, 2014, Ocwen entered into a purchase agreement with the WL Ross Funds to purchase 1,950,296 shares of Common Stock upon conversion of the remaining 62,000 shares of Series A Preferred Stock.  The total purchase price was $72,251,368.67 or approximately $37.05 per share.  This price paid was, without explanation, above the publicly reported trading price of $35.49 per share to $36.50 on that day, suggesting that Owcen overpaid for the Common Stock by as much as $3 million.

On July 31, 2014, Ocwen issued a press release reporting that the Company had net income of $67.0 million, or $0.48 per share, *a more than 10% decline* from the second quarter of 2014 when Ocwen reported net income of $76.7 million, or $0.53 per share, for the second quarter of 2013.  Ocwen generated revenue of $553.1 million, *up only 2%* compared to the second quarter of 2013.  Income from operations grew by 22% to $207.6 million for the second quarter of 2014 as compared to $170.0 million for the second quarter of 2013.

The Company attributed the decline in net income to "significant compliance and regulatory-related costs."  In reaction to this disclosure, the Company's stock plunged from its previous closing price of $34.66 per share to close at $30.17 per share and then continued to decline to $27.68 per share the next day making for a total decline of more than 20%.

On or about August 4, 2014, Benjamin M. Lawsky, Superintendent of the NYDFS, addressed another letter (the "August 4th Letter") to the Company's General Counsel Timothy Hayes seeking documents and information concerning force-placed insurance issued by Ocwen affiliates as well as Mr. Erbey's involvement therewith.  The letter states, in relevant part, that:

Board of Directors of Ocwen Financial Corporation
September 30, 2014
Page 7

As part of the Department's ongoing examination of Ocwen's mortgage servicing practices, *we are reviewing a troubling transaction involving Ocwen's related company, Altisource Portfolio Solutions, S.A. ("Altisource"), and the provision of force-placed insurance. Indeed, this complex arrangement appears designed to funnel as much as $65 million in fees annually from already-distressed homeowners to Altisource for minimal work. Additionally, the role that Ocwen's Executive Chairman William C. Erbey played in approving this arrangement appears to be inconsistent with public statements Ocwen has made, as well as representations in company SEC filings.* As discussed below, we require certain information about this force-placed insurance arrangement and about Mr. Erbey's role in approving the arrangement.

**Background**

As you know, the Department has previously expressed concerns about Ocwen's use of related companies to provide fee-based services such as property inspections, online auction sites, foreclosure sales, real estate brokers, debt collection, and many others. Because mortgage servicing presents the extraordinary circumstance where there is effectively no customer to select a vendor for ancillary services, *Ocwen's use of related companies to provide such services raises concerns about whether such transactions are priced fairly and conducted at arms-length.*

The Department now seeks additional information about Ocwen's provision of force-placed insurance through related companies. As you are aware, the Department's recent investigation into force-placed insurance revealed that mortgage servicers were setting up affiliated insurance agencies to collect commissions on force-placed insurance, and funneling all of their borrowers' force-placed business through their own agencies, in violation of New York Insurance Law section 2324's anti-inducement provisions. The Department discovered that servicers' own insurance agencies had an incentive to purchase force-placed insurance with high premiums because the higher the premiums, the higher the commissions kicked back by insurers to the servicers or their affiliates. The extra expense of higher premiums, in turn, can push already struggling families over the foreclosure cliff. In light of this investigation, the Department last year imposed further prohibitions on these kickbacks to servicers or their affiliates.

However, as part of our broader review of ancillary services provided by non-bank mortgage servicers, we are concerned that certain non-bank mortgage servicers are seeking to side-step those borrower protections through complex arrangements with subsidiaries and affiliated companies. Indeed, in recent weeks, we halted one such arrangement at another non-bank mortgage servicing company.

Board of Directors of Ocwen Financial Corporation
September 30, 2014
Page 8

**Agreements with SWBC and Altisource**

Based on its investigation and through the Monitor's work, *the Department understands that Ocwen's force-placed arrangement with Altisource features the use of an unaffiliated insurance agent, Southwest Business Corporation ("SWBC"), apparently as a pass-through so that Ocwen and Altisource are not directly contracting with each other, but Altisource can still receive insurance commissions and certain fees seemingly for doing very little work.*

These are the facts established by documents Ocwen provided to the Monitor: In August 2013, Ocwen appointed an Altisource subsidiary called Beltline Road Insurance Agency, Inc. ("Beltline") as its exclusive insurance representative, purportedly to negotiate and place a new force-placed insurance program for Ocwen. Ocwen's existing force-placed arrangement with the insurer Assurant was set to expire in March 2014, and Beltline's stated task was to find an alternative arrangement. In January 2014, Altisource provided a memo to the Credit Committee of Ocwen Mortgage Servicing, Inc., recommending, among other things, replacing Assurant with SWBC as Ocwen's managing general agent. SWBC would then be charged with managing Ocwen's force-placed insurance program, including negotiating premiums with insurers. As part of this arrangement, Altisource recommended itself to provide fee-based services to SWBC.

In emails dated January 15 and 16, 2014, the transaction was approved by the three members of the Credit Committee: William Erbey, Duo Zhang, and Richard Cooperstein. The Credit Committee did not meet to discuss this proposal, no minutes were taken of the Credit Committee's consideration of this proposed transaction, and the proposed transaction apparently was not presented for review or approval to any member of the Ocwen Board of Directors except Mr. Erbey, as Mr. Zhang and Mr. Cooperstein are not members of the Ocwen Board of Directors.

Just one month after this Credit Committee approval, on February 26, 2014, the company received the Department's letter raising concerns about potential conflicts of interest between Ocwen and its related public companies. In that letter, we identified facts that "cast serious doubts on recent public statements made by the company that Ocwen has a 'strictly arms-length business relationship' with those companies," and we specifically referenced the multiple roles played by Mr. Erbey as an area of concern.

Disregarding the concerns raised in our letter, Ocwen proceeded to execute contracts formalizing this new force-placed arrangement, apparently without further consideration by any Board member other than Mr. Erbey. Those contracts, dated as of June 1, 2014, indicate that Altisource will generate significant revenue from Ocwen's new force-placed arrangement while apparently

Board of Directors of Ocwen Financial Corporation
September 30, 2014
Page 9

doing very little work. Indeed, a careful review of these and other documents suggests that Ocwen hired Altisource to design Ocwen's new force-placed program with the expectation and intent that Altisource would use this opportunity to steer profits to itself.

First, Altisource will reap enormous insurance commissions for having recommended that Ocwen hire SWBC. Under the contracts, Ocwen promises to give its force-placed insurance business to SWBC. SWBC does the work of negotiating premiums, preparing policies, and handling renewals and cancellations. For these services, SWBC receives commissions from insurers. SWBC then passes on a portion of those commissions, constituting 15% of net written premium on the policies, to Altisource subsidiary Beltline, for "insurance placement services." Documents indicate that Ocwen expects to force-place policies on its borrowers in excess of $400 million net written premium per year; a 15% commission on $400 million would be $60 million per year. It is unclear what insurance placement services, if any, Altisource is providing to justify these commissions.

Second, Altisource will be paid a substantial annual fee for providing technology support that it appears to be already obligated to provide. This fee relates to monitoring services, whereby Ocwen pays a company to monitor whether its borrowers' insurance remains in effect. Such monitoring is necessary to establish which borrowers have lapsed on their payments and need to have insurance force-placed upon them. Prior to 2014, Ocwen was paying ten cents per loan per month to Assurant for monitoring. In this new arrangement, however, Ocwen agrees to pay double the prior amount – twenty cents per loan per month now paid to SWBC, for each of the approximately 2.8 million borrowers serviced by Ocwen. SWBC, in turn, agrees to pass on fifteen out of that twenty cents to Altisource, or an estimated $5 million per year. Altisource provides only one service in exchange for this fee: granting SWBC access to Ocwen's loan files. Altisource, of course, only has access to Ocwen's loan files through its own separate services agreements with Ocwen, which appear to contractually obligate Altisource to provide this access to business users designated by Ocwen to receive such access.

Third, the contracts require SWBC to use Altisource to provide loss draft management services for Ocwen borrowers; to pay Altisource $75 per loss draft for these services; and to pay Altisource an additional $10,000 per month for certain other services.

\*   \*   \*

Board of Directors of Ocwen Financial Corporation
September 30, 2014
Page 10

**Ocwen's Public Statements Concerning Transactions with Related Companies**

In addition to the issues raised above, the Department has serious concerns about the apparently conflicted role played by Ocwen Executive Chairman William Erbey and potentially other Ocwen officers and directors in directing profits to Altisource, which is "related" to Ocwen but is formally a separate, publicly-traded company. As you know, Mr. Erbey is Ocwen's largest shareholder and is also the Chairman of and largest shareholder in Altisource. In fact, Mr. Erbey's stake in Altisource is nearly double his stake in Ocwen: 29 percent versus 15 percent. Thus, for every dollar Ocwen makes, Mr. Erbey's share is 15 cents, but for every dollar Altisource makes, his share is 29 cents.

The Department and its Monitor have uncovered a growing body of evidence that Mr. Erbey has approved a number of transactions with the related companies, despite Ocwen's and Altisource's public claims – including in SEC filings [1 Ocwen Financial Corporation 2013 Form 10-K Annual Report, at 18 ("We have adopted policies, procedures and practices to avoid potential conflicts with respect to our dealings with Altisource, HLSS, AAMC and Residential, including our Executive Chairmen recusing himself from negotiations regarding, and approvals of, transactions with these entities."); Altisource Portfolio Solutions S.A. 2013 Form 10-K Annual Report, at 17 ("We follow policies, procedures and practices to avoid potential conflicts with respect to our dealings with Ocwen, HLSS, AAMC and Residential, including our Chairman recusing himself from negotiations regarding, and approvals of, transactions with these entities.").] – that he recuses himself from decisions involving related companies. Mr. Erbey's approval of this force-placed insurance arrangement as described above appears to be a gross violation of this supposed recusal policy.

\*   \*   \*

Finally, Ocwen and Altisource state in their public filings that rates charged under agreements with related companies are market rate, [2 Ocwen Financial Corporation 2013 Form 10-K Annual Report, at F-60 ("We believe the rates charged under [agreements with Altisource] are market rates as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers."); Altisource Portfolio Solutions S.A. 2013 Form 10-K Annual Report, at 7 ("We record revenue we earn from Ocwen and its subsidiaries under various long-term servicing contracts at rates we believe to be market rates as they are consistent with one or more of the following: the fees we charge to other customers for comparable services; the fees Ocwen pays to other service providers; and fees charged by our competitors.").] but Ocwen has not been able to provide the Monitor with any analysis to support this assertion.

Board of Directors of Ocwen Financial Corporation
September 30, 2014
Page 11

As a result of the ongoing regulatory actions, analysts have lost confidence in Ocwen and have downgraded the Company's outlook. Thus, on August 4, 2014, Oppenheimer issued a report titled: "Very Public Rebuke Suggests Overhang Will Linger – Downgrading to Perform." Oppenheimer further provided that:

> On 8/4, NY Department of Financial Services Superintendent Benjamin Lawsky publicly released a new letter he sent to Ocwen. This letter focuses on potential forced-place insurance conflicts and shows that the superintendent is pursuing OCN with considerable vigo**r. *To us, it indicates that little progress has likely been made in resolving the issues between OCN and the NYDFS, and that the overhang will remain for much longer than we had anticipated.* Thus, we are removing all MSR acquisitions (the benefit of having this overhang removed) from our model between now and YE15. The impact is that our 2015E EPS goes from $4.02 to $2.50 and *thus we are downgrading shares to Perform from Outperform and removing our $36 price target.* [Emphasis added.]

On August 5, 2014, Compass Point issued a report titled: "Risk Too High to Justify Reward; Lowering to Neutral." Compass Point's report went on to state that: "**We are lowering our rating on OCN to Neutral from Buy and lowering our price target to $29 from $34 given the significant and persistent regulatory pressure the company is facing at the current time.**" (Emphasis in original).

On August 10, 2014, Fitch Ratings affirmed its Negative Outlook as to Ocwen stating that: "[t]he Negative Outlook reflects the financial and operational risks associated with Ocwen's aggressive acquisition strategy, high concentration of offshore servicing operations, and potential conflicts of interest with the use of related companies for property valuations, managing real estate owned (REO) and short sales, title services on REO sales, and handling force-placed insurance."

## II.    Claims Demanded to be Pursued by the Company

This demand relates to the following matters which either have caused or threaten to cause the Company damage: (a) Ocwen's purchase of over $230 million of the Company's common stock (the "Common Stock") from the WL Ross Funds, corporate affiliates of Mr. Ross which he controls; (b) Ocwen's potential liability for enabling a complex arrangement designed to funnel as much as $65 million in fees annually from payments to corporate affiliates in which Mr. Erbey maintains a large economic interest; (c) the Company's potential liability for making materially false or misleading statements in violation of the federal securities laws; and (d) Ocwen's repurchase of common stock at inflated prices.

Board of Directors of Ocwen Financial Corporation
September 30, 2014
Page 12

### A. Claims Arising Out of the Company's Purchase of Stock from the WL Ross Funds

Pursuant to the Florida Securities and Investor Protection Act (Fla. Stat. §517.011 *et seq.*) and the federal securities laws, persons occupying a fiduciary relationship with a company are prohibited from profiting through the use of confidential company information (*i.e.*, insider trading). *Accord Kulla v. E.F. Hutton & Co.*, 426 So. 2d 1055, 1059 (Fla. Ct. App. 3d Dist. 1983) (citing *Schein v. Chasen*, 313 So. 2d 739, 747 (Fla. 1975)). *See also E.F. Hutton & Co. v. Rousseff*, 537 So. 2d 978 (Fla. 1989).[1] Ocwen's Code of Business Conduct and Ethics (the "Code of Ethics") similarly prohibits insider trading:

> You are prohibited by Company policy and the law from buying or selling securities of the Company at a time when in possession of "material nonpublic information." . . . This conduct is known as "insider trading."
>
> *    *    *
>
> Information is "material" if (a) there is a substantial likelihood that a reasonable investor would find the information "important" in determining whether to trade in a security; or (b) the information, if made public, likely would affect the market price of a company's securities. ***Examples of types of material information include*** unannounced dividends, ***earnings, financial results,*** new or lost contracts or products, sales results, important personnel changes, business plans, possible mergers, acquisitions, divestitures or joint ventures, ***important litigation developments, and important regulatory, judicial or legislative actions.*** Information may be material even if it relates to future, speculative or contingent events and even if it is significant only when considered in combination with publicly available information. [Emphasis added.]

As a director of the Company since March 2013 and a Board observer prior to formally joining the Board, Mr. Ross was bound by a fiduciary duty to the Company and was prohibited from using the Company's material non-public information for his own purposes and to the detriment of the Company. Similarly, the WL Ross Funds, who had appointed Mr. Ross as a Board observer pursuant to the terms of the Series A Preferred Stock, were bound by a duty not to use the confidential information gained through their Board participation to the Company's detriment. *See Quinn v. Phipps*, 113 So. 419, 429 (1927) ("A party may voluntarily assume a confidential relation toward another, and if he does so, he cannot thereafter do any act for his own gain at the expense of such relation."); *Schein*, 313 So. 2d at 745 ("A person who . . . intentionally causes or assist and agent to violate a duty to his principle is subject to liability to the principal.") (quoting American Law Institute's Restatement of Agency 2d, §312). In

---

[1]    Where actual damage to the company is alleged, a shareholder derivative action is maintainable against those with duties owned to the company that use material non-public information to the company's detriment. *Cf. Schein*, 313 So. 2d at 744-745 (citing *Brophy v. Cities Service Co.*, 70 A.2d 5 (Del. Ch. 1949)).

Board of Directors of Ocwen Financial Corporation
September 30, 2014
Page 13

violation of their duties to the Company, Mr. Ross and the WL Ross Funds used material non-public information to enrich themselves at the expense of the Company.

On or about August 20, 2013, the Board agreed to purchase common stock from the WL Ross Funds upon conversion of their Series A Preferred Stock. On or about September 23, 2013, Ocwen entered into a purchase agreement with the WL Ross Funds for the purchase of 3,145,640 shares of Ocwen common stock upon the conversion of 100,00 shares of Series A Preferred Stock for total proceeds of $158,744,254.93 or approximately $50.46 per share.

At the time the Company entered into the September 2013 purchase agreement, the Company was the target of serious regulatory scrutiny from the CFPB and likely had already entered into negotiations with respect to the CFPB Consent Decree executed on December 19, 2013. To the extent that Mr. Ross was aware of those material regulatory actions and the substantial negative impact they could have upon the Company, it was a breach of his fiduciary duty to the Company to have caused Ocwen's purchase of shares from the WL Ross Funds at inflated prices. Indeed, the Company could have purchased shares of Ocwen common stock on the public market through its ongoing share repurchase program for prices lower than those paid to the WL Ross Funds when the adverse regulatory actions and consequences were factored into market pricing, thereby saving the Company substantial amounts of money.

On or about July 14, 2014, Ocwen entered into a purchase agreement with the WL Ross Funds to purchase 1,950,296 shares upon conversion of the remaining 62,000 shares of Series A Preferred Stock. The transaction was approved by the Board and the Audit Committee. The total purchase price of the 1,950,296 shares of common stock was $72,251,368.67 or approximately $37.05 per share. However, on July 14, 2014, as indicated by Yahoo! Finance, the Company's stock traded in a range between $35.49 per share to $36.50. Accordingly, the Company overpaid for the WL Ross Funds' shares by approximately $3 million based on the market price alone.

Moreover, at the time of Ocwen's July 14, 2014 purchase of shares from the WL Ross Funds, the Company was preparing to release negative financial results which caused Ocwen's share price to fall by 20% from $34.66 per share on July 30, 2014 to $27.68 per share on August 1, 2014. The Company's directors, including Mr. Ross, would have known about the Company's negative financial results at the time they agreed to the July 14, 2014 purchase of shares from the WL Ross Funds. Had the Company waited for the release of that negative information and purchased the same number of shares through its share repurchase program, those 1,950,296 shares would only have cost the Company approximately $54 million on August 1, 2014. Thus, the Company would have saved at least $18 million had it waited to purchase the shares on the public market rather than from the WL Ross Funds directly.

Accordingly, the Company has been harmed by Mr. Ross' and the WL Ross Fund's breach of fiduciary duty by using material non-public information to their own advantage and to the detriment of the Company. The Company should investigate and bring claims for insider trading pursuant to Florida Securities and Investor Protection Act and the federal securities laws as well as claims for breach of fiduciary duty, contribution, indemnification, unjust enrichment,

Board of Directors of Ocwen Financial Corporation
September 30, 2014
Page 14

aiding and abetting, rescission and for the disgorgement of any ill-gotten proceeds in connection with the Company's July 14, 2014 purchase of common stock from the WL Ross Funds against any responsible persons including, but not limited to: William C. Erbey, Ronald M. Farris, Ronald J. Korn, William H. Lacy, Wilbur L. Ross, Jr., Robert A. Salcetti, Barry N. Wish, WL Ross & Co., WL Ross Group, L.P., the WL Ross Funds, El Vedado, LLC, WLR Recovery Associates III LLC, WLR Recovery Associates IV LLC, WLR Master Co-Investment GP, LLC, WLR IV Associates LLC, Invesco Private Capital, Inc. and Invesco WLR IV Associates LLC.

## B. Claims Arising Out of the Related Party Transactions

As result of the Credit Committee's determination to allow force-placed insurance services with Company affiliates such as Altisource, SWBC and Betline, the Company is now under investigation for the funneling of $65 million in fees to those entities in which Mr. Erbey and other Company insiders have substantial financial interests.  The Company has been damaged by the monetary outlays required to cooperate with regulators and face the threat of substantial liability in the form of fines and other regulatory action for arranging these prohibited transactions.

Ocwen should review and investigate its systems and controls to ensure that services provided by Company affiliates, including, but not limited, to force-placed insurance, are proper, lawful and fairly priced.  To the extent the Company's systems and controls are not adequate, the Board should take prompt action to remedy the situation including the implementation of proper systems and procedures to ensure adequate Board oversight of related party transactions.  The Company should additionally bring claims for breach of fiduciary duty, contribution, indemnification, aiding and abetting and unjust enrichment in connection with any improper or unlawful service and/or fee arrangements, including any force-placed insurance arrangements, with the Company's affiliates against any responsible persons including, but not limited to: Willian C. Erbey, Richard Cooperstein, Duo Zhang, Altisource Portfolio Solutions, S.A. ("Altisource"), Home Loan Servicing Solutions, Ltd. ("HLSS"), Altisource Residential Corporation ("Residential"), Altisource Asset Management Corporation ("AAMC"), Southwest Business Corporation ("SWBC") and Betline Road Insurance Agency, Inc. ("Betline").

Ocwen should also review the Company's directors' and senior executives' equity and option holdings in Ocwen's affiliates and take measures to ensure that those individuals are not being improperly incentivized to favor interests other than those of Ocwen and its shareholders.  In addition, the Board should adopt a strengthened clawback provision in order to further discourage corporate executives from engaging in behavior which in the short term produces financial benefits to those executives in terms of additional financial emoluments but in the long term damages the Company by exposing it to the claims such as those discussed herein.

Board of Directors of Ocwen Financial Corporation
September 30, 2014
Page 15

## C.   Claims Against Ocwen's Officers and Directors for Exposing the Company to Liability for Materially False or Misleading Statements

On or about August 12, 2014 a class action complaint was filed in the United States District Court for the Southern District of Florida alleging that Ocwen, Messrs. Ferris, Britti and Erbey made material false and misleading statements in violation of the Securities Exchange Act of 1934 ("the Exchange Act"). *See United Union of Roofers, Waterproofers & Allied Workers Local Union No. 8 v. Ocwen Financial Corporation, et al.*, No. 9:14-cv-81057-WPD (S.D. Fla.). A number of other actions alleging similar violations of the Exchange Act have also been filed in that District as well in the United States District Court for the District of the Virgin Islands.

Those federal securities fraud class actions subject the Company to substantial liability arising out of the individual defendants' wrongdoing.  Ocwen will also be forced to spend substantial sums of money defending itself in the federal securities fraud class action lawsuits. Ocwen should review and investigate the allegations of the federal securities fraud actions to determine if any Company employees are responsible for material false and misleading statements or omissions and take appropriate action against any responsible individuals. Additionally, in connection with the securities fraud class actions and any related regulatory investigations or proceedings, Ocwen should seek to recover any defense costs, liability or other money paid by pursuing contribution and indemnity claims against any responsible persons including, but not limited to:  Willian Erbey, Ronald Farris, John Britti and Barry Wish. *Accord Mehlenbacher v. Jitaru*, No. 04 Civ. 1118 (ACC), 2005 U.S. Dist. LEXIS 42007, at \*16 (M.D. Fla. June 6, 2005) (sustaining contribution and indemnity claims in connection with securities fraud class action).

## D.   Claims Arising Out of Ocwen's Repurchase of Common Stock at Inflated Prices

Between October 31, 2013 and June 30, 2014, Ocwen repurchased 2,663,334 shares of the Company's common stock for a total of $94.6 million or approximately $35.52 per share. Those stock repurchases were made during a period in which the Company was in possession of material non-public information concerning adverse regulatory proceeding and the negative impact they would have upon Ocwen's operations and financial results.  Had the Company waited to purchase shares after the disclosure of this material information it could have saved substantial amounts of money in repurchasing the Company's stock.  Between July 1, 2104 and August 8, 2014, Ocwen repurchased 1,953,407 shares of common stock for a total of $65.5 million or approximately $33.53 per share.  Had the Company waited to repurchase the first 2,663,335 share of common stock it would have saved approximately $5.3 million.  The Company should take action in order to obtain compensation from the officers and/or directors responsible for causing the Company this harm.

In addition, Ocwen should review and investigate the procedures employed in its share repurchase program in order to ensure that purchases are being made at an appropriate price reflecting full disclosure of all relevant material information and that the repurchase program is otherwise being employed in the best interest of the Company and its shareholders.  To the

Board of Directors of Ocwen Financial Corporation
September 30, 2014
Page 16

extent that any deficiencies are identified in the Company's share repurchase program the Company should take prompt action to remedy the situation, including, but not limited, to the implementation of systems and procedures for ensuring its proper functioning.

*   *   *

I look forward to hearing from you.

Very truly yours,

Jeffrey S. Abraham

cc: Dr. Robert Lowinger

EXHIBIT 5

# HYNES KELLER & HERNANDEZ, LLC

## ATTORNEYS AT LAW

PENNSYLVANIA
NEW YORK

June 3, 2014

**VIA EXPRESS MAIL**

Mr. William C. Erbey
Executive Chairman of the Board
Ocwen Financial Corporation
2002 Summit Boulevard, 6th Floor
Atlanta, Georgia 30319

Re:     **Shareholder Demand**

Dear Mr. Erbey:

This firm, along with Faruqi & Faruqi, LLP, represent Helene Hutt (the "Shareholder"), a beneficial shareholder of 200 shares of Ocwen Financial Corporation ("Ocwen" or the "Company"). I write on behalf of the Shareholder to demand that the Company's Board of Directors (the "Board") take action to remedy breaches of fiduciary duties by certain officers and directors of the Company, as alleged herein.

As you are aware, by reason of their positions as officers and/or directors of Ocwen and because of their ability to control the business and corporate affairs of Ocwen, the officers and directors of the Company owe Ocwen and its shareholders the fiduciary obligations of loyalty, good faith and due care. The Shareholder believes that the following officers and/or directors of the Company violated these core fiduciary duty principles, causing Ocwen to suffer damages: Executive Chairman of the Board William C. Erbey ("Erbey"); President, Chief Executive Officer and Director Ronald M. Faris; and Directors Ronald J. Korn, William H. Lacy, Wilbur L. Ross, Jr., Robert A. Salcetti, and Barry N. Wish (collectively, the "Officers and Directors"). The Shareholder contends that the Officers and Directors breached their fiduciary duties in a number of ways, as detailed below.

### Misconduct Servicing Mortgages

On December 19, 2013, the U.S. Consumer Financial Protection Bureau ("CFPB" or the "Bureau") and state officials from 49 states and the District of Columbia ordered Ocwen to provide $2 billion in help to underwater borrowers to resolve allegations of misconduct by Ocwen in the mortgage servicing arena. The Bureau said Ocwen, which is the largest nonbank mortgage servicer in the United States, caused borrowers to lose their homes by failing to appropriately account for payments, by not providing information about alternatives to foreclosure and by robo-signing documents. Per the CFPB and its partner states, Ocwen was engaged in significant and systemic misconduct that occurred at every stage of the mortgage servicing process.

Mr. William C. Erbey
June 3, 2014
Page 2

According to the complaint filed in the federal district court in the District of Columbia, Ocwen's violations of consumer financial protections put thousands of people across the country at risk of losing their homes. Specifically, the complaint says that Ocwen was engaged in the following misconduct:

- **Took advantage of homeowners with servicing shortcuts and unauthorized fees:** Customers relied on Ocwen to, among other things, treat them fairly, give them accurate information, and appropriately charge for services. According to the complaint, Ocwen violated the law in a number of ways, including:
    - Failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements;
    - Charging borrowers unauthorized fees for default-related services;
    - Imposing force-placed insurance on consumers when Ocwen knew or should have known that they already had adequate home-insurance coverage; and
    - Providing false or misleading information in response to consumer complaints.

- **Deceived consumers about foreclosure alternatives and improperly denied loan modifications:** Struggling homeowners generally turn to mortgage servicers, the link to the owners of the loans, as their only means of developing a plan for payment. Ocwen failed to effectively assist, and in fact impeded, struggling homeowners trying to save their homes. This included:
    - Failing to provide accurate information about loan modifications and other loss mitigation services;
    - Failing to properly process borrowers' applications and calculate their eligibility for loan modifications;
    - Providing false or misleading reasons for denying loan modifications;
    - Failing to honor previously agreed upon trial modifications with prior servicers; and
    - Deceptively seeking to collect payments under the mortgage's original unmodified terms after the consumer had already begun a loan modification with the prior servicer.

- **Engaged in illegal foreclosure practices:** One of the most important jobs of a mortgage servicer is managing the foreclosure process. But Ocwen mishandled foreclosures and provided consumers with false information. Specifically, Ocwen is accused of:
    - Providing false or misleading information to consumers about the status of foreclosure proceedings where the borrower was in good faith actively pursuing a loss mitigation alternative also offered by Ocwen; and
    - Robo-signing foreclosure documents, including preparing, executing, notarizing, and filing affidavits in foreclosure proceedings with courts and government agencies without verifying the information.

As noted by CFPB Director Richard Cordray on the Ocwen enforcement action press call:

Mr. William C. Erbey
June 3, 2014
Page 3

The mortgage market is the single largest consumer financial market in the United States, with consumers owing about $10 trillion. Mortgage servicers, who bear responsibility for managing these loans, play a central role in the lives of homeowners. They are the link between a mortgage borrower and a mortgage owner. They collect and apply payments. They work out modifications to the loan terms. And they handle the difficult process of foreclosure. Importantly, consumers cannot take their business elsewhere by voting with their feet. Homeowners are stuck with their mortgage servicer, no matter how good or bad that servicer may turn out to be.

Ocwen specializes in servicing subprime or delinquent loans and it has been greatly expanding its business in the years since the housing collapse. Today it is not only the largest nonbank servicer, but also the fourth-largest mortgage servicer overall in this country. It has acquired smaller competitors such as Homeward Residential and Litton Loan Servicing. And it has taken on servicing duties for some of the big banks. Today its customers number in the millions.

Because Ocwen bought the mortgage servicing rights to millions of existing accounts, for many borrowers Ocwen was not their first servicer. For these struggling homeowners, the Consumer Bureau believes that too often trouble began as soon as a loan transferred to Ocwen, with Ocwen failing to honor trial modifications that were agreed upon by previous servicers.

We believe that Ocwen violated federal consumer financial laws at every stage of the mortgage servicing process. In our complaint filed in federal district court today, we allege that Ocwen took advantage of consumers with servicing shortcuts and unauthorized fees. It misled consumers about alternatives to foreclosures. It provided false or misleading information to consumers about the status of their accounts. It denied loan modifications for eligible homeowners. And it sent documents through the courts after they were robo-signed during the foreclosure process. After examining the potential violations, we have concluded that Ocwen made troubled borrowers even more vulnerable to foreclosure.

So today's order, to which Ocwen has agreed, requires Ocwen to provide $125 million in refunds to consumers who lost their home to foreclosure while being serviced by Ocwen, Homeward Residential Holdings, or Litton Loan Servicing between 2009 and 2012. In addition, over a three-year period, Ocwen must complete sustainable loan modifications that result in a reduction in principal totaling $2 billion for homeowners who are underwater and struggling to pay off their mortgages. This will bring relief to Ocwen's victims and it will improve conditions in the mortgage market by reducing the number of foreclosures.

*      *      *

Mr. William C. Erbey
June 3, 2014
Page 4

But because of its conduct, as described in our complaint, Ocwen will be subject to standards above and beyond the rest of the industry. For example, the proposed court order aims to solve problems surrounding Ocwen's handling of loan modifications in transferred loans. This includes a requirement that when consumers have less mitigation requests pending with a prior servicer within sixty days of any transfer to Ocwen, Ocwen must resolve the requests. This includes a requirement that Ocwen cannot initiate or continue a foreclosure process until it has done so.

Our order also ensures that Ocwen will adhere to these significant new homeowner protections through greater oversight and a court mandate. A special independent monitor will have the authority to require Ocwen's compliance and oversee the settlement. In addition, like the rest of the mortgage servicing industry, Ocwen will have to beef up its standards to ensure that when any of its consumers call for help that they get regular and dependable assistance.

*          *          *

This case stands as a landmark for the new Consumer Bureau, since it is the first time we have partnered with virtually all state attorneys general as well as state regulators. Working together toward the singular goal of protecting consumers, we intend to improve the performance of the mortgage servicing industry for all homeowners, responsible businesses, and the economy as a whole.

It is clear from the complaint and Mr. Cordray's remarks that the problems at Ocwen were not the work of a few bad seeds, but were extensive and represented the business model for the Company when it came to servicing mortgages. In order to reach a compromise regarding the aforementioned wrongdoing, Ocwen agreed to reduce principal loan balances for struggling homeowners by $2 billion, refund $125 million to foreclosed borrowers and follow new rules to protect homeowners.

As to the "new rules," Ocwen must change the way it services mortgages to ensure that borrowers are protected from the illegal behavior that puts them in danger of losing their homes. To ensure this, the CFPB and the states are proposing that Ocwen follow the servicing standards set up by the 2012 National Mortgage Settlement with the five largest banks. Because of Ocwen's track record of problems handling the large volume of mortgage servicing rights it has quickly acquired in recent years, Ocwen is also being ordered to adhere to additional consumer protections, including how it manages transferred loans. Among other things, Ocwen must:

- **Properly process pending requests:** For loans that are transferred to Ocwen, the company must determine the status of in-process loss mitigation requests pending within 60 days of transfer. Until then, Ocwen cannot start, refer to, or proceed with foreclosure.
- **Honor previous loan modification agreements:** If the borrower has a loan modification agreement, Ocwen must honor it under the terms of the company that transferred the loan.

Mr. William C. Erbey
June 3, 2014
Page 5

- ○ **Ensure continuity of contact for consumers:** Ocwen will have to ensure that consumers get regular and dependable assistance when they call for help. This includes requiring more than just a single point of contact assigned to each borrower, but also that other Ocwen employees with access to the borrower's information be available if the borrower wants to speak to someone immediately.
- ○ **Restrict servicing fees:** All servicing fees must be reasonable, bona fide, and disclosed in detail to borrowers. For example, Ocwen cannot collect any late fees if a loan modification application is under review or if the borrower is making timely trial modification payments.
- ○ **Notify consumers of loss mitigation options and restrict dual tracking:** Ocwen generally cannot refer a borrower's account to foreclosure while the borrower's application for a loan modification is still pending. If the loan-modification request is denied, the borrower can appeal that decision and Ocwen cannot proceed to foreclosure until that appeal has been resolved.

In January 2013, the CFPB released new rules on mortgage servicing that will apply to every mortgage servicer. The standards that Ocwen must adhere to according to settlement with the CFPB and the states are in addition to the protections offered to consumers under the new rules that take effect on Jan. 10, 2014.  Thus, the Officers and Directors failure to fulfil their fiduciary duties have not only cost the Company billions of dollars, but also placed the Company at a competitive disadvantage due to the extra layer of rules Ocwen must now abide by, but that other mortgage servicers are not constrained by.

Unfortunately, Ocwen's problems did not end with its settlement of the allegations of misconduct by Ocwen in the mortgage servicing arena.

## Self-Dealing at Ocwen

In a letter sent on Monday April 21, 2014 to Ocwen's General Counsel Timothy Hayes, New York State Department of Financial Service's (NYSDFS) superintendent Benjamin Lawsky ("Lawsky") questioned the Company regarding business dealings related to a relationship between Ocwen and Altisource Portfolio Solutions, a Luxembourg-based distressed property manager.  Specifically, the NYSDFS is looking into the relationship between Ocwen and a subsidiary of Altisource, Hubzu, which Ocwen uses as its principal online auction site for the sale of its borrowers' homes facing foreclosure.  Altisource has an eight-year agreement to manage distressed and repossessed homes in Ocwen's $435 billion servicing portfolio. The agreement requires that properties be listed and marketed through Hubzu, even if a distressed borrower has already signed a contract for a short sale.

Lawsky's letter voices concerns over the two company's arrangement. "Hubzu appears to be charging auction fees on Ocwen-serviced properties that are up to three times the fees charged to non-Ocwen customers. In other words, when Ocwen selects its affiliate Hubzu to host foreclosure or short sale auctions on behalf of mortgage investors and borrowers, the Hubzu auction fee is 4.5%; when Hubzu is competing for auction business on the open market, its fee is as low as 1.5%." This shift in fees raised eyebrows at the NYSDFS, who commented that the fees

Mr. William C. Erbey
June 3, 2014
Page 6

ultimately get passed onto investors and homeowners who are typically attempting to mitigate losses.

Additionally, Lawsky commented that the relationship between the two companies raises questions about whether the inflated fees are through conflicted business relationships, and thus, negatively impact homeowners. Lawksy also noted, "Alternatively, if the lower fees are necessary to attract non-Ocwen business to the open market, it raises concerns about whether Ocwen-serviced properties are being funneled into an uncompetitive platform at inflated costs."

The NYSDFS specifically noted concerns over "self-dealing," citing in a footnote, "As you [Timothy Hayes] know, a number of key Ocwen personnel have individual equity ownership stakes in Altisource Portfolio." Including, William Erbey, Ocwen's executive chairman, who owns or controls 26% of Altisource's stock and 13% of Ocwen's stock. This was not the first time the NYSDFS had raised the issue of possible self-dealing at Ocwen.

Back on February 26th, Lawsky pointed out Ocwen does a lot of business with a group of companies that are principally owned and controlled by William C. Erbey, who is also Executive Chairman of Ocwen. These affiliated companies were Altisource Portfolio Solutions, S.A., Altisource Residential Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions Ltd. Because Ocwen's management owned stock and options in the affiliated companies, Lawsky worried "that management has the opportunity and incentive to make decisions concerning Ocwen that are intended to benefit the share price of affiliated companies, resulting in harm to borrowers, mortgage investors, or Ocwen shareholders as a result." In addition, Lawsky said, "the facts our review has uncovered to date cast serious doubts on recent public statements made by the company that Ocwen has a "strictly arms-length" business relationship" with those companies." Last, Lawsky worried "this tangled web of conflicts could create incentives that harm borrowers and push homeowners unduly into foreclosure," a worry that the Officers and Directors of Ocwen appear to have let come to fruition inside of taking proper steps to prevent.

The April 21st letter requests answers to some key questions, including the percentage of Ocwen-serviced properties on Hubzu, whether investors and homeowners are required to use Hubzu for their REO and short sale properties, and a confirmation of the 4.5 percent auction fee on Ocwen properties compared to the lower fee on auctions of properties not serviced by Ocwen.

Evidently, the dispute over Altisource's role in sales of distressed properties has been going on for a few years. Real estate agents have long grumbled online at Ocwen for intruding in the short sale process and trying to take a piece of their commissions. Phillip Querin, a lawyer who represents the Portland Metropolitan Association of Realtors in Oregon has stated "Ocwen is trying to turn the distressed short sale business into a profit center for itself, above and beyond the servicing fees it is getting." Agents say Ocwen and its affiliates are interfering with bona fide short sale contracts and are trying to extract additional commissions from homebuyers.

There now exists the very real likelihood that the relationships highlighted by Lawsky and the business dealings between Ocwen, Altisource and Hubzu will once again land Ocwen in

Mr. William C. Erbey
June 3, 2014
Page 7

trouble with regulators. An incredible turn of events given Ocwen's recent history with both federal and state regulators. But once again, this is not the end of Ocwen's seemingly endless parade of problems.

### Non-Disparagement Clauses

Most recently, Lawsky said he is looking into reports Ocwen is requiring some struggling homeowners to agree not to criticize the Company in public if they want to have a mortgage modified. Reuters has reported that a number of companies collecting payments on home loans, including Ocwen, are increasingly demanding borrowers in litigation sign non-disparagement clauses if they want the terms on their mortgages eased. Those clauses prohibit consumers from printing or posting anything negative about the companies. These clauses can hurt borrowers who later have problems with their mortgage collector by preventing them from complaining publicly about their difficulties or suing, lawyers said. If a collector, known as a servicer, makes an error, getting everything fixed can be a nightmare without litigation or public outcry.

Not surprisingly, Lawsky responded strongly to the allegations, stating "[r]eports that Ocwen is imposing a gag rule for certain struggling homeowners - preventing them from criticizing the company - are troubling and deeply offensive. We will investigate this issue immediately." "Servicers have a responsibility to act in the best interest of borrowers and investors - not to try and sweep shoddy practices under the rug or muzzle struggling homeowners," Lawsky added. What makes this even more extraordinary for Ocwen is that the Company is just coming off a massive settlement with federal and state regulators arising out of Ocwen's significant and systemic misconduct that occurred at every stage of the mortgage servicing process. It is incomprehensible that the Officers and Directors would allow such conduct while Ocwen remains under such intense scrutiny and additional rules when it comes to mortgage servicing.

### Damages to Ocwen and Shareholder Demand

The Shareholder maintains that the Officers and Directors breached their fiduciary duties by, among other things, (i) engaging in significant and systemic misconduct that occurred at every stage of the mortgage servicing process; (ii) participating in and/or allowing self-dealing transactions; and (iii) forcing mortgagees to enter into non-disparagement clauses in order to receive mortgage modifications as described herein. The foregoing actions are clearly not the product of a good faith exercise of business judgment as they constitute a breach of fiduciary duties by the Officers and Directors and unjustly enriched Erbey at the expense of Ocwen and its shareholders.

Moreover, as a result of these breaches of fiduciary duty, the Company has been forced to provide $2 billion in help to underwater borrowers, refund $125 million to foreclosed borrowers and follow new and more stringent rules to protect homeowners. Furthermore, the Company faces numerous other investigations for which it now must defend itself.

On behalf of the Shareholder, I hereby demand that the Board take action against the Officers and Directors to recover the damages described herein for the benefit of the Company. If the Company does not commence appropriate action within a reasonable period of time, the

Mr. William C. Erbey
June 3, 2014
Page 8

Shareholder will commence a shareholder derivative action on behalf of the Company to obtain appropriate relief.  This Shareholder Demand also serves to put all affected entities and individuals identified herein on notice of their document preservation and collection responsibilities.

Very truly yours,

*Michael J Hynes*

Michael J. Hynes

EXHIBIT 6



ABRAHAM, FRUCHTER & TWERSKY, LLP

December 30, 2014

**By Federal Express**

Board of Directors
Ocwen Financial Corporation
2002 Summit Boulevard, 6th Floor
Atlanta, Georgia 30319

     **Re:**    **Supplemental Demand Upon the Board of Directors**

To the Board of Directors of Ocwen Financial Corporation:

     This firm represents Dr. Robert Lowinger, who is, and at all times relevant to the issues addressed in the letter was, a shareholder of Ocwen Financial Corporation ("Ocwen" or the Company"). I am writing pursuant to Fla. Stat. §607.07401 and to supplement the prior demand made by Dr. Lowinger on the Company's Board of Directors (the "Board"), a copy of which is attached hereto as Exhibit A and incorporated herein by reference.

     On December 19, 2014, the Company entered into a consent decree (the "Consent Decree") with the New York State Department of Financial Services (the "Department" or "DFS"). The Consent Decree arose out of the Department identifying numerous significant violations of a September 1, 2011 agreement which the Company and the Department had entered into with respect to mortgage servicing practices and a subsequent consent order (the "Consent Order") entered into on or about December 5, 2012. A copy of the Consent Decree is attached hereto as Exhibit B and incorporated herein by reference.

     Among other things, the Consent Decree requires that Ocwen pay $150 million as follows: $100 million to be paid by Ocwen to the Department by December 31, 2014, as a civil monetary penalty Pursuant to New York Banking Law §44; and $50 million to be deposited by Ocwen into an interest-bearing escrow account as restitution to current and former Ocwen-serviced borrowers in New York by December 31, 2014. Consent Decree ¶24. The Company is not allowed to take a tax deduction or tax credit for those payments or seek indemnification from any insurance policies for the payments made. Consent Decree ¶¶25 and 58. The Consent Decree also provides for the Company to hire an Operations Manager as selected by the Department (Consent Decree ¶31, *et seq.*) and that William Erbey resign from his position as Executive Chairman of Ocwen as well as his positions with Altsource Portfolio Solutions, S.A, Altsource Residential Corporation, Altsource Asset Management Corporation and Home Loan Servicing Solutions Ltd. (collectively, the "Related Parties.") Consent Decree ¶57.

Board of Directors of Ocwen Financial Corporation
December 30, 2014
Page 2

Dr. Lowinger, in his capacity as a shareholder of Ocwen, demands that you pursue claims: (1) against William Erbey premised on a theory of breach of fiduciary duty, contribution and indemnification; (2) any other officer of Ocwen responsible for the damage caused to the Company by the payments required by the Consent Decree; (3) Ocwen's directors for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, contribution and indemnification based upon their failure to properly insure the Company's compliance with the Consent Order Ocwen entered into with the DFS on or about December 5, 2012; and (4) the Related Parties for aiding and abetting a breach of fiduciary duty, contribution and indemnification. The Company, however, should not be forced to bear alone the $150 million in after-tax costs caused by the wrongful conduct of those parties.

In writing this supplemental demand letter, Dr. Lowinger is aware of paragraph 58 of the Consent Decree which provides that:

> Neither Ocwen, nor any of its parents or affiliates will, collectively or individually, seek or accept, directly or indirectly, reimbursement or indemnification, including, but not limited to, payment made pursuant to any insurance policy, or from any of its parents or affiliates, with regard to any or all of the amounts payable pursuant to this Consent Order.

This provision, to the extent it applies to the claims which are the subject of this demand letter and the demand letter previously sent by Dr. Lowinger, is void as against public policy.[1] Ocwen's directors did not have the right to waive any potential liability they or Ocwen's officers might have to the Company or the right of Dr. Lowinger or other Ocwen shareholders to enforce those rights. Instead, including and agreeing to paragraph 58 as part of the Consent Decree itself constitutes a breach of fiduciary duty on the part of the Board.

In addition, the vindication of corporate claims for breach of fiduciary duty or contribution owned by the Company are not within the administrative purview of the Department and, even if they were, Dr. Lowinger finds it doubtful that the Department would care if Mr. Erbey or any other officer or director of Ocwen or the Related Parties were forced to compensate the Company for the damages caused by the wrongful conduct at issue. Accordingly, Dr. Lowinger further demands that the Company request that the Department waive, modify or suspend paragraph 58 for purposes of allowing Dr. Lowinger to proceed with his shareholder derivative lawsuit or allowing Ocwen to assert those claims in its own right.

In writing this letter, Dr. Lowinger does not intend to concede that this demand letter is a necessary prerequisite to instituting a shareholder derivative claim because these potential claims were already the subject of Dr. Lowinger's previous demand letter. This letter is only being

---

[1]     Dr. Lowinger is not a party to the Consent Decree and also not a parent or affiliate of the Company (terms which the Consent Decree does not define) and, therefore, is not bound by the terms of the Consent Decree.

Board of Directors of Ocwen Financial Corporation
December 30, 2014
Page 3

written in an abundance of caution to negate any possible claim that the previous demand letter does not cover these claims.

Very truly yours,

Jeffrey S. Abraham

cc:    Dr. Robert Lowinger (by e-mail)

       John P. Coffey, Esq. (by e-mail)
       Kramer Levin Naftalis & Frankel, LLP

       Daniel Burstein (by U.S. Mail)
       Executive Deputy Superintendent
       Real Estate Finance Division
       New York State Department of Financial Services
       One State Street
       New York, NY 10004

# EXHIBIT 7

**CARLTON FIELDS**
**JORDEN BURT**

ATTORNEYS AT LAW

**Miami Tower**
100 S.E. Second Street | Suite 4200
Miami, Florida 33131-2113
P.O. Box 019101 | Miami, Florida 33101-9101
305.530.0050 | fax 305.530.0055
www.CFJBLaw.com

Atlanta
Hartford
Los Angeles
**Miami**
New York
Orlando
Tallahassee
Tampa
Washington, D.C.
West Palm Beach

Charles Rosenberg
Shareholder
305.539.7324 direct dial
crosenberg@cfjblaw.com

March 23, 2015

Richard D. Greenfield
Greenfield & Goodman LLC
250 Hudson Street, 8th Floor
New York, NY 10013

**Via FedEx and E-mail**
whitehatrdg@earthlink.net

Dear Mr. Greenfield:

We represent the Special Litigation Committee of the Board of Directors of Ocwen Financial Corporation ("Ocwen" or the "Company"). We are writing in reference to your February 11, 2014 demand letter to Ocwen's Board of Directors, your subsequent correspondence, and the Complaint and Amended Complaint that you have filed in the action captioned *Sokolowski v. Erbey*, No. 9:14-81601 (S.D. Fla. first filed Dec. 24, 2014) (the "*Sokolowski*" action).

After careful consideration of, among other things, the Other Matters (as defined below), the Special Litigation Committee has concluded, based on external factors unrelated to the merits of your allegations, that it is not in the best interests of the Company to proceed with a lawsuit based on your allegations at this time. As more fully described below, the Special Litigation Committee will remain in place, and will monitor the Other Matters, until those actions are resolved or a material change takes place in those actions, at which time the Committee will complete its evaluation of the claims you have asserted.

***Background on the Special Litigation Committee***

The Company's independent directors authorized the creation of a Special Litigation Committee on May 14, 2014. Thereafter, our firm was retained as counsel to the Committee. The independent directors of Ocwen's Board approved resolutions, on August 6, 2014, composing and appointing members to the Committee. In those resolutions, the independent directors vested the Committee with the "full and exclusive power and authority" to investigate the allegations made in a number of letters received from shareholders together with subsequent letters involving related allegations (the "Shareholder Demands") and to determine whether the prosecution of such claims is in the "best interests" of Ocwen and its shareholders:

[T]he Special Litigation Committee shall have the full and exclusive power and authority to (1) investigate, review, and analyze the facts, circumstances, and legal claims that are the subject of the Shareholder Demands and any additional shareholder demands raising the same, similar, or related

allegations and (2) to consider and determine whether or not the Company's prosecution of the claims asserted in the Shareholder Demands, or any other claims arising from the facts and circumstances alleged in the Shareholder Demands, is in the best interests of the Company and its shareholders, and to further consider and determine what action shall be taken on behalf of the Company with respect to the Shareholder Demands . . . .

The Committee is currently composed of directors Phyllis R. Caldwell, William Lacy, and DeForest Black Soaries. Ms. Caldwell and Dr. Soaries joined the Board on January 21, 2015, pursuant to the December 22, 2014, Consent Order between Ocwen and the New York State Department of Financial Services ("NY DFS"). Paragraph 50 of the Consent Order required the Board's expansion "by two independent board members . . . in consultation with the Compliance Monitor or the Operations Monitor." On February 19, 2015, the independent members of Ocwen's Board replaced two Committee members with Ms. Caldwell and Dr. Soaries. Ms. Caldwell and Dr. Soaries are fully apprised of the work that the Committee and its counsel have done to date.

Since the initial formation of the Special Litigation Committee, two derivative lawsuits have been filed:

(1)     The Complaint in the *Sokolowski* action was filed in the U.S. District Court for the Southern District of Florida on December 24, 2014. An Amended Complaint was filed on February 11, 2015.

(2)     The Complaint in *Norbert J. Tuseo Trust v. Faris*, No. 2015-001669 (Fla. 15th Cir. Ct.) was filed in Florida state court on February 11, 2015.

### The Other Matters

In addition to the two derivative actions, Ocwen faces several direct lawsuits, an investigation by the Securities and Exchange Commission, and certain other potential litigation from investors in residential mortgage-backed securities ("MBS"). The parallel litigation, investigation, and threatened litigation (collectively, the "Other Matters") include:

The Ocwen Class Action: A consolidated class action complaint was filed against the Company and certain officers on December 8, 2014, and an amended complaint was filed on February 6, 2015. This action is now captioned *In re Ocwen Financial Corp. Securities Litigation*, No. 9:14-81057 (S.D. Fla. first filed Aug. 12, 2014). The amended complaint asserts causes of action for: (1) violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5; and (2) violations of Section 20(a) of the Exchange Act. The claims arise from, among other things, Ocwen's loan servicing practices, compliance with the terms of regulatory settlements, transactions with Altisource Portfolio Solutions, S.A. ("Altisource"), and Home Loan Servicing Solutions ("HLSS"), and representations to shareholders. This class action is referenced in ¶¶ 132 & 237 of the *Sokolowski* Amended Complaint and ¶ 146 & Ex. A (November 6, 2014 Demand for Legal Action) of the *Tuseo Trust* Complaint.

The Altisource Class Action:  A class action complaint alleging violations of the federal securities law was filed against Altisource on September 8, 2014.  An amended class action complaint adding Ocwen as a defendant was filed on February 2, 2015.  The action is captioned *In re Altisource Portfolio Solutions, S.A. Securities Litigation*, No. 9:14-81156 (S.D. Fla. first filed Sept. 8, 2014).  The amended complaint asserts a claim against Ocwen and William C. Erbey pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 alleging that Ocwen and Mr. Erbey made false disclosures concerning the relationship and transactions between Ocwen and Altisource and certain Ocwen business practices.   A claim is also asserted against Mr. Erbey in his capacity as a control person of Ocwen under Section 20(a).  The *Altisource* Amended Complaint cites to many of the same allegedly false statements that are alleged in the *Sokolowski* Amended Complaint and concern those same alleged practices.

The SEC Investigation:  The Company has received several requests for voluntary production of documents and/or subpoenas from the staff of the New York Regional Office of the SEC ("the Staff") seeking documents and information relating to, among other things, the April 22, 2014 surrender of certain options to purchase the Company's common stock by Mr. Erbey, the Company's business dealings with Altisource, HLSS, Altisource Asset Management Corporation, and Altisource Residential Corporation (all named defendants in the *Sokolowski* action), the interests of the Company's directors and executive officers in these companies, and the Company's announcement in August 2014 that it intended to amend its Annual Report on Form 10-K for the fiscal year ended December 31, 2013 and its Quarterly Report on Form 10-Q for the quarter ended March 31, 2014.  This investigation is cited in ¶¶ 48, 115, 198, & 242 of the *Sokolowski* Amended Complaint and ¶¶ 130-144 of the *Tuseo Trust* Complaint.  The *Tuseo Trust* Complaint states that "[t]he SEC investigation is still on-going as of the date of this filing."  ¶ 144.

MBS Investors: The Company has received a letter alleging a default on the part of the Company from lawyers for BlueMountain Capital Management, LLC, a purported holder of notes issued by HLSS Servicer Advance Receivables Trust, a trust holding notes backed by MSRs serviced by Ocwen.  The basis for the alleged default concerns some of the alleged loan servicing practices described in the *Sokolowski* complaint.  This is cited in ¶ 133 of the *Sokolowski* Amended Complaint.  Blackrock and Pimco, both MBS investors, have also publicly advised that they are contemplating actions against Ocwen arising from its servicing practices.  The *Tuseo Trust* Complaint alleges, to this end, that "Ocwen faces a mounting set of liabilities from investors in Mortgage Back Securities Trusts that have claimed defaults as Ocwen has failed to perform its contractual obligations . . . ."  ¶ 146.

Possible damages in the Other Matters are not stated with specificity but the maximum exposure is alleged to be significant.  The *Sokolowski* Amended Complaint states that the Company's exposure in the Other Matters is potentially billions of dollars.  ¶¶ 25, 163, 234-242; *see Tuseo Trust* Complaint ¶¶ 11, 145

The resolution of the claims asserted in the Other Matters, including liability and damages, turns in substantial part on the same issues as those raised in the demand letter on behalf of your client and in the two pending derivative suits against the Company.

***The Committee's Decision to Defer***

The Committee is tasked with determining a course of action in response to the shareholder demands that is in the best interests of the Company and its shareholders. The Committee concludes that it is in the best interests of the Company and its shareholders to defer for now reaching any conclusion as to the viability of potential claims, the scope of any damages, and whether pursuing any such claims would be in the Company's best interests. The Committee's judgment is based on the following factors:

Pursuing Derivative Claims Could Be in Effect an Admission in the Other Matters: In the demand letters and in the pending derivative litigation, the Company has been asked to take a position that is directly adverse to its defense of the parallel class actions and investigation. *See Furman v. Walton*, 320 Fed. App'x 638, 640 (9th Cir. 2009) (affirming dismissal of derivative action; "The board asserted that bringing suit as per [shareholder's] demand might have constituted a harmful admission in litigation pending against [the company]. [Shareholder] cannot refute this compelling business purpose."); *Cucci v. Edwards*, No. SACV 07-532 PSG (MLGx), 2007 WL 3396234, at *2 (C.D. Cal. Oct. 31, 2007) ("[P]rosecution of the Shareholder Derivative Action would likely conflict with [the company's] defense of the Securities Class Action, since the shareholder derivative Plaintiffs would need to prove allegations that would seriously undermine [the company's] defense of the class action.").

Resolutions of the Other Matters Could Inform the Committee's Judgment as to Claim Viability and Damages: As Other Matters are resolved, the Committee will be able to determine with greater clarity the viability of many of the derivative allegations and the amount of any alleged damages.

With respect to putative derivative claims, if there are factual or legal determinations of any kind — adverse or otherwise to the Company or to its current or former directors and executives — in the Other Matters, those judicial determinations will inform the Committee, to an extent, regarding the viability of the claims proposed in the demand allegations. *See Brudno v. Wise*, No. Civ. A. 19953, 2003 WL 1874750, at *1 (Del. Ch. April 1, 2003) ("[T]o a great extent, the plaintiffs [in the derivative action] expressly hinge [the company's] right to relief on the outcome in the Federal Securities Action. As a result, it makes little sense for this Action to proceed until the bases for the plaintiffs' indemnity claims are settled, or at the very least, closer to that point.").

The Other Matters could also provide greater clarity with respect to the alleged derivative damages. The complaints in the *Sokolowski* and *Tuseo Trust* derivative actions both allege damages that are contingent on the outcome of certain Other Matters. *See Sokolowski* Amended Complaint ¶ 239 (alleging harm that is "not yet fully capable of determination"); *Tuseo Trust* Complaint ¶ 146.

Deferral Will Better Allocate Corporate Resources: The overall investment of the Company's resources, in terms of attorneys' fees and attendant costs, as well as Company executive and staff time, will be substantially reduced if the Other Matters resolve first. *See Cucci,* 2007 WL 3396234, at *2 ("At this early stage of the litigation, it seems sensible for the company and its stockholders for [the company] to devote its resources at this time exclusively to the Securities Class Action. Given the lack of any pressing need for the

simultaneous procession of the Shareholder Derivative Action, litigative efficiency can be advanced at no discernible cost to other interests."); *In re STEC, Inc. Derivative Litig.*, Nos. CV-00667-JVS (MLGx), SACV 10-00220-JVS (MLGx), 2012 WL 8978155, at *6 (C.D. Cal. Jan. 11, 2012) ("[B]ecause diverting [the company's] financial and managerial resources to this action at this time is likely not in [the company's] best interest, the first factor militates toward granting a stay.").

There Is Little or No Prejudice from the Deferral:  Because of the progression of the Committee's investigation, the litigation hold in place, and the fact that the relief of a stay is available in the pending derivative actions, the Committee's decision to defer its determination of the demand allegations results in minimal or no prejudice to the potential claims.

Although the Committee has made no conclusions as to the viability of the demand allegations, its investigation into the various demand allegations has substantially progressed.  The Committee, through counsel, has undertaken an extensive document collection and review, including a collection and review of Board materials, documents that the Company produced to regulators, and more than 120,000 e-mails and attachments from eight key executives at the Company.  Counsel has also conducted interviews with at least 16 Company executives and employees, some on more than one occasion.  These interviews include Mr. Erbey prior to his departure.  A broad litigation hold is in place and will remain in place until at least the Committee makes its determination and any ensuing litigation is resolved.

The Committee is also aware that the fact that derivative claims are presently on file would toll any statute of limitations as of the date of filing.  The Committee would request, consistent with its analysis of the benefits of deferral, to stay those actions or otherwise prevent them from proceeding on the merits at this time.

Finally, the Committee will remain in place, and counsel to the Committee will continue its engagement and update the Committee no less than quarterly on developments in the Other Matters.

Allegations of Ongoing Harm Are Addressed in the Consent Order: To the extent that the demand shareholders have alleged ongoing harm and have requested noneconomic relief or corporate changes, the Committee notes that the December 2014 Consent Order with the NY DFS requires the placement of an Operations Monitor and other, substantial, corporate governance changes.  In assessing whether to proceed with a determination or defer a decision on the demand allegations until after the resolution of the Other Matters, the Committee has also noted that the Company undertook other corporate governance changes in 2014, such as an increased investment in its compliance function.

### *Judgment Not Based on Substantive Consideration of Demand Allegations*

The Committee's judgment not to proceed at this time with a determination of the derivative demands is unrelated to any findings, either in support of or contrary to the shareholder demands.  In fact, the Committee has come to no such determinations of fact or law.  This decision is, instead, based on what the Committee has determined to be in the best interests of the Company at this time, when the Company is facing multiple direct

lawsuits and other inquiries whose claims overlap substantially with those of the shareholder demand letters and derivative lawsuits.  Even assuming that the demand allegations were meritorious, the Committee's judgment would not change that it is in the best interests of the Company to defer in light of the Other Matters.

### *The Work of the Special Litigation Committee Going Forward*

As stated above, the Committee will remain in place with all its constituent powers intact.  We stress that this determination results in a pause and not the final cessation of the Committee's work or its dissolution.  The Committee has determined that it will continue to monitor actively the Other Matters and will revisit its decision not to proceed with the claims as these matters proceed and when and if there is a material change in the litigation landscape against the Company.  Counsel for the Committee will continue to advise the Committee with respect to the parallel litigation, and will update the Committee no less than quarterly, and more often as is necessary and appropriate.

If you have any questions, please contact me at 305.539.7324 or John Clabby at 813.229.4229.

Regards,

Charles M. Rasenberg